# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>Debtor.1 | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>Case No. 17 BK 4780-LTS |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>Plaintiff,<br><br>v.<br><br>HON. PEDRO PIERLUISI, in his official capacity as Governor of Puerto Rico,<br><br>Defendant. | Adv. Proc. No. 24-00062-LTS in 17 BK 4780-LTS |

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's Federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 04780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**OMNIBUS REPLY TO RESPONSES TO SOLAR UNITED NEIGHBORS AND SIERRA CLUB'S PUERTO RICO CHAPTER PETITION TO INTERVENE**

**TO THE HONORABLE COURT:**

COME NOW, Solar United Neighbors ("SUN") and Sierra Club's Puerto Rico Chapter ("Sierra Club")(jointly "Movants"), through its undersigned attorneys, and before this Honorable Court, very respectfully, states and prays:

### I. RELEVANT PROCEDURAL BACKGROUND

1. On July 26, 2024, the Financial Oversight and Management Board for Puerto Rico ("Oversight Board" or "Plaintiff") filed the captioned *Complaint* against Pedro Pierluisi, in his official capacity as Governor of Puerto Rico ("Defendant") for the annulment of Act No. 10-2024 ("Act 10"). **Case No. 3:24-AP-00062 (LTS), ECF No. 1.**

2. On August 8, 2024, the Oversight Board and the Defendant filed a joint motion with a proposed schedule. **ECF No. 5, corrected at 7.** On August 9, 2024, the Court issued its *Order setting expedited schedule* ("Expedited Schedule"). **ECF No. 6.**

3. Pursuant to the *Expedited Schedule*, the Defendant had until August 16, 2024, to file a Motion to Dismiss. Because this deadline passed with no filing, the Defendant was scheduled to file his response to the *Complaint* by September 11, 2024. Additionally, the Court set the deadline for intervenors at September 4, 2024.

4. On September 3, 2024, Movants filed a Petition for Intervention ("Petition"). **ECF. No. 13.** In response, on September 10, 2024, the Defendant filed The Governor's Limited Objection to Solar United Neighbors and Sierra Club Puerto Rico's Intervention Petition ("Governor's Objection"). **ECF No. 25.** On the same date, the Oversight Board filed a Response of Financial Oversight and Management Board for Puerto Rico to the Motion to Request Intervention on Behalf of Solar United Neighbors and Sierra Club's Puerto Rico Chapter ("FOMB Objection")

2

to oppose Movants' intervention. **ECF No. 26.** Pursuant to this Court's schedule, the Movants file the present Reply.

## II. LEGAL ARGUMENTS

5. The FOMB Objection raises multiple arguments against the Movants' intervention in this case. Regarding intervention as of right, the Oversight Board argues that the Movants do not have a protectable interest in the case and that, if they did, this interest would not be impaired by denial of intervention and would be adequately represented by the Defendant.

6. On the issues of permissive intervention, the Oversight Board suggests that because the factors for intervention as of right are not met, there is no case for permissive intervention. Additionally, the Oversight Board argues that Movants' participation will only hinder the proceedings.

7. The Oversight Board also raises arguments more closely related to the merits and the pleading attached to the *Petition*. Moreover, the Oversight Board provides that an alternative to intervenor status is granting leave to file an amicus brief. While both the Oversight Board and the Governor move that, if intervention is allowed, the Movants' participation be limited to what can only be described as an observer role.

8. The Movants will venture to address each area of argument in turn. In sum, Movants maintain that the elements for either form of intervention are met. However, they reserve the right to participate according to any limited scope role the Court allows in alternative to intervention should the *Petition* be denied in whole or in part.

### A. INTERVENTION AS OF RIGHT

9. As mentioned, the Oversight Board argues that the Movants did not meet the requirements under Rule 24(a) regarding: (1) interest in the case; (2) impairment by denial of intervention; or (3) lack of adequate representation.

   **i. Movants have a sufficient interest which may be impaired by denial of intervention.**

10. The ""inherent imprecision of Rule 24(a)(2)'s individual elements dictates that the rule should be applied with an eye toward the commonsense view of the overall litigation." <u>Ungar v. Arafat</u>, 634 F.3d 46, 51 (1st Cir. 2011)(citations omitted).

11. In Section III of the *Petition,* Movants laid out the various interests they have in the present case. SUN is a non-profit organization dedicated to creating a clean, equitable, resilient energy system by helping people and entities access solar. SUN is the only organization that represents solar consumers—those that want access to solar and those that have solar energy systems. In Puerto Rico, specifically, they help communities organize bulk purchase projects, provide consumer educational materials, deploy resilience hubs and other projects using SUN fundraised dollars and federal grants. Net metering is a key factor in SUN's work and an essential element for its members because it is the mechanism that enables more than 99% of the solar + storage installations in Puerto Rico. Absent any other mechanism, it provides fair credit and enables homeowners, businesses, and non-profits to recoup their investment for solar + storage in Puerto Rico.

12. As a result, SUN has a direct interest in any change to net metering policy in Puerto Rico, including an action where the outcome favorable to the Oversight Board would be for the Puerto Rico Energy Bureau ("PREB" or "Bureau") to comply with a law that states it should have studied and implemented changes to the policy five months ago. The immediate effect of

annulling Act 10 would be for PREB to be in violation of Act 114 because it would have exceeded its deadline, meaning that it will be rushed to comply with law rather than give the study the time and public process required.

13. The nature of this interest goes to the heart of SUN's mission and the good work it does here in Puerto Rico. SUN is not an environmental or industry group, but rather a non-partisan organization representing a constituency of solar owners and future solar owners in Puerto Rico. Any changes to net metering would affect this constituency of future solar owners that SUN represents the most. There are currently no organizations that narrowly represent and advocate on behalf of future solar owners. SUN must be granted full intervention status to represent this group.

14. The enactment of Act 10 created a reasonable expectation that the rights of current and future net metering customers, including those represented by SUN and the Sierra Club, would be respected, and preserved in accordance with the law. This reasonable expectation arises from the legal framework established by Act 10, which provided current and future net metering customers with critical assurances about their participation in renewable energy programs, the value of their solar energy contributions, and the regulatory protections upon which they could rely. The potential annulment of Act 10 threatens to undermine these expectations, warranting full intervention by the Movants in this litigation to ensure that the rights of current and future net metering customers are adequately defended.

15. Moreover, both SUN and Sierra Club are key actors in Puerto Rico's movement to renewables, particularly rooftop solar albeit for different reasons Sierra Club advocates for the environmental benefits of solar, while SUN narrowly represents consumers that want fair access to solar energy. Movants have expended resources to their mission regarding these

issues and will be forced to do so in the future, much like the organizational plaintiffs in Hispanics United v. Village of Addison, 958 F. Supp. 1320, 1330 (N.D. Ill. 1997)(citing Havens Realty Crop. v. Coleman, 455 U.S. 363 (1982) *superseded by statute,* held that "as advocates of open housing (the Leadership Council) and as advocates for the advancement, equality, education and celebration of the Hispanic community (Hispanics United and Hispanic Council), the organizational plaintiffs correctly view the alleged targeting of Hispanic neighborhoods for redevelopment and dislocation as a frustration of their goals.").

16. Reference to SUN and Sierra Club's lobbying efforts in favor of Act 10 are not boasts nor should they be construed as an impairment for their participation here. The Movants supported Act 10 because it protects their interests, thus, these actions to annul Act 10 equally affect their interests. The increase in the resources the group will have to devote to their missions because of this action should suffice to establish a protected interest under Rules 24(a)(2). See Id. at 1330 (finding this enough to warrant Article III standing).[2] Contrary to what the Oversight Board insinuates, lobbying is not a dirty word nor cause to dismiss a party's interest in an issue. Parties lobby to protect their interests in a democratic government system, just as they appear before the Court to do so.

17. While Movants raise the issues related to electricity costs for context and support, this does not make them consumer litigants akin to those in Public Serv. Co v. Patch, 173 F.R.D. 17 (D.N.H. 1997) cited by the Oversight Board. These organizations have specific interests in Act 10 beyond the alleged generalized grievance of potentially higher rates.

---

[2] This Court also addressed Diamond: "In a futile effort to overcome the Havens holding, the defendant cites to Diamond v. Charles, 476 U.S. 54, 90 L. Ed. 2d 48, 106 S. Ct. 1697 (1986). That case is clearly distinguishable." Id.

18. However, the Oversight Board argues that Movants have no protectable interest in this litigation. Truly, the Oversight Board is extending Article III standing requirements to a Rule 24 intervention. This is not the appropriate or applicable standard at this stage.

19. To support its position, the Oversight Board cites <u>Diamond v. Charles,</u> 476 U.S. 54 (1986) to establish that only the State has a stake in defending its laws and, therefore, Movants cannot claim a protected interest in an action to annul Act 10. **ECF No. 26 ¶ 12.** However, their reliance on this case is misplaced. In <u>Diamond,</u> the issue before the Court was regarding whether an intervenor could **continue** a suit **in absence of the original party** on whose side they intervened. <u>See Diamond</u>, 476 U.S. at 68. In fact, the Supreme Court's decision mentions that intervenor status was granted in the District Court. It was only in the context of an appeal, where the original party decided not to appeal, that the Supreme Court's ruling was issued. In that case, the Supreme Court applied Article III standing, not the Rule 24 intervention standard.[3]

20. Furthermore, the Oversight Board argues that Movants do not have a protected interest in upholding the law because they are not the Government, and the transaction of this case is the passage and implementation of Act 10.

21. Nevertheless, an intervenor's interests do not have to be exactly aligned with the specific foundation of the cause of action, because the result of the action is what will impact them.

22. Whether directly or indirectly, this case is the Oversight Board's attack on current net metering policy. The Oversight Board erroneously claims the case is solely about "the independence of the Energy Bureau and ensuring compliance with PROMESA's requirements . . . ." **ECF No.**

---

[3] This does not constitute a waiver of arguments regarding an intervenor's right to appeal. Movants reserve the right to argue standing for appeals if it were necessary in the future.

**26 ¶ 14,** as though its challenges can be separated from their attack on the current net metering policy. In truth, while the Oversight Board highlights its procedural arguments in the FOMB Objection, it cannot hide the substantive issues that their challenge to Act 10 raises.

23. Whether a formal estimate is required, or a Section 204 certification is deficient necessarily requires both sides to discuss the current net metering policy and its fiscal impact or lack thereof. Act 10 itself cannot create any fiscal impacts because it is an amendment for a date change. Any alleged impact must stem from the net metering policy that Act 10 keeps in place.

24. Regarding the impairment of Movants' interests, the language of Rule 24(a)(2) does not require a potential intervenor to establish beyond a doubt that the action will impair their interests. The operative word in Rule 24(a)(2) is "may." "As the First Circuit has explained, even a small threat that [the movant's] interests could be jeopardized by the outcome of this case is ample reason for finding that its ability to protect its interest may be adversely affected." See Old Orchard Provisions, LLC v. Town of Old Orchard Beach, 2023 U.S. Dist. LEXIS 219594, *10 (D. Me. 2023)(citation and quotation marks omitted). Movants' interests exceed that low threshold.

25. Moreover, contrary to the Oversight Board's contentions, nullifying Act 10 would not "release the Energy Bureau from rigid schedules and politically motivated restrictions, freeing it to independently study and adopt the net metering policy it deems appropriate on the timeline it deems appropriate." **ECF No. 26 ¶ 20.** On the contrary, Act 10 released the Bureau from the unrealistic deadlines that it was being subjected to and pressured by the Oversight Board to meet. The effect of annulling Act 10 would be to revert the existing legal framework, where the PREB is currently violating the law because the deadline to have finished and implemented the study has passed. In that scenario, how Movants would be able to advocate for their

interests is at best uncertain and at worst a tale of woe in the making because PREB would be rushing to approve a haphazard solution.

26. The Oversight Board is conveniently emphasizing its arguments about PREB independence while downplaying their real problem with Act 10; it allows the current net metering policy to stay in place. The Oversight Board's initial filing paints a drastic picture of lost revenues and inequitable distribution of costs due to net metering, yet in response to Movants' request to intervene their sole focus is the independence of the PREB. Unlike the situation cited by the Oversight Board in Public Serv. Co v. Patch, 136 F.3d 197 (1st Cir. 1998), here the administrative proceeding would not remain "unsullied."

**ii. The Governor cannot adequately represent the Movants' interests in this case.**

27. The "burden of establishing inadequate representation should be treated as minimal and can be satisfied by showing that representation of the interest may be inadequate." Students for Fair Admissions, Inc. v. President & Fellows of Harvard College (Harvard Corp.), 807 F.3d 472, 475 (1st Cir. 2015)(citation and quotation marks omitted).

28. Even when a presumption of adequate representation applies, "to overcome the presumption, the intervenor need only offer an adequate explanation as to why the named party does not sufficiently represent it. One way for the intervenor to show inadequate representation is to demonstrate that its interests are sufficiently different in kind or degree from those of the named party." B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc., 440 F.3d 541, 546 (1st Cir. 2006)(citation and quotation marks omitted).

29. The Oversight Board suggests that the Governor adequately represents Movants' interests.

30. As stated in the *Petition,* while the Defendant's official position today is the defense of Act 10, his interests are different from those of the Movants. However, it should be noted that the

Defendant is not a voluntary party but a statutorily required party under PROMESA. His presence is for the defense of the law he approved pursuant to that statutory framework.

31. While the Defendant, like the Senate, is defending his prerogatives as a political actor, the Movants are defending their own interests and those of solar owners and potential solar owners. The scope of representation the Defendant must cover includes many interests and constituents. The Defendant is not in the same position as the Movants, nor does he respond to those interests. Movants bore witness to these differences in their lobbying efforts.

32. The Movants would not be adequately represented by the Defendant in this litigation, as the Government has repeatedly failed to comply with the public policy and goals established for renewable energy in Puerto Rico. While the Governor may ostensibly defend Act 10, his actions to date demonstrate a lack of consistent commitment to the legislative mandates and policy objectives aimed at promoting renewable energy, particularly in regard to the implementation of net metering policies and other measures essential to the growth of solar energy. This failure to align with the public policy goals of promoting renewable energy directly conflicts with the interests of Movants, who have been on the forefront of advocating for a robust and equitable renewable energy transition in Puerto Rico.

33. The lack of decisive action, continued support of fossil fuel infrastructure, and failure to meet the legally mandated renewable energy targets illustrate that Defendant's priorities are not aligned with the Movants' mission . As such, relying on the Governor to adequately represent Movants' interests in this case would be misguided, as the track record demonstrates no commitment to defending the long-term goals of renewable energy that Act 10 helps support.

34. The Governor's inconsistent commitment to the promotion of renewable energy also raises serious concerns about its willingness to defend Act 10 vigorously in this litigation. If the

Oversight Board's challenge to Act 10 prevails, it would significantly weaken the progress Puerto Rico has made toward achieving its renewable energy targets, particularly through net metering programs. Movants have invested substantial resources and efforts in advocating for these policies, and their interests cannot be properly defended by a government that has failed to prioritize or effectively implement the very policies it is now called upon to defend. Consequently, Movants require full participation as intervenors to ensure that the renewable energy goals Act 10 promotes are fully represented and protected in this case.

35. In <u>Trbovich v. UMW</u>, 404 U.S. 528 (1972), the Supreme Court considered a similar issue in a different context. Where a union member sought intervention in a suit filed by the Secretary of Labor against the union, the plaintiff argued that intervention was improper because the Secretary adequately represented the member's interest because they were identical. But the Court disagreed. <u>Id.</u> at 538. The reason for that was that the Secretary, while in part representing the interests of union members, had other duties of public interest that transcended those narrower interests of union members and might even contradict them. <u>Id.</u> 538-39. "Both functions are important, and they may not always dictate precisely the same approach to the conduct of the litigation." <u>Id.</u> at 539.

36. Here, the Governor has a statutory duty to comply with the Oversight Board's instructions and a statutory prerogative to defend his work. But he is not a party to this case in defense of the same interests as Movants. That should be sufficient to establish inadequate representation. While the Governor may waver on the content of Act 10 or amend it to protect its integrity, the Movants would not. This is why the interests are different. The Governor and the Senate, rightfully, are fighting for their prerogative to govern and legislate pursuant to their

constitutional powers. The Movants are advocates for the content of Act 10, as their previous efforts moved it through those government channels.

37. Movants are concerned with how vigorously the Governor intends to defend Act 10, particularly considering the Governor's objection to Movants' participation in this case—a participation that could only complement his efforts if his ultimate goal were the defense of Act 10 as is. Instead, the Governor asks that the Movants be sidelined as mere observers of the process, with no right to make filings or object to settlements; settlements that we can only assume would be concessions on behalf of the Governor to appease the Oversight Board. Lastly, it should be noted that the Governors pleading sets out only one brief defense whereas the Movants raise various defenses addressing every point of the Oversight Board's filing, adding to the Movants concerns. In addition, Movants raised unique defenses like the absence of indispensable party.

### III. PERMISSIVE INTERVENTION

38. If the Court finds that all of the arguments above are not sufficient to establish intervention as of right, the Movants request that they be considered as basis for permissive intervention.

39. Because permissive intervention is squarely within the Court's discretion, the Oversight Board's main argument against it is the issue of delay. It argues that as additional parties, Movants will necessarily take additional time. However, Movants have shown their commitment to this Court's calendar and have no intention to impede the swift resolution of this case.

40. While it is true, as the Oversight Board posits, that Movants include partial briefing in their pleading, it is untrue that this demonstrates delay or untimeliness. Given the procedural norms set forth by this Court and the expedited schedule, Movants did not think it appropriate to file

a motion to dismiss where the original Defendant did not. Thus, to show the Court that they are ready to participate without delay and to provide the other parties with ample notice of their purported arguments, the Movants included this partial briefing in their responsive pleading. It is not Movants' intent to divert the schedule, only to provide notice. If intervention, or in the alternative leave to file an amicus, were granted, Movants would present their arguments on time and within the guidelines set forth by this Court.

41. Moreover, the requested alternative stay remedy should not be a hindrance to this case, as the Oversight Board suggests. The Movants see the alternative stay remedy as an option for disposition of the case once the Court has decided on the merits if such decision favors the Oversight Board's arguments on the procedural violations by the Defendant. The Movants in no way expect this to be an issue that interferes with the efficient resolution of the case.

## IV. OTHER ISSUES

42. In closing, the Movants would like to briefly address some of the Oversight Board's more isolated remarks.

43. First, as stated above, contrary to the Oversight Board's argument, the pleading attached to the *Petition* is not untimely as it is not a motion for dismissal but a responsive pleading with a partial briefing to aid this process moving forward.

44. Second, the Oversight Board and the Governor's proposed limits to the Movants participation if granted intervenor status are too extreme. The Governor's proposal reduces intervention to a mere spectator role rather than a participant. If intervenor status is granted, while Movants will gladly adhere to any rule requiring that they proceed in a non-duplicative manner, this will require the Governor's cooperation, which has been lacking thus far as Movants reached out to the Governor for that purpose before filing and received no response.

45. Third, while the Movants believe there are sufficient grounds for intervention, if this Court prefers their participation in the form of an amicus brief, Movants will comply with the deadlines and limits set forth. Movants will not abandon the case. While participation as amicus curiae could provide a platform for SUN and Sierra Club to voice their concerns, it would not afford them the full rights and procedural tools necessary to protect their interests fully, as would intervention. Therefore, granting them the limited role of observers through amicus status would not sufficiently safeguard their rights and objectives in this critical litigation.

46. Fourth, the Oversight Board argues that Movants seek to address issues related to Act 10 and its compliance with the fiscal plans and ignore the issue of political interference that it adopts as its new crux. However, it is clear from the pleading attached to the *Petition* that Movants directly address those issues. However, they did not think it proper to raise them at this stage but rather at the pleading stage.

47. Lastly, while Movants will not fully address the Oversight Board's comments on the merits but reserves the right to address them in the summary judgment stage.

**WHEREFORE,** SUN and Sierra Club respectfully request that this Honorable Court take notice of the aforementioned and grant the *Petition*.

    **RESPECTFULLY SUBMITTED.**

    In Ponce, Puerto Rico, this 16th day of September 2024.

    **WE HEREBY CERTIFY** that on this same date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all participants and Standard Parties. A courtesy copy of this Motion will be

delivered to the Court by email to SwainDPRCorresp@nysd.uscourts.gov as provided in *Third Amended Standing Order.*



P.O. Box 10779
Ponce, Puerto Rico 00732
Tel.: 787-848-0666
Fax: 787-841-1435
notificaciones@bufete-emmanuelli.com

*/s/Rolando Emmanuelli-Jiménez*
Rolando Emmanuelli-Jiménez, Esq.
USDC: 214105
rolando@emmanuelli.law

*/s/ Zoé C. Negrón-Comas*
Zoé C. Negrón-Comas, Esq.
USDC: 308702
zoe@emmanuelli.law

*Counsel to* SUN and Sierra Club