**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>    Debtor.[1] | **PROMESA**<br>**Title III**<br><br>**No. 17 BK 3283-LTS**<br>**(Jointly Administered** |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>    Debtor. | **PROMESA**<br>**Title III**<br><br>**No. 17 BK 4780-LTS**<br>**(Jointly Administered)** |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566- LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO,

      Plaintiff-Movant,

v.

HON. PEDRO PIERLUISI, in his official capacity as
Governor of Puerto Rico; and HON. JOSE LUIS DALMAU,
in his official capacity as President of the Senate of Puerto
Rico.

      Defendants-Respondents.

**Adv. Proc. No. 24-00062-LTS**

# MEMORANDUM IN SUPPORT OF FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO BANKRUPTCY RULE 7056

<u>**TABLE OF CONTENTS**</u>

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................... 5

    A.    PREPA and the Energy Bureau ........................................................... 5

    B.    Net Metering in Puerto Rico ................................................................ 6

    C.    The Fiscal Plans' Requirements Regarding the Energy Bureau's Independence
    and Net Metering ................................................................................. 8

    D.    Act 10-2024 ......................................................................................... 11

    E.    The Governor's Deficient § 204 Submission for Act 10 ....................... 13

    F.    The Oversight Board Notifies the Governor and the Legislature of the
    Deficiencies in the § 204(a) Submission and Directs the Governor to Correct
    Them, But the Governor Fails to Do So ............................................... 14

    G.    The Oversight Board's § 108(a)(2) Determinations ............................. 16

    H.    The Energy Bureau Publishes a Draft Study on Net Metering .............. 17

    I.    The Oversight Board Commences This Adversary Proceeding ............. 17

LEGAL STANDARD ........................................................................................... 18

ARGUMENT ...................................................................................................... 19

I.    THE OVERSIGHT BOARD IS ENTITLED TO SUMMARY JUDGMENT BECAUSE
    ACT 10 IMPAIRS OR DEFEATS THE PURPOSES OF PROMESA, AS
    DETERMINED BY THE OVERSIGHT BOARD (COUNT I) ......................... 19

    A.    Under *Ultra Vires* Review, the Oversight Board's § 108(a) Determination
    Should be Upheld and Summary Judgment Granted ............................ 20

        1.    Ultra Vires *is the Correct Standard of Review* ......................... 21

        2.    *The Oversight Board's determination was not* ultra vires ......... 22

    B.    Under the Arbitrary and Capricious Standard, the Oversight Board's
    § 108(a)(2) Determination Should Be Upheld and Summary Judgment
    Granted in Its Favor .......................................................................... 24

        1.    *Act 10 Impairs or Defeats PROMESA's Purposes Because It Is
        Directly Contrary to the Express Terms of the Fiscal Plans* .......... 25

        2.    *Act 10 Impairs or Defeats PROMESA's Purposes Because the
        Governor Failed to Comply with PROMESA § 204(a)* ............... 29

II.     THE OVERSIGHT BOARD IS ENTITLED TO SUMMARY JUDGMENT
        BECAUSE THE GOVERNOR FAILED TO COMPLY WITH PROMESA
        § 204(a) (COUNT II)....................................................................................30

        A.      The Governor Failed to Submit a Formal Estimate Meeting the
                Requirements of § 204(a)..............................................................31

        B.      The Governor's § 204(a) Certification Was Defective...........................36

        C.      The Governor Failed to Correct the Submission's Deficiencies in Response
                to the Oversight Board's Direction ........................................................38

        D.      Act 10 Should Be Nullified To Ensure Compliance With The Fiscal Plans .........39

CONCLUSION......................................................................................................40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*,
    801 F. Supp. 2d 383 (D. Md. 2011), *aff'd*, 698 F. 3d 171 (4th Cir. 2012) ............................24

*Aurelius Inv., LLC v. Puerto Rico*,
    915 F.3d 838 (1st Cir. 2019) (overruled on other grounds by *Fin. Oversight &
Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649 (2020))........................................22

*Cause of Action Inst. v. Eggleston*,
    224 F. Supp. 3d 63 (D.D.C. 2016) .....................................................................................21, 23

*Chamber of Com. of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ...................................................................................................21

*Eagle Tr. Fund v. U.S. Postal Serv.*,
    365 F. Supp. 3d 57 (D.D.C. 2019) .............................................................................................23

*Fin. Oversight & Mgmt. Bd. for P.R. v. Pierluisi Urrutia*,
    634 B.R. 187 (D.P.R. 2021) ("*Act 7*") ...........................................................................26, 31, 40

*Fin. Oversight & Mgmt. Bd. for P.R. v. Pierluisi Urrutia*,
    650 B.R. 334 (D.P.R. 2023), *aff'd*, 77 F.4th 49 (1st Cir. 2023) ("*Act 41*").................... *passim*

*Fin. Oversight & Mgmt. Bd. for P.R. v. Pierluisi Urrutia*,
    77 F.4th 49 (1st Cir. 2023) ("*Act 41 Appeal*").................................................31, 32, 33, 34, 36

*Fin. Oversight & Mgmt. Bd. for P.R. v. Vázquez Garced ("Law 29 I")*,
    403 F. Supp. 3d 1 (D.P.R. 2019)...................................................................................31, 35, 37

*Fin. Oversight & Mgmt. Bd. for P.R. v. Vázquez Garced ("Law 29 II")*,
    616 B.R. 238 (D.P.R. 2020)..........................................................................................18, 25, 27, 40

*Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Human Servs.*,
    830 F.3d 515 (D.C. Cir. 2016) ...................................................................................................23

*Flock v. U.S. Dep't of Transp.*,
    840 F.3d 49 (1st Cir. 2016)........................................................................................................25

*Griffith v. Fed. Lab. Relations Auth.*,
    842 F.2d 487 (D.C. Cir. 1988)..............................................................................................22, 23

*Humphreys v. Roche Biomedical Lab'ys, Inc.*,
    990 F.2d 1078 (8th Cir. 1993) ...................................................................................................18

*La Liga de Ciudades de P.R. v. Fin. Oversight & Mgmt. Bd. For P.R.*
(*In re Fin. Oversight & Mgmt. Bd. for P.R.*),
110 F.4th 295 (1st Cir. 2024) ("*La Liga Appeal*").................................20, 30, 32, 40

*Mandel v. Bos. Phoenix, Inc.*,
456 F.3d 198 (1st Cir. 2006).....................................................................18

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989)..................................................................................25

*Nat'l Air Traffic Controllers Ass'n. AFL-CIO v. Fed. Serv. Impasses Panel*,
437 F.3d 1256 (D.C. Cir. 2006)................................................................23

*New York v. Biden*,
636 F. Supp. 3d 1 (D.D.C. 2022)..............................................................23

*Nyunt v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009)..................................................................23

*Pierluisi v. Fin. Oversight & Mgmt. Bd. for P.R.* ("*Five Laws Appeal*"),
37 F.4th 746 (1st Cir. 2022)............................................................. *passim*

*Puerto Rico v. United States*,
490 F.3d 50 (1st Cir. 2007).......................................................................21

*R.I. Dep't of Env't Mgmt. v. United States*,
304 F.3d 31 (1st Cir. 2002).......................................................................21

*Town of Winthrop v. F.A.A.*,
535 F.3d 1 (1st Cir. 2008).........................................................................25

*Trafalgar Cap. Assocs., Inc. v. Cuomo*,
159 F.3d 21 (1st Cir. 1998).......................................................................25

*Troiano v. Aetna Life Ins. Co.*,
844 F.3d 35 (1st Cir. 2016).......................................................................19

*United States v. 16.03 Acres of Land*,
26 F.3d 349 (2d Cir. 1994)..................................................................22, 24

*United States v. P.R. Indus. Dev. Co.*,
287 F. Supp. 3d 133 (D.P.R. 2017), *aff'd*, 18 F.4th 370 (1st Cir. 2021) ................................19

*Vázquez Garced v. Fin. Oversight & Mgmt. Bd. for P.R.*,
511 F. Supp. 3d 90 (D.P.R. 2020) ("*Five Laws*").......................................... *passim*

*Vineberg v. Bissonnette*,
548 F.3d 50 (1st Cir. 2008).......................................................................18

iv

*Webster v. Doe,*
    486 U.S. 592 (1988)............................................................................................22

**STATUTES & RULES**

48 U.S.C. §§ 2101–2241 ........................................................................................1

PROMESA § 101 ..................................................................................8, 9, 22, 33

PROMESA § 104 ..................................................................................................26

PROMESA § 106(e) ..............................................................................................26

PROMESA § 108 ........................................................................................... *passim*

PROMESA § 201 ..............................................................................9, 16, 20, 22, 26

PROMESA § 202 ....................................................................................................9

PROMESA § 204 ........................................................................................... *passim*

PROMESA § 310 ....................................................................................................1

PROMESA § 405(m)(1) ..........................................................................................8

Fed. R. Bankr. P. 7056 ...........................................................................................1

Fed. R. Civ. P. 24(b) ............................................................................................18

Fed. R. Civ. P. 56 ...........................................................................................1, 18

**OTHER AUTHORITIES**

Net Metering, SESA – Solar and Energy Storage Association of Puerto Rico,
    https://www.facebook.com/story.php/?story_fbid=748078830763960&id=100
    066855504227................................................................................................12

Sunnova Energy International, Inc., Quarterly Report (Form 10-Q),
    October 23, 2024 (https://d18rn0p25nwr6d.cloudfront.net/CIK-
    0001772695%20/e16ba8ac-9691-454c-ae01-b8100e181943.pdf)..........................12

**To the Honorable United States District Judge Laura Taylor Swain:**

Pursuant to Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by § 310 of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] Plaintiff, the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), respectfully submits this memorandum in support of its summary judgment motion (the "Motion").

## PRELIMINARY STATEMENT

As the evidence in its Title III case demonstrated, the Puerto Rico Electric Power Authority ("PREPA" or the "Authority") is plagued by serious financial and operational difficulties resulting in a poorly functioning electrical system that fails to serve adequately the people of Puerto Rico and impedes the recovery of Puerto Rico's economy. A root cause of PREPA's current challenges is that decisions about the management of the utility were historically subject to political influence and interference. Preventing that recurrence is at stake here.

For this reason, in 2014, the Puerto Rico Government enacted Act 57-2014 ("Act 57") and created the Puerto Rico Energy Bureau (the "Energy Bureau") to operate as an "independent government entity" overseeing the implementation of power service. It is also why the Oversight Board—which from its inception recognized the importance of PREPA's recovery and transformation as essential for the utility, Puerto Rico's citizens, and economy—stressed the importance of PREPA operating free from political influence. Indeed, the Oversight Board's certified fiscal plans for both the Commonwealth and PREPA include the requirement that the Energy Bureau be permitted to operate independently and without political interference. The Oversight Board initiated this adversary proceeding to ensure that decisions regarding PREPA are

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101–2241.

made by the Energy Bureau based on facts and regulatory expertise, not by political actors and special interests.

On January 10, 2024, Governor Pedro Pierluisi (the "Governor") signed into law Act 10-2024 ("Act 10"), which puts on hold for at least six years the Energy Bureau's regulation of PREPA's net metering program while also locking in net metering benefits for many entities for decades regardless of whether the Energy Bureau determines they are in the Commonwealth's best interest.

Net metering permits customers with distributed energy-generation systems (such as rooftop solar panels) to export electricity to PREPA as credits against the cost of electricity they purchase from PREPA. The program requires PREPA to purchase excess electricity produced by customers regardless of whether PREPA needs the energy. Program participants receive a full kilowatt-hour credit on their electricity bills for every kilowatt-hour they export to PREPA (the "1:1 net metering rate"). Given the increasing adoption of distributed energy systems on the Island, the net metering program, which has been largely unchanged since its creation in 2007, has a significant impact on PREPA's operations and revenues.

For this reason, the Puerto Rico Government passed Act 17-2019 ("Act 17") directing the Energy Bureau to commence a study to determine what changes, if any, needed to be made to the program and to implement such changes. The study was due to be completed by April 11, 2024. The current certified PREPA Fiscal Plan (the "PREPA Fiscal Plan") recognizes the importance of the study to ensure the program is structured efficiently. Accordingly, the PREPA Fiscal Plan requires the Energy Bureau to complete the study and implement changes to the program it deems appropriate by April 11, 2024.

Act 10, enacted just months before the study's scheduled completion, obstructs the Energy Bureau's regulation of the net metering program in numerous ways.  *First*, Act 10 prohibits the Energy Bureau from making any changes to the 1:1 net metering rate until the Energy Bureau completes a new net metering study.  *Second*, Act 10 mandates that the Energy Bureau cannot even *commence* that study until January 2030.  *Third*, Act 10 provides that if the Energy Bureau decides to change the 1:1 net metering rate, that change will not go into effect for another 12 months (*i.e.*, no earlier than 2031, and likely later).  *Finally*, if the Energy Bureau changes the net metering program, then Act 10 requires the Energy Bureau to honor the existing net metering program's terms (specifically, the 1:1 net metering rate) for every then-existing net metering customer and certain other potential net metering customers for an additional *20 years* (*i.e.*, until at least 2051)—effectively extending the net metering program's terms for at least twenty-seven years for a large swath of net metering customers.

PROMESA prohibits the Governor and the Legislature from enacting, implementing, or enforcing laws that impair or defeat the purposes of PROMESA, as determined by the Oversight Board.  PROMESA § 108(a)(2).  For numerous reasons, the Oversight Board has determined that Act 10 impairs or defeats the purposes of PROMESA.  These reasons include that Act 10 directly conflicts with the 2023 Commonwealth Fiscal Plan, the 2024 Commonwealth Fiscal Plan (together, the "Commonwealth Fiscal Plans"), and the PREPA Fiscal Plan (together with the Commonwealth Fiscal Plans, the "Fiscal Plans") in multiple ways.  For example, Act 10 interferes with the Energy Bureau's ability to regulate PREPA independently—by, among other things, prohibiting the Energy Bureau from making any changes to the 1:1 net metering rate until at least 2030, dictating when such changes may take effect, and mandating that the 1:1 net metering rate be honored for existing and certain potential participants for decades.  In so doing, Act 10 directly

conflicts with the Fiscal Plans' requirement that the Energy Bureau be able to regulate PREPA free from political interference.  Moreover, the PREPA Fiscal Plan recognizes the need to study the net metering program, and for the Energy Bureau to change the program if it deems appropriate based on that study by April 11, 2024.  Act 10 prevented the Energy Bureau from complying with this requirement.  Accordingly, the Oversight Board is entitled to summary judgment nullifying Act 10 pursuant to § 108(a)(2).

The undisputed facts also demonstrate the Oversight Board is entitled to summary judgment nullifying Act 10 pursuant to § 204(a)(5).  Section 204(a) requires the Governor to make a submission to the Oversight Board for every new law containing a "formal estimate" and a certification of the new law's consistency with the applicable fiscal plans.  The undisputed facts demonstrate that the Governor's § 204(a) submission failed to include a compliant estimate or a compliant certification for Act 10, that the Oversight Board notified the Governor that his § 204(a) submission was defective and directed him to correct it, and that the Governor failed to comply with that direction.  These undisputed facts establish not only the Oversight Board's entitlement to summary judgment on its § 204(a) claim, but also provide an additional separate basis for the Oversight Board's determination that Act 10 impairs or defeats the purposes of PROMESA pursuant to § 108(a).

Accordingly, the Oversight Board seeks summary judgment on both its § 108(a) and § 204(a)(5) claims and to have Act 10 declared a nullity.  This relief is necessary because simply enjoining the Governor from implementing and enforcing Act 10 would have no effect, as Act 10 is essentially self-implementing and self-enforcing, preventing the Energy Bureau from regulating an important aspect of PREPA without further Government action.  As such, nullification is the

only method to prevent Act 10 from impairing or defeating the purposes of PROMESA, and to ensure compliance with the Fiscal Plans.

As discussed below, applying applicable law to the undisputed material facts demonstrates the Oversight Board is entitled to summary judgment on its claims and nullification of Act 10.

## **FACTUAL BACKGROUND**[3]

### A. **PREPA and the Energy Bureau.**

Created in 1941, PREPA is the sole electric utility provider for Puerto Rico. SOF ¶ 1. The PREPA Fiscal Plan details PREPA's numerous challenges and the impact those issues have on the people and economy of Puerto Rico. PREPA's customers pay substantially more for electricity relative to their income than the average rate payer in the mainland United States. SOF ¶ 5. Despite imposing high rates on its customers, PREPA provides among the least reliable, most volatile, and most fossil-fuel dependent electricity service among its peers. SOF ¶ 6. Further, PREPA's rates fluctuate due, in large part, to PREPA's reliance on fossil fuels and changes in the price of oil. SOF ¶ 7. Meanwhile, as noted by the PREPA Fiscal Plan, Island customers experience many more service interruptions than the median mainland customer. SOF ¶ 8. The PREPA Fiscal Plan focuses on the rehabilitation of both PREPA's financial position and its operations. SOF ¶ 4.

As the Puerto Rico Government has observed, for most of its existence, PREPA was a "monopoly that regulate[d] itself" leading to "Puerto Rico being among the top U.S. jurisdictions with the highest energy cost." SOF ¶ 10. That changed in 2014, when the Government enacted Act 57, also known as the Puerto Rico Energy Transformation and RELIEF Act. SOF ¶ 9. As then-Senator Eduardo Bhatia, Act 57's author, explained, Act 57 aimed to address the fact

---

[3] The factual statements in this background section are set forth in the *Statement of Uncontested Material Facts in Support of the Financial Management and Oversight Board for Puerto Rico's Motion for Summary Judgment* ("SOF") filed contemporaneously with this memorandum.

PREPA's problems were the result of "the negative dynamics of bureaucracy, patronage, corruption, political intervention, and special interests," and the recognition that a "non-partisan, independent energy regulator, with fiscal autonomy from the government" was necessary to end that influence and improve PREPA's performance.  SOF ¶ 12.  Act 57 created the Energy Bureau (then known as the Puerto Rico Energy Commission) as an "independent government entity" to "oversee and ensure execution and implementation of the public policy on the electric power service of the Commonwealth of Puerto Rico."  SOF ¶ 13.  The Energy Bureau's mandate includes implementing regulations and pursuing regulatory actions to "guarantee the capacity, reliability, safety, efficiency, and reasonability of electricity rates of Puerto Rico . . . ."  SOF ¶ 14.

## B.  Net Metering in Puerto Rico.

"Net metering" refers to the policy that allows electricity customers with their own generation capacity to be financially compensated for the energy they produce.  SOF ¶ 15.  U.S. jurisdictions "differ in the way net metering customers are compensated."  SOF ¶ 16.  Some net metering programs employ a method whereby "energy from net metering capacity offsets energy consumed from the grid in a one-to-one fashion."  SOF ¶ 16.  Others have "adopted alternative compensation approaches" to address concerns that "[i]f a sufficiently large number of customers participate in net metering, costs might increase for non-net metering customers in order to pay for the grid benefits."  SOF ¶ 16.  Those alternative methods include, among others, adding "a fixed charge to net metering customers' bills" or "avoided cost rates, which reflect primarily the utility's cost of producing electricity, and value of solar. . . rates, which additionally consider societal benefits such as reduced air emissions."  SOF ¶ 16.

Puerto Rico's net metering program was established in 2007 by Act 114–2007 ("Act 114"), prior to the creation of the Energy Bureau.  SOF ¶ 17.  The program provides a method for

customers who generate their own electricity to export their excess electricity to PREPA.  SOF ¶ 18.  Net metering customers remain connected to the electrical grid to export their surplus electricity and to draw electricity to meet their own electricity needs (*e.g.*, during non-sunny days, at night, or when their personal demand exceeds their production).  Under the net metering program established by Act 114, which remains essentially unchanged, program participants receive a full kilowatt-hour credit on their electricity bill for every kilowatt-hour they export to PREPA (the 1:1 net metering rate) up to their monthly kilowatt-hour consumption of electricity from PREPA.  SOF ¶ 18.  Customers who export the same or more electricity to the grid than they consume from PREPA are charged only PREPA's monthly service fee (*i.e.*, their consumption or volumetric charges are zero).  SOF ¶ 19. Most of PREPA's costs are recovered through a volumetric charge along with a relatively low fixed monthly customer charge.  SOF ¶¶ 21–22.  Those charges are designed to recover PREPA's costs of producing electricity as well as the costs associated with operating and maintaining PREPA's transmission and distribution system.  SOF ¶ 21.

Net metering has positive effects, including reducing pollutants and greenhouse gases emitted from PREPA's fossil based generating units, as well as positive contributions to the achievement of Puerto Rico's renewable energy goals.  SOF ¶ 22.  However, if not calibrated correctly, a net metering system could create greater inequality among customers.  For example, it could lead to significant costs shifts, where non-net metering customers (who may not have the funds to purchase solar panels) essentially subsidize the costs of a utility's fixed costs for net metering users.  SOF ¶ 24.  Accordingly, determining whether to maintain or modify the current net metering program in Puerto Rico requires experienced judgment taking into account many factors, including those described above.  SOF ¶ 25.

On April 11, 2019, the Government enacted Act 17-2019, known as the Puerto Rico Energy Public Policy Act of 2019 ("Act 17").  SOF ¶ 26.  Among other things, Act 17 amended Act 114, and directed the Energy Bureau to "conduct a study, through an independent formal process and with participation of interested parties and the general public, to evaluate and consider the costs and benefits associated with . . . the net metering program . . . ."  SOF ¶ 27.  The study (the "Act 17 Study") was to be completed within five years of "the approval of" Act 17 (*i.e.*, by April 11, 2024).  SOF ¶ 28.  Act 17 further empowered the Energy Bureau, following completion of the five-year study period (*i.e.*, April 11, 2024), to make decisions regarding the net metering program, including establishing "appropriate values for distributed energy and energy storage systems in accordance with the study," and "determine[] exclusively" the "rate applicable to net metering customers"—*i.e.*, whether to change the 1:1 net metering rate.  SOF ¶¶ 29–30.  Until the Energy Bureau completed the Act 17 Study and authorized new rates, the existing 1:1 net metering rate would remain in effect.  SOF ¶ 30.

## C. The Fiscal Plans' Requirements Regarding the Energy Bureau's Independence and Net Metering.

On June 30, 2016, Congress enacted PROMESA to address the "fiscal emergency" in Puerto Rico that arose from a "combination of severe economic decline, and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing . . . ."  PROMESA § 405(m)(1).  Congress created the Oversight Board for the purpose of providing a method for Puerto Rico to "achieve fiscal responsibility and access to the capital markets."  *Id.* § 101(a).  To accomplish these statutory objectives, Congress encouraged the Oversight Board and the Commonwealth government to work together to formulate and implement Commonwealth fiscal plans and budgets, *id.* §§ 201–02, but granted the Oversight Board final say over such plans and budgets and prohibited the Commonwealth from enacting, implementing,

and/or enforcing laws impairing or defeating the purposes of PROMESA as determined by the Oversight Board. *See id.* §§ 101, 104, 108(a)(2), 201(e)(2), 202(e)(3), 204.

The purpose of the fiscal plans is to provide "a method" for the Commonwealth and its covered territorial instrumentalities "to achieve fiscal responsibility and access to the capital markets." SOF ¶ 34.[4]  The PREPA Fiscal Plan recognizes Puerto Rico's economic recovery depends on a "comprehensive transformation of its energy sector to deliver the safe, reliable, and affordable service that Puerto Rico's residents and businesses deserve." SOF ¶ 36.  The 2024 Commonwealth Fiscal Plan similarly recognizes the importance of transforming and stabilizing PREPA to enhance the Commonwealth's economic prospects and requires "comprehensive energy sector reform to enable a successful transformation and unlock the resulting growth from the 2024 Fiscal Plan projections." SOF ¶ 37.

As noted in the PREPA Fiscal Plan, "Puerto Rico's energy infrastructure lags national standards due to decades of operational and financial mismanagement." SOF ¶ 38.  The Oversight Board concluded one cause of this mismanagement is that, before the Energy Bureau's establishment, PREPA's management decisions were "subject to political influence and instability, leading to high management turnover, discontinuity in capital investment plans, electric customer rates that were insufficient to cover operating and maintenance costs and the mounting costs of debt service." SOF ¶ 39.  Additional consequences of PREPA's politicized decision-making identified by the Oversight Board include: PREPA repeatedly issuing debt to cover payments for existing debt, rather than setting rates sufficient to support its costs; operating under a fiscal deficit since the early 2000s; and underinvesting in its electrical grid, resulting in reliability metrics that

---

[4] PREPA has been designated a covered territorial instrumentality pursuant to PROMESA § 101(d).  SOF ¶ 35.

are "drastically lower" than other U.S. jurisdictions.  SOF ¶ 41.  Indeed, these concerns were a key reason the Puerto Rico Government created the Energy Bureau.  SOF ¶¶ 10–13.

Accordingly, the Oversight Board's fiscal plans have repeatedly recognized the importance of PREPA being regulated by an independent, professional, experienced regulator insulated from political interference.  SOF ¶¶ 42–50.[5]  The PREPA Fiscal Plan continues to emphasize the need for independent regulation of PREPA, mandating the Energy Bureau "remain financially and operationally independent from the Commonwealth Government and ***its determinations must be free from any direct or indirect political influence or interference***."  SOF ¶ 45 (emphasis added).  The 2024 Commonwealth Fiscal Plan similarly deems the Energy Bureau an "essential component of the energy transformation reforms," whose independence is a "necessary and common requirement to ensure properly functioning energy systems."  SOF ¶ 47.[6]  The 2024 Commonwealth Fiscal Plan concludes that "[the Energy Bureau's] independence, particularly in areas such as rate making . . . must not be subjected to political interference."  SOF ¶ 48.

After the enactment of Act 17, the 2019 PREPA Fiscal Plan recognized the importance of the Act 17 Study, listing it among its "Key Regulator Issues and Requirements."  SOF ¶ 51.  Net metering and the Act 17 Study remain important components in the current PREPA Fiscal Plan.  Recognizing renewable distributed generation "provides benefits to rooftop solar customers," the PREPA Fiscal Plan also observes a "sub-optimal net metering program . . . may have unintended

---

[5] For example, the 2018 Commonwealth Fiscal Plan notes "the long-term sustainability of Puerto Rico's energy sector depends on having a strong, independent, and professional regulator," SOF ¶ 43, and the 2021 Commonwealth Fiscal Plan states that "[a] strong and independent energy sector regulator is essential for injecting certainty and stability into the energy market, promoting much needed investments, and enforcing compliance with the energy sector transformation's objectives."  SOF ¶ 44.  The 2020 PREPA Fiscal Plan similarly notes that the transformation of Puerto Rico's energy sector into a "safe, reliable, affordable, modern system depends on the presence and active involvement of a rational, politically independent, and professionally supported regulator" whose determinations "should be free of any political influence or interference."  SOF ¶ 42.

[6] The 2023 Commonwealth Fiscal Plan, in effect at the time Act 10 was enacted, contained similar provisions.  SOF ¶ 50 ("A strong and independent energy sector regulator is essential for injecting certainty and stability into the energy market.").

detrimental effects and risks, including an unequitable distribution of costs throughout the system."

SOF ¶ 52.  For example, the PREPA Fiscal Plan notes that because LUMA Energy, LLC

("LUMA") is required under Act 17 "to purchase the excess energy produced by net metering

customers at the prevailing energy rate, the effective cost to ratepayers of the renewable energy

generated by net metering customers may be higher than the cost of purchasing that same quantity

of electricity from other resources."  SOF ¶ 53.  The cost to LUMA is "then passed on, in whole

or in part, to all other remaining customers."  SOF ¶ 54.

Accordingly, the PREPA Fiscal Plan requires the Energy Bureau to comply with Act 17

such that it "finalize[s] the net metering and distributed generation study" by June 30, 2023 and

"initiate[s] a process for implementing recommendations and conclusions of the study and

updating a net metering compensation and crediting structure, if it deems appropriate," by April

11, 2024.  SOF ¶ 55.  The Energy Bureau did not meet the June 30, 2023 deadline to finalize the

study, but had begun work, including engaging a consultant, to prepare the Act 17 study in 2023,

prior to the enactment of Act 10.  SOF ¶ 56.[7]

**D.  Act 10-2024.**

On January 10, 2024, the Governor signed Act 10 into law.  SOF ¶ 57.[8]  Enacted just

months before Act 17's deadline for the Energy Bureau to complete the Act 17 Study and

---

[7] As noted below, because of Act 10 the Energy Bureau did not complete the study mandated by Act 17—as Act 10 prohibits that study from being commenced before January 2030—but did publish the study it had commenced prior to Act 10's enactment pursuant to its broad general powers.  *See infra* at H; *see also* SOF ¶¶ 98–102.

[8] Although Act 10 has been portrayed as a bill advocated for by environmental groups, the consumer solar industry was heavily involved in efforts to pass Act 10 because its business relies on net metering to sell its products and services.  For example, Sunnova Energy International ("Sunnova"), a prominent commercial and residential solar company, identifies Puerto Rico as its second largest market and "rel[ies] on net metering and related policies to offer competitive pricing to . . . customers in most [current] markets."  Sunnova Energy International, Inc., Annual Report (Form 10-K), February 22, 2024 at 23, 44 (https://d18rn0p25nwr6d.cloudfront.net/CIK-0001772695%20/9b6ea5ef-b790-40bd-b6ef-6f03535e4cda.pdf).  As such, it candidly admits its "growth strategy depends in significant part on government policies and incentives," including net metering, "that promote and support solar energy and enhance the economic viability of distributed solar."  Sunnova Energy International, Inc., Quarterly Report (Form 10-Q), October 23, 2024 at 45 (https://d18rn0p25nwr6d.cloudfront.net/CIK-0001772695%20/e16ba8ac-9691-454c-ae01-

potentially announce changes to the net metering program, Act 10—which was the product of months of lobbying efforts by special interest groups—prevents the Energy Bureau from *even beginning* the Act 17 Study for **more than 5 years**.  SOF ¶ 59.

Specifically, Act 10 provides the Energy Bureau may not commence the Act 17 Study until January 2030, and cannot change the current net metering credit structure (*i.e.*, the 1:1 net metering rate) until the study is completed. SOF ¶¶ 59–61. Even after the study's completion, Act 10 provides any changes to the net metering credit structure can only take effect 12 months after the Energy Bureau "makes any decision to change the net metering policy."  SOF ¶ 61.  In short, Act 10 mandates the current net metering rate structure remain in place until at least 2031.  SOF ¶ 62.

In addition, Act 10 amplifies the consequences of this delay in making changes to the net metering program by requiring the Energy Bureau provide any customer with a contract, or who has a distributed generator installed and certified by a licensed professional and has notified the Energy Bureau of the installation at the time the Energy Bureau issues its final determination changing the net metering structure (which, as noted above, cannot be before 2031), the option to continue to enjoy the 1:1 net metering rate for at least 20 years (or until at least 2051).  SOF ¶ 63.

---

b8100e181943.pdf). Less than three months before Act 10's enactment, Sunnova warned investors that a "change in the value of net metering credits…or changes in other policies or a loss or reduction in such incentives could decrease the attractiveness of distributed solar to us, our dealers and our customers in applicable markets, which could reduce our customer acquisition opportunities," and that "[i]f any of these government regulations, policies or incentives are adversely amended, delayed, eliminated, reduced, retroactively changed or not extended beyond their current expiration dates or there is a negative impact from the recent federal law changes or proposals, our operating results and the demand for, and the economics of, distributed solar energy may decline, which could harm our business." *Id.* at 45–46.

Sunnova is a member of the Solar Energy and Storage Association of Puerto Rico ("SESA"), "an association representing Puerto Rico's solar and energy storage industries" and committed to "advocat[ing] solar and storage technologies as a central solution to the energy needs of Puerto Rico, and promot[ing] public policy that will benefit the growth of these industries."  *See* SESA – Solar and Energy Storage Association of Puerto Rico, https://www.sesapr.org/.  Given the money at stake for these private companies, it is no surprise SESA was heavily involved in efforts to pass Act 10 and has mounted a furious campaign against the Oversight Board's efforts—including this litigation—to return regulatory authority over net metering to the Energy Bureau. *See* Net Metering, SESA – Solar and Energy Storage Association of Puerto Rico, https://www.sesapr.org/netmetering; *see also* https://www.facebook.com/story.php/?story_fbid=748078830763960&id=100066855504227 (noting its "advocacy" for Act 10).

**E.  The Governor's Deficient § 204 Submission for Act 10.**

Section 204(a) requires the Governor to submit to the Oversight Board each newly enacted law, as well as a "formal estimate" of the law's impact on expenditures and revenues and a certification the law is or is not "significantly inconsistent" with the fiscal plan.  PROMESA § 204(a)(1–2).  On February 12, 2024, the Oversight Board received the Governor's § 204(a) submission for Act 10 (the "Submission").  SOF ¶ 64.  The Submission consisted of:  (*i*) a copy of Act 10; (*ii*) a document titled "Section 204(a) Certification, Act 10-2024, Enacted on January 10, 2024" prepared by the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF," by its Spanish acronym) (the "AAFAF Certification"); (*iii*) Attachment A to the Certification, (the "OMB Attachment") prepared by the Puerto Rico Office of Management and Budget ("OMB"); and (*iv*) Attachment B to the Certification (the "Treasury Attachment") prepared by the Puerto Rico Department of Treasury ("Treasury Department").  SOF ¶ 64.

The OMB Attachment is a one-page document.  SOF ¶ 65.  It states that after evaluating whether Act 10 "may have a potential fiscal impact on the Expenditure Budget of the Government of Puerto Rico," the OMB determined Act 10 "would not have a fiscal impact and, if any, it would have a minimal impact on the certified budget for the fiscal years 2023-2024."  SOF ¶ 66.  The OMB further states that its findings do not "imply any budgetary impact for the subsequent fiscal years contained in the Certified Fiscal Plan."  SOF ¶ 67. The OMB provided no reasoning, explanation, or financial calculation to support its conclusions.  SOF ¶ 68.

The Treasury Attachment contains three "check" boxes, signifying the Treasury Department examined the law after enactment, and concluded Act 10 "does not have a fiscal impact," and "would not have an incremental effect" on the "FY 2023-2024 certified budget for" an unspecified agency.  SOF ¶ 69.  The Treasury Attachment includes no reasoning, explanation,

13

or financial calculation to support the Treasury Department's conclusions.  SOF ¶ 70.  The Treasury Attachment only attempted to address the impact of Act 10 for fiscal year 2023-2024, and did not attempt to examine the impact over the entire period covered by the Fiscal Plans.  SOF ¶ 69.  The AAFAF Certification contained some fiscal analysis, but AAFAF has informed the Oversight Board that, pursuant to Executive Order 2019-057, it does not conduct formal estimates for § 204(a) submissions.[9]  SOF ¶¶ 71–72.

Neither OMB nor the Treasury Department provided the certification required by § 204(a)(2)(B); neither entity addressed Act 10's consistency with the then-applicable Fiscal Plans.[10] SOF ¶¶ 73–75.  The AAFAF Certification states that "Act 10 is not significantly inconsistent with the [2023] Certified [Commonwealth] Fiscal Plan and PREPA's Certified Fiscal Plan."  SOF ¶ 6.  The AAFAF Certification, however, did not address the Fiscal Plans' requirements concerning the Energy Bureau's independence.  SOF ¶ 77.  As for the PREPA Fiscal Plan's requirements regarding the study and regulation of the net metering program, the AAFAF Certification suggested Act 10 was consistent with those requirements as "Act 10 still requires [the Energy Bureau] to conduct the study, it just extends the date for doing so" and the PREPA Fiscal Plan "does not include or require a change to the current net metering law or policy."  SOF ¶ 78.

### F.  The Oversight Board Notifies the Governor and the Legislature of the Deficiencies in the § 204(a) Submission and Directs the Governor to Correct Them, But the Governor Fails to Do So.

In a letter dated April 10, 2024, the Oversight Board provided AAFAF, the Governor, and

---

[9] Executive Order 2019-057 (the "<u>Executive Order</u>"), provides that the OMB Director is the "sole official authorized to issue certifications of availability of public funds" and only OMB and the Treasury Department are charged with undertaking analyses of new laws to certify their estimated impacts on revenues and spending, as required under PROMESA § 204(a). SOF ¶ 71.  In a letter dated June 16, 2023, AAFAF confirmed to the Oversight Board that, per the terms of the Executive Order, it does not conduct formal estimates for § 204(a) purposes.  SOF ¶ 72.

[10] The Treasury Attachment has "check boxes" for the Treasury Department to make such a certification, but the Treasury Department left them blank.  SOF ¶ 75.

14

the Legislature with a detailed assessment of the Submission and, pursuant to § 204(a)(3)(A–B), a notification that the Governor had not provided the required formal estimate and certification.  SOF ¶ 79.  Pursuant to § 204(a)(4)(A), the Oversight Board directed the Governor to submit a revised submission, including a formal estimate and a certification in compliance with the requirements of § 204(a)(2), by April 19, 2024.  SOF ¶ 80.  The Oversight Board also requested confirmation by April 15, 2024, that the Government would repeal or amend Act 10 and further requested a "concrete plan and timeline for doing so."  SOF ¶ 81.

AAFAF responded on April 15, 2024, stating the "Government understands the Oversight Board's concerns expressed in the [April 10] Letter" and would "assess[] any potential changes to the 204 Submission, or to Act 10, (if any) that may be warranted in order to implement [Act 10] in a manner not significantly inconsistent with PREPA's Certified Fiscal Plan."  SOF ¶ 82.  AAFAF requested an unspecified amount of "additional time" to conduct that assessment.  SOF ¶ 83.

The Oversight Board responded on May 2, 2024.  SOF ¶ 84.  It reiterated its concerns and noted that AAFAF's letter did not "resolve the issues raised by the Oversight Board" regarding Act 10.  SOF ¶ 84.  The Oversight Board also urged legislation to repeal or amend Act 10 be introduced in the Legislature no later than May 7, 2024—the last day to introduce legislation for consideration in the then-current legislative session—and enacted no later than June 30, 2024, the last day of the then-current legislative session, to "restore [the Energy Bureau's] full statutory oversight over Puerto Rico's energy system."  SOF ¶ 86.  The Oversight Board offered to "work with" the Government to "ensure the issues with Act 10 are fully resolved."  SOF ¶ 87.

On May 7, 2024, AAFAF responded to the Oversight Board, requesting that the Legislature be given "additional time within the current legislative session that ends on June 30, [2024] to

consider the Oversight Board's objections, engage in discussions and address potential amendments to Act 10 through the legislative process" and "gather industry feedback" to make an "informed decision regarding Act 10."  SOF ¶ 88.

As of this filing, no legislation has been passed repealing or amending Act 10 and the Governor has failed to comply with the Oversight Board's direction to provide a compliant formal estimate and certification for Act 10.  SOF ¶ 90.

### G. The Oversight Board's § 108(a)(2) Determinations.

After Act 10's enactment, the Oversight Board and its advisors examined the law.  SOF ¶ 91.  On April 5, 2024, based on its review and analysis, the Oversight Board determined Act 10 impairs or defeats PROMESA's purposes of achieving fiscal responsibility and access to capital markets for multiple independent reasons, including because Act 10:

- violates the express terms of the PREPA Fiscal Plan and the 2023 Commonwealth Fiscal Plan which require the Energy Bureau to be politically independent;

- violates the express terms of the PREPA Fiscal Plan, which requires the Energy Bureau to conduct and complete its net metering study and implement any changes to PREPA's net metering program it deems appropriate by April 11, 2024; and

- impairs the Oversight Board's ability to carry out its statutory duties under § 201(b)(1)(B), (G), (H), and (J) to ensure funding of the essential public service of reliable electricity, to enable the achievement of fiscal targets, to create independent revenue forecasts, and to provide for capital expenditures and investments necessary to promote economic growth.

SOF ¶ 92.  The Oversight Board memorialized its determination in a resolution passed on April 5, 2024 (the "April Resolution"), and informed the Governor, Senate President, and Speaker of the House of Representatives of its determination and concerns regarding Act 10 on April 8, 2024. SOF ¶¶ 93–94.

On June 5, 2024, the Oversight Board certified the 2024 Commonwealth Fiscal Plan, which includes similar provisions to the 2023 Commonwealth Fiscal Plan regarding the need for the Energy Bureau to operate independently and without political interference.  SOF ¶¶ 95–96.  On

June 21, 2024, the Oversight Board again determined that Act 10 impairs or defeats the purposes

of PROMESA for the same reasons as set forth in the April Resolution but taking into account the

certification of the 2024 Commonwealth Fiscal Plan and the Governor's violations of § 204(a)

(discussed above), and memorialized its decision in a separate resolution (the "June Resolution").

SOF ¶ 97.

### H.  The Energy Bureau Publishes a Draft Study on Net Metering.

On June 14, 2024, the Energy Bureau approved a resolution (the "Energy Bureau

Resolution") authorizing the publication of an 82-page draft study on net metering and distributed

energy (the "Draft Study").  SOF ¶ 98.  The Energy Bureau Resolution references the requirement

to conduct the Act 17 Study,[11] but notes the requirement was amended by Act 10.  SOF ¶ 100.

Accordingly, the Energy Bureau published the Draft Study pursuant to its "broad delegated powers

and duties" under Act 57, and not Act 114, as amended by Act 17.  SOF ¶ 100.

The Draft Study was drafted by KeyLogic Systems, a company engaged by the Energy

Bureau to conduct the Act 17 Study, and includes an analysis of net metering programs generally,

the experience with such programs in different states, and Puerto Rico's program.  SOF ¶ 101.  It

concludes that "Puerto Rico will find [net metering] uns[us]tainable in the long-run" and "[n]ew

methods need to be explored and adopted."  SOF ¶ 102.

### I.  The Oversight Board Commences This Adversary Proceeding.

Despite the Oversight Board's efforts, Act 10 remains in full effect, including its

restrictions on the Energy Bureau's ability to regulate PREPA.  Therefore, on July 26, 2024, the

Oversight Board filed this Adversary Proceeding against the Governor, seeking, among other

---

[11] The Energy Bureau Resolution references Act 114, as amended.  SOF ¶ 100.  As discussed above, Act 114 was
amended by Act 17 to, among other things, require the net metering study.

relief, declaratory and injunctive relief to enjoin and nullify Act 10.  ECF No. 1.  On September

11, 2024, the Senate President was permitted to intervene in this matter pursuant to Fed. R. Civ.

P. 24(b).  ECF No. 27.

## LEGAL STANDARD

Summary judgment is appropriate where the record presents no genuine issue of material

fact and demonstrates the movant is entitled to judgment as a matter of law.  *Pierluisi v. Fin.*

*Oversight & Mgmt. Bd. for P.R.*, 37 F.4th 746, 759 (1st Cir. 2022) ("*Five Laws Appeal*") (citing

Fed. R. Civ. P. 56(a)).  Material facts are those that "possess[] the capacity to sway the outcome

of the litigation under the applicable law," and there is a genuine dispute where an issue "may

reasonably be resolved in favor of either party." *Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir.

2008) (citations omitted); *Fin. Oversight & Mgmt. Bd. for P.R. v. Vázquez Garced*, 616 B.R. 238,

245 (D.P.R. 2020) ("*Law 29 II*").  Summary judgment should be granted "where further inquiry

into the facts is not desirable to clarify the application of the law."  *Mandel v. Bos. Phoenix, Inc.*,

456 F.3d 198, 205 (1st Cir. 2006) (citation omitted).

By its plain terms, Rule 56 "does not require trial courts to allow parties to conduct

discovery before entering summary judgment."  *Humphreys v. Roche Biomedical Lab'ys, Inc.*,

990 F.2d 1078, 1081 (8th Cir. 1993) (citation omitted).  While Rule 56(d) affords the non-

moving party an opportunity to request postponement until necessary discovery has been

conducted, postponement should not be granted where the non-movant is "unlikely to garner

useful evidence from supplemental discovery."  *See Troiano v. Aetna Life Ins. Co.*, 844 F.3d 35,

45–46 (1st Cir. 2016) (citation omitted) (affirming summary judgment prior to discovery where

lawsuit "was a matter of interpreting [ERISA] Plan language"); *United States v. P.R. Indus. Dev.*

*Co.*, 287 F. Supp. 3d 133, 139 (D.P.R. 2017), *aff'd*, 18 F.4th 370 (1st Cir. 2021) (denying request

to postpone summary judgment ruling pending further discovery because the discovery sought

is "immaterial").

As set forth herein, the facts necessary to resolve the Oversight Board's claims are

neither in dispute nor in need of discovery, and the Oversight Board is entitled to summary

judgment on both Counts in its Complaint.

## **ARGUMENT**

## I.     THE OVERSIGHT BOARD IS ENTITLED TO SUMMARY JUDGMENT BECAUSE ACT 10 IMPAIRS OR DEFEATS THE PURPOSES OF PROMESA, AS DETERMINED BY THE OVERSIGHT BOARD (COUNT I).

Section 108(a)(2) is unambiguously clear:  the  Governor and Legislature are prohibited

from "enact[ing], implement[ing], or enforc[ing] any statute, resolution, policy, or rule that would

impair or defeat the purposes of this Act, as determined by the Oversight Board."    PROMESA

§  108(a)(2).    Based  on  this  clear  language,  this  Court  has  recognized  that  a  §  108(a)(2)

determination  by  the  Oversight  Board  "***triggers  a  statutory  prohibition  on  action  by  the***

***Government to go forward with the targeted statute***."    *Vázquez Garced v. Fin. Oversight &*

*Mgmt. Bd. for P.R.*, 511 F. Supp. 3d 90, 134  (D.P.R. 2020) ("*Five Laws*") (emphasis added),

*aff'd  sub  nom.  Five Laws Appeal*.   In this regard, the First Circuit recently ruled the Oversight

Board  has  the  power,  under  §  108(a)(2)  and  other  provisions  of  PROMESA,  "to  prevent  laws

inconsistent with PROMESA from taking effect," and this Court has the "concomitant authority

to enforce the [Oversight] Board's mandates by nullifying such a law from its inception." *La Liga*

*de Ciudades de P.R. v. Fin. Oversight & Mgmt. Bd. For P.R. (In re Fin. Oversight & Mgmt. Bd. for*

*P.R.)*, 110 F.4th 295, 326 (1st Cir. 2024) ("*La Liga Appeal*").

The facts here are indisputable.  Based on its review and analysis, the Oversight Board

determined Act 10 impairs or defeats PROMESA's purposes of achieving fiscal responsibility for

a number of reasons, including:

a. By interfering with the Energy Bureau's regulation of PREPA's net metering program, Act 10 violates the express terms of the Commonwealth Fiscal Plans and PREPA Fiscal Plan which require the Energy Bureau to be politically independent;

b. Act 10 violates the express terms of the PREPA Fiscal Plan, which requires the Energy Bureau to conduct and complete its net metering study and implement any changes to PREPA's net metering program it deems appropriate by April 11, 2024;

c. Act 10 impairs the Oversight Board's ability to carry out its statutory duties under §§ 201(b)(1)(B), (G), (H), and (J) to ensure funding of the essential public service of reliable electricity, to enable the achievement of fiscal targets, to create independent revenue forecasts, and to provide for capital expenditures and investments necessary to promote economic growth; and

d. The Governor failed to provide a compliant formal estimate and certification for Act 10 required by § 204(a) and failed to comply with the Oversight Board's direction to submit compliant documents.

SOF ¶¶ 92–93.

Because Act 10 impairs or defeats PROMESA's purposes, as determined by the Oversight Board, § 108(a)(2) bars the Government from enacting, implementing, and enforcing Act 10. In fact, the Oversight Board's determination served to prevent Act 10 from taking effect. *See La Liga Appeal*, 110 F.4th at 326. However, Act 10 has not been amended or repealed. As such, the Oversight Board has been forced, once again, to seek this Court's authority "to enforce the [Oversight] Board's mandates by nullifying [a challenged law] from its inception." *Id*. For reasons discussed below, the indisputable facts dictate that the Oversight Board is entitled to summary judgment and Act 10 should be nullified.

A.   **Under *Ultra Vires* Review, the Oversight Board's § 108(a) Determination Should be Upheld and Summary Judgment Granted.**

The Oversight Board submits that, given the plain language of PROMESA, its § 108(a) determinations should be reviewed only to determine whether the Oversight Board exceeded its authority, also known as "*ultra vires*" review. *See, e.g.*, *R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002). Previously, and as discussed below in § I.B, the Oversight Board

20

urged the Court to review its determinations based on the arbitrary and capricious standard. *See* Adv. Proc. No. 20-00080 [ECF No. 14] at 8; Adv. Proc. No. 22-00063 [ECF No. 30] at 42. The Court's use of that standard has been affirmed. *Five Laws Appeal*, 37 F.4th 746. In that appeal, however, the First Circuit held that the Oversight Board had waived any argument about *ultra vires* review by failing to raise it before this Court, and declined to clarify the appropriate standard of judicial review for § 108(a) determinations (a finding of waiver which the Oversight Board disagreed with). *Five Laws Appeal*, 37 F.4th at 760 n.12. The Oversight Board therefore again invites the Court to decide the question of the appropriate standard of review and, for reasons set forth herein, decide that *ultra vires* review is the correct standard.

1. Ultra Vires *is the Correct Standard of Review.*

*Ultra vires* is the correct standard of review for the Oversight Board's § 108(a) determination because it is the only way a plaintiff may challenge government action in court where it "is unable to bring [its] case predicated on either a specific or general statutory review provision." *Cause of Action Inst. v. Eggleston,* 224 F. Supp. 3d 63, 76 (D.D.C. 2016) (quoting *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996)); *see also Puerto Rico v. United States*, 490 F.3d 50, 59 (1st Cir. 2007) (noting non-statutory review actions are subject to an *ultra vires* standard). PROMESA does not provide for judicial review of § 108(a) determinations and does not prescribe a standard of review). Moreover, the Oversight Board's determinations are not subject to the Administrative Procedure Act because the Oversight Board is not an agency. *See Five Laws Appeal*, 37 F.4th at 760–61.

The plain language of PROMESA further supports *ultra vires* review. Section 108(a) bars the enactment and enforcement of laws that "impair or defeat the purposes of [PROMESA], *as determined by the Oversight Board*" (emphasis added). The final clause indicates the Oversight Board alone is meant to decide whether a law impairs or defeats PROMESA. *See, e.g.*, *Webster*

*v. Doe*, 486 U.S. 592, 600 (1988).   The great deference to the Oversight Board's determinations reflected in the statutory language of § 108(a) is why *ultra vires* review is most appropriate.   The *ultra vires* standard specifically determines whether the entity charged with making a determination acted within the authorizing statute's language.   *See United States v. 16.03 Acres of Land*, 26 F.3d 349, 355 (2d Cir. 1994) (noting under *ultra vires* standard courts are "limited to examining the four corners of the statute [authorizing official action] and determining whether the officials have complied with the statute's language"); *Griffith v. Fed. Lab. Relations Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988) (*ultra vires* review is "intended to be of extremely limited scope").

PROMESA contains no formula or instructions for determining whether a law "impairs or defeats" PROMESA's purposes.   Those matters were evidently left for the Oversight Board to determine, not the courts.   Congress also placed § 108(a) within a provision entitled "Autonomy of Oversight Board," which is further evidence of its intent to insulate § 108(a) determinations from judicial review.   Finally, broad discretion under § 108(a) fits the nature of the Oversight Board's mission, which calls for the exercise of significant expertise, judgment, and flexibility.   *See* PROMESA §§ 201(b)(1), 101(a); *Aurelius Inv., LLC v. Puerto Rico*, 915 F.3d 838, 843–46 (1st Cir. 2019) (noting Congress enacted PROMESA "to deal with Puerto Rico's 'fiscal emergency' and to help mitigate the Island's 'severe economic decline'" and granted the Oversight Board "additional authority and powers . . . with similarly unfettered discretion") (overruled on other grounds by *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649 (2020)). For all these reasons, the Oversight Board's determinations under § 108(a) should be subject only to *ultra vires* review.

2.   *The Oversight Board's determination was not* ultra vires*.*

*Ultra vires* review is "extremely narrow."   *Nat'l Air Traffic Controllers Ass'n. AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006).   Courts applying this standard

consider only whether an entity has exceeded its authority, either by patently misconstruing a statute, disregarding an unambiguous statutory directive, or violating a specific statutory command. *Griffith*, 842 F.2d at 493. An entity's erroneous exercise of its discretion is insufficient; rather, it must have engaged in "completely unauthorized or illegal conduct . . . ." *Cause of Action Inst.*, 224 F. Supp. 3d at 76; *see also Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (requiring error "so extreme that one may view it as jurisdictional or nearly so" (citation omitted)); *Griffith*, 842 F.2d at 493 ("Garden-variety errors of law or fact are not enough."); *New York v. Biden*, 636 F. Supp. 3d 1, 12 (D.D.C. 2022) (citing *Griffith*); *Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Human Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016) (disagreement over appropriateness of agency action was insufficient to demonstrate an "obvious" or "patent violation of agency authority" necessary to find an action *ultra vires*) (citation omitted). Thus, an entity does not act *ultra vires* simply because its "authorized action was imprudent" or because "in validly exercising its judgment, [it] reached the wrong result." *Eagle Tr. Fund v. U.S. Postal Serv.*, 365 F. Supp. 3d 57, 67–68 (D.D.C. 2019). Accordingly, the *ultra vires* inquiry is limited to "whether the officials have complied with the statute's language," not "*the manner* in which the officials exercised their authority." *16.03 Acres of Land*, 26 F.3d at 355.[12]

The Oversight Board acted within the scope of its authority when it determined that Act 10 impairs or defeats the purposes of PROMESA and its determination therefore easily satisfies *ultra vires* review. Specifically, the Oversight Board issued resolutions on April 5, 2024 and on June 21, 2024 memorializing its determination that Act 10 impairs or defeats the purposes of PROMESA. SOF ¶¶ 93, 97.

---

[12] *Ultra vires* review "does not include the full scope of review applied by courts in 'arbitrary and capricious' challenges under the [Administrative Procedures Act]." *See Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 406 (D. Md. 2011), *aff'd*, 698 F. 3d 171 (4th Cir. 2012).

23

In making this determination, the Oversight Board concluded that Act 10 "violates the Fiscal Plans by interfering with [the Energy Bureau's] independence [and] by imposing numerous decisions upon [the Energy Bureau] regarding net metering," including by "prohibiting it from making any changes to PREPA's net metering policy until at least 2031, and [] mandating that it establish a legacy program providing PREPA net metering customers and other eligible customers with the current net metering program's terms through at least 2051." SOF ¶ 93.

In exercising the discretion granted to it by Congress, the Oversight Board's determination survives *ultra vires* review. The Oversight Board has engaged in "authorized conduct" squarely within its ambit; namely, exercising its sole discretion to determine whether Act 10 impairs or defeats the purposes of PROMESA. The Oversight Board's resolutions and communications make clear that doing so has not exceeded its authority, including by articulating why Act 10 impairs or defeats PROMESA's purposes. As such, the Court should apply *ultra vires* review, uphold the Oversight Board's § 108(a)(2) determination, grant it summary judgment, and nullify Act 10.

## B. Under the Arbitrary and Capricious Standard, the Oversight Board's § 108(a)(2) Determination Should Be Upheld and Summary Judgment Granted in Its Favor.

As discussed above, this Court previously applied the arbitrary and capricious standard in reviewing the Oversight Board's § 108(a)(2) determinations. If the Court declines to apply the *ultra vires* standard, discussed above, and instead employs the arbitrary and capricious review standard, that assessment is still narrow and deferential. *Flock v. U.S. Dep't of Transp.*, 840 F.3d 49, 55 (1st Cir. 2016). Under the arbitrary and capricious review standard, a court must affirm the Oversight Board's determination if its judgment is "reasoned[] and supported by substantial evidence in the record." *Law 29 II*, 616 B.R. at 253 (quoting *Trafalgar Cap. Assocs., Inc. v. Cuomo*, 159 F.3d 21, 26 (1st Cir. 1998)); *see also Five Laws Appeal*, 37 F.4th at 746 (affirming district court's decision which applied the arbitrary and capricious standard). In so doing, a court

24

must find the Oversight Board has acted reasonably if it relied on "reasonable opinions of [the entity's] own qualified experts even if . . . a court might find contrary views more persuasive." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). Courts also defer to an entity's expertise in its reliance on the factual adequacy and legitimacy of certain data in making its determinations. *See, e.g.*, *Town of Winthrop v. F.A.A.*, 535 F.3d 1, 8 (1st Cir. 2008) (deferring to FAA's determination that three-year-old data was sufficient in determining air quality and noise impacts of construction at Boston Logan airport).

As discussed below, the Oversight Board determined Act 10 impairs or defeats PROMESA's purposes for a number of independently sufficient reasons, each of which is rational, reasoned, and not arbitrary or capricious.

1. *Act 10 Impairs or Defeats PROMESA's Purposes Because It Is Directly Contrary to the Express Terms of the Fiscal Plans.*

PROMESA requires the Oversight Board to certify fiscal plans, which provide a blueprint for the Commonwealth and covered territorial instrumentalities to achieve fiscal responsibility, access to capital markets, and other goals, including ensuring funding for essential public services; enabling the achievement of fiscal targets; creating independent forecasts of revenue; and providing for capital expenditures and investments necessary to promote economic growth. PROMESA § 201(b)(1)(B), (G), (H), & (J). Congress considered the Oversight Board's duties and authority with respect to fiscal plans so critical that it barred any challenges to the Oversight Board's fiscal plan certification decisions. *Id.* § 106(e).

As this Court has noted, "PROMESA's fiscal plans and budgets are critical for the Oversight Board to achieve PROMESA's purpose. . ." *Fin. Oversight & Mgmt. Bd. for P.R. v. Pierluisi Urrutia*, 634 B.R. 187, 205 (D.P.R. 2021) ("*Act 7*"). Similarly, the First Circuit observed that "fiscal plans are a key instrument under PROMESA for the achievement of the

25

statute's goals." *Five Laws*, 511 F. Supp. 3d at 137.  Laws contrary to fiscal plan provisions therefore necessarily impair or defeat PROMESA's purposes, as they impede accomplishment of fiscal plan objectives and undermine the authority Congress entrusted to the Oversight Board with respect to developing and certifying the "key instrument[s]" for accomplishing PROMESA's goals. *Id.* at 206.

Indeed, on three occasions (affecting four laws) this Court has upheld determinations made by the Oversight Board that laws impaired or defeated PROMESA's purposes because they conflicted with provisions in a fiscal plan.   In litigation over Act 7-2021 ("Act 7"), the Court ruled that Act 7, which purported to establish a new defined-benefit pension system despite the 2021 Fiscal Plan's requirement that the Commonwealth maintain the PayGo system, violated that fiscal plan.  As a consequence, it upheld the Oversight Board's determination that Act 7 impaired or defeated the purposes of PROMESA.   *Act 7*, 634 B.R. at 206 (noting "the government's resolve to engage in conduct that directly conflicts with the Fiscal Plan is not hypothetical, but is a present intent that impairs PROMESA in violation of [§] 108(a)").   Similarly, in *Five Laws*, the Court upheld the Oversight Board's determinations that two separate laws—Act 176-2019 and Act 47-2020—violated the 2019 Commonwealth Fiscal Plan's requirements that the Commonwealth right-size its workforce and tax laws be revenue neutral, respectively.   *Five Laws*, 511 F. Supp. 3d at 132–33 (finding, with respect to Act 176-2019, that "no reasonable fact finder could determine the Oversight Board's § 108(a)(2) determination," which was based on the measure's inconsistency with the fiscal plan's right-sizing requirements, "was arbitrary and capricious"); *id.* at 137 (finding with respect to Act 47-2020, that it is "neither arbitrary nor capricious for the Oversight Board to determine that a direct violation (at least of this magnitude of uncompensated revenue reduction) of a clear Fiscal Plan policy position does, in fact, impair or defeat PROMESA's

purposes"). Finally, in the *Law 29* litigation, the Court nullified Law 29-2019 based, in part, on the Oversight Board's § 108(a) determination that the pension law "impairs the functioning of financial measures approved by the Oversight Board [in the 2019 Fiscal Plan] in the exercise of powers explicitly conferred upon it by PROMESA." *Law 29 II*, 616 B.R. at 254.

Here, Act 10 indisputably conflicts with the Fiscal Plans in significant ways, each of which provides independently sufficient justification for the Oversight Board's § 108(a) determination and upon which the Court should nullify Act 10.

First, Act 10 conflicts with the requirement in the Fiscal Plans that the Energy Bureau must be able to independently regulate PREPA. The Commonwealth Fiscal Plans require PREPA have a "strong and independent energy sector regulator" to achieve the energy-sector transformation Puerto Rico needs. SOF ¶¶ 47–50. Similarly, the PREPA Fiscal Plan requires the Energy Bureau to "remain financially and operationally independent from the Commonwealth Government and its determinations must be free from any direct or indirect political influence or interference." SOF ¶ 45. The reason for this requirement is clear. As stated in the PREPA Fiscal Plan, a root cause of PREPA's current challenges is that its management decisions have historically been "subject to political influence and instability, leading to high management turnover, discontinuity in capital investment plans, electric customer rates that were insufficient to cover operating and maintenance costs and the mounting costs of debt service." SOF ¶ 39. The Fiscal Plans all require a politically independent, professional regulator to avoid the mistakes of the past and ensure PREPA can effectuate necessary operational and fiscal improvements.

Act 10 is a direct afront to this requirement. By enacting Act 10, the Government has prevented the Energy Bureau from regulating PREPA's net metering program by prohibiting it from changing the 1:1 net metering rate until at least 2031. Further, Act 10 restricts the Energy

Bureau's regulatory authority should it decide to make such a change by, among other things, delaying when changes may be implemented and mandating the Energy Bureau extend the 1:1 net metering rate to all net metering customers at that time—"grandfathering" that rate for the next 20 years (until at least 2051). The implications are significantly negative, as the Government has stripped the Energy Bureau of a potential tool to nimbly address PREPA's pressing needs. For example, if the costs of the net metering program skyrocket due to a sharp increase the number of net metering customers, the Energy Bureau will be unable to address that impact through changes to the program and will have to find other methods which may be less effective and desirable.

Act 10 returns the Commonwealth to a time where PREPA's policies were subject to political whims and special interest influence, as opposed to being regulated by a professional, independent entity guided by facts and focused on the needs of the utility and its customers. That is precisely the type of interference that led PREPA to its current crisis, and what the Fiscal Plans expressly prohibit. Accordingly, the Oversight Board's determination that Act 10 impairs or defeats the purposes of PROMESA by conflicting with the Fiscal Plans' prohibition on political interference with the Energy Bureau was rational, reasoned, and certainly not arbitrary or capricious.

Second, not only does Act 10 violate the Fiscal Plans' prohibition on political interference with PREPA, it also directly conflicts with the PREPA Fiscal Plan's provisions regarding net metering. The PREPA Fiscal Plan recognizes the importance of net metering, but also that PREPA's current net metering program may have "unintended detrimental effects," including "an unequitable distribution of costs throughout the system" as it requires LUMA "to purchase the excess energy produced by net metering customers at the prevailing energy rate," SOF ¶ 53,

28

whether PREPA needs the excess energy or not.  This may shift costs from net metering participants to PREPA's other customers who do not participate in the net metering program.  *Id.*

Given these circumstances, the PREPA Fiscal Plan mandates the prompt completion of the Act 17 Study and for the Energy Bureau to implement changes it deems appropriate by April 11, 2024, going so far as to list those possible changes as a regulatory milestone.  SOF ¶ 55.  Act 10 prohibits the Energy Bureau from accomplishing these objectives for at least five years, and likely much longer.

Accordingly, Act 10 is directly contrary to the PREPA Fiscal Plan's provisions regarding the study and implementation of changes to the net metering program, and the Oversight Board's determination that Act 10 impairs or defeats the purposes of PROMESA on this ground was also rational, reasoned, and not arbitrary or capricious.

        2.    *Act 10 Impairs or Defeats PROMESA's Purposes Because the Governor Failed to Comply with PROMESA § 204(a).*

The Oversight Board also determined that Act 10 impairs or defeats the purposes of PROMESA because the Governor failed to comply with his obligations under § 204(a).  SOF ¶ 97.  Section 204(a) requires the Governor to submit any new law for review by the Oversight Board with a formal estimate of the law's impact on the Commonwealth's expenditures and revenues, and a "certification" that the new law either is or is not "significantly inconsistent" with the operative fiscal plan.  PROMESA § 204(a)(2).

The Governor failed to provide a compliant formal estimate of Act 10's impact on revenues and expenditures and failed to submit a compliant certification that Act 10 is or is not significantly inconsistent with the then-applicable fiscal plans, as required by § 204(a).  *See infra* at § II.A–B. The Oversight Board notified him of these failures and directed him to remedy them, but the Governor failed to comply.  *See infra* at § II.C.  These facts are not in dispute.

As the First Circuit held, "the procedures and obligations contemplated by section 204(a) are not procedure for procedure's sake.  Rather, they serve the critical purpose of allowing the [Oversight] Board to determine that the legislation at issue adheres to the fiscal plan and will not impair PROMESA's purpose of restoring Puerto Rico to fiscal stability."  *Five Laws Appeal*, 37 F.4th at 766.  Accordingly, the Oversight Board's § 108(a)(2) determination that the Governor's failure to adhere to § 204(a) procedures and obligations impaired or defeated PROMESA's purposes was rational, reasoned, and not arbitrary or capricious.

\* \* \*

The indisputable facts demonstrate that each of the Oversight Board's determinations that Act 10 impairs or defeats the purposes of PROMESA are not *ultra vires* and, in addition, is rational, reasoned, and not arbitrary and capricious, and each is an independent basis for preventing the law "from taking effect."  *La Liga Appeal*, 110 F.4th at 326.  Accordingly, the Oversight Board is entitled to summary judgment nullifying Act 10.  *Id.* (this Court has the "concomitant authority to enforce the [Oversight] Board's mandates by nullifying" laws).

## II.    THE OVERSIGHT BOARD IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE GOVERNOR FAILED TO COMPLY WITH PROMESA § 204(a) (COUNT II).

Section 204(a) requires the Governor to submit to the Oversight Board every new law along with: (i) a "formal estimate" of the law's impact on expenditures and revenues; and (ii) a certification that the law is or is not "significantly inconsistent" with the applicable fiscal plan. PROMESA § 204(a)(1–2).  If the Governor fails to comply with these requirements, and fails to correct them after notification and direction to do so, the Oversight Board is empowered to "take such actions it considers necessary" to ensure the enactment or enforcement of the new law will not adversely affect the Government's compliance with the fiscal plan, including preventing the enforcement or application of the law.  *Id.* § 204(a)(5); *see also Act 7*, 634 B.R. at 201–02

30

(granting summary judgment on the Oversight Board's § 204(a)(5) claim and nullifying Act 7 in its entirety as "the proper remedy"); *Fin. Oversight & Mgmt. Bd. for P.R. v. Pierluisi Urrutia*, 650 B.R. 334, 358 (D.P.R. 2023) ("*Act 41*"), *aff'd*, 77 F.4th 49 (1st Cir. 2023) ("*Act 41 Appeal*") (finding "the Governor has failed to comply with section 204(a)," with respect to Act 41-2022 and nullifying it *ab initio*).   PROMESA "demands recognition" of the Oversight Board's "ability to question and, if necessary, bring before the Court challenges to the sufficiency and accuracy of documents as important as revenue estimates and certifications regarding significant inconsistencies with fiscal plans." *Fin. Oversight & Mgmt. Bd. for P.R. v. Vázquez Garced* ("*Law 29 I*"), 403 F. Supp. 3d 1, 13–14 (D.P.R. 2019).

The Governor failed to provide a compliant formal estimate or a compliant certification and, despite being notified of and directed to correct the deficiencies, failed to remedy these violations.   As such, and because Act 10 has already and, if permitted to remain in effect, will continue to adversely affect the Commonwealth's compliance with the Fiscal Plans, the Oversight Board is entitled to summary judgment nullifying the law.   *See La Liga Appeal*, 110 F.4th at 325 ("By authorizing the Board to 'prevent[]' the 'application' of [new] law[s], section 204(a)(5) plainly empowers the Board to oversee Puerto Rico's legislative enactments and ensure their compliance with the Fiscal Plan from the moment of their enactment.").

A. **The Governor Failed to Submit a Formal Estimate Meeting the Requirements of § 204(a).**

To comply with PROMESA's "formal estimate" requirement, the Governor must submit "a complete and accurate estimate covering revenue and expenditure effects of new legislation over the entire period of the fiscal plan." *Five Laws Appeal*, 37 F.4th at 752 (internal quotation marks and citations omitted).   This formal estimate must be prepared "by an appropriate entity of

31

the territorial government with expertise in budgets and financial management." PROMESA
§ 204(a)(A).

The formal estimate requirement is "not procedure for procedure's sake" but rather serves
"the critical purpose of allowing the Board to determine that the legislation at issue adheres to the
fiscal plan and will not impair PROMESA's purpose of restoring Puerto Rico to fiscal stability."
*Act 41 Appeal*, 77 F.4th at 64. As such, this requirement is "not satisfied by the mere presentation
of a figure on official letterhead." *Five Laws*, 511 F. Supp. 3d at 126. Rather, to satisfy the formal
estimate requirement, the Government must "show its work" and present an estimate "that [is]
sufficiently informative and complete." *Id.* at 126–27.

A "sufficiently informative and complete" estimate for Act 10 must take into account that
net metering impacts PREPA's revenues and expenses and the possibility the Energy Bureau
would have made changes to the program prior to 2030 in the absence of Act 10. The net metering
program's 1:1 net metering rate has not changed since the program was created in 2007 and, in
passing Act 17, the Government implicitly recognized that changes to the program were likely
necessary. Absent enactment of Act 10, it was likely the Energy Bureau would have decided to
change the 1:1 net metering rate.[13] Accordingly, given that Act 10 prohibits changes to the net
metering program, the formal estimate should have assessed the cost of maintaining the current
net metering program for the next seven years and enshrining the current program's terms for
program participants for the following twenty years. Said differently, because Act 10 altered the
status quo and prevented changes to the program for a significant period of time, the formal

---

[13] Indeed, Act 10 reflects this likelihood and a desire by special interest groups to avoid it. Act 10 was enacted, after
intensive special interest lobbying efforts, just months before the Energy Bureau would be able to make changes to
the net metering program. ECF No. 13 at 1; *see also supra* n.8. It is precisely because the deadline was approaching
and belief the Energy Bureau would possibly (or was likely) going to make changes that groups lobbied for and the
Government, responding to that pressure, enacted Act 10.

estimate was required to evaluate the potential impact freezing the program could have on PREPA's revenues and expenses.

The formal estimate requirement in PROMESA exists, in part, to "decreas[e] the likelihood that the Commonwealth will enact legislation that will prolong the [Oversight] Board's supervision, or even worse, repeat the practices that led to the Commonwealth's insolvency." *See Act 41 Appeal* at 64.  It also reflects the self-evident fact that to meet PROMESA's purpose of achieving fiscal responsibility, the Government should not be enacting laws without examining their potential fiscal impact.  PROMESA §§ 101, 204(a).  As such, even though there was uncertainty about what the Energy Bureau might do with respect to the net metering program, the fact Act 10 prevents any changes to the 1:1 net metering rate for a lengthy period of time could not be ignored and some attempt to analyze that issue had to have been made.  As the First Circuit observed, § 204(a)'s "use of the term 'estimate' makes clear that "uncertainty as to a law's effects does not generally provide an excuse for making no serious attempt" to estimate a new law's fiscal impact pursuant to § 204(a).  *Act 41 Appeal* at 64 (considering Governor's argument that formal estimate for a law impacting private labor market was not required because it would be "speculative" and § 204(a) "does not require speculation about remote future fiscal effects," and rejecting the argument).

The Submission's purported "estimates" prepared by the OMB and Treasury Department, separately or taken together, fail to meet the formal estimate requirement of § 204(a).[14]

---

[14] The AAFAF Certification contains a "Fiscal Impact" section.  AAFAF confirmed to the Oversight Board in a letter dated June 16, 2023 that, pursuant to the Executive Order, only the Treasury Department and OMB "conduct the cost estimate analysis because those entities (not AAFAF) have the best information and expertise to determine a new law's effects on Government expenditures and revenues."  SOF ¶¶ 71–72.  Accordingly, the AAFAF Certification is not the Governor's formal estimate.

The OMB Attachment is a one-page document stating that, after evaluating whether Act 10 "may have a potential fiscal impact on the Expenditure Budget of the Government of Puerto Rico," the OMB found Act 10 "would not have a fiscal impact and, if any, it would have a minimal impact on the certified budget for the fiscal years 2023-2024."  SOF ¶ 66. The OMB further noted that its remarks do not "imply any budgetary impact for the subsequent fiscal years contained in the Certified Fiscal Plan."   SOF ¶ 67.   While the OMB Attachment references unspecified "corresponding evaluation and analysis," it contains no figures, formulas, or explanation as to what evaluation and analysis OMB undertook to arrive at its conclusion.  SOF ¶ 68.  Indeed, OMB suggests Act 10 *could* have a "minimal" impact, but it does not quantify what that impact is, how it was calculated, or provide any other details permitting the Oversight Board to assess OMB's "evaluation and analysis."  SOF ¶¶ 66–68.

The Treasury Attachment is similarly deficient.  That document merely checks boxes indicating that Act 10 "does not have a fiscal impact" on the "Expenditure Budget of the Government of Puerto Rico."  SOF ¶ 69.  Likewise, the Treasury Attachment references a "corresponding evaluation and analysis" of Act 10, but it provides no details or documentation of such evaluation and analysis.  SOF ¶¶ 69–70.

As such, the OMB and the Treasury Department "estimates" constitute little more than the type of conclusory statements, devoid of any explanation, analysis, or data, that this Court has repeatedly found do not meet the "formal estimate" requirement of § 204(a).  *See, e.g., Act 41*, 650 B.R. at 357 (formal estimate requirement "is not satisfied by the mere presentation of a figure on official letterhead") (citation omitted); *Five Laws*, 511 F. Supp. 3d at 127 (Governor failed to "substantiate [his] estimate" for Act 82-2019 as he "failed to distinguish between the short-term impact . . . and [the law's] projected impact for the duration of the [] Fiscal Plan."); *id.* at 129

34

(Governor's estimate for Act 138-2019 "contain[s] even less content than the Act 82 Certificate" and warranted enjoinment.).[15]

Indeed, the "estimates" provide no information regarding how the entities reached their conclusions, including whether they examined Act 10's impact on PREPA's expenditures and revenues. In fact, it appears an analysis of Act 10's fiscal impact on PREPA was *not* conducted, as AAFAF in a letter responding to the Oversight Board's concerns about the Submission contended that such an estimate "represents the functional equivalent of completing the [net metering] Study, which the Government acknowledges is [the Energy Bureau's] responsibility given its expertise and unique role as PREPA's independent regulator." SOF ¶ 82.[16] Further, AAFAF's statement provides another basis for why OMB and the Treasury Department's "estimates" are deficient. Section 204(a) mandates that the "formal estimate" be prepared by "an appropriate entity of the territorial government with expertise in budgets and financial management." PROMESA § 204(a)(2)(A). AAFAF's statement indicates neither OMB nor the Treasury Department are "appropriate entit[ies]" for preparing the formal estimate for Act 10, and only the Energy Bureau could provide the necessary analysis.

---

[15] The Treasury Department's "estimate" is deficient for the additional reason that it only attempts to address the impact of Act 10 for fiscal year 2023-2024, SOF ¶ 69, which does not account for "the entire period covered by [the operative fiscal plan]" as required by § 204(a). *Law 29 I*, 403 F. Supp. 3d at 13–14 (Governor's failure to analyze impact of Law 29-2019 over the entire duration of the fiscal plan sufficient to sustain Oversight Board's § 204(a) claim).

[16] In its April 15, 2024 letter, AAFAF suggests the analysis of PREPA Fiscal Plan projections in the AAFAF Certification is a suitable substitute to a formal estimate of Act 10's impact on expenditures and revenues, but in so doing (1) admits its analysis does not meet PROMESA's formal estimate requirements (*i.e.*, is not an assessment of expenditures and revenues); and (2) fails to address the fact it (AAFAF) is, by its own admission, not authorized to submit § 204(a) formal estimates. SOF ¶¶ 71–72, 82. Even if that were not the case, AAFAF admits it lacks the expertise to assess Act 10's fiscal impact on PREPA, acknowledging that is a task for which the Energy Bureau is qualified. SOF ¶ 82. Accordingly, AAFAF is not "an appropriate entity" to prepare the formal estimate for Act 10. PROMESA § 204(a)(2)(A). Indeed, a review of AAFAF's analysis confirms this fact. AAFAF concludes Act 10 will have no fiscal impact on PREPA because to meet the PREPA Fiscal Plan's projected rate of new interconnected net solar metering capacity, AAFAF claims the current rate of growth must be maintained, and assumes the only way that can happen is if the current net metering program is continued without changes. But AAFAF provides no explanation for why its conclusions and assumptions should be credited and what AAFAF did to test its hypothesis. SOF ¶ 78.

Accordingly, the undisputed facts demonstrate the Governor's Submission failed to include a formal estimate compliant with § 204(a).

### B. The Governor's § 204(a) Certification Was Defective.

Section 204(a) also requires the Governor to submit a certification finding the newly enacted law either is or is not "significantly inconsistent with the Fiscal Plan." PROMESA § 204(a)(2)(B–C). This certification must be issued by the same "appropriate entity of the territorial government with expertise in budgets and financial management" that prepared the formal estimate of the law's impact on revenues and expenditures. *Id*.

None of the documents provided in the Submission meet the basic certification requirements of § 204(a). As an initial matter, none of the purported certifications could be compliant with § 204(a) because the underlying estimates are defective, for reasons discussed above, *see supra* § II.A, and "there is no dispute that the certification must rely on an appropriate formal estimate." *Act 41 Appeal,* 77 F.4th at 63. Indeed, it is not possible to assess a law's consistency with the fiscal plan if a valid estimate of the law's impact on revenues and expenditures has not been conducted. *See Act 41*, 650 B.R. at 357 (rejecting arguments that deficiencies in the formal estimate would not impact the certification decision).

But even if that were not the case, neither OMB nor the Treasury Department, the entities that provided the "estimates," included a certification that Act 10 is or is not significantly inconsistent with the then-applicable Fiscal Plans. SOF ¶¶ 73–73. The OMB Attachment is silent on the matter. SOF ¶ 73. The Treasury Attachment similarly ignores this obligation.[17] SOF ¶ 74.

While the AAFAF Attachment states "the Government has determined Act 10 is not significantly inconsistent with the Certified Fiscal Plan," that document does not satisfy the

---

[17] Notably, the Treasury Attachment includes "check boxes" to make the requisite § 204(a) certification, but the Treasury Department left them blank. SOF ¶ 75.

certification requirement because AAFAF did not prepare a formal estimate and § 204(a) requires the certification be prepared by the entity that prepared the formal estimate.  PROMESA § 204(a)(2)(B–C).[18]

But even if AAFAF was an entity that could submit a compliant § 204(a) certification, its certification is defective because it is patently incorrect.  *See Law 29 I*, 403 F. Supp. 3d at 13–14 (the Oversight Board can "bring before the Court challenges to the sufficiency and accuracy of documents as important as revenue estimates and certifications regarding significant inconsistencies with fiscal plans.").  Act 10 *is* significantly inconsistent with the Fiscal Plans' requirement the Energy Bureau be able to operate independently and "free from any direct or indirect political influence or interference."  SOF ¶¶ 45.  The AAFAF Certification does not even mention those requirements.  SOF ¶ 77.

While the AAFAF Certification does address the PREPA Fiscal Plan's provisions regarding the Act 17 Study and the net metering program, its assessment is patently defective.  The PREPA Fiscal Plan states unequivocally the Energy Bureau "must" complete the Act 17 Study and determine whether to make changes to the net metering program and initiate those changes by April 11, 2024.  By prohibiting the Energy Bureau from even conducting the Act 17 Study until January 2030 and from making changes to the net metering program before 2031 (at the earliest), Act 10 is significantly inconsistent with that provision in the PREPA Fiscal Plan.  Accordingly, AAFAF's suggestion that Act 10 is consistent with the PREPA Fiscal Plan because it "still requires [the Energy Bureau] to conduct the study, it just extends the date for doing so" is an inaccurate reflection of both the law and the PREPA Fiscal Plan.  SOF ¶ 78.  The Act 17 Study is not just a study, and Act 10 does not merely "extend[]" the deadline to complete the study.  The Act 17

---

[18] *See supra* n.9.

Study is the prerequisite for the Energy Bureau making any changes to the 1:1 net metering rate, and by changing the timing of the Act 17 Study, Act 10 effectively neuters the Energy Bureau's ability to regulate the net metering program until well into the next decade.

That is contrary to the PREPA Fiscal Plan's provisions regarding the Energy Bureau making changes to the program it deems appropriate by April 11, 2024.  The AAFAF Certification suggests that because the PREPA Fiscal Plan "does not include or require a change to the current net metering law or policy," Act 10, by prohibiting such changes, does not conflict.  SOF ¶ 78. That is manifestly incorrect.  While the PREPA Fiscal Plan leaves it to the Energy Bureau to make an independent and reasoned judgment about whether to make changes to the net metering program by April 11, 2024, Act 10 blocks the Energy Bureau from doing so.  It prohibits any changes to the 1:1 net metering rate until at least 2031, and then dictates that those changes cannot go into effect for another 12 months and that the changes cannot impact a whole host of customers until 2051.[19]  The notion that Act 10 is anything other than significantly inconsistent with the PREPA Fiscal Plan's provisions regarding changes to the net metering program strains credulity and is simply wrong.

Accordingly, it is indisputable that the Governor's Submission failed to include a certification compliant with § 204(a)'s requirements.

### C.   The Governor Failed to Correct the Submission's Deficiencies in Response to the Oversight Board's Direction.

On April 10, 2024, the Oversight Board notified the Governor and the Legislature, pursuant to § 204(a)(3), of the Governor's failure to provide a compliant estimate or certification and, pursuant to § 204(a)(4), directed the Governor to correct the deficiencies.  SOF ¶¶ 79–80.  It is

---

[19] It also goes without saying that characterizing Act 10's change to the Act 17 Study deadline as a mere "extension" is a gross understatement.  Act 10 changes the Act 17 Study deadline such that instead of being *completed* by April 2024, it *cannot commence* before January 2030.

indisputable that the Governor did not comply with the Oversight Board's direction to correct the Submission; he has not submitted a revised formal estimate or certification.  SOF ¶ 89.  Further, Act 10 has not been repealed or amended.  SOF ¶ 90.

### D.    Act 10 Should Be Nullified to Ensure Compliance with the Fiscal Plans.

Because the Governor failed to comply with the Oversight Board's direction pursuant to § 204(a)(4) to correct the deficiencies in his § 204(a) Submission, the Oversight Board is empowered to "take such actions as it considers necessary, consistent with [PROMESA], to ensure that the enactment or enforcement of the law will not adversely affect the [Commonwealth's] compliance with the Fiscal Plan, including preventing the enforcement or application of the law." PROMESA § 204(a)(5).  This provision "plainly empowers the [Oversight] Board to oversee Puerto Rico's legislative enactments and ensure their compliance with the Fiscal Plan from the moment of their enactment," and is one of several provisions in PROMESA that "confirm[] the [Oversight] Board's power to prevent laws inconsistent with PROMESA from taking effect, as well as [this Court's] concomitant authority to enforce the [Oversight] Board's mandates by nullifying such a law from its inception." *La Liga Appeal*, 110 F.4th at 325–26.

Act 10 directly contravenes the express terms of the Fiscal Plans, interfering with the Energy Bureau's independence by suspending its ability to make changes to the net metering program until at least 2031 and dictating that it extend the existing terms of the program for anyone participating in the program or certain potential participants as of the date it makes any changes for an additional 20 years (*i.e.*, until at least 2051).  As noted above, Act 10 requires PREPA to purchase electricity under the net metering program whether it needs it or not.  These requirements are also directly inconsistent with the PREPA Fiscal Plan, which requires the Energy Bureau to analyze the net metering program and make appropriate changes.  There is no way to remedy these inconsistencies with the Fiscal Plans without nullifying the law in its entirety.  Injunctive relief

alone will not suffice because Act 10 prevents the Energy Bureau from regulating rates for the net metering program for at least five years and then imposes restrictions on its ability to regulate the program.  This interference requires no additional Governmental action.  As such, the law is essentially self-implementing and enforcing.

Accordingly, nothing short of nullifying the law will lift the restrictions imposed by Act 10 on the Energy Bureau and the only method to ensure Act 10 will not adversely affect compliance with the 2024 Commonwealth Fiscal Plan and the PREPA Fiscal Plan is to nullify the law, just as this Court has already done three times before for violations of § 204(a).  *See Act 41*, 650 B.R. at 358 (nullifying *ab initio* Act 41 based on failure to comply with § 204(a)); *Act 7*, 634 B.R. at 202 (nullifying Act 7 based on failure to comply with § 204(a)); *Law 29 II*, 616 B.R. at 248 (deeming Law 29 "a nullity" where, *inter alia*, the Governor's formal estimate and certification did not meet the requirements of § 204(a)).

## **CONCLUSION**

For the foregoing reasons, the Oversight Board's motion for summary judgment should be granted and Act 10 nullified.

[*Remainder of Page Intentionally Left Blank*]

40

Dated: September 25, 2024
    San Juan, Puerto Rico

/s/ Miguel E. Gierbolini
Miguel E. Gierbolini
U.S.D.C. – P.R. No. 211,901
**GIERBOLINI & CARROLL LAW
OFFICES, PSC**
P.O. Box 9022936
San Juan, P.R. 00902-2936
Tel:  (787) 620-0685
Email:  miguelgierbolini@gmail.com

/s/ Martin J. Bienenstock
Martin J. Bienenstock (*pro hac vice*)
Timothy W. Mungovan (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900
Email:  mbienenstock@proskauer.com
       tmungovan@proskauer.com

/s/ Guy Brenner
Guy Brenner (*pro hac vice*)
**PROSKAUER ROSE LLP**
1001 Pennsylvania Ave., NW
Suite 600 South
Washington, DC 20004
Tel:     (202) 416-6800
Fax:     (202) 416-6899
Email: gbrenner@proskauer.com

*Attorneys for the Financial Oversight and
Management Board in its own right and as
representative of the Puerto Rico Electric
Power Authority*

## CERTIFICATE OF SERVICE

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

*/s/ Miguel E. Gierbolini*
Miguel E. Gierbolini