## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>    Debtor.[1] | **PROMESA**<br>**Title III**<br><br>**No. 17 BK 3283-LTS**<br>**(Jointly Administered** |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>    Debtor. | **PROMESA**<br>**Title III**<br><br>**No. 17 BK 4780-LTS**<br>**(Jointly Administered)** |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566- LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO,

      Plaintiff-Movant,

v.

HON. PEDRO PIERLUISI, in his official capacity as
Governor of Puerto Rico; and HON. JOSE LUIS DALMAU,
in his official capacity as President of the Senate of Puerto
Rico.

      Defendants-Respondents.

**Adv. Proc. No. 24-00062-LTS**

**STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**To the Honorable United States District Judge Laura Taylor Swain:**

Pursuant to Local Rule 56(b), applicable to this proceeding through Local Bankruptcy Rule 1001-1(d), Plaintiff the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") respectfully submits this Statement of Uncontested Material Facts in support of its Motion for Summary Judgment in the above-captioned adversary proceeding. The Oversight Board contends there is no genuine issue of fact to be tried with respect to these material facts.

## STATEMENT OF UNCONTESTED FACTS[2]

### A. PREPA and the Energy Bureau.

1.     PREPA was created in 1941. Mujica Decl. Ex. 2 at 23; Governor's Answer, ECF No. 28, ¶ 25; Senate President's Answer, ECF No. 31, ¶ 25.

2.     PREPA is the sole electric utility provider for Puerto Rico. Mujica Decl. ¶ 2 & Ex. 2 at 23; Governor's Answer, ECF No. 28, ¶ 25; Senate President's Answer, ECF No. 31, ¶ 25.

3.     The PREPA Fiscal Plan details PREPA's current challenges and the impact those issues have on the people of Puerto Rico and the Island's economy. Mujica Decl. ¶ 7.

4.     The PREPA Fiscal Plan focuses on the rehabilitation of both PREPA's financial position and its operations. Mujica Decl. ¶ 7.

5.     PREPA's customers pay substantially more for electricity than the average ratepayer in the mainland United States. Mujica Decl. ¶ 3 & Ex. 2 at 43; Senate President's Answer, ECF No. 31, ¶ 26; *see also* Governor's Answer, ECF No. 28, ¶ 26.

---

[2] All capitalized terms used herein have the meanings set forth and defined in the *Memorandum in Support of Financial Oversight and Management Board for Puerto Rico's Motion for Summary Judgment Pursuant to Bankruptcy Rule* 7056.

6.     PREPA provides among the least reliable, most volatile, and most fossil-fuel dependent electricity service among its peers.  Mujica Decl. Ex. 2 at 21; Senate President's Answer, ECF No. 31, ¶ 26; *see also* Governor's Answer, ECF No. 28, ¶ 26.

7.     PREPA's rates fluctuate due, in part, to PREPA's reliance on fossil fuels and changes in the price of oil.  Mujica Decl. Ex. 2 at 21, 36; Senate President's Answer; ECF No. 31, ¶ 26; *see also* Governor's Answer, ECF No. 28, ¶ 26.

8.     PREPA customers experience many more service interruptions than the median stateside customer.  Mujica Decl. ¶ 3 & Ex. 2 at 23–24; Senate President's Answer, ECF No. 31, ¶ 26; *see also* Governor's Answer, ECF No. 28, ¶ 26.

9.     In 2014, the Government enacted Act 57, also known as the Puerto Rico Energy Transformation and RELIEF Act.  Brenner Decl. Ex. 2 at 1; Governor's Answer, ECF No. 28, ¶ 28; Senate President's Answer, ECF No. 31, ¶ 28.

10.     The Government, in enacting Act 57, found in 2014 that, for most of its existence, PREPA was a "monopoly that regulate[d] itself" leading to "Puerto Rico being among the top U.S. jurisdictions with the highest energy cost."  Brenner Decl. Ex. 2 at Statement of Motives.

11.     Then-Senator Eduardo Bhatia authored Act 57.  Brenner Decl. Ex. 7.

12.     Then-Senator Eduardo Bhatia submitted written testimony to Congress in 2018 stating that:

a.     PREPA's problems were the result of "reckless governance of PREPA and the lack of serious leadership";

b.     PREPA had been exposed to "the negative dynamics of bureaucracy, patronage, corruption, political intervention, and special interests," and that "significant

energy decisions were taken, for decades, from the Governor's Office, using the

utility's governing board and executive directors as mere proxies"; and

    c.  the "main concept of Act 57 is that PREPA and other energy stakeholders on the

Island must conduct themselves in accordance with applicable energy policy and

regulation; **not** by the seasonal wishes or 'public policy' of the administration from

any political party in power."

Brenner Decl. Ex. 7 at 3–5 (emphasis in original).

    13.    Act 57 created the Energy Bureau (then known as the Puerto Rico Energy

Commission) as a "non-partisan, independent energy regulator, with fiscal autonomy from the

government."  Brenner Decl. Ex. 7 at 3; *see also* Brenner Decl. Ex. 2 at 9 (Act 57 establishing the

Energy Commission as an "independent government entity"); Senate President's Answer, ECF

No. 28, ¶ 29.

    14.    The Energy Bureau's mandate includes the duty to "[e]stablish and implement

regulations and the necessary regulatory actions to guarantee the capacity, reliability, safety,

efficiency, and reasonability of electricity rates of Puerto Rico . . . . "  *See* Brenner Decl. Ex. 2

§ 6.3(c); Senate President's Answer, ECF No. 28, ¶ 29.

### B.  Net Metering in Puerto Rico.

    15.    Net metering refers to the "policy that allows electricity customers with their own

generation capacity to be financially compensated for the energy they produce."  Brenner Decl.

Ex. 10 at Summary; *see also* Brenner Decl. Ex. 9 at 4; Mujica Decl. ¶ 10.

    16.    U.S. jurisdictions "differ in the way net metering customers are compensated."

Brenner Decl. Ex. 10 at 1.  Some net metering programs employ a method whereby "energy from

net metering capacity offsets energy consumed from the grid in a one-to-one fashion."  Brenner

3

Decl. Ex. 10 at 1; Mujica Decl. Ex. 9 at 4–5.  Others have "adopted alternative compensation approaches" to address concerns that "[i]f a sufficiently large number of customers participate in net metering, costs might increase for non-net metering customers in order to pay for the grid benefits."  Brenner Decl. Ex. 10 at 1; *see also* Mujica Decl. Ex. 9 at 14–16.  Those alternative methods include, among others, "a fixed charge to net metering customers' bills" or "avoided cost rates, which reflect primarily the utility's cost of producing electricity, and value of solar . . . rates, which additionally consider societal benefits such as reduced air emissions."  Brenner Decl. Ex. 10 at 2; *see also* Mujica Decl.  Ex. 9 at 14–16.

17.    Puerto Rico's net metering program was established in 2007 by Act 114 prior to the creation of the Energy Bureau.  *See* Brenner Decl. Ex. 1; Governor's Answer, ECF No. 28, ¶ 35; *see also* Senate President's Answer, ECF No. 31, ¶ 35.

18.    Under the net metering program established by Act 114, which remains essentially unchanged, program participants are "entitled to offset the energy they purchase from PREPA with the energy they export to the grid on a one-to-one basis, at the prevailing retail rate."  Brenner Decl. Ex. 1 at 45–46; Senate President's Answer, ECF No. 31, ¶ 37.

19.    Customers who export the same or more electricity to the grid than they consume from PREPA are charged only PREPA's monthly service fee (*i.e.*, their consumption or volumetric charges are zero).  Mujica Decl. ¶ 10 & Ex. 2 at 143–44; Senate President's Answer, ECF No. 31, ¶ 37.

20.    PREPA recoups its energy transmission costs through its volumetric (*i.e.*, usage) charges.  Mujica Decl. ¶ 10; *see also* Mujica Decl. Ex. 9 at 71.

21.     PREPA's fixed monthly charges are designed to recover PREPA's costs of producing electricity as well as the costs associated with operating and maintaining PREPA's transmission and distribution system.  Mujica Decl. Ex. 9 at 72.

22.     Net metering customers' use of green energy sources, such as solar, to produce electricity can also provide benefits, including reducing pollutants and greenhouse gases emitted from PREPA's fossil based generating units, as well as positive contributions to the achievement of Puerto Rico's renewable energy goals.  Mujica Decl. ¶ 10; *see also* Governor's Answer, ECF No. 28, ¶ 39.

23.     A report from the Congressional Research Service found "[n]et metering customers generate electricity for their own consumption, which reduces the amount of utility-provided electricity they need (and, consequentially, the utility's costs to produce electricity).  However, self-generation does not necessarily reduce the amount of other utility-provided services a customer uses (or, generally, the utility's costs to provide those services, such as maintaining the grid)."  Brenner Decl. Ex. 10 at 6.

24.     If not calibrated correctly, a net metering system could create greater inequality among customers.  For example, it could lead to significant costs shifts, where non-net metering customers (who may not have the funds to obtain solar panels or live in structures such as multiunit dwellings or urban areas that are not conducive to solar energy generation) essentially subsidize the costs of a utility's fixed costs for net metering users.  Mujica Decl. ¶ 10.

25.     Determining whether to maintain or modify Puerto Rico's current net metering program involves balancing many important, complex financial and policy factors.  Mujica Decl. ¶ 10; Governor's Answer, ECF No. 28, ¶ 39; Senate President's Answer, ECF No. 31, ¶ 39.

26.     On April 11, 2019, the Government enacted Act 17, known as the Puerto Rico Energy Public Policy Act of 2019.  Brenner Decl. Ex. 3; *see also* Senate President's Answer, ECF No. 28, ¶ 40.

27.     Among other things, Act 17 amended Act 114, and directed the Energy Bureau to "conduct a study, through an independent formal process and with participation of interested parties and the general public, to evaluate and consider the costs and benefits associated with . . . the net metering program . . . ."  Brenner Decl. Ex. 3 § 3.4(a).

28.     Act 17 required the Act 17 Study to be completed within five years of the effective date of Act 17 (*i.e.*, by April 11, 2024).  Brenner Decl. Ex. 3 § 3.4(a).

29.     Act 17 further empowered the Energy Bureau, following completion of the five-year study period (*i.e.*, April 11, 2024), to make decisions regarding the net metering program taking into account the results of the Act 17 Study, including establishing "appropriate values for distributed energy and energy storage systems in accordance with the study," and "determin[ing] exclusively" the "rate applicable to net metering customers."  Brenner Decl. Ex. 3 § 3.4(a–b).

30.     Act 17 provides that until the Energy Bureau completes the Act 17 Study and authorizes new net metering rates, the existing rate (*i.e.*, the 1:1 net metering rate) would remain in effect.  Brenner Decl. Ex. 3 § 3.4(b).

**C. The Fiscal Plans' Requirements Regarding the Energy Bureau's Independence and Net Metering.**

31.     On June 30, 2016, Congress enacted PROMESA to address the "fiscal emergency" in Puerto Rico that arose from a "combination of severe economic decline, and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing . . . ."  PROMESA § 405(m)(1).

6

32.     Congress created the Oversight Board for the purpose of providing a method for Puerto Rico to "achieve fiscal responsibility and access to the capital markets."  PROMESA § 101(a); *see also* Senate President's Answer, ECF No. 28, ¶ 30.

33.     To accomplish these statutory objectives, Congress encouraged the Oversight Board and the territorial government to work together to formulate and implement fiscal plans and budgets, PROMESA §§ 201–202, but granted the Oversight Board final say over such plans and budgets and prohibited the Governor and Legislature from enacting, implementing, and/or enforcing laws impairing or defeating the purposes of PROMESA as determined by the Oversight Board.  *See* PROMESA §§ 101, 104, 108(a)(2), 201(e)(2), 202(e)(3), 204.

34.     One purpose of the fiscal plans is to provide "a method" for the Commonwealth and covered territorial instrumentalities "to achieve fiscal responsibility and access to the capital markets."  PROMESA § 201(b).

35.     PREPA has been designated by the Oversight Board as a covered territorial instrumentality pursuant to PROMESA § 101(d).  Mujica Decl. ¶ 5.

36.     The PREPA Fiscal Plan states that "Puerto Rico's economic recovery depends on . . . a comprehensive transformation of its energy sector to deliver the safe, reliable, and affordable service that Puerto Rico's residents and businesses deserve."  Mujica Decl. Ex. 2 at 19.

37.     The 2024 Commonwealth Fiscal Plan states that "[t]he Commonwealth must continue its efforts to implement a comprehensive energy sector reform to enable a successful transformation and unlock the resulting growth from the 2024 Fiscal Plan projections."  Mujica Decl. Ex. 8 at 137.

38.     The PREPA Fiscal Plan states that "Puerto Rico's energy infrastructure lags national standards due to decades of operational and financial mismanagement." Mujica Decl. Ex. 2 at 21.

39.     The PREPA Fiscal Plan states that "[d]ecisions about the management of the Puerto Rican grid have historically been subject to political influence and instability, leading to high management turnover, discontinuity in capital investment plans, electric customer rates that were insufficient to cover operating and maintenance costs and the mounting costs of debt service." Mujica Decl. Ex. 2 at 36.

40.     The PREPA Fiscal Plan states that the "decision to transform Puerto Rico's energy system . . . was in large part an answer to this issue and to depoliticize decisions of the energy service." Mujica Decl. Ex. 2 at 36.

41.     Additional consequences of PREPA's politicized decision-making identified by the PREPA Fiscal Plan include: PREPA repeatedly "issu[ing] more debt to cover current debt service rather than [setting] rates at a level sufficiently high" to support its costs; "operat[ing] under a fiscal deficit since the early 2000s"; and "historically underinvest[ing]" in its electrical grid, resulting in "reliability metrics drastically lower than other U.S. peers." Mujica Decl. Ex. 2 at 36, 100.

42.     The 2020 PREPA Fiscal Plan states the transformation of Puerto Rico's energy sector into a "safe, reliable, affordable, modern system depends on the presence and active involvement of a rational, politically independent, and professionally supported regulator" whose determinations "should be free of any political influence or interference." Mujica Decl. Ex. 4 at 36.

8

43.     The October 2018 Commonwealth Fiscal Plan states that "[a] strong and independent regulator of the power sector is required and will additionally support the success of the power sector transformation" and is key to the "the long-term sustainability of Puerto Rico's energy sector."  Mujica Decl. Ex. 5 at 56.

44.     The 2021 Commonwealth Fiscal Plan states that "[a] strong and independent energy sector regulator is essential for injecting certainty and stability into the energy market, promoting much needed investments, and enforcing compliance with the energy sector transformation's objectives."  Mujica Decl. Ex. 6 at 129.

45.     The PREPA Fiscal Plan mandates the Energy Bureau "remain financially and operationally independent from the Commonwealth Government and its determinations must be free from any direct or indirect political influence or interference."  Mujica Decl. Ex. 2 at 74.

46.     The PREPA Fiscal Plan also states "[t]he focus in coming years will be continuing to support the independence of the regulator and enabling the regulator to execute on its mandate." Mujica Decl. Ex. 2 at 130.

47.     The 2024 Commonwealth Fiscal Plan deems the Energy Bureau an "essential component of the energy transformation reforms," as "the existence of an independent energy regulator is a necessary and common requirement to ensure properly functioning energy systems." Mujica Decl. Ex. 8 at 76.

48.     The 2024 Commonwealth Fiscal Plan states that "[the Energy Bureau's] independence, particularly in areas such as rate making . . . must not be subjected to political interference."  Mujica Decl. Ex. 8 at 76.

49.     The 2023 Commonwealth Fiscal Plan was in effect at the time Act 10 was enacted. Mujica Decl. Ex. 7.

50.     The 2023 Commonwealth Fiscal Plan states: "A strong and independent energy sector regulator is essential for injecting certainty and stability into the energy market."  Mujica Decl. Ex. 7 at vol. 3, p. 42.

51.     The 2019 PREPA Fiscal Plan lists the Act 17 Study as one of its "Key Regulator Issues and Requirements."  Mujica Decl. Ex. 3 at 48.

52.     The PREPA Fiscal Plan states that renewable distributed generation "provides benefits to rooftop solar customers," and that a "sub-optimal net metering program . . . may have unintended detrimental effects and risks, including an unequitable distribution of costs throughout the system."  Mujica Decl. Ex. 2 at 58.

53.     The PREPA Fiscal Plan notes that because LUMA is required "to purchase the excess energy produced by net metering customers at the prevailing energy rate, the effective cost to ratepayers of the renewable energy generated by net metering customers may be higher than the cost of purchasing that same quantity of electricity from other resources."  Mujica Decl. Ex. 2 at 58.

54.     The PREPA Fiscal Plan states that the cost to LUMA of the net metering program is "then passed on, in whole or in part, to all other remaining customers."  Mujica Decl. Ex. 2 at 58.

55.     The PREPA Fiscal Plan requires the Energy Bureau to "finalize the [Act 17] net metering and distributed generation study" by June 30, 2023 and "initiate a process for implementing recommendations and conclusions of the study and updating a net metering compensation and crediting structure, if it deems appropriate," by April 11, 2024, and lists the study and proposed new crediting structure as a regulatory milestone.  Mujica Decl. Ex. 2 at 58–59; *see also id.* at 52.

10

56.    The Energy Bureau engaged a consultant, KeyLogic Systems, LLC, to prepare the Act 17 study in 2023.  Mujica Decl. ¶ 13; Brenner Decl. Ex. 11.

**D.  Act 10-2024.**

57.    On January 10, 2024, the Governor signed Act 10 into law.  Mujica Decl. Ex. 10 at 5.

58.    Act 10 was enacted three months before Act 17's deadline for the Energy Bureau to complete the Act 17 Study and potentially announce changes to the net metering program. Brenner Decl. Exs. 4 at 5, 3 at 68–69.

59.    Act 10 provides the Energy Bureau may not commence the Act 17 Study on net metering until January 2030, which is more than five years after the study was required to be completed under Act 17.  Brenner Decl Exs. 4, § 1(a),  3 at 68–70.

60.    Act 10 provides the Energy Bureau cannot "make any determination related to the net metering program" until "after the study is concluded[.]"  Brenner Decl. Ex. 4, § 1(a).

61.    Act 10 provides any changes to the net metering rate structure can only take effect 12 months after the Energy Bureau decides to make any such changes.  Brenner Decl. Ex. 4, § 1(a).

62.    Act 10's provisions, taken together, mean that the "current net metering policy", including the 1:1 net metering rate structure, must remain in place until at least 2031.  Brenner Decl. Ex. 4, § 1(a).

63.    Act 10 provides that any customer with a contract, or who has a distributed generator installed and certified by a licensed professional and has notified the Energy Bureau of the installation at the time the Energy Bureau issues its final determination changing the net

metering rate structure must be entitled to enjoy the present 1:1 net metering rate for at least 20
years from the date of such final determination.  Brenner Decl. Ex. 4, § 1(a).

**E.  The Governor's Deficient § 204 Submission for Act 10.**

64.     On February 12, 2024, the Oversight Board received the Submission on behalf of
the Governor regarding Act 10, which consisted of:  (*i*) a Spanish-language copy of Act 10; (*ii*)
the AAFAF Certification; (*iii*) the OMB Attachment prepared in Spanish; and (*iv*) the Treasury
Attachment prepared in Spanish. Mujica Decl. ¶ 15 & Exs. 10, 11, 12, and 13; Brenner Decl. Exs.
4, 5, and 6.

65.     The OMB Attachment is a one-page document.  Brenner Decl. Ex. 5.

66.     The OMB Attachment states, in part, that after evaluating whether Act 10 "may
have a potential fiscal impact on the Expenditure Budget of the Government of Puerto Rico[,]" the
OMB determined Act 10 "would not have a fiscal impact and, if any, it would have a minimal
impact on the certified budget for the fiscal years 2023-2024."  Brenner Decl. Ex. 5 at 1.

67.     The OMB Attachment states that its findings regarding Act 10 do not "imply any
budgetary impact for the subsequent fiscal years contained in the Certified Fiscal Plan."  Brenner
Decl. Ex. 5 at 1.

68.     While the OMB Attachment references unspecified "corresponding evaluation and
analysis," it contains no reasoning, explanation, or financial calculation to support its conclusions.
Brenner Decl. Ex. 5.

69.     The Treasury Attachment "checks" three boxes, signifying the Treasury
Department examined the law after enactment, and concluded Act 10 "does not have a fiscal
impact," and "would not have an incremental effect" on the "FY 2023-2024 certified budget for"
an unspecified agency.  Brenner Decl. Ex. 6 at 1.  The Treasury Attachment only attempted to

address the impact of Act 10 for fiscal year 2023-2024, and did not attempt to examine the impact over the entire period covered by the Fiscal Plans.  Brenner Decl. Ex. 6.

70.     The Treasury Attachment includes no reasoning, explanation, or financial calculation to support the Treasury Department's conclusions.  Brenner Decl. Ex. 6.

71.     The Executive Order states, in part, that the OMB Director is the "sole official authorized to issue certifications of availability of public funds" and only OMB and the Treasury Department are charged with undertaking analyses of new laws to certify their estimated impacts on revenues and spending, as required under PROMESA § 204(a).  Brenner Decl. Ex. 8, § 2.

72.     In a letter dated June 16, 2023, AAFAF confirmed to the Oversight Board that, per the terms of the Executive Order, it does not conduct formal estimates for § 204(a) purposes, stating that "Treasury and/or OMB conduct the cost estimate analysis because those entities (not AAFAF) have the best information and expertise to determine a new law's effects on Government expenditures and revenues."  *See* Mujica Decl. Ex. 14 at 2.

73.     The OMB Attachment does not contain the certification that Act 10 is or is not significantly inconsistent with any fiscal plan.  *See* Mujica Decl. Ex. 12 (Spanish-Language OMB Attachment); Brenner Decl. Ex. 5 (Certified English Translation of OMB Attachment).

74.     The Treasury Attachment does not contain a certification that Act 10 is or is not significantly inconsistent with any fiscal plan.  *See* Mujica Decl. Ex. 13 (Spanish-Language Treasury Attachment); Brenner Decl. Ex. 6 (Certified English Translation of Treasury Attachment).

75.     The Treasury Attachment has "check boxes" for the Treasury Department to certify that the law is or is not "significantly inconsistent with the Certified Fiscal Plan," but neither of the check boxes for certifying consistency with the Fiscal Plan is checked.  Mujica Decl. Ex. 13

13

(Spanish-Language Treasury Attachment) at 2; Brenner Decl. Ex. 6 (Certified English Translation of Treasury Attachment) at 2.

76.     The AAFAF Certification includes the following statement:   "Act 10 is not significantly inconsistent with the provisions of the [2023] Certified [Commonwealth] Fiscal Plan and PREPA's Certified Fiscal Plan."  Mujica Decl. Ex. 11 at 6.

77.     The AAFAF Certification does not address the Fiscal Plans' requirements concerning the Energy Bureau's independence.  Mujica Decl. Ex. 11.

78.     The AAFAF Certification states that Act 10 still requires [the Energy Bureau] to conduct the study, it just extends the date for doing so" and the PREPA Fiscal Plan "does not include or require a change to the current net metering law or policy."  Mujica Decl. Ex. 11 at 6. AAFAF concluded Act 10 will have no fiscal impact on PREPA because to meet the PREPA Fiscal Plan's projected rate of new interconnected net solar metering capacity, AAFAF claims the current rate of growth must be maintained, and assumes the only way that can happen is if the current net metering program is continued without changes—but provides no explanation for why its conclusions and assumptions should be credited and what AAFAF did to test its hypothesis. *Id.* at 5.

**F.  The Oversight Board Notifies the Governor and the Legislature of the Deficiencies in the § 204(a) Submission and Directs the Governor to Correct Them; The Governor Fails to Do So.**

79.     In a letter dated April 10, 2024, the Oversight Board provided AAFAF, the Governor, and the Legislature with its assessment of the Submission and, pursuant to PROMESA § 204(a)(3)(A–B), a notification that the Governor had not provided the required formal estimate and certification.  Mujica Decl. ¶ 18 & Ex. 15.

80.     In its April 10, 2024 letter, pursuant to PROMESA § 204(a)(4)(A), the Oversight Board directed the Governor to submit a revised submission, including a formal estimate and a

certification in compliance with the requirements of PROMESA § 204(a)(2), by April 19, 2024. Mujica Decl. ¶ 19 & Ex. 15 at 6.

81.    In its April 10, 2024 letter, the Oversight Board also requested confirmation by April 15, 2024, that the Government would repeal or amend Act 10 and further requested a "concrete plan and timeline for doing so."  Mujica Decl. ¶ 19 & Ex. 15 at 6.

82.    AAFAF responded to the Oversight Board's April 10, 2024 letter in a letter dated April 15, 2024, stating, in part, that the "Government understands the Oversight Board's concerns expressed in the [April 10] Letter" and that it would "assess[] any potential changes to the 204 Submission, or to Act 10, (if any) that may be warranted in order to implement [Act 10] in a manner not significantly inconsistent with PREPA's Certified Fiscal Plan."  Mujica Decl. ¶ 20 & Ex. 16 at 2.  It further claimed that conducting the formal estimate required by PROMESA § 204(a) "represents the functional equivalent of completing the [net metering] Study, which the Government acknowledges is [the Energy Bureau's] responsibility given its expertise and unique role as PREPA's independent regulator."  Mujica Decl. Ex. 16 at 2.  It further suggested that AAFAF's analysis of PREPA Fiscal Plan projections was a suitable formal estimate.  *Id.*

83.    In AAFAF's April 15, 2024 letter, it requested the Oversight Board "provide" an unspecified amount of "additional time" to conduct its assessment of "any potential changes to the 204 Submission, or to Act 10, (if any) that may be warranted in order to implement [Act 10] in a manner not significantly inconsistent with PREPA's Certified Fiscal Plan."  Mujica Decl. ¶ 20 & Ex. 16 at 2.

84.    The Oversight Board responded to AAFAF's April 15, 2024 letter in a letter dated May 2, 2024, in which it, among other things, reiterated its concerns and noted that AAFAF's

letter did not "resolve the issues raised by the Oversight Board" regarding Act 10.  Mujica Decl. ¶ 21 & Ex. 17 at 1.

85.    In its May 2, 2024 letter, the Oversight Board requested the Governor "take immediate action and work with the [Legislature] to repeal or amend Act 10 to restore [the Energy Bureau's] full statutory oversight over Puerto Rico's energy system."  Mujica Decl. ¶ 21 & Ex. 17 at 2.

86.    In its May 2, 2024 letter, the Oversight Board requested that such "legislation to repeal or amend" the provisions of Act 10 "be introduced in the Legislature no later than May 7, 2024"—the last day to introduce legislation for consideration in the then-current legislative session—"and enacted no later than June 30, 2024" to "restore [the Energy Bureau's] full statutory oversight over Puerto Rico's energy system."  Mujica Decl. ¶ 21 & Ex. 17 at 2.

87.    In its May 2, 2024 letter, the Oversight Board offered to "work with" the Government to "ensure the issues with Act 10 are fully resolved."  Mujica Decl. ¶ 21 & Ex. 17 at 2.

88.    In a letter dated May 7, 2024, AAFAF responded to the Oversight Board, requesting that the Legislature be given "additional time within the current legislative session that ends on June 30, [2024] to consider the Oversight Board's objections, engage in discussions and address potential amendments to Act 10 through the legislative process" and "gather industry feedback" in order to make an "informed decision regarding Act 10."  Mujica Decl. ¶ 22 & Ex. 18 at 1–2.

89.    As of September 25, 2024, the Governor has made no additional submissions pursuant to § 204(a) with regard to Act 10.  Accordingly, he has failed to comply with the

Oversight Board's direction, made on April 10, 2024, to provide a compliant formal estimate and certification for Act 10.  Mujica Decl. ¶ 24.

90.     As of September 25, 2024, no legislation has been passed repealing or amending Act 10.  Mujica Decl. ¶ 23.

**G.  The Oversight Board's § 108(a)(2) Determinations.**

91.     After Act 10's enactment, the Oversight Board and its advisors examined the law. Mujica Decl. ¶ 25.

92.     On April 5, 2024, based on its review and analysis, the Oversight Board determined Act 10 impairs or defeats PROMESA's purposes of achieving fiscal responsibility and access to capital markets for multiple independent reasons, including because Act 10:

a.  "directly contravene[es] the express terms of the [PREPA Fiscal Plan and the 2023 Commonwealth Fiscal Plan], which require [the Energy Bureau] to be political independent";

b.  violates the express terms of the PREPA Fiscal Plan, which requires the Energy Bureau to conduct and "complete its net metering study and implement any changes to PREPA's net metering program it deems appropriate by April 11, 2024"; and

c.  "impairs the Oversight Board's ability to carry out its statutory duties under PROMESA § 201(b)(1)(B), (G), (H), and (J) to ensure funding of the essential public service of reliable electricity, to enable the achievement of fiscal targets, to create independent revenue forecasts, and to provide for capital expenditures and investments necessary to promote economic growth."

Mujica Decl. Ex. 19 at 3.

93.     The Oversight Board memorialized its determination in the April Resolution passed on April 5, 2024, which concluded, in part, that Act 10 "violates the Fiscal Plans by interfering with [the Energy Bureau's] independence [and] by imposing numerous decisions upon [the Energy Bureau] regarding net metering," including by "prohibiting it from making any changes to PREPA's net metering policy until at least 2031, and [] mandating that it establish a legacy program providing PREPA net metering customers and other eligible customers with the current net metering program's terms through at least 2051." Mujica Decl. Ex. 19.

94.     The Oversight Board informed the Governor, Senate President, and Speaker of the House of Representatives of its April 5, 2024 determination and concerns regarding Act 10 in a letter dated April 8, 2024. Mujica Decl. ¶ 27 & Ex 20. The Oversight Board issued a corrected version of its April 8, 2024 letter on April 10, 2024, adding additional detail regarding Act 10's inconsistency with the PREPA and Commonwealth Fiscal Plans requirements for the Energy Bureau's political independence and the PREPA Fiscal Plan's requirements as to net metering, and providing the Governor more time to respond. Mujica Decl. ¶ 28 & Ex. 15.

95.     On June 5, 2024, the Oversight Board certified the 2024 Commonwealth Fiscal Plan. Mujica Decl. ¶ 29 & Ex. 8.

96.     The 2024 Commonwealth Fiscal Plan includes similar provisions to the 2023 Commonwealth Fiscal Plan regarding the need for the Energy Bureau to operate independently and without political interference. Mujica Decl. ¶ 30 & Ex. 8 at 76, 140.

97.     On June 21, 2024, the Oversight Board again determined that Act 10 impairs or defeats the purposes of PROMESA for the same reasons set forth in the April Resolution but taking into account the certification of the 2024 Commonwealth Fiscal Plan and the Governor's deficient PROMESA § 204(a) Submission and failure to comply with the Oversight Board's direction to

correct the deficiencies, and memorialized its decision in the June Resolution.  Mujica Decl. ¶ 31 & Ex. 21.

### H.  The Energy Bureau Publishes a Draft Study on Net Metering.

98.     On June 14, 2024, the Energy Bureau approved a resolution authorizing the publication of an 82-page Draft Study on net metering and distributed energy.  Mujica Decl. ¶ 14 & Ex. 9; Brenner Decl. Ex. 9.

99.     The Energy Bureau Resolution references the requirement to conduct the Act 17 Study, but notes the requirement was amended by Act 10.  Brenner Decl. Ex. 9.

100.     The Energy Bureau Resolution references the requirement to conduct the Act 17 Study, but notes the requirement was amended by Act 10, and further states that the Energy Bureau would publish the Draft Study pursuant to the Energy Bureau's "broad delegated powers and duties" under Act 57, and not Act 114, as amended by Act 17.  Brenner Decl. Ex. 9.

101.     The Draft Study was prepared by KeyLogic Systems, a company engaged by the Energy Bureau to conduct the Act 17 Study, and includes an analysis of net metering programs generally, the experience with such programs in different states, and Puerto Rico's program. Mujica Decl. Ex. 9.

102.     The Draft Study finds that "as the penetration of [net energy metering] increases, so will the need to consider alternative pricing approaches along with technical provisions that govern when and how power is exported into the grid" and concludes that "Puerto Rico will find [net metering] uns[us]tainable in the long-run" and "[n]ew methods need to be explored and adopted."  Mujica Decl. Ex. 9 at 3, 82.

[*Remainder of Page Intentionally Left Blank*]

19

Dated: September 25, 2024
    San Juan, Puerto Rico

*/s/ Miguel E. Gierbolini*
Miguel E. Gierbolini
U.S.D.C. – P.R. No. 211,901
**GIERBOLINI & CARROLL LAW
OFFICES, PSC**
P.O. Box 9022936
San Juan, P.R. 00902-2936
Tel:   (787) 620-0685
Email:  miguelgierbolini@gmail.com

*/s/ Martin J. Bienenstock*
Martin J. Bienenstock (*pro hac vice*)
Timothy W. Mungovan (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900
Email:  mbienenstock@proskauer.com
       tmungovan@proskauer.com

*/s/ Guy Brenner*
Guy Brenner (*pro hac vice*)
**PROSKAUER ROSE LLP**
1001 Pennsylvania Ave., NW
Suite 600 South
Washington, DC 20004
Tel:     (202) 416-6800
Fax:     (202) 416-6899
Email:  gbrenner@proskauer.com

*Attorneys for the Financial Oversight and
Management Board in its own right and as
representative of the Puerto Rico Electric
Power Authority*