# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>Debtor.1 | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>                              Debtor. | PROMESA<br>Title III<br><br>Case No. 17 BK 4780-LTS |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>Plaintiff,<br><br>v.<br><br>HON. PEDRO PIERLUISI, in his official capacity as Governor of Puerto Rico,<br><br>                              Defendant. | Adv. Proc. No. 24-00062-LTS in 17 BK 4780-LTS |

**JOINT AMICUS CURIAE BRIEF ON BEHALF OF
SOLAR UNITED NEIGHBORS AND SIERRA CLUB**

**TO THE HONORABLE DISTRICT COURT:**

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's Federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 04780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**COMES NOW** Solar United Neighbors ("SUN") and Sierra Club's Puerto Rico Chapter ("Sierra Club") as friends of the Court, and through the undersigned counsel, respectfully allege, state, and pray as follows:

### RELEVANT PROCEDURAL BACKGROUND

1. On July 26, 2024, the Financial Oversight and Management Board for Puerto Rico ("Oversight Board") filed the captioned *Complaint* against Pedro Pierluisi, in his official capacity as Governor of Puerto Rico ("Governor") for the annulment of Act No. 10-2024 ("Act 10"). **Case No. 3:24-AP-00062 (LTS), ECF No. 1.**

2. On August 8, 2024, the Oversight Board and the Defendant filed a joint motion with a proposed schedule. **ECF No. 5, corrected at 7.** On August 9, 2024, the Court issued its *Order setting expedited schedule* ("Expedited Schedule"). **ECF No. 6.**

3. Pursuant to the *Expedited Schedule*, on September 3, 2024, Movants filed a *Petition for Intervention*. **ECF. No. 13.** On September 25, 2024, the Court denied the intervention. **ECF No. 41.** However, the Court allowed SUN and Sierra to file a joint amicus brief that may not exceed fifteen pages by October 23, 2024. **ECF No. 41 at 15.**

### INTEREST OF SUN AND SIERRA CLUB IN THE ACTION

4. SUN is a non-profit organization focused on fostering a clean and equitable energy system through solar initiatives. With a vision of empowering local communities, SUN has successfully assisted over 10,000 homes and organizations nationwide in adopting solar energy, totaling 90 MW of capacity. In Puerto Rico, SUN organizes bulk purchases of solar systems and develops Resilience Hubs in vulnerable areas, enhancing community resilience during natural disasters. The organization has also secured significant funding for low-cost solar projects, impacting over 50,000 solar supporters across the island. Its efforts aim to democratize energy access while creating a sustainable energy future. The annulment of Act 10 poses serious risks to SUN's initiatives and the broader solar

2

landscape. This legislation is crucial for maintaining stable net metering policies, which directly affect the affordability and feasibility of solar installations.

5. Sierra Club, a prominent environmental organization, shares these concerns, advocating for renewable energy transitions to reduce fossil fuel reliance and protect local communities from pollution. The annulment of Act 10 would hinder progress toward renewable energy goals, jeopardize federal funding opportunities, and exacerbate energy inequality. Both SUN and the Sierra Club emphasize the importance of maintaining Act 10 to ensure continued growth in solar energy and compliance with the renewable energy targets.

6. In view of the foregoing, SUN and Sierra Club jointly file this brief in support of the *Motion for Summary Judgment of the Senate of Puerto Rico*, **ECF No. 42**, particularly with regard to the arguments presented in Section B of the Senate's arguments. **ECF No. 42 at 9-11. As such, for the purpose of this brief, SUN and Sierra Club rely on the** *Statement of Uncontested Material Facts in Support of the Senate's Motion for Summary Judgment*, **ECF. No. 43,** (herein "SUMF") with which the appearing parties agree.

## DISCUSSION

7. The appearing parties are disappointed to find that the efforts to pass Act 10 may reach a dead end in this Court where so many other laws have perished at the hands of the Oversight Board. This time, clearly, to appease the Puerto Rico Electric Power Authority's ("PREPA") creditors by promising increased revenues, however speculative and unsustainable that promise may be.

8. The current net metering policies are determined by Puerto Rico's democratically elected representatives and supported by grassroots organizations such as SUN and Sierra Club. They have the feedback of the Puerto Rico Energy Bureau ("PREB") and align existing laws and policies. They exist for the benefit of the people of Puerto Rico, to foster

3

environmentally sound practices and promote a level of energy resilience that PREPA is unable to provide, and which increased revenues for bondholders will not achieve.

9. Under the guise of procedural noncompliance, the Oversight Board is attempting to apply pressure against current net metering policies without concern for the effects that will have on third parties or the populace. Moreover, the Oversight Board's actions border the most absurd form of micromanagement: **<u>a simple date change is the object of litigation to annul a revenue neutral law</u>**. Everything else the Oversight Board takes issue with was already part of Act 114, not a product of Act 10. To say that this case is easily distinguishable from every other instance where this Court has ruled in favor of the Oversight Board and annulled a Puerto Rico law would be an understatement and can only highlight the level to which this action is, not only arbitrary and capricious, but petty.

10. This Court must determine whether the Oversight Board's effort to annul Act 10 under Section 108 of PROMESA is arbitrary and capricious. While Section 108 prohibits Commonwealth laws that impair or defeat PROMESA's purposes, such determinations must be grounded in rationality and supported by substantial evidence. <u>Pierluisi v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)</u>, 37 F.4th 746, 752 (1st Cir. 2022). The challenge to Act 10, which merely extends the deadline for a renewable energy study, lacks this necessary evidentiary support. The amendment does not alter any substantive policy or affect the fiscal plan. The Oversight Board's actions amount to an overreach that undermines both the legislative process and Puerto Rico's energy goals. As this Court has previously held, any determination under Section 108 must be rational and supported by substantial evidence. The Oversight Board's decision here, however, ignores the factual record and extrapolates an affront to PROMESA from a simple date change—an act that exemplifies arbitrary and capricious decision-making.

    A. **<u>THE OVERSIGHT BOARD'S ARGUMENTS UNDER COUNT I ARE ARBITRARY AND CAPRICIOUS.</u>**

4

11. To justify a Section 108 claim, the Oversight Board misstates the effect, content and scope of Act 10's amendment to Act 114. Additionally, the Oversight Board claims interference with PREB's independence, whereas PREB itself does not.

12. Section 108 of PROMESA establishes that the Government may not "enact, implement, or enforce any statute . . . that would impair or defeat the purposes of [PROMESA], as determined by the Oversight Board." 48 U.S.C. § 2128(a)(1). However, this power is not absolute. Those "determinations that Commonwealth laws impair or defeat the purposes of PROMESA are reviewed under the 'arbitrary and capricious' standard typically used to review federal agency decisions." Pierluisi v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 37 F.4th 746, 752 (1st Cir. 2022)(citation omitted). Under this standard, the Court "must decide whether the Oversight Board's determinations were supported by a rational basis and must affirm its decisions if they are reasoned and supported by substantial evidence in the record." Id. (citation omitted).

13. Act 114 was enacted on August 16, 2007. **See ECF No. 1, Ex. 5.** Its purpose was to stimulate energy production through renewable resources, a solution to Puerto Rico's energy problems that was adjusted to its geographic and climate realities. **See ECF No. 1, Ex. 5 at 1.** Act 17 was enacted on April 11, 2019. **See ECF No. 1, Ex. 6.** Among other things, Act 17 established the Renewable Portfolio Standard for each calendar year between 2015 and 2050. **See ECF No. 1, Ex. 6 at 83.** According to this, by 2022 the Required Renewable Energy Percentage was 20%. Between 2023 and 2025, it was 40%. **See ECF No. 1, Ex. 6 at 83.** This standard was accompanied by amendments to Act 114 which included adding the following language:

> The Energy Bureau is hereby directed to conduct a study, **through an independent formal process and with participation of interested parties and the general public**, to evaluate and consider the costs and benefits associated with: (1) the net metering program, (2) distributed generation technologies, (3) small scale solar energy projects, (4) energy storage systems. Said study must be **completed within five (5) years as of the effective date of**

5

>  the Puerto Rico Energy Public Policy Act, **shall be subject to public comment,** . . . **Five (5) years after the approval** of the Puerto Rico Energy Public Policy Act, the Bureau **may** issue any determination concerning the net metering program while taking into account the results of such study. . . .
>
> . . . . . . . .
>
>  Once the aforementioned five (5)-year term has elapsed, the rate applicable to net metering customers, including the rate or mechanisms through which customers shall be compensated for the energy they supply to the electric power grid, shall be determined exclusively by the Energy Bureau as part of the electric power service rate review process provided in Act No. 57-2014, or through a separate administrative process when deemed necessary or convenient. Any determination regarding the net metering program shall take effect within the term provided by the Bureau.
>
>  **Any customer that, on the date in which the Bureau issues its final determination, has a net metering contract or has notified the Bureau about the certification** of the distributed generator installed by a professional engineer or expert electrician, both members of their professional associations and admitted to the practice of their profession, **shall be automatically grandfathered as a net metering customer under the rate in effect before the Bureau's final determination.**
>
>  In such cases, the net metering customer shall have the right to the rate or compensation mechanism in effect at the **time for a term of not less than twenty (20) years as of the execution of the net metering contract**. However, the net metering customer shall be entitled and may opt to avail himself of the new rate or compensation mechanism approved by the Bureau. **ECF No. 51, Ex. 4 at 50 (certified translation)(emphasis added).**

14. **As seen above at the time that Act 17 was enacted, the five-year mark would have fallen in the period of time where Puerto Rico would have to meet at least a 25% Renewable Energy Percentage.** Pursuant to its legislative history, Act 10 recognized that the five-year period included in Act 17 when it amended Act 114 **was based on those proposed renewable energy goals**. In fact, the PREB participated in that process, did not object and its insight was instrumental. **SUMF ¶ 7.**

    Because it understood that a benefit could be obtained from having a specific date for conducting the net metering study, the PREB suggested "to reach consensus as to the date on which the study should be carried out, based on the different contributions, suggestions and recommendations from all sectors, including industry and the Puerto Rican people." **SUMF ¶ 8 (citation omitted).**

15. The Report concludes as follows:

    > In order not to weaken the net metering program, it is necessary to amend Article 4 of Law 114-2007. The study mandated by said Article is supposed to be conducted in April 2024, that is, 5 years after the approval of

6

Act 114-2007. **When that term was established, it was thought that, at the end of those 5 years, Puerto Rico would be above 25% of distributed renewable energy generation. We are far from that. As of today, we barely surpass 3% of distributed solar energy generation.**

Therefore, by amending Article 4 of Act 114-2007, as proposed in the amended bill, **we give until the year 2030 for the net metering rate to remain unchanged. According to the information provided by the Bureau, the interconnection rate of distributed solar systems would reach about 2500 MW of distributed renewable energy generation by 2030, which would be equivalent to 25% of Puerto Rico's energy consumption**. ECF No. 18, Ex. 1 (certified translation)(emphasis added).

16. The amendment, without the PREB's objection and incorporating its suggestion, modified the date to 2030 **because of the expected energy goals**. This is not a substantive change, nor a policy change. **This is a recognition of the reality of how behind Puerto Rico is to meet the Required Renewable Energy Standards in Act 17, which the Fiscal Plan is based on**. Every other provision that the Oversight Board challenges regarding the time limits and grandfathered contracts was already a part of Act 114 as amended by Act 17 and not properly before this Court to annul under the Oversight Board's powers.

17. **Act 10 does nothing more than to change a date and extend the period for the PREB to do its study, in order to comply with the original goals and expectations of Act 114 and Act 17**. It does not deprive the PREB of any powers or abilities, it merely provides the PREB space and time to do the work as Act 17 intended, when the renewable energy goals were on track. Furthermore, if PREB thought Act 10 infringed upon its independence, it could have said so in its participation. However, instead, PREB guided the legislature.

18. The Oversight Board's attempt to annul Act 10 constitutes a direct interference with the independence of the PREB. Act 10 simply extends the deadline for PREB to complete its study on net metering, a decision that PREB itself supported. By seeking to annul this extension, the Oversight Board is undermining PREB's ability to carry out its regulatory functions independently and consciously.

7

19. The Oversight Board's actions effectively attempt to force PREB into a rushed decision-making process that is not aligned with the realities of Puerto Rico's renewable energy goals, thereby limiting PREB's authority to regulate the energy sector on its own terms. This interference is contrary to the Oversight Board's claim that it seeks to protect PREB's independence. In reality, it is the Oversight Board, not Act 10, that is constraining PREB's power by denying it the flexibility to responsibly manage the net metering program and energy policy without undue external pressure.

20. The Fiscal Plan required that PREB complete a study and implement changes by April 11, 2024, only because Act 17 said so. **Act 17 adopted this date based on tangible factors, not arbitrarily. Thus, the Oversight Board cannot arbitrarily claim a date established by law in the Fiscal Plan to defeat the purpose of the law itself.**[2] Moreover, it should be noted that Act 10 promotes the renewable energy policy that is also part of the Fiscal Plan.

21. In truth, Act 10 does not impair the Oversight Board's ability to do anything. The Oversight Board's challenge can only be described as seeming to be a tantrum resulting from not getting its way immediately. The Oversight Board speculates that PREB is going to immediately change net metering in a way that would increase revenues to be promised to PREPA's creditors and is unwilling to wait. Clearly it is the Oversight Board that is attempting to use this case as a subterfuge to pressure PREB into action whether or not the agency is ready to take such actions.

22. As such, there is no true justification for why the Oversight Board is dead set against a date change that aligns with Act 17 and the realities of renewable energy adoption. Its objection is arbitrary and capricious. Perhaps it is from the Oversight Board that PREB truly needs protection so it may work independently, without outside pressures.

---

[2] It should be noted that this is not the first time the Oversight Board plays with the Fiscal Plan to interfere with existing laws. See, for example, the removal of the 20 cent per kilowatt hour threshold in the 2018 PREPA Fiscal Plan which was removed after it was adopted in Act 17, so as to justify the preemption of that provision in the Plan of Adjustment.

8

23. It is the Oversight Board that is improperly intervening in the solar market and energy public policy. Act 10 is only the Legislature's attempt to maintain the status quo while the PREB is able to responsibly carry out its duties and comply with that public policy.

24. Furthermore, any arguments that the Oversight Board raises against the current net metering policy **are immaterial, speculative and premature.** The Oversight Board's action is not asking to annul the current policy, it is asking to annul a law that changes a date. If the Oversight Board finds that the interests that other parties have in maintaining the current policy are not before the Court, then it cannot raise its interest in getting rid of that policy in the same breath. It cannot have its cake and eat it too. However, to the extent that this Court decides to consider those arguments, it must have a fuller picture.

### B. THE OVERSIGHT BOARD'S POSITION ON CURRENT NET METERING POLICY IS NOT FACT AND DOES NOT REPRESENT THE WHOLE PICTURE.

25. The Oversight Board attempts to pass off its position on the current net metering policy as fact by including it in its uncontested facts. However, these points are largely incomplete and hardly uncontested.

26. For instance, the Oversight Board notes that net metering ". . . can also provide benefits, including reducing pollutants and greenhouse gases emitted from PREPA's fossil based generating units, as well as positive contributions to the achievement of Puerto Rico's renewable energy goals." **ECF No. 47 ¶ 22.** The wording used by the Oversight Board detracts from the fact that these benefits are known, not hypothetical. Additionally, it omits the numerous additional benefits that go directly to the financial aspects such as resiliency, cost savings, job creation, etc. The Oversight Board presents as an undisputed fact an appreciation that is not based on technical expertise and represents a fundamental

9

misunderstanding of the importance of net metering for the millions of people facing the current energy crisis in Puerto Rico.[3]

27. Net metered solar installations with battery storage provide critical generation capacity that prevents daytime blackouts and strengthens reliability of the grid with zero fuel costs.[4] Today, most net metered solar systems also include battery storage. There are now over 128,000 net-metered solar installations accounting for over 890 MW of generating capacity.[5] Taken as a whole, the 890 MW of net metered solar using a free, local fuel source would account for what is Puerto Rico's third largest "power plant" behind the Aguirre power plant (1,534 MW) and Costa Sur power plant (990 MW). In simple terms, the power produced by net metered solar and storage installations provides much-needed power capacity to meet electricity demand when Puerto Rico's aging fleet of power plants are struggling to meet demand.

28. Net metering facilitates a vast majority of the lifesaving solar and battery backup needed to save lives and keep homes, businesses and non-profits operational during the frequent grid outages. The solar industry estimates that more than 80% of the net metered solar installations couple battery storage with solar installations for backup power.[6] Providing

---

[3] GABEL ASSOCIATES INC., VALUE OF NET METERED SOLAR ENERGY IN PUERTO RICO (2024)(*available at* https://gabelassociates.com/wp-content/uploads/2024/04/Gabel-Associates-Puerto-Rico-Value-of-Solar-NM-English-04.16.24.pdf); ENVIRONMENT AMERICA & FRONTIER GROUP, THE TRUE VALUE OF SOLAR: MEASURING THE BENEFITS OF ROOFTOP SOLAR POWER (2019)(*available at* https://publicinterestnetwork.org/wp-content/uploads/2022/08/AME20Rooftop20Solar20Jul1920web-1.pdf); Koami Soulemane Hayibo & Joshua M. Pearce, *A review of the value of solar methodology with a case study of the U.S. VOS*, RENEWABLE AND SUSTAINABLE ENERGY REVIEWS, Vol. 137 (2021).
[4] LUMA, BATTERY EMERGENCY DEMAND RESPONSE PROGRAM (2023)(*available at* https://lumapr.com/wp-content/uploads/2023/09/Battery-Emergency-DR-Program-Guidelines-V1.0.pdf); *Sunrun's 'PowerOn Puerto Rico' Virtual Power Plant Helps Island Avoid Rolling Blackouts*, SUNRUN (2024)(*available at* https://investors.sunrun.com/news-events/press-releases/detail/310/sunruns-poweron-puerto-rico-virtual-power-plant).
[5] *Motion submitting Interconnections Progress Report for April through June 2024 and Supporting Materials,* submitted by LUMA in Case No. NEPR-MI-2019-0016 *(available at* https://energia.pr.gov/wp-content/uploads/sites/7/2024/08/20240815-MI20190016-Motion-Subm.-Interconnections-Prog.-Report-for-April-through-June-2024-and-Supp.-Materials.pdf).
[6] William Driscoll, *Puerto Rico distributed solar rises to 680 MW, residential storage to 1.6 GWh*, PV Magazine, https://www.pv-magazine.com/2024/02/15/puerto-rico-distributed-solar-rises-to-680-mw-residential-storage-to-1-6-gwh/ (February 15, 2024).

net metering and ensuring a strong, fair credit for the solar energy provided to the grid by distributed solar systems is essential to increasing access to solar. Especially considering that Puerto Ricans do not have access to any tax credits or other incentives as many Americans do (except for a few specific, limited federal grant programs). Net metering is one of the only Puerto Rican energy policies facilitating more distributed solar and storage.

29. The Oversight Board's portrayal of the current net metering policy as solely a cost is an oversimplification that disregards the comprehensive benefits provided by the policy, including financial, environmental, and grid stability advantages.[7] Importantly, the Oversight Board has not presented any concrete evidence to support its claim that Act 10, which merely extends the deadline for a study on net metering, is anything but revenue-neutral. The extension of this deadline does not modify the existing net metering framework or alter any financial obligations, meaning that it does not create any new expenses or revenues that could impact PREPA's fiscal projections or the certified Fiscal Plan.

30. Without any data or analysis to suggest that the study extension will generate additional costs or reduce revenues, the Oversight Board's assertion that Act 10 has any fiscal impact remains speculative and unsubstantiated. Moreover, the relevant governmental entities, including the Puerto Rico Treasury Department and the Office of Management and Budget, have certified that Act 10 has a neutral fiscal impact. Therefore, the Oversight Board's attempt to annul the law based on an unsupported fiscal argument is both factually unfounded and legally unsustainable. In the absence of any credible information to the contrary, Act 10 must be treated as revenue-neutral, and its annulment cannot be justified.

### C. THE OVERSIGHT BOARD'S RELIANCE ON THE PREB DRAFT STUDY IS MISPLACED AND MISLEADING.

---

[7] Id.

31. The Oversight Board relies heavily on the PREB's June 14 draft study to establish that, in fact, Act 10 infringes on the PREB's independence and that in absence of Act 10 the PREB would undoubtedly change the net metering policy. **ECF No. 47, ¶¶ 98-102.**

32. The Court should note that the draft study is dated months after the deadline that the Oversight Board wants to uphold, and it does not meet the public comment requirements of Act 114 and Act 17. **ECF No. 1, Ex. 19 & 20.** The study itself states:

> The authors understand that others may have different perspectives and understanding of the implications and that what we provide enables using the same factual basis. Given the richness of experience of the Puerto Rico solar community, we welcome feedback and discussion to improve the content of the report and correct any error that the report may contain.
> . . . . . . . .
> We recommend that the Energy Bureau begin a public evaluation of alternatives to the current pricing system (based upon the questions articulated at the end of this report) in the interim, to maintain stability in the behind-the-meter solar market.
> . . . . . . . .
> We recommend that the Energy Bureau commence regulatory processes that will provide the **answers to questions raised in this report**. Such a process **should begin with a public vetting of this report**. We believe that a collaborative approach to developing the information necessary to fully evaluate and implement alternatives to NEM is appropriate. **ECF No. 1, Ex. 19 at 12-13, 92 (emphasis added).**

33. Moreover, this draft study cherry-picks data and includes information in the seven states where net metering has been changed or cancelled, without including the data from the thirty-six states and territories including the District of Columbia that currently had net metering programs like that in Puerto Rico as of November 2023.[8] Most studies show that net metering policies like those in Puerto Rico have a net positive value, given the benefits that they provide like: (1) capacity benefits and reliability related benefits; (2) avoidance of investment in transmission and distribution infrastructure; and (3) avoided energy costs.[9]

---

[8] NET METERING, DSIRE (2023) (*available at* https://ncsolarcen-prod.s3.amazonaws.com/wp-content/uploads/2023/11/DSIRE_Net_Metering_Nov2023.pdf).
[9] Tabuchi, *supra* note 6.

34. Relying on this study to show that the PREB needs to act now is irresponsible and disregards the safeguards that Act 10, Act 114 and Act 17 place in order to ensure public participation and well-rounded analysis of energy policy. PREB was built to be independent from political pressure from the majority party, not to be insulated from the public.

35. If anything, the draft study shows that PREB is not prepared to give the study the necessary consideration within the Oversight Board's unreasonable time limits and its pressure to change the current policy. This is especially true if the renewable energy generation goals are considered, which are also part of PREB's mandate under Act 17.

### D.  THE OVERSIGHT BOARD'S ARGUMENTS UNDER COUNT II ARE ARBITRARY AND CAPRICIOUS BECAUSE THE GOVERNMENT MET THE REQUIREMENTS OF PROMESA.

36. The Oversight Board is using Section 204 to say that any effort by the government that they disagree with substantively is procedurally non-compliant. This interpretation cannot be allowed. Procedural compliance is one thing, submission is another. The Oversight Board has not made the case that the Government failed to comply with Section 204.

37. Under Section 204, "[t]he Governor shall include with each law submitted to the Oversight Board . . . [a] formal estimate prepared by an appropriate entity of the territorial government with expertise in budgets and financial management **of** the impact, **if any**, that the law will have on expenditures and revenues." 48 U.S.C. § 2144(a)(2)(A)(emphasis added). If that entity "finds that the law is not significantly inconsistent with the Fiscal Plan for the fiscal year, it shall issue a certification of such finding." Id. § 2144(a)(2)(B).

38. Section 204(a)(2)(A) states that the Defendant needs to prepare a formal estimate of the impact **if there is any**. Because the agencies involved determined that there would be no impact, a formal estimate of that impact is unnecessary.  Because Act 10 only delays a process, there are no new expenditures attached to it. The impact is neutral or so minimal

13

that a formal estimate is unnecessary. The Treasury Department and the Budget Office attested to that.

39. The law requires the Defendant to submit a formal estimate if there is a fiscal impact. The Defendant did not submit a formal estimate because there is no fiscal impact. This meets the procedural requirement. If the Oversight Board disagrees with the declaration made by the Defendant and believes that there is in fact a fiscal impact, that does not mean that the Defendant did not comply with the process. Disagreement with content is not equal to procedural noncompliance. Moreover, to the extent that Section 204(a)(2)(B) requires that the entity that submits the formal estimate should certify, but there was no need for a formal estimate. AFFAF, in conjunction with both agencies, created the certification. This is a gap in the law, not a non-compliance. It is a matter of formality that is easily rectified and should not result in the annulment of a law. While the Oversight Board treats our laws like flies to swat out of the way, this Court should recognize the importance they have.

40. The certification says that "the implementation of Act 10 – as compared to PREPA's Certified Fiscal Plan revenue and cost projections is expected to be neutral and will help reach Renewable Portfolio Standard of 100% by 2050." **ECF No. 1, Ex. 10 at 6.** Moreover, it states that "**PREPA's Certified Fiscal Plan load forecast fully deducts expected DG production from load to calculate Net Utility Sales . . . and there are no projected revenues from DG customers**." ECF No. 2, Ex. 10 at 6 (emphasis added). "Thus, **PREPA's Certified Fiscal Plan assumes that the existing net metering policy and bill credit structure remains in place**." ECF No. 1, Ex. 10 at 6 (emphasis added).

41. Evidently, AFFAF **did** address compliance with the Fiscal Plan in its certification and the Oversight Board's arguments to the contrary are arbitrary and capricious. The Oversight Board may disagree with AFAFF's conclusion, but it cannot equate that with noncompliance of the procedural requirement. **A date change is not a measure that**

14

**brings with it a fiscal impact, to force the Governor to "show its work" borders on absurdity; forcing a party to prove a negative this way cannot be what Congress intended.**

## CONCLUSION

42. In light of the foregoing, SUN and Sierra Club fully support the Motion for Summary Judgment filed by the Senate of Puerto Rico, ECF No. 42. This Court should reject the Oversight Board's overreach in attempting to annul a revenue-neutral law that simply extends the deadline for a study essential to Puerto Rico's renewable energy framework. Act 10 does not alter substantive policy, nor does it create any fiscal impact, as confirmed by the relevant governmental entities. The challenge is not only legally unsound, but it also undermines the independence of the PREB, which benefits from the extension to ensure a comprehensive evaluation of the net metering program. By seeking to invalidate a procedural amendment, the Oversight Board is engaging in an arbitrary and capricious exercise of power, attempting to micromanage Puerto Rico's energy policy without any rational or evidentiary basis. The requested relief is not only radical and unfounded but represents an unjustified interference in Puerto Rico's legislative process and energy goals. The Court should therefore rule against the Oversight Board.

**Date:** October 22nd, 2024.

*[SIGNATURES ON THE NEXT PAGE]*



P.O. Box 10779
Ponce, Puerto Rico 00732
Tel.: 787-848-0666
Fax: 787-841-1435
notificaciones@bufete-emmanuelli.com

*s/ Rolando Emmanuelli Jiménez*
**Lcdo. Rolando Emmanuelli Jiménez**
**USDC:** 214105
rolando@emmanuelli.law

*s/ Zoé C. Negrón Comas*
**Lcda. Zoé C. Negrón Comas**
**USDC:** 308702
zoe@emmanuelli.law

*Counsel for Solar United Neighbors and Sierra Club PR*

16

## CERTIFICATE OF SERVICE

I hereby certify that on this same date we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all participants and Standard Parties. A courtesy copy of this Motion will be delivered to the Court by email to SwainDPRCorresp@nysd.uscourts.gov as provided in *Third Amended Standing Order*.

*s/ Zoé C. Negrón Comas*
**Lcda. Zoé C. Negrón Comas**
**USDC:** 308702
zoe@emmanuelli.law