# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br>as representative of<br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br>Debtors. [1] | PROMESA<br>Title III<br><br><br>Case No. 17-BK-3283-LTS<br>(Jointly Administered) |
| In re:<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br>as representative of<br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br>Debtor. | PROMESA<br>Title III<br><br><br>Case No. 17-BK-4780-LTS<br>(Jointly Administered) |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br>Plaintiff,<br>v.<br>HON. PEDRO PIERLUISI, in his official capacity as Governor of Puerto Rico,<br>Defendant. | Adv. Proc. No. 24-00062-LTS |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17- BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (III) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17- BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**THE SENATE'S RESPONSE TO THE**
**FOMB'S STATEMENT OF UNCONTESTED MATERIAL FACTS**

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE LAURA TAYLOR SWAIN:**

Pursuant to Local Rule 56(c), applicable to this proceeding through Local Bankruptcy Rule 1001-1(d), Hon. José Luis Dalmau, in his official capacity as the President of the Senate of Puerto Rico (the "Senate") respectfully submits the following response to Statement of Uncontested Material Facts in Support of the Financial Oversight and Management Board for Puerto Rico's Motion for Summary Judgment (the "SUMF") in the above-captioned adversary proceeding (Dkt. No. 47). By responding, the Senate does not concede that any of the "statement" in the SOUF are (i) facts, (ii) supported by evidence that is admissible at trial, (iii) proper statements under Local Rule 56(b) or the Federal Rules of Civil Procedure, or (iv) material or relevant to any issue in this action. Nor does the Senate concede that any of the documents and testimony that the FOMB cites are relevant or admissible. The Senate also does not concede that the SUMF are all facts material the FOMB's Motion for Summary Judgment.

The Senate objects to the entire SOUF on the ground that it consists of legal arguments, conclusory allegations, and unsupported speculation rather than a "statement of material facts," as Local Civil Rule 56(b) requires. *See* Local Civil Rule 56(b) ("A motion for summary judgment shall be supported by a separate, short, and concise statement of material facts, . . . as to which the moving party contends there is no genuine issue of material fact to be tried."); *Oquendo-Rivera v. Toledo*, 736 F. Supp. 2d 434, 436 (D.P.R. 2010) ("As a general principle, parties may not include legal arguments or conclusions in their statement of facts."); *P.R. Tel. Co. v. San Juan Cable Co. LLC*, 196 F. Supp. 3d 248, 314 (D.P.R. 2016) ("[T]he Court 'afford[s] no evidentiary

weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which,

in the aggregate, is less than significantly probative.'") (quoting *Tropigas de Puerto Rico, Inc. v.

Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

## RESPONSE TO SUMF

1.          **PREPA was created in 1941. Mujica Decl. Ex. 2 at 23; Governor's
Answer, ECF No. 28, ¶ 25; Senate President's Answer, ECF No. 31, ¶ 25**.

Senate's Response to SUMF 1: Admitted.

2.          **PREPA is the sole electric utility provider for Puerto Rico. Mujica Decl. ¶ 2
& Ex. 2 at 23; Governor'sAnswer, ECF No. 28, ¶ 25; Senate President's Answer, ECF No.
31, ¶ 25.**

Senate's Response to SUMF 2: Admitted.

3.          **The PREPA Fiscal Plan details PREPA's current challenges and the
impact those issues have on the people of Puerto Rico and the Island's economy. Mujica
Decl. ¶ 7.**

Senate's Response to SUMF 3: Denied. SUMF 3 is immaterial as the FOMB has not

approved a PREPA Fiscal Plan for year 2024.

4.          **The PREPA Fiscal Plan focuses on the rehabilitation of both PREPA's
financial position and its operations. Mujica Decl. ¶ 7.**

Senate's Response to SUMF 4: Denied. SUMF 4 is immaterial as the FOMB has not

approved a PREPA Fiscal Plan for year 2024.

5.          **PREPA's customers pay substantially more for electricity than the
average ratepayer in the mainland United States. Mujica Decl. ¶ 3 & Ex. 2 at 43; Senate
President's Answer, ECF No. 31, ¶ 26;** *see also* **Governor's Answer, ECF No. 28, ¶ 26.**

Senate's Response to SUMF 5: Admitted.

6.          **PREPA provides among the least reliable, most volatile, and most fossil-
fuel dependent electricity service among its peers. Mujica Decl. Ex. 2 at 21; Senate
President's Answer, ECF No. 31, ¶ 26;** *see also* **Governor's Answer, ECF No. 28, ¶ 26.**

Senate's Response to SUMF 6: Admitted

7.       **PREPA's rates fluctuate due, in part, to PREPA's reliance on fossil fuels and changes in the price of oil. Mujica Decl. Ex. 2 at 21, 36; Senate President's Answer; ECF No. 31, ¶ 26; *see also* Governor's Answer, ECFNo. 28, ¶ 26.**

Senate's Response to SUMF 7: Admitted

8.       **PREPA customers experience many more service interruptions than the median stateside customer. Mujica Decl. ¶ 3 & Ex. 2 at 23–24; Senate President's Answer, ECF No. 31, ¶ 26; *see also* Governor's Answer,ECF No. 28, ¶ 26.**

Senate's Response to SUMF 8: Admitted.

9.       **In 2014, the Government enacted Act 57, also known as the Puerto Rico Energy Transformation and RELIEF Act. Brenner Decl. Ex. 2 at 1; Governor's Answer, ECF No. 28, ¶ 28; Senate President's Answer, ECF No. 31, ¶ 28.**

Senate's Response to SUMF 9: Admitted.

10.      **The Government, in enacting Act 57, found in 2014 that, for most of its existence, PREPA was a "monopoly that regulate[d] itself" leading to "Puerto Rico being among the top U.S. jurisdictions with the highest energy cost." Brenner Decl. Ex. 2 at Statement of Motives.**

Senate's Response to SUMF 10: Denied. The Senate objects to this statement as it is not

supported by admissible evidence. To the extent the FOMB is presenting the content of

the statement of motives of Act 57 as a **secondary source** it is not a **fact** and if it is

presented as an **expert report** it would not be admissible in court as it is hearsay and is

not presented by an expert. *See Fed. R. Civ. P. 56(c)(2).* Additionally, the content of Act

57 is the basis for a legal argument not an undisputed fact.

11.      **Then-Senator Eduardo Bhatia authored Act 57. Brenner Decl. Ex. 7.**

Senate's Response to SUMF 11: Qualified admission. SUMF 12 is admitted, but it is

objected to as immaterial to the controversy. Additionally, it should be qualified that

Senator Bathia co-authored the initial bill, not Act 57 as a whole which was the product

of a robust legislative process.

12.      **Then-Senator Eduardo Bhatia submitted written testimony to Congress
in 2018 stating that:**

    a.   **PREPA's problems were the result of "reckless governance of PREPA
and the lack of serious leadership";**

    b.   **PREPA had been exposed to "the negative dynamics of bureaucracy,
patronage, corruption, political intervention, and special interests," and
that "significant energy decisions were taken, for decades, from the
Governor's Office, using the utility's governing board and executive
directors as mere proxies"; and**

    c.   **the "main concept of Act 57 is that PREPA and other energy stakeholders
on the Island must conduct themselves in accordance with applicable
energy policy and regulation; <u>not</u> by the seasonal wishes or 'public
policy' of the administration from any political party in power."**

**Brenner Decl. Ex. 7 at 3–5 (emphasis in original).**

<u>Senate's Response to SUMF 12</u>: Denied. The Senate objects to this statement as it  is not

supported by admissible evidence. To the extent the FOMB is raising the content of Mr.

Bathia's testimony as fact, it fails because this is one person's opinion that is not proffered

by an expert. *See Fed. R. Civ. P. 56(c)(2).* Moreover, it would be inadmissible to the extent

that it is not presented by its declarant and is hearsay. If the FOMB is presenting the content

of the testimony as a **secondary source** it is not a fact. In the alternative, Mr. Bathia's

comments are not facts for this Court's consideration, but an argument.

13.      **Act 57 created the Energy Bureau (then known as the Puerto Rico Energy
Commission) as a "non-partisan, independent energy regulator, with fiscal autonomy from
the government." Brenner Decl. Ex. 7 at 3;** *see also* **Brenner Decl. Ex. 2 at 9 (Act 57
establishing the Energy Commission as an "independent government entity"); Senate
President's Answer, ECF No. 28, ¶ 29.**

<u>Senate's Response to SUMF 13</u>: Admitted.

14.        The Energy Bureau's mandate includes the duty to "[e]stablish and implement regulations and the necessary regulatory actions to guarantee the capacity, reliability, safety, efficiency, and reasonability of electricity rates of Puerto Rico . . . " *See* Brenner Decl. Ex. 2§ 6.3(c); Senate President's Answer, ECF No. 28, ¶29.

Senate's Response to SUMF 14: Admitted.

15.        Net metering refers to the "policy that allows electricity customers with their own generation capacity to be financially compensated for the energy they produce." Brenner Decl. Ex. 10 at Summary; *see also* Brenner Decl. Ex. 9 at 4; Mujica Decl. ¶ 10.

Senate's Response to SUMF 15: Denied. The Senate objects to this statement. To the extent that FOMB is only stating as a fact that the Congressional Report stated this, the fact is **immaterial.** To the extent the FOMB is raising the **content** of the Congressional Research Service as fact, the Senate objects it as **immaterial** to the extent that it is unrelated to Puerto Rico's net metering program. If FOMB is presenting the content of the report as a **secondary source** it is not a **fact** and if it is presented as an **expert report** it would not be admissible in court as it is hearsay and is not presented by an expert. *See Fed. R. Civ. P. 56(c)(2).* Moreover, as the FOMB argues that net metering policy is not the issue before this Court, the entire stated "fact" is immaterial and beyond the scope of the issue under this Court's jurisdiction, because the decision on whether the net metering policy needs to be changed lies with the PREB. In the alternative that the content of the Congressional Report is deemed material**,** it does not present any facts for this Court's consideration and is instead an argument. The statement is also disputed, since met metering is the policy that allows solar customers to send electricity back to the grid and receive credits at the retail rate for that energy. Other policies, such as 'net billing' compensate solar customers at another predetermined rate, lower than the retail rate, for the electricity they send back to the grid. *See* Declaration of Patrick J. Wilson ("Wilson Decl."), ¶ 11. What the FOMB is

defining in this statement is not "net metering" but "net billing." Net metering is specific

to the 1:1 retail rate, while net billing can encompass other rate structures.

16.        **U.S. jurisdictions "differ in the way net metering customers are
compensated." Brenner Decl. Ex.10 at 1. Some net metering programs employ a method
whereby "energy from net metering capacity offsets energy consumed from the grid in a
one-to-one fashion." Brenner Decl. Ex. 10 at 1; Mujica Decl. Ex. 9 at 4–5. Others have
"adopted alternative compensation approaches" to address concerns that "[i]f a sufficiently
large number of customers participate in net metering, costs might increase for non-net
metering customers in order to pay for the grid benefits." Brenner Decl. Ex. 10 at 1; *see
also* Mujica Decl. Ex. 9 at 14–16. Those alternative methods include, among others, "a fixed
charge to net metering customers' bills" or "avoided cost rates, which reflect primarily the
utility's cost of producing electricity, and value of solar . . . rates, which additionally
consider societal benefits such as reduced air emissions." Brenner Decl. Ex. 10 at 2; *see also*
Mujica Decl. Ex. 9 at 14–16.**

> Senate's Response to SUMF 16: Denied. The Senate objects to this statement in its
>
> entirety as it is not supported by admissible evidence. To the extent that this is an expert
>
> opinion and Mr. Mujica and Mr. Brenner are not qualified to make it, it would not be
>
> admissible in court. *See Fed. R. Civ. P. 56(c)(2).* Additionally, the declarations do not
>
> establish personal knowledge. *See Fed. R. Civ. P. 56(c)(4).* To the extent the FOMB is
>
> raising the **content** of the Congressional Research Service as fact, the Senate objects it as
>
> **immaterial** to the extent that it is unrelated to Puerto Rico's net metering program. If
>
> FOMB is presenting the content of the report as a **secondary source** it is not a **fact** and if
>
> it is presented as an **expert report** it would not be admissible in court as it is hearsay and
>
> is not presented by an expert. *See Fed. R. Civ. P. 56(c)(2).* Moreover, as the FOMB argues
>
> that the current net metering policy is not the issue before this Court, the entire stated
>
> "fact" is immaterial and beyond the scope of the issue under this Court's jurisdiction,
>
> because the decision on whether the net metering policy needs to be changed lies with the
>
> PREB. In the alternative that the content of the Congressional Report is deemed material,

it does not present any facts for this Court's consideration and is instead an argument. In the alternative, the statement cannot be considered in isolation and must be considered in conjunction with the opposing arguments presented by the Defendant and the Senate.

To the extent that FOMB is raising the **content** of the Draft Study as fact, and FOMB is presenting the content of the report as a **secondary source** it is not a **fact** and if it is presented as an **expert report** it would not be admissible in court as it is hearsay and is not presented by an expert. *See Fed. R. Civ. P. 56(c)(2).* Moreover, as the FOMB argues that the current net metering policy is not the issue before this Court, the entire stated "fact" is immaterial and beyond the scope of the issue under this Court's jurisdiction, because the decision on whether the net metering policy needs to be changed lies with the PREB. In the alternative that the content of the Draft Study is deemed material**,** it does not present any facts for this Court's consideration and is instead an argument. In the alternative, the statement cannot be considered in isolation and must be considered in harmony with the rest of the document and the opposing arguments presented by the Defendant and the Senate.

To the extent that the FOMB is raising as a fact the motivations of unknown and undefined third parties, this is not a material fact that can be undisputed, it is an argument. Additionally, to the extent that this is deemed a material fact, it is hardly undisputed since it is also true that "if sufficiently large numbers of customers install and operate solar generation, and if utilities make only prudent and cost-effective investments in the grid, costs for utility services will decline for all customers." Declaration of Karl Rábago ("Rábago Declaration"), ¶¶ 11-12.

Furthermore, in Puerto Rico net metering provides an avoided energy cost value of 27¢/kWh, an avoided capacity cost value of 1¢/kWh, and an avoided transmission and distribution cost value of 3¢/kWh. *See* Gabel Decl. Exh. 1 at p. 8 of 13, ¶¶ 4.1-4.3. Moreover, the direct benefit to the grid and all other ratepayers of net metering is 33 cents per kWh, which is 36% greater than the retail rate of 24 cents per kWh. Accordingly, there is no subsidy flowing from other ratepayers to on-site solar customers. In fact, there are benefits flowing to all other customers from this solar production. *See* Gabel Decl. Exh. 1 at p. 12 of 13.

The statement is also disputed, since met metering is the policy that allows solar customers to send electricity back to the grid and receive credits at the retail rate for that energy. Other policies, such as 'net billing' compensate solar customers at another predetermined rate, lower than the retail rate, for the electricity they send back to the grid. *See* Wilson Decl., ¶ 11. What the FOMB is defining in this statement is not "net metering" but "net billing." Net metering is specific to the 1:1 retail rate, while net billing can encompass other rate structures.

17.     **Puerto Rico's net metering program was established in 2007 by Act 114 prior to the creation of the Energy Bureau. *See* Brenner Decl. Ex. 1; Governor's Answer, ECF No. 28, ¶ 35; *see also* Senate President's Answer, ECF No. 31, ¶ 35.**

Senate's Response to SUMF 17: Admitted.

18.     **Under the net metering program established by Act 114, which remains essentially unchanged, program participants are "entitled to offset the energy they purchase from PREPA with the energy they export to the grid on a one-to-one basis, at the prevailing retail rate." Brenner Decl. Ex. 1 at 45–46; Senate President's Answer, ECF No. 31, ¶ 37.**

Senate's Response to SUMF 18: Admitted.

19. **Customers who export the same or more electricity to the grid than they consume from PREPA are charged only PREPA's monthly service fee (*i.e.*, their consumption or volumetric charges are zero). Mujica Decl. ¶10 & Ex. 2 at 143–44; Senate President's Answer, ECF No. 31,¶ 37.**

Senate's Response to SUMF 19: Admitted.

20. **PREPA recoups its energy transmission costs through its volumetric (*i.e.*, usage) charges. Mujica Decl. ¶ 10; *see also* Mujica Decl. Ex. 9 at 71.**

**Senate's Response to SUMF 20**: Denied. The Senate objects to this fact as it is not supported by admissible evidence. To the extent that this is an expert opinion and Mr. Mujica is not qualified to make it, it would not be admissible in court. *See Fed. R. Civ. P. 56(c)(2)*. Additionally, the declaration does not establish personal knowledge. *See Fed. R. Civ. P. 56(c)(4)*. In addition, to the extent that this is deemed a material fact, it is disputed. There is no entitlement to revenue recovery without regulatory review. PREB determines allowed transmission and other costs that PREPA can recover. Rábago Decl. ¶¶ 13-15.

21. **PREPA's fixed monthly charges are designed to recover PREPA's costs of producing electricity as well as the costs associated with operating and maintaining PREPA's transmission and distribution system. Mujica Decl. Ex. 9 at 72.**

Senate's Response to SUMF 21: Denied. The Senate objects to it as it is not supported by admissible evidence. To the extent that this is an expert opinion and Mr. Mujica is not qualified to make it, it would not be admissible in court. *See Fed. R. Civ. P. 56(c)(2)*. Additionally, the declaration does not establish personal knowledge. *See Fed. R. Civ. P. 56(c)(4)*. Additionally, to the extent that this is deemed a material fact, it is disputed. There is no entitlement to revenue recovery without regulatory review. PREB determines allowed transmission and other costs that PREPA can recover. Rábago Decl. ¶¶ 13-16.

22.      **Net metering customers' use of green energy sources, such as solar, to produce electricity can also provide benefits, including reducing pollutants and greenhouse gases emitted from PREPA's fossil based generating units, as well as positive contributions to the achievement of Puerto Rico's renewable energy goals.Mujica Decl. ¶ 10;** *see also* **Governor's Answer, ECF No. 28, ¶ 39.**

Senate's Response to SUMF 22: Qualified admission. There are known benefits of net metered, local solar, so this should not be a conditional statement. Moreover, it does not encompass additional benefits which include cost savings, resiliency, grid benefits, local economic development, and job creation.  Rábago Decl. ¶¶ 17-18. Furthermore, in Puerto Rico net metering provides an avoided energy cost value of 27¢/kWh, an avoided capacity cost value of 1¢/kWh, and an avoided transmission and distribution cost value of 3¢/kWh. *See* Gabel Decl. Exh. 1 at p. 8 of 13, ¶¶ 4.1-4.3.

23.      **A report from the Congressional Research Service found "[n]et metering customers generate electricity for their own consumption, which reduces the amount of utility-provided electricity they need (and, consequentially, the utility's costs to produce electricity). However, self-generation does not necessarily reduce the amount of other utility-provided services a customer uses (or, generally, the utility's costs to provide those services, such as maintaining the grid)." Brenner Decl. Ex. 10 at 6.**

Senate's Response to SUMF 23: Denied. To the extent the FOMB is raising the **content** of the Congressional Research Service as fact, the Senate objects to it as **immaterial** to the extent that it is unrelated to Puerto Rico's net metering program. If FOMB is presenting the content of the report as a **secondary source** it is not a **fact** and if it is presented as an **expert report** it would not be admissible in court as it is hearsay and is not presented by an expert. *See Fed. R. Civ. P. 56(c)(2).* Moreover, as the FOMB argues that the current net metering policy is not the issue before this Court, the entire stated "fact" is immaterial and beyond the scope of the issue under this Court's jurisdiction, because the decision on whether the net metering policy needs to be changed lies with the

PREB. In the alternative that the content of the Congressional Report is deemed material,
it does not present any facts for this Court's consideration and is instead an argument. In
the alternative, the statement cannot be considered in isolation and must be considered in
conjunction with the opposing arguments presented by the Defendant and the Senate.

Additionally, to the extent that this is deemed a material fact, it is hardly
undisputed since it is also true that "if sufficiently large numbers of customers install and
operate solar generation, and if utilities make only prudent and cost-effective investments
in the grid, costs for utility services will decline for all customers." Rábago Decl. ¶ 11.

Furthermore, in Puerto Rico net metering provides an avoided energy cost value
of 27¢/kWh, an avoided capacity cost value of 1¢/kWh, and an avoided transmission and
distribution cost value of 3¢/kWh. *See* Gabel Decl. Exh. 1 at p. 8 of 13, ¶¶ 4.1-4.3.
Moreover, the direct benefit to the grid and all other ratepayers of net metering is 33 cents
per kWh, which is 36% greater than the retail rate of 24 cents per kWh. Accordingly,
there is no subsidy flowing from other ratepayers to on-site solar customers. In fact, there
are benefits flowing to all other customers from this solar production. *See* Gabel Decl.
Exh. 1 at p. 12 of 13.

24.        **If not calibrated correctly, a net metering system could create greater
inequality among customers. For example, it could lead to significant costs shifts, where
non-net metering customers (who may not have the funds to obtain solar panels or live in
structures such as multi-unit dwellings or urban areas that are not conducive to solar
energy generation) essentially subsidize the costs of a utility's fixed costs for net metering
users. Mujica Decl. ¶ 10.**

Senate's Response to SUMF 24: Denied. The Senate objects to this "fact" as it is not
supported by admissible evidence. To the extent that this is an expert opinion and Mr.
Mujica is not qualified to make it, it would not be admissible in court. *See Fed. R. Civ. P.*

*56(c)(2).* Additionally, the declaration does not establish personal knowledge. *See Fed. R. Civ. P. 56(c)(4).* Moreover, as the FOMB argues that the current net metering policy is not the issue before this Court, the entire stated "fact" is immaterial and beyond the scope of the issue under this Court's jurisdiction, because the decision on whether the net metering policy needs to be changed lies with the PREB. In the alternative that this statement is deemed material, the statement cannot be considered in isolation and must be considered in conjunction with the opposing arguments presented by the Defendant and the Senate.

Additionally, to the extent that this is deemed a material fact, it is hardly undisputed since it is also true that "if sufficiently large numbers of customers install and operate solar generation, and if utilities make only prudent and cost-effective investments in the grid, costs for utility services will decline for all customers." Rábago Decl. ¶ 11. Moreover, this entire paragraph is vague and overly broad and is not based on any specific data from PREPA, LUMA or any other electric utilities. It is an argument that ignores the many benefits created by customer-sited solar generation, including the benefits of diverse sources of generation, generation embedded in the distribution grid, reductions in utility spending that would otherwise be regressively charged to low-use low-income customers, economic development benefits, and others. Rábago Decl. ¶ 17. Indeed, such is the case in Puerto Rico, where the vast majority (58.5%) of existing net metering systems are located in households classified as low, moderate and middle-income families. A significantly higher percentage of Puerto Rico's low-income population is investing their own money, or financing through loans of leases, to install solar energy compared to the national level. *See* Wilson Decl. Exh. 1, Pp. 5-6. Additionally, this statement falsely labels the cause of

potential inequality as net metering and ignores how rate making is performed. Customer self-generation reduces utility costs for generation, transmission, and delivery and provides additional incremental benefits to the grid and society. A prudent utility would reduce its spending to account for these benefits, which exceed the small incremental costs of managing the operational impacts of customer-sited generation on the grid. Rábago Decl. ¶¶ 20-21.

Furthermore, in Puerto Rico net metering provides an avoided energy cost value of 27¢/kWh, an avoided capacity cost value of 1¢/kWh, and an avoided transmission and distribution cost value of 3¢/kWh. *See* Gabel Decl. Exh. 1 at p. 8 of 13, ¶¶ 4.1-4.3. Moreover, the direct benefit to the grid and all other ratepayers of net metering is 33 cents per kWh, which is 36% greater than the retail rate of 24 cents per kWh. Accordingly, there is no subsidy flowing from other ratepayers to on-site solar customers. In fact, there are benefits flowing to all other customers from this solar production. *See* Gabel Decl. Exh. 1 at p. 12 of 13.

25.     **Determining whether to maintain or modify Puerto Rico's current net metering program involves balancing many important, complex financial and policy factors. Mujica Decl. ¶ 10; Governor's Answer, ECF No.28, ¶ 39; Senate President's Answer, ECF No. 31, ¶ 39.**

Senate's Response to SUMF 25: Denied. The Senate objects to this "fact" as immaterial. As the FOMB argues that the current net metering policy is not the issue before this Court, the entire stated "fact" is immaterial and beyond the scope of the issue under this Court's jurisdiction, because the decision on whether the net metering policy needs to be changed lies with the PREB.

26.     **O**n April 11, 2019, the Government enacted Act 17, known as the Puerto Rico Energy Public Policy Act of 2019. Brenner Decl. Ex. 3; *see also* Senate President's Answer, ECF No. 28, ¶ 40.**

Senate's Response to SUMF 26: Admitted.

27.        **Among other things, Act 17 amended Act 114, and directed the Energy Bureau to "conduct a study, through an independent formal process and with participation of interested parties and the general public, to evaluate and consider the costs and benefits associated with . . . the net metering program . . . ." Brenner Decl. Ex. 3 § 3.4(a).**

Senate's Response to SUMF 27: Qualified admission. SUMF 27 is admitted, but the partial quotation is misleading. Act 114 was enacted on August 16, 2007, with the purpose of stimulating energy production through renewable resources, a solution to Puerto Rico's energy problems that was adjusted to its geographic and climate realities. Dkt. No. 1, Exh. 5 at 1. Act 17 was enacted on April 11, 2019 to promote the stunted transition to renewables. Among other things, Act 17 established the Renewable Portfolio Standard for each calendar year between 2015 and 2050. Dkt. No. 1, Exh. 6 at 83. According to this, by 2022 the Required Renewable Energy Percentage was 20%. Between 2023 and 2025, it was 40%. Dkt. No. 1, Exh. 6 at 83.

28.        **Act 17 required the Act 17 Study to be completed within five years of the effective date of Act 17 (*i.e.*, by April 11, 2024). Brenner Decl. Ex. 3 § 3.4(a).**

**Senate's Response to SUMF 28:** Denied. This partial quotation is objected to as misleading. Act 17 was enacted on April 11, 2019. Among other things, Act 17 established the Renewable Portfolio Standard for each calendar year between 2015 and 2050. Dkt. No. 1, Exh. 6 at 83. According to this, in 2022 the Required Renewable Energy Percentage is 20%. Between 2023 and 2025, it is 40%. Dkt. No. 1, Exh. 6 at 83. Thus, the five-year mark would have fallen in the period where Puerto Rico would have to meet more than 20% and on path to 40% Renewable Energy. Dkt. No. 1, Exh. 6 at 83.

29.        **Act 17 further empowered the Energy Bureau, following completion of the five- year study period (*i.e.*, April 11, 2024), to make decisions regarding the net metering program taking into account the results of the Act 17 Study, including establishing**

**"appropriate values for distributed energy and energy storage systems in accordance with the study," and "determin[ing] exclusively" the "rate applicable to net metering customers." Brenner Decl. Ex. 3 § 3.4(a–b).**

> Senate's Response to SUMF 29: Qualified admission. Even under Act 17 before the amendments by Act 10, PREB can only establish a new compensation structure **after** the study is completed and **only** prospectively subject to the grandfathered limitations that Act 17 established. That is, PREB can establish a new compensation structure after the study, but only prospectively not to all "net metering customers" but only new, future ones.

30.     **Act 17 provides that until the Energy Bureau completes the Act 17 Study and authorizes new net metering rates, the existing rate (*i.e.*, the 1:1 net metering rate) would remain in effect. Brenner Decl. Ex. 3 § 3.4(b).**

> Senate's Response to SUMF 30: SUMF 30 is denied. Even under Act 17 before the amendments by Act 10, PREB can only establish a new compensation structure **after** the study is completed and **only** prospectively subject to the grandfathered limitations that Act 17 established. Act 17 provides as follows:

>> Once the aforementioned five (5)-year term has elapsed, the rate applicable to net metering customers, including the rate or mechanisms through which customers shall be compensated for the energy they supply to the electric power grid, shall be determined exclusively by the Energy Bureau as part of the electric power service rate review process provided in Act No. 57-2014, or through a separate administrative process when deemed necessary or convenient. Any determination regarding the net metering program shall take effect within the term provided by the Bureau.
>> **Any customer that, on the date in which the Bureau issues its final determination, has a net metering contract or has notified the Bureau about the certification** of the distributed generator installed by a professional engineer or expert electrician, both members of their professional associations and admitted to the practice of their profession, **shall be automatically grandfathered as a net metering customer under the rate in effect before the Bureau's final determination.**

16

In such cases, the net metering customer shall have the right to the rate or compensation mechanism in effect at the **time for a term of not less than twenty (20) years as of the execution of the net metering contract**. However, the net metering customer shall be entitled and may opt to avail himself of the new rate or compensation mechanism approved by the Bureau.

Dkt. No. 1, Exh. 6 at 70-71 (emphasis added).

31.      **On June 30, 2016, Congress enacted PROMESA to address the "fiscal emergency" in Puerto Rico that arose from a "combination of severe economic decline, and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing . . . ." PROMESA § 405(m)(1).**

Senate's Response to SUMF 31: Admitted.

32.      **Congress created the Oversight Board for the purpose of providing a method for Puerto Rico to "achieve fiscal responsibility and access to the capital markets." PROMESA § 101(a); *see also* Senate President's Answer, ECF No. 28, ¶ 30.**

Senate's Response to SUMF 32: Admitted.

33.      **To accomplish these statutory objectives, Congress encouraged the Oversight Board and the territorial government to work together to formulate and implement fiscal plans and budgets, PROMESA §§ 201–202, but granted the Oversight Board final say over such plans and budgets and prohibited the Governor and Legislature from enacting, implementing, and/or enforcing laws impairing or defeating the purposes of PROMESA as determined by the Oversight Board. *See* PROMESA §§ 101, 104, 108(a)(2), 201(e)(2), 202(e)(3), 204.**

**Senate's Response to SUMF 33**: Admitted.

34.      **One purpose of the fiscal plans is to provide "a method" for the Commonwealth and covered territorial instrumentalities "to achieve fiscal responsibility and access to the capital markets." PROMESA § 201(b).**

Senate's Response to SUMF 34: Admitted.

35.      **PREPA has been designated by the Oversight Board as a covered territorial instrumentality pursuant to PROMESA § 101(d). Mujica Decl. ¶ 5.**

Senate's Response to SUMF 35: Admitted.

36.　　　**The PREPA Fiscal Plan states that "Puerto Rico's economic recovery depends on . . . a comprehensive transformation of its energy sector to deliver the safe, reliable, and affordable service that Puerto Rico's residents and businesses deserve." Mujica Decl. Ex. 2 at 19.**

Senate's Response to SUMF 36: Qualified admission. It is admitted that the Mujica Declaration so states, but SUMF 36 is immaterial as the FOMB has not approved a PREPA Fiscal Plan for year 2024.

37.　　　**The 2024 Commonwealth Fiscal Plan states that "[t]he Commonwealth must continue its efforts to implement a comprehensive energy sector reform to enable a successful transformation and unlock the resulting growth from the 2024 Fiscal Plan projections." Mujica Decl. Ex. 8 at 137.**

Senate's Response to SUMF 37: Qualified admission. It is admitted that the Mujica Declaration so states, but SUMF 37 is immaterial as PREPA is a covered instrumentality under PROMESA and the FOMB has not approved a PREPA Fiscal Plan for year 2024.

38.　　　**The PREPA Fiscal Plan states that "Puerto Rico's energy infrastructure lags national standards due to decades of operational and financial mismanagement." Mujica Decl. Ex. 2 at 21.**

Senate's Response to SUMF 38: Qualified admission. It is admitted that the Mujica Declaration so states, but SUMF 38 is immaterial as the FOMB has not approved a PREPA Fiscal Plan for year 2024.

39.　　　**The PREPA Fiscal Plan states that "[d]ecisions about the management of the Puerto Rican grid have historically been subject to political influence and instability, leading to high management turnover, discontinuity in capital investment plans, electric customer rates that were insufficient to cover operating and maintenance costs and the mounting costs of debt service." Mujica Decl. Ex. 2 at 36.**

Senate's Response to SUMF 39: Qualified admission. It is admitted that the Mujica

Declaration so states, but SUMF 39 is immaterial as the FOMB has not approved a

PREPA Fiscal Plan for year 2024.

40.        **The PREPA Fiscal Plan states that the "decision to transform Puerto
Rico's energy system . . . was in large part an answer to this issue and to depoliticize
decisions of the energy service." Mujica Decl. Ex. 2 at 36.**

Senate's Response to SUMF 40: Qualified admission. It is admitted that the Mujica

Declaration so states, but SUMF 40 is immaterial as the FOMB has not approved a

PREPA Fiscal Plan for year 2024.

41.        **Additional consequences of PREPA's politicized decision-making
identified by the PREPA Fiscal Plan include: PREPA repeatedly "issu[ing] more debt to
cover current debt service rather than [setting] rates at a level sufficiently high" to support
its costs; "operat[ing] under a fiscal deficit since the early 2000s"; and "historically
underinvest[ing]" in its electrical grid, resulting in "reliability metrics drastically lower
than other U.S. peers." Mujica Decl. Ex. 2 at 36, 100.**

Senate's Response to SUMF 41: Qualified admission. It is admitted that the Mujica

Declaration so states, but SUMF 40 is immaterial as the FOMB has not approved a

PREPA Fiscal Plan for year 2024.

42.        **The 2020 PREPA Fiscal Plan states the transformation of Puerto Rico's
energy sector into a "safe, reliable, affordable, modern system depends on the presence and
active involvement of a rational, politically independent, and professionally supported
regulator" whose determinations "should be free of any political influence or interference."
Mujica Decl. Ex. 4 at 36.**

Senate's Response to SUMF 42: Qualified admission. It is admitted that the Mujica

Declaration so states, but SUMF 42 is immaterial as PREPA is a covered instrumentality

under PROMESA and the FOMB has not approved a PREPA Fiscal Plan for year 2024.

43.        **The October 2018 Commonwealth Fiscal Plan states that "[a] strong and
independent regulator of the power sector is required and will additionally support the**

success of the power sector transformation" and is key to the "the long-term sustainability of Puerto Rico's energy sector." Mujica Decl. Ex. 5 at 56.

Senate's Response to SUMF 43: Qualified admission. It is admitted that the Mujica Declaration so states, but SUMF 43 is immaterial as PREPA is a covered instrumentality under PROMESA and the FOMB has not approved a PREPA Fiscal Plan for year 2024.

44.      The 2021 Commonwealth Fiscal Plan states that "[a] strong and independent energy sector regulator is essential for injecting certainty and stability into the energy market, promoting much needed investments, and enforcing compliance with the energy sector transformation's objectives." Mujica Decl. Ex. 6 at 129.

Senate's Response to SUMF 44: Qualified admission. It is admitted that the Mujica Declaration so states, but SUMF 44 is immaterial as PREPA is a covered instrumentality under PROMESA and the FOMB has not approved a PREPA Fiscal Plan for year 2024.

45.      The PREPA Fiscal Plan mandates the Energy Bureau "remain financially and operationally independent from the Commonwealth Government and its determinations must be free from any direct or indirect political influence or interference." Mujica Decl. Ex. 2 at 74.

Senate's Response to SUMF 45: Qualified admission. It is admitted that the Mujica Declaration so states, but SUMF 45 is immaterial as the FOMB has not approved a PREPA Fiscal Plan for year 2024.

46.      The PREPA Fiscal Plan also states "[t]he focus in coming years will be continuing to support the independence of the regulator and enabling the regulator to execute on its mandate." Mujica Decl. Ex. 2 at 130.

Senate's Response to SUMF 46: Qualified admission. It is admitted that the Mujica Declaration so states, but SUMF 46 is immaterial as the FOMB has not approved a PREPA Fiscal Plan for year 2024.

47.      The 2024 Commonwealth Fiscal Plan deems the Energy Bureau an "essential component of the energy transformation reforms," as "the existence of an

independent energy regulator is a necessary and common requirement to ensure properly functioning energy systems." Mujica Decl. Ex. 8 at 76.

Senate's Response to SUMF 47: Qualified admission. It is admitted that the Mujica Declaration so states, but SUMF 47 is immaterial as PREPA is a covered instrumentality under PROMESA and the FOMB has not approved a PREPA Fiscal Plan for year 2024.

48.    The 2024 Commonwealth Fiscal Plan states that "[the Energy Bureau's] independence, particularly in areas such as rate making . . . must not be subjected to political interference." Mujica Decl. Ex. 8 at 76.

Senate's Response to SUMF 48: Qualified admission. It is admitted that the Mujica Declaration so states, but SUMF 48 is immaterial as PREPA is a covered instrumentality under PROMESA and the FOMB has not approved a PREPA Fiscal Plan for year 2024.

49.    The 2023 Commonwealth Fiscal Plan was in effect at the time Act 10 was enacted. Mujica Decl. Ex. 7.

Senate's Response to SUMF 49: Qualified admission. It is admitted that the Mujica Declaration so states, but SUMF 49 is immaterial as PREPA is a covered instrumentality under PROMESA and the FOMB has not approved a PREPA Fiscal Plan for year 2024.

50.    The 2023 Commonwealth Fiscal Plan states: "A strong and independent energy sector regulator is essential for injecting certainty and stability into the energy market." Mujica Decl. Ex. 7 at vol. 3, p. 42.

Senate's Response to SUMF 50: Qualified admission. It is admitted that the Mujica Declaration so states, but SUMF 50 is immaterial as PREPA is a covered instrumentality under PROMESA and the FOMB has not approved a PREPA Fiscal Plan for year 2024.

51.    The 2019 PREPA Fiscal Plan lists the Act 17 Study as one of its "Key Regulator Issues and Requirements." Mujica Decl. Ex. 3 at 48.

Senate's Response to SUMF 51: Qualified admission. It is admitted that the Mujica

Declaration so states, but SUMF 51 is immaterial as the FOMB has not approved a PREPA

Fiscal Plan for year 2024.

52. **The PREPA Fiscal Plan states that renewable distributed generation "provides benefits to rooftop solar customers," and that a "sub-optimal net metering program . . . may have unintended detrimental effects and risks, including an unequitable distribution of costs throughout the system." Mujica Decl. Ex. 2 at 58.**

Senate's Response to SUMF 52: Denied. SUMF 52 is immaterial and speculative as the

FOMB has not approved a PREPA Fiscal Plan for year 2024. Additionally, to the extent

that this is deemed a material fact, it is hardly undisputed since it is also true that "if

sufficiently large numbers of customers install and operate solar generation, and if utilities

make only prudent and cost-effective investments in the grid, costs for utility services will

decline for all customers." Rábago Decl., ¶ 11. Furthermore, in Puerto Rico net metering

provides an avoided energy cost value of 27¢/kWh, an avoided capacity cost value of

1¢/kWh, and an avoided transmission and distribution cost value of 3¢/kWh. *See* Gabel

Decl. Exh. 1 at p. 8 of 13, ¶¶ 4.1-4.3. Moreover, the direct benefit to the grid and all other

ratepayers of net metering is 33 cents per kWh, which is 36% greater than the retail rate

of 24 cents per kWh. Accordingly, there is no subsidy flowing from other ratepayers to

on-site solar customers. In fact, there are benefits flowing to all other customers from this

solar production. *See* Gabel Decl. Exh. 1 at p. 12 of 13.

53. **The PREPA Fiscal Plan notes that because LUMA is required "to purchase the excess energy produced by net metering customers at the prevailing energy rate, the effective cost to ratepayers of the renewable energy generated by net metering customers may be higher than the cost of purchasing that same quantity of electricity from other resources." Mujica Decl. Ex. 2 at 58.**

<u>Senate's Response to SUMF 53</u>: Denied. SUMF 53 is immaterial and speculative as the FOMB has not approved a PREPA Fiscal Plan for year 2024. Additionally, to the extent that this is deemed a material fact, it is hardly undisputed since it is also true that "if sufficiently large numbers of customers install and operate solar generation, and if utilities make only prudent and cost-effective investments in the grid, costs for utility services will decline for all customers." Rábago Decl. ¶ 11. Furthermore, in Puerto Rico net metering provides an avoided energy cost value of 27¢/kWh, an avoided capacity cost value of 1¢/kWh, and an avoided transmission and distribution cost value of 3¢/kWh. *See* Gabel Decl. Exh. 1 at p. 8 of 13, ¶¶ 4.1-4.3. Moreover, the direct benefit to the grid and all other ratepayers of net metering is 33 cents per kWh, which is 36% greater than the retail rate of 24 cents per kWh. Accordingly, there is no subsidy flowing from other ratepayers to on-site solar customers. In fact, there are benefits flowing to all other customers from this solar production. *See* Gabel Decl. Exh. 1 at p. 12 of 13. Finally, the word "purchase" is false and misleading. LUMA in no case ever "purchases the excess energy….at the prevailing energy rate". LUMA only **credits** customers on their bills, it never "purchase[s]…at the prevailing energy rate". Wilson Decl. ¶ 13.

54.     **The PREPA Fiscal Plan states that the cost to LUMA of the net metering program is "then passed on, in whole or in part, to all other remaining customers." Mujica Decl. Ex. 2 at 58.**

<u>Senate's Response to SUMF 54</u>: Denied. SUMF 54 is immaterial and speculative as the FOMB has not approved a PREPA Fiscal Plan for year 2024. Additionally, to the extent that this is deemed a material fact, it is hardly undisputed since it is also true that "if sufficiently large numbers of customers install and operate solar generation, and if utilities make only prudent and cost-effective investments in the grid, costs for utility services will

decline for all customers." Rábago Decl. ¶ 11. Furthermore, in Puerto Rico net metering provides an avoided energy cost value of 27¢/kWh, an avoided capacity cost value of 1¢/kWh, and an avoided transmission and distribution cost value of 3¢/kWh. *See* Gabel Decl. Exh. 1 at p. 8 of 13, ¶¶ 4.1-4.3. Moreover, the direct benefit to the grid and all other ratepayers of net metering is 33 cents per kWh, which is 36% greater than the retail rate of 24 cents per kWh. Accordingly, there is no subsidy flowing from other ratepayers to on-site solar customers. In fact, there are benefits flowing to all other customers from this solar production. *See* Gabel Decl. Exh. 1 at p. 12 of 13.

55.      **The PREPA Fiscal Plan requires the Energy Bureau to "finalize the [Act 17] net metering and distributed generation study" by June 30, 2023 and "initiate a process for implementing recommendations and conclusions of the study and updating a net metering compensation and crediting structure, if it deems appropriate," by April 11, 2024, and lists the study and proposed new crediting structure as a regulatory milestone. Mujica Decl. Ex. 2 at 58– 59; *see also id.* at 52.**

Senate's Response to SUMF 55: Denied. SUMF 55 is immaterial as the FOMB has not approved a PREPA Fiscal Plan for year 2024. SUMF 55 is contrary to the plain text of Act 17, which requires the Act 17 Study to be completed by April 11, 2024, not June 30, 2023. *See* SUMF 28, *supra*.

56.      **The Energy Bureau engaged a consultant, KeyLogic Systems, LLC, to prepare the Act 17 study in 2023. Mujica Decl. ¶ 13; Brenner Decl. Ex. 11.**

Senate's Response to SUMF 56: Admitted.

57.      **On January 10, 2024, the Governor signed Act 10 into law. Mujica Decl. Ex. 10 at 5.**

Senate's Response to SUMF 57: Admitted.

58.     **Act 10 was enacted three months before Act 17's deadline for the Energy Bureau to complete the Act 17 Study and potentially announce changes to the net metering program. Brenner Decl. Exs. 4 at 5, 3 at 68–69.**

**Senate's Response to SUMF 58**: Denied. The Senate objects to this statement as immaterial, misleading, argumentative, and speculative. From filing at the Senate on October 21, 2022, to signature by the Governor on January 10, 2024, the approval process of S.B. 1064 as Act 10, took 14 months and 11 days. *See* Dkt. No. 53-1; § 2, at p. 9 (certified translation). Whether the Energy Bureau was to announce changes to the net metering program is speculative and, thus, not a fact to be considered by the Court. Moreover, whether the Energy Bureau was going to complete and potentially announce changes to the net metering program is not substantiated by the Declaration nor by the Attachments cited in the Declaration. Additionally, the statement is **materially false**. There was **no possibility** that the Energy Bureau would announce changes to net metering on that date because the Energy Bureau had not completed the study required by Act 17 with its public comment requirements. Act 17 which the Declaration cites clearly states that the study **"shall be subject to public comment"**. **Brenner Decl. Ex. 3 at 70.** This is clearly evidenced by the preliminary draft study that was published months after the deadline, with no clear conclusions and which expressly states that public comment is needed.

59.     **Act 10 provides the Energy Bureau may not commence the Act 17 Study on net metering until January 2030, which is more than five years after the study was required to be completed under Act 17. Brenner Decl Exs. 4, § 1(a), 3 at 68–70.**

Senate's Response to SUMF 59: Denied. It is admitted that Act 10 provides that the Energy Bureau may not commence the Act 17 net metering study until January 2030. The rest of SUMF 59 is denied. At the time that Act 17 was enacted, the five-year mark would have fallen in the period where Puerto Rico would have to meet well above 20%

Renewable Energy and on path to 40%. Dkt. No. 1, Exh. 6 at 83. Pursuant to its legislative history, Act 10 recognized that the five-year period included in Act 17 when it amended Act 114 was based on those proposed renewable energy goals, specifically 25% distributed solar energy. The Report of the Strategic Project and Energy Commission of the Senate of Puerto Rico concluded that:

> In order not to weaken the net metering program, it is necessary to amend Article 4 of Law 114-2007. The study mandated by said Article is supposed to be conducted in April 2024, that is, 5 years after the approval of Act 114-2007. **When that term was established, it was thought that, at the end of those 5 years, Puerto Rico would be above 25% of distributed renewable energy generation. We are far from that. As of today, we barely surpass 3% of distributed solar energy generation.**
>
> Therefore, by amending Article 4 of Act 114-2007, as proposed in the amended bill, **we give until the year 2030 for the net metering rate to remain unchanged. According to the information provided by the Bureau, the interconnection rate of distributed solar systems would reach about 2500 MW of distributed renewable energy generation by 2030, which would be equivalent to 25% of Puerto Rico's energy consumption**.

Dkt. No. 18-1, (certified translation) (emphasis added).

60.      **Act 10 provides the Energy Bureau cannot "make any determination related to the net metering program" until "after the study is concluded[.]" Brenner Decl. Ex. 4, § 1(a).**

> Senate's Response to SUMF 60: Denied. The Senate objects to this statement as grossly misleading. This language is not exclusive to Act 10 and is related to the underlying assumption that the net metering program is meant to promote renewable energy. **The clauses that maintain current policy until the study is completed and carried out are not a product of Act 10, but have been an essential part of Act 114 since Act 17 was**

**enacted, with FOMB's approva**l. The text of Act 10, which amends Act 114 as amended by Act 17 states:

> **After the study is concluded, the Bureau may make any determination** related to the net metering program, t**aking into consideration the results of such study**, **<u>provided that the current net metering policy shall continue while the study is being carried out</u>**, and for a period of not less than 12 months after the Bureau of Energy makes any decision to change the net metering policy.

Brenner Decl. Exs.  3 at 70 (emphasis added). Meanwhile the original text of Act 17 amending Act 114 states:

> Five (5) years after the approval of the Puerto Rico Energy Public Policy Act, **the Bureau may issue any determination concerning the net metering program while taking into account the results of such study**. . . . **During the aforementioned five (5)-year period, and until the Energy Bureau establishes the appropriate values** for distributed energy and energy storage systems **in accordance with the study** described in the preceding subsection, **the credit for energy exported by net metering customers shall be** equal to the value of such energy according to the customer's applicable rate, and any charges applicable to net metering customers shall be based on their net consumption.

Dkt. No. 1, Exh. 6 at 69-70 (emphasis added).

Additionally, at the time that Act 17 was enacted, the five-year mark would have fallen in the period where Puerto Rico would have had to meet well over 20% Renewable Energy and on path to 40%. Dkt. No. 1, Exh. 6 at 83. Pursuant to its legislative history, Act 10 recognized that the five-year period included in Act 17 when it amended Act 114 was based on those proposed renewable energy goals. The Report of the Strategic Project and Energy Commission of the Senate of Puerto Rico concluded that:

> In order not to weaken the net metering program, it is necessary to amend Article 4 of Law 114-2007. The study mandated by said Article is supposed to be conducted in April 2024, that is, 5 years after the approval of Act 114-2007. **When that term was established, it was thought that, at the end**

of those 5 years, Puerto Rico would be above 25% of distributed renewable energy generation. We are far from that. As of today, we barely surpass 3% of distributed solar energy generation.

Therefore, by amending Article 4 of Act 114-2007, as proposed in the amended bill, **we give until the year 2030 for the net metering rate to remain unchanged. According to the information provided by the Bureau, the interconnection rate of distributed solar systems would reach about 2500 MW of distributed renewable energy generation by 2030, which would be equivalent to 25% of Puerto Rico's energy consumption**.

Dkt. No. 18-1, (certified translation) (emphasis added).

6      1.      **Act 10 provides any changes to the net metering rate structure can only take effect 12 months after the Energy Bureau decides to make any such changes. Brenner Decl. Ex. 4, § 1(a).**

Senate's Response to SUMF 61: Qualified admission. SUMF 61 is admitted with the

following clarification: At the time that Act 17 was enacted, the five-year mark would

have fallen in the period where Puerto Rico would have had to meet well over 20% %

Renewable Energy and on path to 40%. Dkt. No. 1, Exh. 6 at 83. Pursuant to its legislative

history, Act 10 recognized that the five-year period included in Act 17 when it amended

Act 114 was based on those proposed renewable energy goals. The Report of the Strategic

Project and Energy Commission of the Senate of Puerto Rico concluded that:

In order not to weaken the net metering program, it is necessary to amend Article 4 of Law 114-2007. The study mandated by said Article is supposed to be conducted in April 2024, that is, 5 years after the approval of Act 114-2007. **When that term was established, it was thought that, at the end of those 5 years, Puerto Rico would be above 25% of distributed renewable energy generation. We are far from that. As of today, we barely surpass 3% of distributed solar energy generation.**

Therefore, by amending Article 4 of Act 114-2007, as proposed in the amended bill, **we give until the year 2030 for the net metering rate to**

**remain unchanged. According to the information provided by the Bureau, the interconnection rate of distributed solar systems would reach about 2500 MW of distributed renewable energy generation by 2030, which would be equivalent to 25% of Puerto Rico's energy consumption**.

Dkt. No. 18-1, (certified translation) (emphasis added).

62.       **Act 10's provisions, taken together, mean that the "current net metering policy", including the 1:1 net metering rate structure, must remain in place until at least 2031. Brenner Decl. Ex. 4, § 1(a).**

Senate's Response to SUMF 62: Qualified admission. SUMF 62 is admitted with the following clarification: At the time that Act 17 was enacted, the five-year mark would have fallen in the period where Puerto Rico would have had to meet well over 20% Renewable Energy, and on path to 40%. Dkt. No. 1, Exh. 6 at 83. Pursuant to its legislative history, Act 10 recognized that the five-year period included in Act 17 when it amended Act 114 was based on those proposed renewable energy goals. The Report of the Strategic Project and Energy Commission of the Senate of Puerto Rico concluded that:

In order not to weaken the net metering program, it is necessary to amend Article 4 of Law 114-2007. The study mandated by said Article is supposed to be conducted in April 2024, that is, 5 years after the approval of Act 114-2007. **When that term was established, it was thought that, at the end of those 5 years, Puerto Rico would be above 25% of distributed renewable energy generation. We are far from that. As of today, we barely surpass 3% of distributed solar energy generation.**

Therefore, by amending Article 4 of Act 114-2007, as proposed in the amended bill, **we give until the year 2030 for the net metering rate to remain unchanged. According to the information provided by the Bureau, the interconnection rate of distributed solar systems would reach about 2500 MW of distributed renewable energy generation by 2030, which would be equivalent to 25% of Puerto Rico's energy consumption**.

Dkt. No. 18-1, (certified translation) (emphasis added).

63.     **Act 10 provides that any customer with a contract, or who has a distributed generator installed and certified by a licensed professional and has notified the Energy Bureau of the installation at the time the Energy Bureau issues its final determination changing the net metering rate structure must be entitled to enjoy the present 1:1 net metering rate for at least 20 years from the date of such final determination. Brenner Decl. Ex. 4, § 1(a).**

Senate's Response to SUMF 63: This statement is denied. The Senate objects to this statement as **misleading**. This language is not exclusive to Act 10 and is related to the underlying assumption that the net metering program is meant to promote renewable energy. **The grandfather clause is not a product of Act 10, but has been an essential part of Act 114 since Act 17 was enacted, with FOMB's approval.** The text of Act 10, which amends Act 114 as amended by Act 17 states:

> **Any customer who, on the date on which the Bureau issues its final determination, has a net metering contract** or who has notified the Bureau of the certification of a distributed generator installed by a licensed and registered engineer or by a licensed and registered expert electrician, **shall automatically be considered as a grandfathered net metering customer under the rate in effect prior to the Bureau's final determination**. In such cases, the net metering customer shall be entitled to the rate or compensation mechanism in effect at that time **for a term of not less than twenty (20) years,** counted from the date of such final determination related to net metering. Notwithstanding the foregoing, the net metering customer shall have the right and the option to choose to avail itself of the new rate or compensation mechanism approved by the Bureau.

**Brenner Decl. Ex. 3 at 70 (emphasis added).** Meanwhile the original text of Act 17 amending Act 114 states:

> **Any customer that, on the date in which the Bureau issues its final determination, has a net metering contract** or has notified the Bureau about the certification of the distributed generator installed by a professional engineer or expert electrician, both members of their professional associations and admitted to the practice of their profession, **shall be**

**automatically grandfathered as a net metering customer under the rate in effect before the Bureau's final determination**. In such cases, the net metering customer shall have the right to the rate or compensation mechanism in effect at the time **for a term of not less than twenty (20) years** as of the execution of the net metering contract. However, the net metering customer shall be entitled and may opt to avail himself of the new rate or compensation mechanism approved by the Bureau.

Dkt. No. 1, Exh. 6, at 69-70 (emphasis added).

64.        On February 12, 2024, the Oversight Board received the Submission on behalf of the Governor regarding Act 10, which consisted of: (*i*) a Spanish-language copy of Act 10; (*ii*) the AAFAF Certification; (*iii*) the OMB Attachment prepared in Spanish; and (*iv*) the Treasury Attachment prepared in Spanish. Mujica Decl. ¶ 15& Exs. 10, 11, 12, and 13; Brenner Decl. Exs. 4, 5, and 6.

Senate's Response to SUMF 64: Admitted.

65.        The OMB Attachment is a one-page document. Brenner Decl. Ex. 5.

Senate's Response to SUMF 65: Admitted.

66.        The OMB Attachment states, in part, that after evaluating whether Act 10 "may have a potential fiscal impact on the Expenditure Budget of the Government of Puerto Rico[,]" the OMB determined Act 10 "would not have a fiscal impact and, if any, it would have a minimal impact on the certified budget for the fiscal years 2023-2024." Brenner Decl. Ex. 5 at 1.

Senate's Response to SUMF 66: Admitted.

67.        The OMB Attachment states that its findings regarding Act 10 do not "imply any budgetary impact for the subsequent fiscal years contained in the Certified Fiscal Plan." Brenner Decl. Ex. 5 at 1.

Senate's Response to SUMF 67: Admitted.

68.        While the OMB Attachment references unspecified "corresponding evaluation and analysis," it contains no reasoning, explanation, or financial calculation to support its conclusions. Brenner Decl. Ex. 5.

Senate's Response to SUMF 68: Denied. SUMF 68 is misleading and unduly argumentative. Under PROMESA Section 204, "[t]he Governor shall include with each law submitted to the Oversight Board . . . [a] formal estimate prepared by an appropriate entity of the territorial government with expertise in budgets and financial management **of** the impact, **if any**, that the law will have on expenditures and revenues." 48 U.S.C. § 2144(a)(2)(A )(emphasis added). If that entity "finds that the law is not significantly inconsistent with the Fiscal Plan for the fiscal year, it shall issue a certification of such finding." Id. § 2144(a)(2)(B). Section 204(a)(2)(A) states that the Defendant needs to prepare a formal estimate of the impact **if there is any**. Because the OMB determined that there would be no impact, a formal estimate of that impact is unnecessary.

69.     **The Treasury Attachment "checks" three boxes, signifying the Treasury Department examined the law after enactment, and concluded Act 10 "does not have a fiscal impact," and "would not have an incremental effect" on the "FY 2023-2024 certified budget for" an unspecified agency. Brenner Decl. Ex. 6 at 1. The Treasury Attachment only attempted to address the impact of Act 10 for fiscal year 2023-2024, and did not attempt to examine the impact over the entire period covered by the Fiscal Plans. Brenner Decl. Ex. 6.**

Senate's Response to SUMF 69: Denied. SUMF 69 is misleading and unduly argumentative. Under PROMESA Section 204, "[t]he Governor shall include with each law submitted to the Oversight Board . . . [a] formal estimate prepared by an appropriate entity of the territorial government with expertise in budgets and financial management **of** the impact, **if any**, that the law will have on expenditures and revenues." 48 U.S.C. § 2144(a)(2)(A) (emphasis added). If that entity "finds that the law is not significantly inconsistent with the Fiscal Plan for the fiscal year, it shall issue a certification of such finding." Id. § 2144(a)(2)(B). Section 204(a)(2)(A) states that the Defendant needs to prepare a formal estimate of the impact **if there is any**. Because the OMB and the

Treasury determined that there would be no impact, a formal estimate of that impact is unnecessary.

70.    **The Treasury Attachment includes no reasoning, explanation, or financial calculation to support the Treasury Department's conclusions. Brenner Decl. Ex. 6.**

Senate's Response to SUMF 70: Denied. SUMF 70 is misleading and unduly argumentative. Under PROMESA Section 204, "[t]he Governor shall include with each law submitted to the Oversight Board . . . [a] formal estimate prepared by an appropriate entity of the territorial government with expertise in budgets and financial management **of** the impact, **if any**, that the law will have on expenditures and revenues." 48 U.S.C. § 2144(a)(2)(A) (emphasis added). If that entity "finds that the law is not significantly inconsistent with the Fiscal Plan for the fiscal year, it shall issue a certification of such finding." Id. § 2144(a)(2)(B). Section 204(a)(2)(A) states that the Defendant needs to prepare a formal estimate of the impact **if there is any**. Because the OMB and the Treasury determined that there would be no impact, a formal estimate of that impact is unnecessary.

71.    **The Executive Order states, in part, that the OMB Director is the "sole official authorized to issue certifications of availability of public funds" and only OMB and the Treasury Department are charged with undertaking analyses of new laws to certify their estimated impacts on revenues and spending, as required under PROMESA § 204(a). Brenner Decl. Ex. 8, § 2.**

Senate's Response to SUMF 71: Admitted.

72.    **In a letter dated June 16, 2023, AAFAF confirmed to the Oversight Board that, per the terms of the Executive Order, it does not conduct formal estimates for § 204(a) purposes, stating that "Treasury and/or OMB conduct the cost estimate analysis because those entities (not AAFAF) have the best information and expertise to determine a new law's effects on Government expenditures and revenues." *See* Mujica Decl. Ex. 14 at 2.**

Senate's Response to SUMF 72: Admitted.

73. **The OMB Attachment does not contain the certification that Act 10 is or is not significantly inconsistent with any fiscal plan.** *See* **Mujica Decl. Ex. 12 (Spanish-Language OMB Attachment); Brenner Decl. Ex. 5 (Certified English Translation of OMB Attachment).**

<u>Senate's Response to SUMF 73</u>: Denied. The OMB issued a Certification of Fiscal Impact that specifically refers to the certified fiscal plan. *See* Dkt. No. 48-5 (certified translation).

74. **The Treasury Attachment does not contain a certification that Act 10 is or is not significantly inconsistent with any fiscal plan.** *See* **Mujica Decl. Ex. 13 (Spanish-Language Treasury Attachment); Brenner Decl. Ex. 6 (Certified English Translation of Treasury Attachment).**

<u>Senate's Response to SUMF 74</u>: Admitted.

75. **The Treasury Attachment has "check boxes" for the Treasury Department to certify that the law is or is not "significantly inconsistent with the Certified Fiscal Plan," but neither of the check boxes for certifying consistency with the Fiscal Plan is checked. Mujica Decl. Ex. 13. (Spanish-Language Treasury Attachment) at 2;Brenner Decl. Ex. 6 (Certified English Translation of Treasury Attachment) at 2.**

<u>Senate's Response to SUMF 75</u>: Admitted

76. **The AAFAF Certification includes the following statement: "Act 10 is not significantly inconsistent with the provisions of the [2023] Certified [Commonwealth] Fiscal Plan and PREPA's Certified Fiscal Plan." Mujica Decl. Ex. 11 at 6.**

<u>Senate's Response to SUMF 76</u>: Admitted.

77. **The AAFAF Certification does not address the Fiscal Plans' requirements concerning the Energy Bureau's independence. Mujica Decl. Ex. 11.**

<u>Senate's Response to SUMF 77</u>: Admitted.

78. **The AAFAF Certification states that Act 10 still requires [the Energy Bureau] to conduct the study, it just extends the date for doing so" and the PREPA Fiscal Plan "does not include or require a change to the current net metering law or policy." Mujica Decl. Ex. 11 at 6. AAFAF concluded Act 10 will have no fiscal impact on PREPA because to meet the PREPA Fiscal Plan's projected rate of new interconnected net solar metering capacity, AAFAF claims the current rate of growth must be maintained, and**

assumes the only way that can happen is if the current net metering program is continued without changes—but provides no explanation for why its conclusions and assumptions should be credited and what AAFAF did to test its hypothesis. *Id.* at 5.

Senate's Response to SUMF 78: Denied. The first sentence of SUMF 78 is admitted. The second sentence is denied as argumentative, in violation of *Fed.R.Civ.P. 56*, and misleading. Under PROMESA Section 204, "[t]he Governor shall include with each law submitted to the Oversight Board . . . [a] formal estimate prepared by an appropriate entity of the territorial government with expertise in budgets and financial management **of** the impact, **if any**, that the law will have on expenditures and revenues." 48 U.S.C. § 2144(a)(2)(A)(emphasis added). If that entity "finds that the law is not significantly inconsistent with the Fiscal Plan for the fiscal year, it shall issue a certification of such finding." Id. § 2144(a)(2)(B). Section 204(a)(2)(A) states that the Defendant needs to prepare a formal estimate of the impact **if there is any**. Because the OMB and the Treasury determined that there would be no impact, a formal estimate of that impact is unnecessary. AAFAF's certification confirmed OMB's and the Treasury's prior analysis.

79.     **In a letter dated April 10, 2024, the Oversight Board provided AAFAF, the Governor, and the Legislature with its assessment of the Submission and, pursuant to PROMESA § 204(a)(3)(A–B), a notification that the Governor had not provided the required formal estimate and certification. Mujica Decl. ¶ 18 & Ex. 15.**

Senate's Response to SUMF 79: Denied. It is admitted that the FOMB sent such a communication. It is denied that the Governor had not provided the required formal estimate and certification. Under PROMESA Section 204, "[t]he Governor shall include with each law submitted to the Oversight Board . . . [a] formal estimate prepared by an appropriate entity of the territorial government with expertise in budgets and financial management **of** the impact, **if any**, that the law will have on expenditures and revenues."

48 U.S.C. § 2144(a)(2)(A)(emphasis added). If that entity "finds that the law is not significantly inconsistent with the Fiscal Plan for the fiscal year, it shall issue a certification of such finding." Id. § 2144(a)(2)(B). Section 204(a)(2)(A) states that the Defendant needs to prepare a formal estimate of the impact **if there is any**. Because the OMB and the Treasury determined that there would be no impact, a formal estimate of that impact is unnecessary. AAFAF's certification confirmed OMB's and the Treasury's prior analysis. Furthermore, both the OMB and the Treasury issued their own certifications of fiscal impact. *See* Dkt. Nos. 48-5 & 48-6 (certified translations).

80.     **In its April 10, 2024 letter, pursuant to PROMESA § 204(a)(4)(A), the Oversight Board directed the Governor to submit a revised submission, including a formal estimate and a certification in compliance with the requirements of PROMESA § 204(a)(2), by April 19, 2024. Mujica Decl. ¶ 19 & Ex. 15 at 6.**

Senate's Response to SUMF 80: Denied. It is admitted the FOMB sent such a communication. It is denied that the Governor could require the Governor to submit a revised submission. Under PROMESA Section 204, "[t]he Governor shall include with each law submitted to the Oversight Board . . . [a] formal estimate prepared by an appropriate entity of the territorial government with expertise in budgets and financial management **of** the impact, **if any**, that the law will have on expenditures and revenues." 48 U.S.C. § 2144(a)(2)(A)(emphasis added). If that entity "finds that the law is not significantly inconsistent with the Fiscal Plan for the fiscal year, it shall issue a certification of such finding." Id. § 2144(a)(2)(B). Section 204(a)(2)(A) states that the Defendant needs to prepare a formal estimate of the impact **if there is any**. Because the OMB and the Treasury determined that there would be no impact, a formal estimate of that impact is unnecessary. AAFAF's certification confirmed OMB's and the Treasury's

prior analysis. Furthermore, both the OMB and the Treasury issued their own certifications of fiscal impact. *See* Dkt. Nos. 48-5 & 48-6 (certified translations).

81.        **In its April 10, 2024 letter, the Oversight Board also requested confirmation by April 15, 2024, that the Government would repeal or amend Act 10 and further requested a "concrete plan and timeline for doing so." Mujica Decl. ¶ 19 & Ex. 15 at 6.**

Senate's Response to SUMF 81: Denied. It is admitted the FOMB sent such a communication. It is denied that the FOMB is authorized to require the Government to repeal or amend Act 10. Under PROMESA Section 204, "[t]he Governor shall include with each law submitted to the Oversight Board . . . [a] formal estimate prepared by an appropriate entity of the territorial government with expertise in budgets and financial management **of** the impact, **if any**, that the law will have on expenditures and revenues." 48 U.S.C. § 2144(a)(2)(A)(emphasis added). If that entity "finds that the law is not significantly inconsistent with the Fiscal Plan for the fiscal year, it shall issue a certification of such finding." Id. § 2144(a)(2)(B). Section 204(a)(2)(A) states that the Defendant needs to prepare a formal estimate of the impact **if there is any**. Because the OMB and the Treasury determined that there would be no impact, a formal estimate of that impact is unnecessary. AAFAF's certification confirmed OMB's and the Treasury's prior analysis. Furthermore, both the OMB and the Treasury issued their own certifications of fiscal impact. *See* Dkt. Nos. 48-5 & 48-6 (certified translations).

82.        **AAFAF responded to the Oversight Board's April 10, 2024 letter in a letter dated April 15, 2024, stating, in part, that the "Government understands the Oversight Board's concerns expressed in the [April 10] Letter" and that it would "assess[] any potential changes to the 204 Submission, or to Act 10, (if any) that may be warranted in order to implement [Act 10] in a manner not significantly inconsistent with PREPA's Certified Fiscal Plan." Mujica Decl. ¶ 20 & Ex. 16 at 2. It further claimed that conducting the formal estimate required by PROMESA § 204(a) "represents the functional equivalent of completing the [net metering] Study, which the Government acknowledges is [the Energy**

Bureau's] responsibility given its expertise and unique role as PREPA's independent
regulator." Mujica Decl. Ex. 16 at 2. It further suggested that AAFAF's analysis of PREPA
Fiscal Plan projections was a suitable formal estimate. *Id.*

    Senate's Response to SUMF 82: Admitted.

    83.      In AAFAF's April 15, 2024 letter, it requested the Oversight Board
"provide" an unspecified amount of "additional time" to conduct its assessment of "any
potential changes to the 204 Submission, or to Act 10, (if any) that may be warranted in
order to implement [Act 10] in a manner not significantly inconsistent with PREPA's
Certified Fiscal Plan." Mujica Decl. ¶ 20 & Ex. 16 at 2.

    Senate's Response to SUMF 83: Admitted.

    84.    The Oversight Board responded to AAFAF's April 15, 2024 letter in a letter
dated May 2, 2024, in which it, among other things, reiterated its concerns and noted that
AAFAF's letter did not "resolve the issues raised by the Oversight Board" regarding Act
10. Mujica Decl. ¶ 21 & Ex. 17 at 1.

    Senate's Response to SUMF 84: Denied. It is admitted that the FOMB sent such a

communication. It is denied that AAFAF's letter did not resolve the issues raised by the

FOMB because it is false that the Governor had not provided the required formal estimate

and certification. Under PROMESA Section 204, "[t]he Governor shall include with each

law submitted to the Oversight Board . . . [a] formal estimate prepared by an appropriate

entity of the territorial government with expertise in budgets and financial management **of**

the impact, **if any**, that the law will have on expenditures and revenues." 48 U.S.C. §

2144(a)(2)(A)(emphasis added). If that entity "finds that the law is not significantly

inconsistent with the Fiscal Plan for the fiscal year, it shall issue a certification of such

finding." Id. § 2144(a)(2)(B). Section 204(a)(2)(A) states that the Defendant needs to

prepare a formal estimate of the impact **if there is any**. Because the OMB and the Treasury

determined that there would be no impact, a formal estimate of that impact is unnecessary.

AAFAF's certification confirmed OMB's and the Treasury's prior analysis. Furthermore,

both the OMB and the Treasury issued their own certifications of fiscal impact. *See* Dkt.

Nos. 48-5 & 48-6 (certified translations).

85.    **In its May 2, 2024 letter, the Oversight Board requested the Governor "take immediate action and work with the [Legislature] to repeal or amend Act 10 to restore [the Energy Bureau's] full statutory oversight over Puerto Rico's energy system." Mujica Decl. ¶ 21 & Ex. 17 at 2.**

**Senate's Response to SUMF 85**: Qualified admission. SUMF 85 is admitted with the

following clarification: Act 10 did not limit the Energy Bureau's authority in any way. Act

10 merely changes the timeframe for the PREB's study on the net metering program, from a

due date of April 2024 to a date of January 2030, when it may begin the study. It does not

introduce any substantive changes to the operation or regulation of the net metering program

itself, nor does it alter the compensation mechanisms for existing customers. *See* Act 10

(Certified English Translation), Dkt. 1-7, Pp. 6-8 of 12. Furthermore, at the time that Act 17

was enacted, the five-year mark would have fallen in the period where Puerto Rico would

have to meet well over 20% Renewable Energy, and on path to 40%. Dkt. No. 1, Exh. 6 at

83. Pursuant to its legislative history, Act 10 recognized that the five-year period included in

Act 17 when it amended Act 114 was based on those proposed renewable energy goals. The

Report of the Strategic Project and Energy Commission of the Senate of Puerto Rico

concluded that:

> In order not to weaken the net metering program, it is necessary to amend Article 4 of Law 114-2007. The study mandated by said Article is supposed to be conducted in April 2024, that is, 5 years after the approval of Act 114-2007. **When that term was established, it was thought that, at the end of those 5 years, Puerto Rico would be above 25% of distributed renewable energy generation. We are far from that. As of today, we barely surpass 3% of distributed solar energy generation.**

Therefore, by amending Article 4 of Act 114-2007, as proposed in the amended bill **we give until the year 2030 for the net metering rate to remain unchanged. According to the information provided by the Bureau, the interconnection rate of distributed solar systems would reach about 2500 MW of distributed renewable energy generation by 2030, which would be equivalent to 25% of Puerto Rico's energy consumption**.

Dkt. No. 18-1, (certified translation) (emphasis added).

86.          **In its May 2, 2024 letter, the Oversight Board requested that such "legislation to repeal or amend" the provisions of Act 10 "be introduced in the Legislature no later than May 7, 2024"—the last day to introduce legislation for consideration in the then-current legislative session—"and enacted no later than June 30, 2024" to "restore [the Energy Bureau's] full statutory oversight over Puerto Rico's energy system." Mujica Decl. ¶ 21 & Ex. 17 at 2.**

Senate's Response to SUMF 86: Qualified admission. SUMF 86 is admitted with the following clarification: Act 10 did not limit the Energy Bureau's authority in any way. Act 10 merely changes the timeframe for the PREB's study on the net metering program, from a due date of April 2024 to a date of January 2030, when it may begin the study. It does not introduce any substantive changes to the operation or regulation of the net metering program itself, nor does it alter the compensation mechanisms for existing customers. *See* Act 10 (Certified English Translation), Dkt. 1-7, Pp. 6-8 of 12. Furthermore, at the time that Act 17 was enacted, the five-year mark would have fallen in the period where Puerto Rico would have to meet at least a 25% Renewable Energy Percentage. Dkt. No. 1, Exh. 6 at 83. Pursuant to its legislative history, Act 10 recognized that the five-year period included in Act 17 when it amended Act 114 was based on those proposed renewable energy goals. The Report of the Strategic Project and Energy Commission of the Senate of Puerto Rico concluded that:

In order not to weaken the net metering program, it is necessary to amend Article 4 of Law 114-2007. The study mandated by said Article is supposed to be conducted in April 2024, that is, 5 years after the approval of Act 114-

2007. **When that term was established, it was thought that, at the end
of those 5 years, Puerto Rico would be above 25% of distributed
renewable energy generation. We are far from that. As of today, we
barely surpass 3% of distributed solar energy generation.**

Therefore, by amending Article 4 of Act 114-2007, as proposed in the
amended bill, **we give until the year 2030 for the net metering rate to
remain unchanged. According to the information provided by the
Bureau, the interconnection rate of distributed solar systems would
reach about 2500 MW of distributed renewable energy generation by
2030, which would be equivalent to 25% of Puerto Rico's energy
consumption**.

Dkt. No. 18-1, (certified translation) (emphasis added).

87.        **In its May 2, 2024 letter, the Oversight Board offered to "work with" the
Government to "ensure the issues with Act 10 are fully resolved." Mujica Decl. ¶ 21 & Ex.
17 at 2.**

Senate's Response to SUMF 87: Qualified admission. SUMF 87 is admitted with the

following clarification: There was no need to resolve issues with Act 10, as it did not limit the

Energy Bureau's authority in any way. Act 10 merely changes the timeframe for the PREB's study

on the net metering program, from a due date of April 2024 to a date of January 2030, when it may

begin the study. It does not introduce any substantive changes to the operation or regulation of the

net metering program itself, nor does it alter the compensation mechanisms for existing customers.

*See* Act 10 (Certified English Translation), Dkt. 1-7, Pp. 6-8 of 12. Furthermore, at the time that

Act 17 was enacted, the five-year mark would have fallen in the period where Puerto Rico would

have to meet well over 20% Renewable Energy and on path to 40%. Dkt. No. 1, Exh. 6 at 83.

Pursuant to its legislative history, Act 10 recognized that the five-year period included in Act 17

when it amended Act 114 was based on those proposed renewable energy goals. The Report of the

Strategic Project and Energy Commission of the Senate of Puerto Rico concluded that:

In order not to weaken the net metering program, it is necessary to amend Article 4 of Law 114-2007. The study mandated by said Article is supposed to be conducted in April 2024, that is, 5 years after the approval of Act 114-2007. **When that term was established, it was thought that, at the end of those 5 years, Puerto Rico would be above 25% of distributed renewable energy generation. We are far from that. As of today, we barely surpass 3% of distributed solar energy generation.**

Therefore, by amending Article 4 of Act 114-2007, as proposed in the amended bill **we give until the year 2030 for the net metering rate to remain unchanged. According to the information provided by the Bureau, the interconnection rate of distributed solar systems would reach about 2500 MW of distributed renewable energy generation by 2030, which would be equivalent to 25% of Puerto Rico's energy consumption**.

Dkt. No. 18-1, (certified translation) (emphasis added).

88.     **In a letter dated May 7, 2024, AAFAF responded to the Oversight Board, requesting that the Legislature be given "additional time within the current legislative session that ends on June 30, [2024] to consider the Oversight Board's objections, engage in discussions and address potential amendments to Act 10 through the legislative process" and "gather industry feedback" in order to make an "informed decision regarding Act 10."Mujica Decl. ¶ 22 & Ex. 18 at 1–2.**

<u>**Senate's Response to SUMF 88**</u>: Qualified admission. SUMF 88 is admitted with the following clarification: Act 10 did not limit the Energy Bureau's authority in any way. Act 10 merely changes the timeframe for the PREB's study on the net metering program, from a due date of April 2024 to a date of January 2030, when it may begin the study. It does not introduce any substantive changes to the operation or regulation of the net metering program itself, nor does it alter the compensation mechanisms for existing customers. *See* Act 10 (Certified English Translation), Dkt. 1-7, Pp. 6-8 of 12. Furthermore, at the time that Act 17 was enacted, the five-year mark would have fallen in the period where Puerto Rico would have to meet well over 20% Renewable Energy, and on path to 40%. Dkt. No. 1, Exh. 6 at 83. Pursuant to its legislative history,

Act 10 recognized that the five-year period included in Act 17 when it amended Act 114 was based on those proposed renewable energy goals. The Report of the Strategic Project and Energy Commission of the Senate of Puerto Rico concluded that:

> In order not to weaken the net metering program, it is necessary to amend Article 4 of Law 114-2007. The study mandated by said Article is supposed to be conducted in April 2024, that is, 5 years after the approval of Act 114-2007. **When that term was established, it was thought that, at the end of those 5 years, Puerto Rico would be above 25% of distributed renewable energy generation. We are far from that. As of today, we barely surpass 3% of distributed solar energy generation.**
>
> Therefore, by amending Article 4 of Act 114-2007, as proposed in the amended bill, **we give until the year 2030 for the net metering rate to remain unchanged. According to the information provided by the Bureau, the interconnection rate of distributed solar systems would reach about 2500 MW of distributed renewable energy generation by 2030, which would be equivalent to 25% of Puerto Rico's energy consumption**.

Dkt. No. 18-1, (certified translation) (emphasis added).

89. **As of September 25, 2024, the Governor has made no additional submissions pursuant to § 204(a) with regard to Act 10. Accordingly, he has failed to comply with the Oversight Board's direction, made onApril 10, 2024, to provide a compliant formal estimate and certification for Act 10. Mujica Decl. ¶ 24.**

**Senate's Response to SUMF 89**: Denied. The first sentence of SUMF 89 is admitted. It is denied that the Governor failed to provide a compliant estimate and certification for Act 10. It is false that the Governor had not provided the required formal estimate and certification. Under PROMESA Section 204, "[t]he Governor shall include with each law submitted to the Oversight Board . . . [a] formal estimate prepared by an appropriate entity of the territorial government with expertise in budgets and financial management **of** the impact, **if any**, that the law will have on expenditures and revenues." 48 U.S.C. §

2144(a)(2)(A) (emphasis added). If that entity "finds that the law is not significantly inconsistent with the Fiscal Plan for the fiscal year, it shall issue a certification of such finding." Id. § 2144(a)(2)(B). Section 204(a)(2)(A) states that the Defendant needs to prepare a formal estimate of the impact **if there is any**. Because the OMB and the Treasury determined that there would be no impact, a formal estimate of that impact is unnecessary. AAFAF's certification confirmed OMB's and the Treasury's prior analysis. Furthermore, both the OMB and the Treasury issued their own certifications of fiscal impact. See Dkt. Nos. 48-5 & 48-6 (certified translations).

90.      **As of September 25, 2024, no legislation has been passed repealing or amending Act 10. Mujica Decl. ¶ 23.**

Senate's Response to SUMF 90: Admitted.

91.      **After Act 10's enactment, the Oversight Board and its advisors examined the law. Mujica Decl. ¶ 25.**

Senate's Response to SUMF 91: Admitted.

92.      **On April 5, 2024, based on its review and analysis, the Oversight Board determined Act 10 impairs or defeats PROMESA's purposes of achieving fiscal responsibility and access to capital markets for multiple independent reasons, including because Act 10:**

    a.      **"directly contravene[es] the express terms of the [PREPA Fiscal Plan and the 2023 Commonwealth Fiscal Plan], which require [the Energy Bureau] to be political independent";**

    b.      **violates the express terms of the PREPA Fiscal Plan, which requires the Energy Bureau to conduct and "complete its net metering study and implement any changes to PREPA's net metering program it deems appropriate by April 11, 2024"; and**

    c.      **"impairs the Oversight Board's ability to carry out its statutory duties under PROMESA § 201(b)(1)(B), (G), (H), and (J) to ensure funding of the essential public service of reliable electricity, to enable the achievement of fiscal targets, to create independent revenue forecasts, and to provide for capital expenditures and investments necessary to promote economic growth." Mujica Decl. Ex. 19 at 3.**

<u>Senate's Response to SUMF 92</u>: Denied. The FOMB's conclusions are false. Act 10 did not limit the Energy Bureau's authority in any way. Act 10 merely changes the timeframe for the PREB's study on the net metering program, from a due date of April 2024 to a date of January 2030, when it may begin the study. It does not introduce any substantive changes to the operation or regulation of the net metering program itself, nor does it alter the compensation mechanisms for existing customers. *See* Act 10 (Certified English Translation), Dkt. 1-7, Pp. 6-8 of 12. Furthermore, at the time that Act 17 was enacted, the five-year mark would have fallen in the period where Puerto Rico would have to meet well over 20% Renewable Energy, and on path to 40%. Dkt. No. 1, Exh. 6 at 83. Pursuant to its legislative history, Act 10 recognized that the five-year period included in Act 17 when it amended Act 114 was based on those proposed renewable energy goals. The Report of the Strategic Project and Energy Commission of the Senate of Puerto Rico concluded that:

> In order not to weaken the net metering program, it is necessary to amend Article 4 of Law 114-2007. The study mandated by said Article is supposed to be conducted in April 2024, that is, 5 years after the approval of Act 114-2007. **When that term was established, it was thought that, at the end of those 5 years, Puerto Rico would be above 25% of distributed renewable energy generation. We are far from that. As of today, we barely surpass 3% of distributed solar energy generation.**
>
> Therefore, by amending Article 4 of Act 114-2007, as proposed in the amended bill, **we give until the year 2030 for the net metering rate to remain unchanged. According to the information provided by the Bureau, the interconnection rate of distributed solar systems would reach about 2500 MW of distributed renewable energy generation by 2030, which would be equivalent to 25% of Puerto Rico's energy consumption**.

Dkt. No. 18-1, (certified translation) (emphasis added).

In addition, SUMF 92 is contrary to the plain text of Act 17, which requires the Act 17 Study to be completed by April 11, 2024, not June 30, 2023. *See* SUMF 28, *supra*. Additionally, to the extent that this is deemed a material fact, it is hardly undisputed since net metering has a positive impact in Puerto Rico's economy. In Puerto Rico, net metering provides an avoided energy cost value of 27¢/kWh, an avoided capacity cost value of 1¢/kWh, and an avoided transmission and distribution cost value of 3¢/kWh. *See* Gabel Decl. Exh. 1 at p. 8 of 13, ¶¶ 4.1-4.3. Moreover, the direct benefit to the grid and all other ratepayers of net metering is 33 cents per kWh, which is 36% greater than the retail rate of 24 cents per kWh. Accordingly, there is no subsidy flowing from other ratepayers to on-site solar customers. In fact, there are benefits flowing to all other customers from this solar production. *See* Gabel Decl. Exh. 1 at p. 12 of 13.

93.        **The Oversight Board memorialized its determination in the April Resolution passed on April 5, 2024, which concluded, in part, that Act 10 "violates the Fiscal Plans by interfering with [the Energy Bureau's] independence [and] by imposing numerous decisions upon [the Energy Bureau] regarding net metering," including by "prohibiting it from making any changes to PREPA's net metering policy until at least 2031, and [] mandating that it establish a legacy program providing PREPA net metering customers and other eligible customers with the current net metering program's terms through at least 2051." Mujica Decl. Ex. 19.**

Senate's Response to SUMF 93: Denied. The FOMB's conclusions are false. Act 10 did not limit the Energy Bureau's authority in any way. Act 10 merely changes the timeframe for the PREB's study on the net metering program, from a due date of April 2024 to a date of January 2030, when it may begin the study. It does not introduce any substantive changes to the operation or regulation of the net metering program itself, nor does it alter the compensation mechanisms for existing customers. *See* Act 10 (Certified English Translation), Dkt. 1-7, Pp. 6-8 of 12. Furthermore, at the time that Act 17 was enacted, the

five-year mark would have fallen in the period where Puerto Rico would have to meet well over 20% Renewable Energy, and on path to 40%. Dkt. No. 1, Exh. 6 at 83. Pursuant to its legislative history, Act 10 recognized that the five-year period included in Act 17 when it amended Act 114 was based on those proposed renewable energy goals. The Report of the Strategic Project and Energy Commission of the Senate of Puerto Rico concluded that:

> In order not to weaken the net metering program, it is necessary to amend Article 4 of Law 114-2007. The study mandated by said Article is supposed to be conducted in April 2024, that is, 5 years after the approval of Act 114-2007. **When that term was established, it was thought that, at the end of those 5 years, Puerto Rico would be above 25% of distributed renewable energy generation. We are far from that. As of today, we barely surpass 3% of distributed solar energy generation.**
>
> Therefore, by amending Article 4 of Act 114-2007, as proposed in the amended bill, **we give until the year 2030 for the net metering rate to remain unchanged. According to the information provided by the Bureau, the interconnection rate of distributed solar systems would reach about 2500 MW of distributed renewable energy generation by 2030, which would be equivalent to 25% of Puerto Rico's energy consumption**.

Dkt. No. 18-1, (certified translation) (emphasis added).

In addition, this statement is denied as **misleading**. This language is not exclusive to Act 10 and is related to the underlying assumption that the net metering program is meant to promote renewable energy. The text of Act 10, which amends Act 114 as amended by Act 17 states:

> **Any customer who, on the date on which the Bureau issues its final determination, has a net metering contract** or who has notified the Bureau of the certification of a distributed generator installed by a licensed and registered engineer or by a licensed and registered expert electrician, **shall automatically be considered as a grandfathered net metering customer under the rate in effect prior to the Bureau's final determination**. In such cases, the net metering customer shall be entitled to

47

the rate or compensation mechanism in effect at that time **for a term of not less than twenty (20) years,** counted from the date of such final determination related to net metering. Notwithstanding the foregoing, the net metering customer shall have the right and the option to choose to avail itself of the new rate or compensation mechanism approved by the Bureau.

**Brenner Decl. Ex. 3 at 70 (emphasis added).** Meanwhile the original text of Act

17 amending Act 114 states:

**Any customer that, on the date in which the Bureau issues its final determination, has a net metering contract** or has notified the Bureau about the certification of the distributed generator installed by a professional engineer or expert electrician, both members of their professional associations and admitted to the practice of their profession, **shall be automatically grandfathered as a net metering customer under the rate in effect before the Bureau's final determination**. In such cases, the net metering customer shall have the right to the rate or compensation mechanism in effect at the time **for a term of not less than twenty (20) years** as of the execution of the net metering contract. However, the net metering customer shall be entitled and may opt to avail himself of the new rate or compensation mechanism approved by the Bureau.

Dkt. No. 1, Exh. 6 at 69-70 (emphasis added).

94.        **The Oversight Board informed the Governor, Senate President, and Speaker of the House of Representatives of its April 5, 2024 determination and concerns regarding Act 10 in a letter dated April 8, 2024.Mujica Decl. ¶ 27 & Ex 20. The Oversight Board issued a corrected version of its April 8, 2024 letter on April 10, 2024, adding additional detail regarding Act 10's inconsistency with the PREPA and Commonwealth Fiscal Plans requirements for the Energy Bureau's political independence and the PREPA Fiscal Plan's requirements as to net metering, and providing the Governor more time to respond. Mujica Decl. ¶ 28 & Ex. 15.**

Senate's Response to SUMF 94: Denied. The first sentence of SUMF 94 is admitted. The

second sentence of SUMF 94 is denied. Act 10 did not limit the Energy Bureau's authority

in any way. Act 10 merely changes the timeframe for the PREB's study on the net metering

program, from a due date of April 2024 to a date of January 2030, when it may begin the

study. It does not introduce any substantive changes to the operation or regulation of the net metering program itself, nor does it alter the compensation mechanisms for existing customers. *See* Act 10 (Certified English Translation), Dkt. 1-7, Pp. 6-8 of 12. Furthermore, at the time that Act 17 was enacted, the five-year mark would have fallen in the period where Puerto Rico would have to meet well over 20% Renewable Energy, and on path to 40%. Dkt. No. 1, Exh. 6 at 83. Pursuant to its legislative history, Act 10 recognized that the five-year period included in Act 17 when it amended Act 114 was based on those proposed renewable energy goals. The Report of the Strategic Project and Energy Commission of the Senate of Puerto Rico concluded that:

> In order not to weaken the net metering program, it is necessary to amend Article 4 of Law 114-2007. The study mandated by said Article is supposed to be conducted in April 2024, that is, 5 years after the approval of Act 114-2007. **When that term was established, it was thought that, at the end of those 5 years, Puerto Rico would be above 25% of distributed renewable energy generation. We are far from that. As of today, we barely surpass 3% of distributed solar energy generation.**
>
> Therefore, by amending Article 4 of Act 114-2007, as proposed in the amended bill, **we give until the year 2030 for the net metering rate to remain unchanged. According to the information provided by the Bureau, the interconnection rate of distributed solar systems would reach about 2500 MW of distributed renewable energy generation by 2030, which would be equivalent to 25% of Puerto Rico's energy consumption**.

Dkt. No. 18-1, (certified translation) (emphasis added).

In addition, SUMF 92 is contrary to the plain text of Act 17, which requires the Act 17 Study to be completed by April 11, 2024, not June 30, 2023. *See* SUMF 28, *supra*. Additionally, to the extent that this is deemed a material fact, it is hardly undisputed since net metering has a positive impact in Puerto Rico's economy. In Puerto Rico net metering

provides an avoided energy cost value of 27¢/kWh, an avoided capacity cost value of

1¢/kWh, and an avoided transmission and distribution cost value of 3¢/kWh. *See* Gabel

Decl. Exh. 1 at p. 8 of 13, ¶¶ 4.1-4.3. Moreover, the direct benefit to the grid and all other

ratepayers of net metering is 33 cents per kWh, which is 36% greater than the retail rate

of 24 cents per kWh. Accordingly, there is no subsidy flowing from other ratepayers to

on-site solar customers. In fact, there are benefits flowing to all other customers from this

solar production. *See* Gabel Decl. Exh. 1 at p. 12 of 13.

95.        **On June 5, 2024, the Oversight Board certified the 2024 Commonwealth
Fiscal Plan. Mujica Decl. ¶ 29 & Ex. 8.**

Senate's Response to SUMF 95: Qualified admission. SUMF 95 is admitted, but it is

immaterial as the FOMB has not approved a PREPA Fiscal Plan for year 2024.

96.        **The 2024 Commonwealth Fiscal Plan includes similar provisions to the
2023 Commonwealth Fiscal Plan regarding the need for the Energy Bureau to operate
independently and without political interference. Mujica Decl. ¶ 30 & Ex. 8 at 76, 140.**

Senate's Response to SUMF 96: Qualified admission. SUMF 96 is admitted, but it is

immaterial as the FOMB has not approved a PREPA Fiscal Plan for year 2024.

97.        **On June 21, 2024, the Oversight Board again determined that Act 10 impairs
or defeats the purposes of PROMESA for the same reasons set forth in the April Resolution
but taking into account the certification of the 2024 Commonwealth Fiscal Plan and the
Governor's deficient PROMESA § 204(a) Submission and failure to comply with the
Oversight Board's direction to correct the deficiencies, and memorialized its decision in the
June Resolution. Mujica Decl. ¶ 31 & Ex. 21.**

Senate's Response to SUMF 97: Denied. The FOMB's conclusions are false. Act 10 did

not limit the Energy Bureau's authority in any way. Act 10 merely changes the timeframe

for the PREB's study on the net metering program, from a due date of April 2024 to a date

of January 2030, when it may begin the study. It does not introduce any substantive changes

to the operation or regulation of the net metering program itself, nor does it alter the compensation mechanisms for existing customers. *See* Act 10 (Certified English Translation), Dkt. 1-7, Pp. 6-8 of 12. Furthermore, at the time that Act 17 was enacted, the five-year mark would have fallen in the period where Puerto Rico would have to meet well over 20%Renewable Energy, and on path to 40%. Dkt. No. 1, Exh. 6 at 83. Pursuant to its legislative history, Act 10 recognized that the five-year period included in Act 17 when it amended Act 114 was based on those proposed renewable energy goals. The Report of the Strategic Project and Energy Commission of the Senate of Puerto Rico concluded that:

> In order not to weaken the net metering program, it is necessary to amend Article 4 of Law 114-2007. The study mandated by said Article is supposed to be conducted in April 2024, that is, 5 years after the approval of Act 114-2007. **When that term was established, it was thought that, at the end of those 5 years, Puerto Rico would be above 25% of distributed renewable energy generation. We are far from that. As of today, we barely surpass 3% of distributed solar energy generation.**

> Therefore, by amending Article 4 of Act 114-2007, as proposed in the amended bill, **we give until the year 2030 for the net metering rate to remain unchanged. According to the information provided by the Bureau, the interconnection rate of distributed solar systems would reach about 2500 MW of distributed renewable energy generation by 2030, which would be equivalent to 25% of Puerto Rico's energy consumption**.

Dkt. No. 18-1, (certified translation) (emphasis added).

In addition, under PROMESA Section 204, "[t]he Governor shall include with each law submitted to the Oversight Board . . . [a] formal estimate prepared by an appropriate entity of the territorial government with expertise in budgets and financial management **of** the impact, **if any**, that the law will have on expenditures and revenues." 48 U.S.C. § 2144(a)(2)(A)(emphasis added). If that entity "finds that the law is not

significantly inconsistent with the Fiscal Plan for the fiscal year, it shall issue a certification of such finding." Id. § 2144(a)(2)(B). Section 204(a)(2)(A) states that the Defendant needs to prepare a formal estimate of the impact **if there is any**. Because the OMB and the Treasury determined that there would be no impact, a formal estimate of that impact is unnecessary. AAFAF's certification confirmed OMB's and the Treasury's prior analysis. Furthermore, both the OMB and the Treasury issued their own certifications of fiscal impact. See Dkt. Nos. 48-5 & 48-6 (certified translations).

98.      **On June 14, 2024, the Energy Bureau approved a resolution authorizing the publication of an 82-page Draft Study on net metering and distributed energy. Mujica Decl. ¶ 14 & Ex. 9; Brenner Decl. Ex. 9.**

Senate's Response to SUMF 98: Qualified admission. SUMF 98 is admitted, but is immaterial as the Oversight Board argues that the current net metering policy is not the issue before this Court. Thus, the entire stated "fact" is immaterial and beyond the scope of the issue under this Court's jurisdiction, because the decision on whether the net metering policy needs to be changed lies with the PREB.

99.      **The Energy Bureau Resolution references the requirement to conduct the Act 17 Study, but notes the requirement was amended by Act 10. Brenner Decl. Ex. 9.**

Senate's Response to SUMF 99: Denied. To the extent that FOMB is only stating as a fact that the Draft Report stated this, the fact is **immaterial.** If the FOMB is raising the **content** of the report as fact, and FOMB is presenting the content of the report as a **secondary source** it is not a **fact** and if it is presented as an **expert report** it would not be admissible in court as it is hearsay and is not presented by an expert. See Fed. R. Civ. P. 56(c)(2). Moreover, as the Oversight Board argues that the current net metering policy is not the issue before this Court, the entire stated "fact" is immaterial and beyond the scope of the issue under this Court's jurisdiction.

100.      **The Energy Bureau Resolution references the requirement to conduct the Act 17 Study, but notes the requirement was amended by Act 10, and further states that the Energy Bureau would publish the Draft Study pursuant to the Energy Bureau's "broad delegated powers and duties" under Act 57, and not Act 114, as amended by Act 17. Brenner Decl. Ex. 9.**

Senate's Response to SUMF 100: Denied. To the extent that FOMB is only stating as a fact that the Draft Report stated this, the fact is **immaterial.** If the FOMB is raising the **content** of the report as fact, and FOMB is presenting the content of the report as a **secondary source** it is not a **fact** and if it is presented as an **expert report** it would not be admissible in court as it is hearsay and is not presented by an expert. *See Fed. R. Civ. P. 56(c)(2).* Moreover, as the Oversight Board argues that the current net metering policy is not the issue before this Court, the entire stated "fact" is immaterial and beyond the scope of the issue under this Court's jurisdiction.

101.      **The Draft Study was prepared by KeyLogic Systems, a company engaged by the Energy Bureau to conduct the Act 17 Study, and includes an analysis of net metering programs generally, the experience with such programs in different states, and Puerto Rico's program. Mujica Decl. Ex. 9.**

Senate's Response to SUMF 101: Denied. It is admitted that the Draft Study was prepared by KeyLogic Systems, a company engaged by the Energy Bureau to conduct the Act 17 Study, under prior law. The remainder of SUMF 101 is denied. To the extent that FOMB is only stating as a fact that the Draft Report included such analysis, the Senate objects to the fact as **immaterial.**

102.      **The Draft Study finds that "as the penetration of [net energy metering] increases, so will the need to consider alternative pricing approaches along with technical provisions that govern when and how power is exported into the grid" and concludes that "Puerto Rico will find [net metering] uns[us]tainable in the long-run" and "[n]ew methods need to be explored and adopted." Mujica Decl. Ex. 9 at 3, 82.**

<u>Senate's Response to SUMF 102</u>: Denied. To the extent that FOMB is only stating as a fact that the Draft Report stated this, the Senate objects to the fact as **immaterial.** If the FOMB is raising the **content** of the report as fact, and FOMB is presenting the content of the report as a **secondary source** it is not a **fact** and if it is presented as an **expert report** it would not be admissible in court as it is hearsay and is not presented by an expert. *See Fed. R. Civ. P. 56(c)(2).* Moreover, as FOMB argues that the current net metering policy is not the issue before this Court, the entire stated "fact" is immaterial and beyond the scope of the issue under this Court's jurisdiction, because the decision on whether the net metering policy needs to be changed lies with the PREB. In the alternative that the content of the Draft Study is deemed material**,** it does not present any facts for this Court's consideration and is instead an argument. In the alternative, the statement cannot be considered in isolation and must be considered in harmony with the rest of the document, which expressly states:

> The authors understand that **others may have different perspectives and understanding of the implications** and that what we provide enables using the same factual basis. **Given the richness of experience of the <u>Puerto Rico solar community</u>, we welcome feedback and discussion to improve the content of the report and correct any error that the report may contain.**
> . . . . . .
> We recommend that the Energy Bureau commence regulatory processes that will **provide the answers to questions raised in this report.** Such a process s**hould begin with a public vetting of this report.** We believe that a collaborative approach to developing the information necessary to fully evaluate and implement alternatives to NEM is appropriate.

Mujica Decl. Ex. 19 at 13, 92(emphasis added).

Additionally, to the extent that this is deemed a material fact, it is hardly undisputed since it is also true that "if sufficiently large numbers of customers install and

operate solar generation, and if utilities make only prudent and cost-effective investments

in the grid, costs for utility services will decline for all customers." Rábago Decl. ¶ 11.

Additionally, the content of the Draft Study is filled with subjective positions of one party,

and it is misleading to include them as a statement that purports to document undisputed

facts. Rábago Decl. ¶ 24.

Furthermore, in Puerto Rico net metering provides an avoided energy cost value

of 27¢/kWh, an avoided capacity cost value of 1¢/kWh, and an avoided transmission and

distribution cost value of 3¢/kWh. *See* Gabel Decl. Exh. 1 at p. 8 of 13, ¶¶ 4.1-4.3.

Moreover, the direct benefit to the grid and all other ratepayers of net metering is 33 cents

per kWh, which is 36% greater than the retail rate of 24 cents per kWh. Accordingly,

there is no subsidy flowing from other ratepayers to on-site solar customers. In fact, there

are benefits flowing to all other customers from this solar production. *See* Gabel Decl.

Exh. 1 at p. 12 of 13.


### Senate's Statement of Additional Uncontested Material Facts in Opposition to the FOMB's Motion for Summary Judgment

1.     On October 21, 2022, Senate Bill 1064 ("S.B. 1064"), which later became Act 10,

was presented by Senator Juan Zaragoza-Gómez upon petition of the environmental organization

Sierra Club. *See*, Dkt. 43, Exhibit 1 ("Rivera Decl."), ¶ 2; S.B. 1064, Dkt. 53-1 (certified

translation).

2.     S.B. 1064 purpose was

[t]o amend Section 4 of Act 114-2007, as amended, known as the
'Electric Power Authority Net Metering Program Act', in order to
reformulate the term provided for conducting a study on net
metering and distributed energy; so that the Electric Utility may

request the Bureau of Energy and the Federal Emergency
Management Agency (FEMA), the necessary funds to increase the
capacity of the distribution system to integrate photovoltaic systems;
and for other purposes.

S.B. 1064, Dkt. 53-1, at p. 1 (certified translation).

3.      S.B. 1064 initially proposed to defer the term for the net metering study to be

conducted by PREB until distributed renewable energy generation had exceeded 25% of Puerto

Rico's energy consumption. S.B. 1064, Dkt. 53-1, § 1, at Pp. 5-6 (certified translation).

4.      The following senators became the co-authors of S.B. 1064 along with Mr.

Zaragoza-Gómez: Gretchen Hau, Javier Aponte-Dalmau, Joanne Rodríguez-Veve, Migdalia

González-Arroyo, Rubén Soto Rivera, and William Villafañe-Ramos. Rivera Decl., Dkt. No. 43,

Exh. 1, ¶ 4.

5.      After the initial presentation, S.B. 1064 was referred to the Senate's Committee

on Strategic Projects and Energy, chaired by Senator Javier Aponte Dalmau. The committee

rendered a positive report on June 24, 2023, recommending the passage of the bill with

amendments. Rivera Decl., Dkt. No. 43, Exh. 1, ¶ 5.

6.      The following entities appeared before the Senate's Committee on Strategic

Projects and Energy to provide their comments to S.B. 1064: Solar and Energy Storage Association

of Puerto Rico (SESA); LUMA Energy, LLC; the Puerto Rico Energy Bureau ("PREB"); the

Puerto Rico Fiscal Agency and Financial Authority ("AAFAF" by its Spanish acronym); Cambio

PR; the Puerto Rico Association of Renewable Energy Consultants and Contractors, Inc.

("ACONER" by its Spanish acronym).  Rivera Decl., Dkt. No. 43, Exhibit 1, ¶ 6.

7.      The PREB did not oppose S.B. 1064. The PREB recognized that deferring the

study on net metering until the growth of distributed renewable energy generation reached 25% of

Puerto Rico's energy consumption could benefit the net metering program and distribution. *See Explanatory Memorandum of the PREB*, Dkt. No. 53-3, Pp. 7-8 (certified translation).

8.        Because it understood that a benefit could be obtained from having a specific date for conducting the net metering study, the PREB suggested "to reach consensus as to the date on which the study should be carried out, based on the different contributions, suggestions and recommendations from all sectors, including industry and the Puerto Rican people." *Explanatory Memorandum of the PREB*, Dkt. No. 53-3, p. 8 (certified translation).

9.        On June 25, 2023, the Senate unanimously approved S.B. 1064 with 26 votes in favor and no votes against. Rivera Decl., Dkt. No. 43, Exh. 1, ¶ 9.

10.        S.B. 1064 was sent to the House of Representatives, where it was referred to the House Committee on Economic Development, Planning, Telecommunications, Public-Private Partnerships, and Energy. Rivera Decl., Dkt. No. 43, Exh. 1, ¶ 10.

11.        On October 24, 2023, the House of Representatives made minor amendments to S.B. 1064 and approved it with 37 votes in favor, no votes against, and 14 representatives absent. Rivera Decl., Dkt. No. 43, Exh. 1, ¶ 11.

12.        On November 8, 2023, the Senate received the bill with the House's amendments and voted to concur. The vote in the Senate was 25 in favor, no votes against, and two senators absent. Rivera Decl., Dkt. No. 43, Exh. 1, ¶ 12.

13.        After final approval by both legislative chambers, S.B. 1064 was signed by the President of the Senate on December 1, 2023, and by the President of the House of Representatives on January 8, 2024. The bill was sent to the Governor of Puerto Rico, Pedro Pierluisi-Urrutia, on January 9, 2024. Governor Pierluisi signed the bill into law on January 10, 2024, officially enacting Act 10. Rivera Decl., Dkt. No. 43, Exh. 1, ¶ 13.

14.      Act 10 "amend[s] Articles 4 and 9 of Act 114-2007, as amended, known as the 'Electric Power Authority Net Metering Program Act', in order to reformulate the term provided to conduct a study on net metering and distributed energy; and for other purposes." *See* Act 10 (Certified English Translation), Dkt. 1-7, p. 2 of 12 (Certification).

15.      Act 10 changes the timeframe for the PREB's study on the net metering program, from a due date of April 2024 to a date of January 2030, when it may begin the study. It does not introduce any substantive changes to the operation or regulation of the net metering program itself, nor does it alter the compensation mechanisms for existing customers. *See* Act 10 (Certified English Translation), Dkt. 1-7, Pp. 6-8 of 12.

16.      In legislating Act 10, the Senate considered and included the change requested by the PREB for establishing a specific timeframe for conducting the net metering study. *See* Act 10 (Certified English Translation), Dkt. 1-7, § 1, Pp. 6-7 of 12; *Explanatory Memorandum of the PREB*, Dkt. No. 53-3, p. 8 (certified translation).

17.      The Senate amended S.B. 1064 to delete the language regarding the financial obligations of the electric services company (LUMA) on feeder improvements, which AAFAF had asserted out in its written comments to the Senate's Committee on Strategic Projects and Energy might not align with the 'Fiscal Neutrality Principle' of PROMESA. *See* Act 10 (Certified English Translation), Dkt. 1-7, § 1, Pp. 6-8 of 12; *Explanatory Memorandum of AAFAF*, Dkt. No. 53-2, p. 5 (certified translation); S.B. 1064, Dkt. 53-1; § 2, at p. 9 (certified translation).

18.      From filing at the Senate on October 21, 2022, to signature by the Governor on January 10, 2024, the approval process of S.B. 1064 as Law 10-2024, took 14 months and 11 days. *See* S.B. 1064, Dkt. No. 53-1; § 2, at p. 9.

19.     The combination of fuel and purchased power from private coal and natural gas plants has historically been the electrical system's single largest and most volatile expense. In fiscal year 2023, for example, fuel and purchased power accounted for 71% of electrical system expenses. ("Kunkel Decl."), Exhibit 1, at p. 6.

20.     The FOMB has recognized the importance of renewable energy to reduce Puerto Rico's exposure to fuel price volatility, noting that a spike in global oil prices drove rates from 16 cents per kilowatt-hour (kWh) in October 2020 to more than 35 cents/kWh in October 2022. *See* Kunkel Decl., Exhibit 1, at p. 6.

22.     The only reason that the 2023 PREPA Fiscal Plan requires that the PREB finalize its study by April 11, 2024, is based on Act 17 amendments to Act 114. *See* 2023 Fiscal Plan, Dkt. No.1, Exh. 4, § 3.3.7).

23.     The PREB was not on course to complete the net metering study by the April 11, 2024, due date in compliance with the requirements of Act 114. On September 27, 2023, the PREB contracted with KeyLogics. This agreement included a set of deliverables with estimated completion times. Among them was: Review of rate design (4 months); NEM debate and alternatives (6 months); Emergent technical challenges of developing NEM (8 months); Equity and justice considerations (8 months); Proposed NEM Protocol (10 months). Brenner Ex. 11

24.     The Draft Report dated June 2024, two months after the April 2024 deadline, **does not** include any of the above listed deliverables. Mujica Ex #9, Dkt. 49-9

25.     The Draft Report has not been subject to public comment as required by Act 114 and was not released under Act 114 but as a periodic study under Act 57. Brenner Ex. 9.

26.     In order to consider whether net metering provides a subsidy to customers who have solar projects on their sites at the expense of other LUMA customers it is necessary to consider

whether the benefits of this solar energy exceed the cost of paying the retail level net metering credit. *See* Gabel Decl., Exhibit 1 at p. 1 of 13.

27.     The Value of Solar ("VoS") is a term used to represent the full range of economic value that solar power generation provides to the electricity grid and society as a whole. *See* Gabel Decl. Exh. 1 at p. 5 of 13.

28.     VoS is a framework used to determine fair compensation for solar energy exported to the grid by solar power systems. *See* Gabel Decl. Exh. 1 at p. 5 of 13.

29.      VoS takes into account various factors, including the environmental benefits, energy generation, and the grid-related services provided by solar power systems. *See* Gabel Decl. Exh. 1 at p. 5 of 13.

30.     VoS reflects the full value stack of economic and environmental benefits made possible by building and operating solar power plants. The direct benefits refer to: avoided generation energy costs; avoided generation capacity costs; avoided transmission and distribution capacity costs; and avoided reliability-related economic losses. The societal benefits refer to: avoided emissions damages; and local economic value added. *See* Gabel Decl. Exh. 1 at p. 5 of 13.

31.      Avoided generation energy costs are the customer bill savings realized by not having to produce or procure energy from traditional generation sources, such as coal or natural gas. *See* Gabel Decl. Exh. 1 at p. 5 of 13, ¶ 3.1.

32.      Avoided generation capacity costs are the expenses that a utility avoids by not having to invest in, operate, and maintain additional power generation infrastructure. When the need for traditional power plant decreases, the associated costs of these plants – capital costs,

operation and maintenance costs, and even decommissioning costs at the end of their life – are also avoided. *See* Gabel Decl. Exh. 1 at Pp. 5-6 of 13, ¶ 3.2.

33.     On-site solar projects allow the utility to avoid incurrence of capital cost to construct power generation that would otherwise be needed to meet the demand and energy requirements of the utility. *See* Gabel Decl. Exh. 1 at p.6 of 13, ¶ 3.2.

34.     Avoided transmission and distribution capacity costs reflect the reduced need for investments in constructing and maintaining transmission and distribution infrastructure. *See* Gabel Decl. Exh. 1 at p. 6 of 13, ¶ 3.3.

35.     Avoided reliability-related losses refers to the increased economic value communities gain when transitioning from a centralized grid to distributed customer-site solar energy generation. Improved resiliency and reliability allow for more "up-time" for businesses and individuals, which translates to increased economic activity. *See* Gabel Decl. Exh. 1 at p. 6 of 13, ¶ 3.4.

36.     Solar projects bolster energy security. *See* Gabel Decl. Exh. 1 at p. 6 of 13, ¶ 3.4. Rooftop Solar is crucial for energy security and resiliency. The widespread adoption of rooftop solar systems by residents and businesses has been pivotal in increasing energy resilience, given both the ongoing instability of Puerto Rico's grid and the risk of hurricanes. As of March 2024, over 110,000 households had installed rooftop solar, the vast majority with battery backup systems for resiliency. *See* Kunkle Decl. ¶ 5.

38.     Net metering has been a critical tool for households and businesses seeking to install rooftop solar. As of June 2024, less than 5,000 of the more than 110,000 installed residential rooftop solar systems had benefited from federal incentives; in other words, more than 95% had been financed entirely by individual households. *See* Kunkle Decl. ¶ 7.

39.     Avoided emission and pollutant costs reflect the economic savings resulting from using clean power from solar resources instead of emitting power from traditional thermal resources. The Environmental Protection Agency's social cost of carbon assigns a monetary value to the long-term damage caused by greenhouse gas emissions, considering factors like reduced agricultural productivity, health effects, property damages, and changes in energy system costs. *See* Gabel Decl. Exh. 1 at Pp. 6-7 of 13, ¶ 3.5.

40.     The savings in health and environmental costs associated with gas emissions are calculated based on factors including medical treatment expenses, lost workdays, and environmental degradation costs.  *See* Gabel Decl. Exh. 1 at p. 7 of 13, ¶3.5.

41.     Local economic value added refers to the financial and job growth benefits that communities gain when local resources are utilized to construct solar projects. *See* Gabel Decl. Exh. 1 at p. 7 of 13, ¶ 3.6.

42.     In Puerto Rico, net metering provides an avoided energy cost value of 27¢/kWh. This value comprises 82% of the total direct benefits and 26% of the total overall benefits of net metering in Puerto Rico. *See* Gabel Decl. Exh. 1 at p. 8 of 13, ¶ 4.1.

43.     In Puerto Rico, net metering provides an avoided capacity cost value of 1¢/kWh. This value comprises 2% of the total direct benefits and 1% of the total overall benefits of net metering in Puerto Rico. *See* Gabel Decl. Exh. 1 at p. 9 of 13, ¶ 4.2.

44.      In Puerto Rico, net metering provides an avoided transmission and distribution cost value of 3¢/kWh. This value comprises 10% of the total direct benefits and 3% of the total overall benefits. *See* Gabel Decl. Exh. 1 at p. 9 of 13, ¶ 4.3.

45.     In Puerto Rico, net metering provides an avoided reliability-related losses cost value of 2¢/kWh. This value comprises 6% of the total direct benefits and 2% of the total overall benefits. *See* Gabel Decl. Exh. 1 at p. 9 of 13, ¶ 4.4.

46.     In Puerto Rico, net metering provides an avoided emission cost value of 54¢/kWh. This value comprises 78% of the total societal benefits and 53% of the total overall benefits. *See* Gabel Decl. Exh. 1 at p. 10 of 13, ¶ 4.5.

47.     In Puerto Rico, net metering provides an incremental value potential of 16¢/kWh to the local economy. This value comprises 22% of the total societal benefits and 15% of the total overall benefits. *See* Gabel Decl. Exh. 1 at p. 10 of 13, ¶ 4.6.

48.     Therefore, the total estimated solar value stack equals 103¢/kWh, including 33¢/kWh of direct benefits and 70¢/kWh of societal benefits. Since the current Puerto Rico net metering value equates to 24¢/kWh, the current framework for valuing solar in Puerto Rico fails to capture approximately 77% of the known and measurable benefits solar provides. *See* Gabel Decl. Exh. 1 at Pp. 10-11 of 13, ¶ 4.7.

49.     The Gabel Report found that the direct benefit to the grid and all other ratepayers of net metering is 33 cents per kWh, which is 36% greater than the retail rate of 24 cents per kWh. Accordingly, there is no subsidy flowing from other ratepayers to on-site solar customers. In fact, there are benefits flowing to all other customers from this solar production. *See* Gabel Decl. Exh. 1 at p. 12 of 13.

50.     The Gabel Report found that the social benefits of net metering result in an additional 70 cents per kWh on top of the direct ratepayer benefits. *See* Gabel Decl. Exh. 1 at p. 12 of 13.

51.     The Gabel Report found that continuation of Puerto Rico's net metering policy will not cause customers to subsidize on-site solar customers. *See* Gabel Decl. Exh. 1 at p. 12 of 13.

52.     The Gabel Report concluded that Puerto Rico's net metering policy realizes benefits to all customers by providing lower cost of energy supply, grid resilience, and other benefits. *See* Gabel Decl. Exh. 1 at p. 12 of 13.

53.     In Puerto Rico, the percentage of rooftop solar systems installed in households of low-income families, as this term is defined by the HUD, is 10.9%. *See* Wilson Decl., Exh. 1, at p. 5.

54.     In Puerto Rico, the percentage of rooftop solar systems installed in households of moderate-income families, as this term is defined by the HUD, is 16.9%. *See* Wilson Decl., Exh. 1, p. 5.

55.     In Puerto Rico, the percentage of rooftop solar systems installed in households of middle-income families, as this term is defined by the HUD, is 30.6%. *See* Wilson Decl., Exh. 1, p. 5.

56.     In Puerto Rico, the vast majority (58.5%) of existing net metering systems are located in households classified as low, moderate and middle-income families. *See* Wilson Decl., Exh. 1, p. 5.

57.     A significantly higher percentage of Puerto Rico's low-income population is investing their own money, or financing through loans of leases, to install solar energy compared to the national level. Nearly 100% of residential solar installations in Puerto Rico also include battery storage, compared to less than 10% nationally. *See* Wilson Decl., Exh. 1, p. 6.

58.     While the devaluation of net measurement would likely have a regressive impact anywhere in the U.S., the negative impact on the low, moderate and middle-income population in Puerto Rico would be much more pronounced than the national averages. *See* Wilson Decl., Exh. 1, p. 5.

59.     Because blackouts are much more frequent in Puerto Rico, less net-metering solar would result in, not only fewer solar-powered families, but also fewer low-income families' lives protected by battery backup. *See* Wilson Decl., Exh. 1, p. 6.

60.     An average of 3,350 homes install solar energy each month in Puerto Rico. This rate is highly dependent on maintaining the net metering policy. *See* Wilson Decl., Exh. 1, p. 7.

61.     The SESA Study compared scenarios of reductions of 28%, 59% and 80%, modeling the potential results if the net metering in Puerto Rico were to be devalued. *See* Wilson Decl., Exh. 1, p. 9.

62.     The expected economic losses of a devaluation of net metering in Puerto Rico range from $1,989,489,600 to $5,684,256,000 in a period of six years, considering the three reduction scenarios analyzed in the SESA Study. *See* Wilson Decl., Exh. 1, p. 11.

63.     SESA currently estimates that there are currently 10,000 jobs in Puerto Rico in the distributed solar and battery storage industry. *See* Wilson Decl., Exh. 1, p. 11.

64.     The expected job losses of a devaluation of net metering in Puerto Rico range from 2,800 to 8,000 jobs, considering the three reduction scenarios analyzed in the SESA Study. *See* Wilson Decl., Exh. 1, p. 11.

65.     The reduction scenarios analyzed in the SESA Study show a drastically lower number of megawatts of solar and storage deployed over the 2025-2030 time horizon if the net metering policy is eliminated or reduced. There would be 398 to 1,137 fewer megawatts of solar

power and 1 to 3 gigawatt-hours less installed batteries if net metering were to be devalued in Puerto Rico. *See* Wilson Decl., Exh. 1 p. 12.

66.    The growth in rooftop solar represents the main area of progress towards Puerto Rico's renewable energy goals. As of June 2024, Puerto Rico was at 9%, up from 2-3% prior to Hurricane Maria. All of this growth had been due to rooftop solar installations. *See* Kunkle Decl. ¶ 6. Without the extension provided by Act 10-2024, Puerto Rico risks falling further behind its renewable energy targets, delaying the transition away from fossil fuels and missing out on the financial and environmental benefits of increased solar generation. *See* Kunkle Decl. ¶ 11.

67.    Reducing or eliminating the net metering compensation would significantly undermine the financial viability of private rooftop solar installations, as highlighted by the rapid decline in new solar installations observed in California following similar policy changes. *See* Kunkle Decl. ¶ 7. In 2022, California had 8% penetration of distributed solar, similar to Puerto Rico's current figure. California reformed its net metering compensation structure, reducing compensation by between one-third to one-half the retail rate; this change took effect in April 2023. New installations fell by 66% to 83% across different utility service territories in the first five months after the policy took effect. *See* Kunkle Decl., Exh.1 Pp. 12-13; Wilson Decl., Exh. 1, p. 3.

68. The annulment of the net metering extension and possible subsequent reduction in net metering compensation would reduce the financial payback for households and businesses seeking to invest in rooftop solar. This would be a significant setback to the only form of renewable energy that has been expanding rapidly in Puerto Rico. *See* Kunkle Decl. ¶ 9.

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that the instant document has been filed with the Court's CM/ECF System, which will simultaneously serve notice on all counsels of record to their registered e-mail addresses. Any non-registered attorneys and/or parties will be served via regular mail.

In San Juan, Puerto Rico this 23rd day of October, 2024.

**RESPECTFULLY SUBMITTED.**

**QUIÑONES & ARBONA, PSC**
PO Box 10906
San Juan, Puerto Rico  00922
☎ Tel.787-620-6776
🖷 Fax. 787-620-6777

**S/ EDWIN QUIÑONES-RIVERA**
USDC-PR No. 124305
E-mail: equinones@qaclaw.com

*Attorneys for* intervenor, *Senate of Puerto Rico and its President, Hon. Jose Luis Dalmau Santiago, in his official capacity as President of the Senate of Puerto Rico.*