**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>Debtor. | PROMESA<br>Title III<br><br><br>No. 17 BK 3283-LTS<br><br><br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br><br><br>Case No. 17 BK 4780-LTS |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>Plaintiff,<br><br>v.<br><br>HON. PEDRO PIERLUISI, in his official capacity as Governor of Puerto Rico,<br><br>Defendant. | Adv. Proc. No. 24-00062-LTS in 17 BK 4780-LTS |

**DECLARATION IN SUPPORT OF SENATE'S OPPOSITION TO FOMB'S MOTION FOR SUMMARY JUDGMENT**

I, Karl R. Rábago, of legal age, Principal at Rábago Energy, LLC and resident of Denver, Colorado, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge:

**I.  BACKGROUND AND EXPERTISE**

1. I am the principal of Rábago Energy LLC, a Colorado limited liability company, located at 1350 Gaylord Street, Denver, Colorado.

2. I earned a Bachelor of Business Administration in Management from Texas A&M University in 1977, a Juris Doctorate with Honors from The University of Texas School of Law in 1984, a Master of Laws in Military Law from the U.S. Army Judge Advocate General's School in 1988, and a Master of Laws in Environmental Law from the Pace University Elisabeth Haub School of Law in 1990.

3. I have worked for more than 33 years in the utility industry and related fields, following my honorable discharge from the U.S. Army, where I served as an Armored Cavalry officer and a Judge Advocate. I am actively involved in a wide range of utility regulatory and ratemaking issues across the United States. My previous employment experience includes Commissioner with the Public Utility Commission of Texas, Deputy Assistant Secretary with the U.S. Department of Energy, Vice President with Austin Energy, Executive Director of the Pace Energy and Climate Center, Managing Director with the Rocky Mountain Institute, and Director with AES Corporation, among others. My resume is attached as **Exhibit 1.**

4. In the past 15 years, I have submitted testimony, comments, or presentations in utility proceedings in Alabama, Arkansas, Arizona, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Guam, Hawaii, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Hampshire, New York, North Carolina, Ohio, Pennsylvania, Puerto Rico, Rhode Island, Texas, Vermont, Virginia, Washington, and Wisconsin. I have also testified before the U.S. Congress and have been a participant in comments and briefs filed at several federal agencies and courts.

5. As a public utility commissioner in Texas, I participated in making decisions on hundreds of rate review, rulemaking, and planning decisions in cases involving investor-owned, municipal, and cooperative electric and telephone utilities. Those matters ranged widely, from ministerial annual interest rate approvals, for example, to prudence and rate decisions on a $12.4 billion nuclear power plant, to mergers and acquisitions. I have appeared before hundreds of commissioners and board members in formal, informal, and educational proceedings in the years since. I have contributed to the writing and passage of laws and rules in many jurisdictions and have made a career of advancing regulatory and market opportunities for competitive alternatives to monopoly control of essential services businesses. I remain honored to have served as a utility regulator and remain deeply respectful of the public interest obligation that comes with the job.

6. Specifically regarding solar energy, net metering, and the value of solar, I have testified and/or submitted formal comments in eighteen states and territories and at the Federal Energy Regulatory Commission (FERC). I testified and/or submitted formal comments on solar valuation in Arkansas, California, Connecticut, Georgia, Guam, Iowa, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Missouri, New York, North Carolina, Rhode Island, Vermont, and Virginia.

7. As a consultant advisor to the National Audubon Society, I worked and continue to work on several past and on-going dockets, including before the Arkansas Public Service Commission, the New Orleans City Council, the Mississippi Public Service Commission, and the FERC on matters relating to net energy metering, regulatory and legislative solar policy, transmission planning and siting, and markets for distributed energy resources.

8. As Executive Director of the Pace Energy and Climate Project, I was an active participant in the New York "Reforming the Energy Vision" proceeding, including proceedings relating to the Value of Distributed Energy Resources.

3

9. At Austin Energy, I led the utility's $5 million annual capital program for solar project development on public buildings, and managed commercial and residential rebate and net metering programs as well. While there, I developed a new performance-based incentive program for commercial customers, and I created the award-winning "Value of Solar Tariff" now used in Austin for residential customers and subsequently adopted in Minnesota law.

## II. PROFESSIONAL REVIEW OF THE OB'S SUMF

10. I have read and carefully reviewed the document entitled *Statement of Uncontested Material Facts in Support of Financial Oversight and Management Board for Puerto Rico's Motion for Summary Judgment* ("SUMF") found in Docket Number 47 of this case. The following is a statement of my professional opinion regarding the SUMF, specifically Section B. Net Metering in Puerto Rico and Section H. The Energy Bureau Publishes a Draft Study on Net Metering.

11. In ¶16, the Oversight Board ("OB") claims that "Others have 'adopted alternative compensation approaches' to address concerns that '[i]f a sufficiently large number of customers participate in net metering, costs might increase for non-net metering customers in order to pay for the grid benefits.'" This language fails as a statement of undisputed fact for several reasons. First, it makes an undocumented assertion about the subjective intentions and unspecified actions of an undefined subset of actors regarding ratemaking for solar customer generators. Second, it asserts a causation relationship between unspecified increases in the numbers of solar customer-generators and unspecified "costs." The closest thing to an undisputed fact in the paragraph is that "others"—presumably, but not clearly meaning "other regulatory jurisdictions," have adopted net metering rates that differ from those in Puerto Rico. As proposed, however, the paragraph is simply a one-sided and unsubstantiated argument that ignores extensive analysis that shows that if

4

sufficiently large numbers of customers install and operate solar generation, and if utilities make only prudent and cost-effective investments in the grid, costs for utility services will decline for all customers.

12. There are many reasons that net metering policies have been changed to alternative approaches including utility lobbying and utility efforts to stifle non-utility generation.[1] The original phrasing incorrectly simplifies a complex discussion in favor of one utility-biased claim of cause and effect.

13. In ¶ 20, the OB states that "PREPA recoups its energy transmission costs through its volumetric (*i.e.*, usage) charges." A key argument from utilities seeking to stifle markets for customer-installed solar generation is that reduced sales to ultimate customers due to self-generation frustrates fair recovery of revenue requirements through rates. Of course, utility sales can be impacted by a wide range of customer, natural, and endogenous actions. For example, customers reduce their consumption through the installation of efficiency measures like weatherstripping or air conditioner maintenance, through conservation and voluntary rationing, or in times of milder weather.

14. If a utility fails to acknowledge and factor such changes in consumption behavior in the rate-setting process, it will spend and propose spending on infrastructure that is both more expensive and more profitable than necessary to provide safe and adequate service. Utility regulators are supposed to stand as the substitute for the forces of competition that would discipline such unreasonable spending that the utility would face if it were not a monopoly. As such, regulators have a duty to not only carefully scrutinize the spending levels and consumption forecasts that underlie utility spending proposals, but also to deny recovery of costs associated with imprudent spending.

---

[1] Tabuchi, H. 2017. New York Times. "Rooftop Solar Dims Under Pressure From Utility Lobbyists." https://www.nytimes.com/2017/07/08/climate/rooftop-solar-panels-tax-credits-utility-companies-lobbying.html.

5

15. Moreover, customer-sited solar generation offers a cost-effective alternative to excessive utility infrastructure spending has been encouraged by legislators and regulators around the world as a cost-control approach. The proposed language ignores the regulatory review process and implies a utility right to absolute recoupment of all transmission and other spending. Utilities have no such right under established regulatory law. To constitute an uncontested fact, instead of "recoups" this should read "recovers its allowed transmission costs." There is no entitlement to revenue recovery without regulatory review. PREB determines allowed transmission and other costs that PREPA can recover.

16. Similarly, in ¶ 21 the two instances of "costs" should be replaced with "allowed costs" to reflect that costs are determined by PREB oversight. These proposed changes are also necessary to avoid the hazard of judicial rate making. The OB's failure to acknowledge the function of regulatory review of costs argues for utility entitlement to collect rates to "recoup" all costs regardless of prudence, and to eliminate the regulator from the equation.

17. The OB notes in ¶ 22 that net metering "can also provide benefits, including reducing pollutants and greenhouse gases emitted from PREPA's fossil based generating units, as well as positive contributions to the achievement of Puerto Rico's renewable energy goals." There are known benefits of net metered, local solar, so this should not be a conditional statement using the word "can." The phrase should begin "provides incremental benefits including."

18. Additional benefits include cost savings, resiliency, grid benefits, local economic development, and job creation.[2]

---

[2] Gabel Associates. 2024. "Value of Net Metered Solar Energy in Puerto Rico." https://gabelassociates.com/wp-content/uploads/2024/04/Gabel-Associates-Puerto-Rico-Value-of-Solar-NM-English-04.16.24.pdf; Environment America & Frontier Group. 2019. "The True Value of Solar" https://publicinterestnetwork.org/wp-content/uploads/2022/08/AME20Rooftop20Solar20Jul1920web-1.pdf; Hayibo, K.S. & J. M. Pearce. 2021. Renewable and Sustainable Energy Reviews. "A review of the value of solar methodology with a case study of the U.S. VOS" Vol 137. https://www.sciencedirect.com/science/article/abs/pii/S1364032120308832.

19. The OB's proposed language in ¶ 24 begins: "If not calibrated correctly, a net metering system could create greater inequality among customers." This entire paragraph is vague and overly broad and is not based on any specific data from PREPA, LUMA or any other electric utilities. It is an argument that ignores the many benefits created by customer-sited solar generation, including the benefits of diverse sources of generation, generation embedded in the distribution grid, reductions in utility spending that would otherwise be regressively charged to low-use low-income customers, economic development benefits, and others.

20. Importantly, the OB statement also falsely labels the cause of potential inequality as net metering and ignores how rate making is performed. Customer self-generation reduces utility costs for generation, transmission, and delivery and provides additional incremental benefits to the grid and society. A prudent utility would reduce its spending to account for these benefits—benefits that cumulatively exceed the small incremental costs of managing the operational impacts of customer-sited generation on the grid.

21. Only an irresponsible and imprudent utility would keep spending as if the customer-sited generation was not producing these benefits. Only an unjust utility would propose to maintain higher-than necessary rates for non-generator customers in order to maximize monopoly rents even after net costs have fallen. Only an irresponsible utility bent on preserving and enhancing monopoly control of the grid would propose rates that "recoup" unnecessary spending, with a return, and at the same time cripple the economic viability of individual customer investments in customer-sited generation that benefit all customers taking service from the grid. These unjust results are not "created" by net metering or net metering customers. And, again, they cannot happen without regulatory approval.

22. In ¶ 25, the OB states that "Determining whether to maintain or modify Puerto Rico's current net metering program involves balancing many important, complex financial and

7

policy factors." This is conclusory and implies the application of subjective judgment. Others performing rigorous analysis will reasonably reach different conclusions by applying less biased judgment. It further assumes a binomial distribution of outcomes typical of the monopolist's perspective on non-monopoly choices for goods and services. That is not how the grid and rate regulation works in a realistically complex world. Rather, regulation is about maximizing against multiple outcomes.

23. Just and reasonable rates for customer-sited generation are about win-win-win solutions that benefit the solar customer, all other customers, and the electric service provider. For net metering customers to win does not mean that others must lose. Making a determination about the net metering program, therefore, requires detailed analysis as a starting point, not the cynical assumption that maximizing utility returns equals the general welfare and therefore requires suppression of non-utility options for resource value. This paragraph should not be included in a document intended to relate undisputed facts.

24. In ¶ 102, the OB includes quotes from PREB's draft study. I do not dispute that these are quotes from the study. However, these are subjective positions of one party, and it is misleading to include this paragraph in a statement that purports to document undisputed facts.

25. In sum, Sections B and H cannot be considered undisputed facts, as they are targeted biased conclusions made by individuals without technical expertise on a highly complex topic.

26. **I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.**

Date: October 23, 2024

*[signature]*

Karl R. Rábago

8

# RÁBAGO DECLARATION

# EXHIBIT 1

# Karl R. Rábago

**Rábago Energy LLC**
1350 Gaylord Street, Denver, Colorado 80206-2114
c/SMS: +1.512.968.7543 | e: karl@rabagoenergy.com | rabagoenergy.com

Nationally recognized leader and innovator in electricity and energy law, policy, and regulation. Experienced as a regulatory expert, utility executive, research and development manager, sustainability leader, senior government official, educator, and advocate. Law teaching experience at Pace University Elisabeth Haub School of Law, University of Houston Law Center, and U.S. Military Academy at West Point. Military veteran.

### Employment

#### RÁBAGO ENERGY LLC

Principal: July 2012—Present. Consulting practice dedicated to providing business sustainability, expert witness, and regulatory advice and services to organizations in the clean and advanced energy sectors. Prepared and submitted testimony in more than 35 jurisdictions and 165 electricity and gas regulatory proceedings. Recognized national leader in development and implementation of innovative "Value of Solar" alternative to traditional net metering. Additional information at rabagoenergy.com.

- Director, Colorado Electric Transmission Authority (2022-present).
- Chairman of the Board, Center for Resource Solutions (1997-present). Past chair of the Green-e Governance Board.
- Director, Solar United Neighbors (2018-2024).
- Advisor, Commission Shift (2021-present).
- Director, Texas Solar Energy Society (2022-2024).

#### PACE ENERGY AND CLIMATE CENTER, PACE UNIVERSITY ELISABETH HAUB SCHOOL OF LAW

Senior Policy Advisor: September 2019—September 2020. Part-time advisor and staff member. Provided transitional expert witness, project management, and business development support on electric and gas regulatory and policy issues and activities.

Executive Director: May 2014—August 2019. Leader of a team of professional and technical experts and law students in energy and climate law, policy, and regulation. Secured funding for and managed execution of regulatory intervention, research, market development support, and advisory services. Taught Energy Law. Provided learning and development opportunities for law students. Additional activities:

- Director, Alliance for Clean Energy – New York (2018-2019).
- Director, Interstate Renewable Energy Council (IREC) (2012-2018).
- Co-Director and Principal Investigator, Northeast Solar Energy Market Coalition (2015-2017). The NESEMC was a US Department of Energy's SunShot Initiative Solar Market Pathways project. Funded under a cooperative agreement between the US DOE and Pace University, the NESEMC worked to harmonize solar market policy and advance supportive policy and regulatory practices in the northeast United States.

**Karl R. Rábago**

**AUSTIN ENERGY – THE CITY OF AUSTIN, TEXAS**

Vice President, Distributed Energy Services: April 2009—June 2012. Executive in one of the largest public power electric utilities, serving more than one million people in central Texas. Responsible for management and oversight of energy efficiency, demand response, and conservation programs; low-income weatherization; distributed solar and other renewable energy technologies; green buildings program; key accounts relationships; electric vehicle infrastructure; and market research and product development. Executive sponsor of Austin Energy's participation in an innovative federally funded smart grid demonstration project led by the Pecan Street Project. Led teams that successfully secured over $39 million in federal stimulus funds for energy efficiency, smart grid, and advanced electric transportation initiatives. Additional activities included:

- Director, Renewable Energy Markets Association. REMA is a trade association dedicated to maintaining and strengthening renewable energy markets in the United States.

- Member, Pedernales Electric Cooperative Member Advisory Board. Invited by the Board of Directors to sit on first-ever board to provide formal input and guidance on energy efficiency and renewable energy issues for the nation's largest electric cooperative.

**THE AES CORPORATION**

Director, Government & Regulatory Affairs: June 2006—December 2008. Director, Global Regulatory Affairs, provided regulatory support and group management to AES's international electric utility operations on five continents. Managing Director, Standards and Practices, for Greenhouse Gas Services, LLC, a GE Energy and AES venture committed to generating and marketing voluntary market greenhouse gas credits. Government and regulatory affairs manager for AES Wind Generation. Managed a portfolio of regulatory and legislative initiatives to support wind energy market development in Texas, across the United States, and in many international markets.

**JICARILLA APACHE NATION UTILITY AUTHORITY**

Director: 1998—2008. Located in New Mexico, the JANUA was an independent utility developing profitable and autonomous utility services that provided natural gas, water utility services, low-income housing, and energy planning for the Nation. Authored "First Steps" renewable energy and energy efficiency strategic plan with support from U.S. Department of Energy.

**HOUSTON ADVANCED RESEARCH CENTER**

Group Director, Energy and Buildings Solutions: December 2003—May 2006. Leader of energy and building science staff at a mission-driven not-for-profit contract research organization based in The Woodlands, Texas. Responsible for developing, maintaining, and expanding on technology development, application, and commercialization support programmatic activities, including the Center for Fuel Cell Research and Applications; the Gulf Coast Combined Heat and Power Application Center; and the High-Performance Green Buildings Practice. Secured funding for major new initiative in carbon nanotechnology applications in the energy sector.

- President, Texas Renewable Energy Industries Association. As elected president of the statewide business association, led and managed successful efforts to secure and implement significant expansion of the state's renewable portfolio standard as well as other policy, regulatory, and market development activities.

- Director, Southwest Biofuels Initiative. Established the Initiative as an umbrella structure for multiple biofuels related projects.

# Karl R. Rábago

- Member, Committee to Study the Environmental Impacts of Wind Power, National Academies of Science National Research Council. The Committee was chartered by Congress and the Council on Environmental Quality to assess the impacts of wind power on the environment.
- Advisory Board Member, Environmental & Energy Law & Policy Journal, University of Houston Law Center.

### CARGILL DOW LLC (NOW NATUREWORKS, LLC)

Sustainability Alliances Leader: April 2002—December 2003. Integrated sustainability principles into all aspects of a ground-breaking bio-based polymer manufacturing venture. Responsible for maintaining, enhancing, and building relationships with stakeholders in the worldwide sustainability community, as well as managing corporate and external sustainability initiatives.

- Successfully completed Minnesota Management Institute at University of Minnesota Carlson School of Management, an alternative to an executive MBA program that surveyed fundamentals and new developments in finance, accounting, operations management, strategic planning, and human resource management.

### ROCKY MOUNTAIN INSTITUTE

Managing Director/Principal: October 1999–April 2002. Co-authored "Small Is Profitable," a comprehensive analysis of the benefits of distributed energy resources. Provided consulting and advisory services to help business and government clients achieve sustainability through application and incorporation of Natural Capitalism principles.

- President of the Board, Texas Ratepayers Organization to Save Energy. Texas R.O.S.E. is a non-profit organization advocating low-income consumer issues and energy efficiency programs.
- Co-Founder and Chair of the Advisory Board, Renewable Energy Policy Project-Center for Renewable Energy and Sustainable Technology. REPP-CREST was a national non-profit research and internet services organization.

### CH2M HILL

Vice President, Energy, Environment and Systems Group: July 1998–August 1999. Responsible for providing consulting services to a wide range of energy-related businesses and organizations, and for creating new business opportunities in the energy industry for an established engineering and consulting firm. Completed comprehensive electric utility restructuring studies for Colorado and Alaska.

### PLANERGY

Vice President, New Energy Markets: January 1998–July 1998. Responsible for developing and managing new business opportunities for the energy services market. Provided consulting and advisory services to utility and energy service companies.

### ENVIRONMENTAL DEFENSE FUND

Energy Program Manager: March 1996–January 1998. Managed renewable energy, energy efficiency, and electric utility restructuring programs. Led regulatory intervention activities in Texas and California. In Texas, played a key role in crafting Deliberative Polling processes. Participated in national environmental and energy advocacy networks, including the Energy Advocates Network, the National Wind Coordinating Committee, the NCSL Advisory Committee on Energy, and the PV-COMPACT Coordinating Council. Frequently appeared before the Texas Legislature, Austin City Council, and regulatory commissions on electric restructuring issues.

## Karl R. Rábago

#### UNITED STATES DEPARTMENT OF ENERGY

Deputy Assistant Secretary, Utility Technologies: January 1995–March 1996. Manager of the Department's programs in renewable energy technologies and systems, electric energy systems, energy efficiency, and integrated resource planning. Supervised technology research, development and deployment activities in photovoltaics, wind energy, geothermal energy, solar thermal energy, biomass energy, high-temperature superconductivity, transmission and distribution, hydrogen, and electric and magnetic fields. Managed, coordinated, and developed international agreements. Supervised development and deployment support activities at national laboratories. Developed, advocated, and managed a Congressional budget appropriation of approximately $300 million.

#### STATE OF TEXAS

Commissioner, Public Utility Commission of Texas. May 1992–December 1994. Appointed by Governor Ann W. Richards. Regulated electric and telephone utilities in Texas. Co-chair and organizer of the Texas Sustainable Energy Development Council. Vice-Chair of the National Association of Regulatory Utility Commissioners (NARUC) Committee on Energy Conservation. Member and co-creator of the Photovoltaic Collaborative Market Project to Accelerate Commercial Technology (PV-COMPACT).

#### LAW TEACHING

**Professor for a Designated Service:** Pace University Elisabeth Haub School of Law, 2014-2019. Non-tenured member of faculty. Taught Energy Law. Supervised a student intern practice.

**Associate Professor of Law:** University of Houston Law Center, 1990–1992. Full time, tenure track member of faculty. Courses taught: Criminal Law, Environmental Law, Criminal Procedure, Environmental Crimes Seminar, Wildlife Protection Law.

**Assistant Professor:** United States Military Academy, West Point, New York, 1988–1990. Member of the faculty in the Department of Law. Honorably discharged in August 1990, as Major in the Regular Army. Courses taught: Constitutional Law, Military Law, and Environmental Law Seminar.

#### LITIGATION

Trial Defense Attorney and Prosecutor, U.S. Army Judge Advocate General's Corps, Fort Polk, Louisiana, January 1985–July 1987. Assigned to Trial Defense Service and Office of the Staff Judge Advocate.

#### NON-LEGAL MILITARY SERVICE

Armored Cavalry Officer, 2d Squadron 9th Armored Cavalry, Fort Stewart, Georgia, May 1978–August 1981. Served as Logistics Staff Officer (S-4). Managed budget, supplies, fuel, ammunition, and other support for an Armored Cavalry Squadron. Served as Support Platoon Leader for the Squadron (logistical support), and as line Platoon Leader in an Armored Cavalry Troop. Graduate of Airborne and Ranger Schools. Special training in Air Mobilization Planning and Nuclear, Biological and Chemical Warfare.

# Karl R. Rábago

**Formal Education**

    **LL.M., Environmental Law, Pace University School of Law, 1990:** Curriculum designed to provide breadth and depth in study of theoretical and practical aspects of environmental law. Courses included: International and Comparative Environmental Law, Conservation Law, Land Use Law, Seminar in Electric Utility Regulation, Scientific and Technical Issues Affecting Environmental Law, Environmental Regulation of Real Estate, Hazardous Wastes Law. Individual research with Hudson Riverkeeper Fund, Garrison, New York, on federal regulation of cooling water intake structures for electric power plants.

    **LL.M., Military Law, U.S. Army Judge Advocate General's School, 1988:** Curriculum designed to prepare Judge Advocates for senior level staff service. Courses included: Administrative Law, Defensive Federal Litigation, Government Information Practices, Advanced Federal Litigation, Federal Tort Claims Act Seminar, Legal Writing and Communications, Comparative International Law.

    **J.D. with Honors, University of Texas School of Law, 1984:** Attended law school under the U.S. Army Funded Legal Education Program, a fully funded scholarship awarded to 25 or fewer officers each year. Served as Editor-in-Chief (1983–84); Articles Editor (1982–83); Member (1982) of the Review of Litigation. Moot Court, Mock Trial, Board of Advocates. Summer internship at Staff Judge Advocate's offices. Prosecuted first cases prior to entering law school.

    **B.B.A., Business Management, Texas A&M University, 1977:** ROTC Scholarship (3–yr). Member: Corps of Cadets, Parson's Mounted Cavalry, Wings & Sabers Scholarship Society, Rudder's Rangers, Town Hall Society, Freshman Honor Society, Alpha Phi Omega service fraternity.

# Karl R. Rábago

## Selected Publications

*The Future of Decentralized Electricity Distribution Networks: Ch. 14 – Performance-Based Regulation to Drive Transformation and Encourage DER Market Growth,* contributing co-author with Jesse Hitchcock, Elsevier (2023).

*Climate Change Law: An Introduction,* contributing author (Introduction to Energy Law), Elgar (2021).

*Distributed Generation Law,* contributing author, American Bar Association Environment, Energy, and Resources Section (August 2020)

*National Standard Practice Manual for Benefit-Cost Analysis of Distributed Energy Resources,* contributing author, National Energy Screening Project (August 2020)

*Achieving 100% Renewables: Supply-Shaping through Curtailment,* with Richard Perez, Marc Perez, and Morgan Putnam, PV Tech Power, Vol. 19 (May 2019).

*A Radical Idea to Get a High-Renewable Electric Grid: Build Way More Solar and Wind than Needed,* with Richard Perez, The Conversation, online at http://bit.ly/2YjnM15 (May 29, 2019).

*Reversing Energy System Inequity: Urgency and Opportunity During the Clean Energy Transition,* with John Howat, John Colgan, Wendy Gerlitz, and Melanie Santiago-Mosier, National Consumer Law Center, online at www.nclc.org (Feb. 26, 2019).

*Revisiting Bonbright's Principles of Public Utility Rates in a DER World,* with Radina Valova, The Electricity Journal, Vol. 31, Issue 8, pp. 9-13 (Oct. 2018).

*Achieving very high PV penetration – The need for an effective electricity remuneration framework and a central role for grid operators,* with Richard Perez (corresponding author), Energy Policy, Vol. 96, pp. 27-35 (2016).

*The Net Metering Riddle,* Electricity Policy.com, April 2016.

*The Clean Power Plan,* Power Engineering Magazine (invited editorial), Vol. 119, Issue 12 (Dec. 2, 2015)

*The 'Sharing Utility:' Enabling & Rewarding Utility Performance, Service & Value in a Distributed Energy Age,* co-author, 51st State Initiative, Solar Electric Power Association (Feb. 27, 2015)

*Rethinking the Grid: Encouraging Distributed Generation,* Building Energy Magazine, Vol. 33, No. 1 Northeast Sustainable Energy Association (Spring 2015)

*The Value of Solar Tariff: Net Metering 2.0,* The ICER Chronicle, Ed. 1, p. 46 [International Confederation of Energy Regulators] (December 2013)

*A Regulator's Guidebook: Calculating the Benefits and Costs of Distributed Solar Generation,* co-author with Jason Keyes, Interstate Renewable Energy Council (October 2013)

*The 'Value of Solar' Rate: Designing an Improved Residential Solar Tariff,* Solar Industry, Vol. 6, No. 1 (Feb. 2013)

*Jicarilla Apache Nation Utility Authority Strategic Plan for Energy Efficiency and Renewable Energy Development,* lead author & project manager, U.S. Department of Energy First Steps Toward Developing Renewable Energy and Energy Efficiency on Tribal Lands Program (2008)

*A Review of Barriers to Biofuels Market Development in the United States,* 2 Environmental & Energy Law & Policy Journal 179 (2008)

*A Strategy for Developing Stationary Biodiesel Generation,* Cumberland Law Review, Vol. 36, p.461 (2006)

**Karl R. Rábago**

*Evaluating Fuel Cell Performance through Industry Collaboration,* co-author, Fuel Cell Magazine (2005)

*Applications of Life Cycle Assessment to NatureWorks™ Polylactide (PLA) Production,* co-author, Polymer Degradation and Stability 80, 403-19 (2003)

*An Energy Resource Investment Strategy for the City of San Francisco: Scenario Analysis of Alternative Electric Resource Options,* contributing author, Prepared for the San Francisco Public Utilities Commission, Rocky Mountain Institute (2002)

*Small Is Profitable: The Hidden Economic Benefits of Making Electrical Resources the Right Size,* co-author, Rocky Mountain Institute (2002)

*Socio-Economic and Legal Issues Related to an Evaluation of the Regulatory Structure of the Retail Electric Industry in the State of Colorado,* with Thomas E. Feiler, Colorado Public Utilities Commission and Colorado Electricity Advisory Panel (April 1, 1999)

*Study of Electric Utility Restructuring in Alaska,* with Thomas E. Feiler, Legislative Joint Committee on electric Restructuring and the Alaska Public Utilities Commission (April 1, 1999)

*New Markets and New Opportunities: Competition in the Electric Industry Opens the Way for Renewables and Empowers Customers,* EEBA Excellence (Journal of the Energy Efficient Building Association) (Summer 1998)

*Building a Better Future: Why Public Support for Renewable Energy Makes Sense,* Spectrum: The Journal of State Government (Spring 1998)

*The Green-e Program: An Opportunity for Customers,* with Ryan Wiser and Jan Hamrin, Electricity Journal, Vol. 11, No. 1 (January/February 1998)

*Being Virtual: Beyond Restructuring and How We Get There,* Proceedings of the First Symposium on the Virtual Utility, Klewer Press (1997)

*Information Technology,* Public Utilities Fortnightly (March 15, 1996)

*Better Decisions with Better Information: The Promise of GIS,* with James P. Spiers, Public Utilities Fortnightly (November 1, 1993)

*The Regulatory Environment for Utility Energy Efficiency Programs,* Proceedings of the Meeting on the Efficient Use of Electric Energy, Inter-American Development Bank (May 1993)

*An Alternative Framework for Low-Income Electric Ratepayer Services,* with Danielle Jaussaud and Stephen Benenson, Proceedings of the Fourth National Conference on Integrated Resource Planning, National Association of Regulatory Utility Commissioners (September 1992)

*What Comes Out Must Go In: The Federal Non-Regulation of Cooling Water Intakes Under Section 316 of the Clean Water Act,* Harvard Environmental Law Review, Vol. 16, p. 429 (1992)

*Least Cost Electricity for Texas,* State Bar of Texas Environmental Law Journal, Vol. 22, p. 93 (1992)

*Environmental Costs of Electricity,* Pace University School of Law, Contributor–Impingement and Entrainment Impacts, Oceana Publications, Inc. (1990)