# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>    Debtor.[1] | **PROMESA**<br>**Title III**<br><br>**No. 17 BK 3283-LTS**<br>**(Jointly Administered** |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>    Debtor. | **PROMESA**<br>**Title III**<br><br>**No. 17 BK 4780-LTS**<br>**(Jointly Administered)** |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566- LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

| | |
|---|---|
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, <br><br>     Plaintiff, <br><br> v. <br><br> HON. PEDRO PIERLUISI, in his official capacity as Governor of Puerto Rico; and HON. JOSE LUIS DALMAU, in his official capacity as President of the Senate of Puerto Rico, <br><br>     Defendants. | **Adv. Proc. No. 24-00062-LTS** |
| HON. JOSE LUIS DALMAU, in his official capacity as President of the Senate of Puerto Rico, <br><br>     Defendant-Movant, <br> v. <br><br> THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, <br><br>     Plaintiff-Respondent. | |

**OPPOSITION OF FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO TO MOTION FOR SUMMARY JUDGMENT OF THE PRESIDENT OF <u>THE PUERTO RICO SENATE</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...............................................................................................1

FACTUAL BACKGROUND...............................................................................................4

     A.     PREPA and the Energy Bureau. ....................................................................4

     B.     Net Metering in Puerto Rico. ........................................................................6

     C.     The Fiscal Plans' Requirements Regarding the Energy Bureau's Independence
          and Net Metering. .........................................................................................7

     D.     Act 10-2024. ................................................................................................10

     E.     The Governor's Deficient § 204 Submission for Act 10. ......................13

     F.     The Oversight Board's § 108(a)(2) Determinations. ..............................14

     G.     The Energy Bureau Publishes a Draft Study on Net Metering. ............................15

     H.     The Oversight Board Commences This Adversary Proceeding. ...........................16

LEGAL STANDARD..........................................................................................................16

ARGUMENT .......................................................................................................................17

I.      PROMESA EMPOWERS THE OVERSIGHT BOARD TO PREVENT LAWS
       FROM TAKING EFFECT; ANY CONTRARY PUERTO RICO LAW IS
       PREEMPTED. .....................................................................................................17

II.     THE OVERSIGHT BOARD'S POWERS ARE NOT LIMITED TO "ECONOMIC"
       OR "FISCAL" LAWS AND POLICIES. ..........................................................20

III.    ACT 10 HAS CLEAR "FISCAL" OR "ECONOMIC" IMPACT. ...............................25

CONCLUSION....................................................................................................................27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Fin. Oversight & Mgmt. Bd. for P.R. v. Hernández-Montañez,*
  82 F.4th 57 (1st Cir. 2023) ("*Act 41 En Banc Decision*") ..........................................17, 19, 21

*Fin. Oversight & Mgmt. Bd. for P.R. v. Pierluisi,*
  650 B.R. 334 (D.P.R. 2023) ("*Act 41*") .................................................................18, 20

*Fin. Oversight & Mgmt. Bd. for P.R. v. Vázquez Garced,*
  616 B.R. 238 (D.P.R. 2020) ("*Law 29 II*") ...............................................................16, 18

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
  583 B.R. 626 (D.P.R. 2017) ("*CTO Opinion*").................................................................24

*Fin. Oversight & Mgmt. Bd. for P.R. v. Pierluisi Urrutia,*
  634 B.R. 187 (D.P.R. 2021) ("*Act 7*") ..................................................................18, 21

*La Liga de Ciudades de P.R. v. Fin. Oversight & Mgmt. Bd. for P.R.,*
  110 F.4th 295 (1st Cir. 2024) ("*La Liga Appeal*")......................................................2, 18, 20

*Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R.,*
  916 F.3d 98 (1st Cir. 2019)...............................................................................19

*Pierluisi v. Fin. Oversight & Mgmt. Bd. for P.R.,*
  37 F.4th 746 (1st Cir. 2022) ("*Five Laws Appeal*")......................................................16

*Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R.,*
  330 F. Supp. 3d 685 (D.P.R. 2018), *aff'd,* 945 F.3d 3 (1st Cir. 2019)
  ("*Title III Budget Case"*) ...............................................................................22

*Vázquez Garced v. Fin. Oversight & Mgmt. Bd. for P.R.,*
  511 F. Supp. 3d 90 (D.P.R. 2020), 511 F. Supp. 3d 90 (D.P.R. 2020) ("*Five Laws*"), *aff'd,* 37 F.4th 746 (1st Cir. 2022)...............................................................2, 18, 20

*Vineberg v. Bissonnette,*
  548 F.3d 50 (1st Cir. 2008)...............................................................................16

STATUTES, RULES & CONSTITUTIONS

48 U.S.C. §§ 2101–2241...............................................................................1

PROMESA § 4...............................................................................2, 19

PROMESA § 101...............................................................................7

ii

PROMESA § 104 ...................................................................................................7

PROMESA § 106 .................................................................................................23

PROMESA § 108 ............................................................................................ *passim*

PROMESA § 201 .........................................................................................7, 14, 22

PROMESA § 202 ...................................................................................................7

PROMESA § 204 ............................................................................................ *passim*

PROMESA § 205 .............................................................................................3, 22

PROMESA § 207 .................................................................................................23

PROMESA § 303 ..................................................................................3, 19, 20, 24

PROMESA § 305 .................................................................................................20

PROMESA § 405 .............................................................................................7, 22

Fed. R. Bankr. P. 7056 ...........................................................................................1

Fed. R. Civ. P. 24 ................................................................................................16

Fed. R. Civ. P. 56 .............................................................................................1, 16

CONST PR Art. IV § 6 .........................................................................................18

**OTHER AUTHORITIES**

Net Metering, SESA – Solar and Energy Storage Association of Puerto Rico,
https://www.sesapr.org/netmetering ...............................................................10

Sunnova Energy International, Inc., Annual Report (Form 10-K), February 22,
2024 (https://d18rn0p25nwr6d.cloudfront.net/CIK-
0001772695%20/9b6ea5ef-b790-40bd-b6ef-6f03535e4cda.pdf)..........................10

Sunnova Energy International, Inc., Quarterly Report (Form 10-Q), October 23,
2024 (https://d18rn0p25nwr6d.cloudfront.net/CIK-
0001772695%20/e16ba8ac-9691-454c-ae01-b8100e181943.pdf)..........................10

**To the Honorable United States District Judge Laura Taylor Swain:**

Pursuant to Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by § 310 of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] Plaintiff, the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), respectfully submits this opposition to Honorable Jose Luis Dalmau's (the "Senate President") summary judgment motion (the "Motion").

## PRELIMINARY STATEMENT

The Oversight Board commenced this Adversary Proceeding to nullify Act 10-2024 ("Act 10"), a law that interferes with the ability of the Puerto Rico Energy Bureau (the "Energy Bureau") to regulate an important aspect of the operations of the Puerto Rico Electric Power Authority ("PREPA" or the "Authority")—its net metering program under which PREPA must purchase solar power regardless of whether it needs the electricity or can produce it at lower cost. In enacting Act 10, the Puerto Rico Government violated the 2023 PREPA Fiscal Plan (the "PREPA Fiscal Plan"), the 2023 Commonwealth Fiscal Plan, and the 2024 Commonwealth Fiscal Plan's (together, the "Commonwealth Fiscal Plans" and together with the PREPA Fiscal Plan, the "Fiscal Plans") requirement that the Energy Bureau be able to regulate PREPA without political interference, and the PREPA Fiscal Plan's requirement that the Energy Bureau complete its net metering study and implement changes it deemed appropriate by April 11, 2024.

The Senate President seeks dismissal of this Adversary Proceeding, arguing the Oversight Board lacks authority to seek to nullify Puerto Rico laws. His Motion relies on a series of

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101–2241.

misinterpretations and faulty characterizations of PROMESA and Act 10, and therefore must be denied.

The Senate President is simply wrong when he claims the Oversight Board lacks authority to seek nullification of Act 10.  Congress unambiguously provided the Oversight Board with the power to do precisely that.  PROMESA § 108(a)(2) grants the Oversight Board the power to "trigger[] a statutory prohibition on action by the Government to go forward with the . . . statute [or] policy" at issue by determining the law or policy impairs or defeats the purposes of PROMESA, and this Court has the "authority to enforce the [Oversight] Board's mandates by nullifying such a law from its inception." *Vázquez Garced v. Fin. Oversight & Mgmt. Bd. for P.R.*, 511 F. Supp. 3d 90, 134 (D.P.R. 2020) ("*Five Laws*"), *aff'd,* 37 F.4th 746 (1st Cir. 2022); *La Liga de Ciudades de P.R. v. Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 326 (1st Cir. 2024) ("*La Liga Appeal*"); PROMESA § 108(a).  There is no dispute that the Oversight Board has made the triggering determination with respect to Act 10.  Further, § 204(a)(5) expressly provides the Oversight Board the authority to "take such actions as it considers necessary" to ensure a law "will not adversely affect . . . compliance with the Fiscal Plan."  Accordingly, and as has been repeatedly recognized by this Court and the First Circuit, the Oversight Board has the power under PROMESA §§ 108(a)(2) and 204(a)(5) to seek to nullify or otherwise block enforcement of laws, as it is doing in this Adversary Proceeding.  To the extent those provisions of PROMESA conflict with Senate powers set forth in the Puerto Rico Constitution, those powers are expressly preempted by § 4 of PROMESA.

The Senate President's "fall back" position is that the Oversight Board's authority is limited to fiscal (or economic) matters, and Act 10 is a non-fiscal measure.  The Senate President is wrong.  First, the Oversight Board's authority extends beyond matters considered purely "fiscal"

2

or "economic," as made clear by the powers bestowed by PROMESA §§ 108 and 205, among others.  Indeed, nowhere does PROMESA contain the limitation asserted by the Senate President, and his efforts to manufacture it rely on a misreading of PROMESA and this Court's precedent.  For example, his reliance on PROMESA § 303, which preserves certain powers of the Commonwealth Government, fails to account for its critical introductory clause, which provides those powers are "[s]ubject to the limitations set forth in titles I and II of" PROMESA—the very limitations the Oversight Board seeks to enforce in this Adversary Proceeding.

But even if the Oversight Board were so limited (it is not), Act 10 is clearly a fiscal measure with economic impact.  Net metering requires PREPA to purchase electricity from net metering customers at any time and regardless of whether it needs the power.  It pays for that electricity via a 1:1 credit against the electricity charges that customers accrue by consuming power from PREPA's grid.  Accordingly, net metering has an obvious impact on PREPA's revenues and expenditures, and Act 10 directly impacts economics and fiscal responsibility.  The Senate President's arguments to the contrary are based on portraying Act 10's "only change" being "the extension of the [net metering] study commencement date to 2030." Mot. at 11.  But this argument ignores that the study at issue is *more* than just a study; it is a condition precedent for making *any* changes to the net metering program.  Accordingly, while Act 10 does delay the net metering study, in so doing it prevents the Energy Bureau from deciding to make any changes to the net metering credit formula until at least 2030, when prior to Act 10 it could make such changes beginning on April 11, 2024.

Further, the Senate President's portrayal of Act 10 ignores other provisions in the law directly impacting the Energy Bureau's ability to regulate the net metering program's credit (*i.e.*, economic) terms.  For example, once the Energy Bureau completes the study, Act 10 bars any

decision to change net metering rates from going into effect for a full calendar year (*i.e.*, until 2031). In addition, once those changes go into effect, Act 10 mandates the Energy Bureau permit all net metering customers and certain potential net metering customers to enjoy current net metering rates until at least 2051. Accordingly, the Senate President's claim that Act 10's only "substantive modification[] involved **extending the timeline** for the [net metering] study," Mot. at 9 (emphasis in original), grossly mischaracterizes the law, including its impact on the net metering program and PREPA's revenues and expenses. By preventing any changes to the net metering program until 2031 and enshrining current net metering rates for over 100,000 net metering customers for decades more, Act 10 is not merely regressive, it is antithetical to fiscal responsibility, directly violative of PROMESA's purposes, and contrary to express provisions of the Fiscal Plans.

Therefore, and as discussed in more detail below, the Senate President's Motion should be denied.

## FACTUAL BACKGROUND

The Factual Background section of the Senate President's Motion is almost entirely devoted to the legislative history of Act 10, which is irrelevant to the arguments raised in his Motion.

To the extent any facts are necessary to decide the pending Motion, the Oversight Board sets forth below relevant background facts.[3]

### A. PREPA and the Energy Bureau.

PREPA is the sole electric utility provider for Puerto Rico. *Statement of Uncontested Material Facts in Support of Financial Oversight and Management Board for Puerto Rico's*

---

[3] Not all facts included in this factual background section are material for the purposes of deciding the Motion. The Oversight Board has included such facts in this section to provide the Court with helpful context. For additional

*Motion for Summary Judgment*, ECF No. 47 ("ECF No. 47") ¶ 2.  PREPA has numerous challenges that impact the people and economy of Puerto Rico.  The PREPA Fiscal Plan details those challenges and impacts, and provides a method to achieve the rehabilitation of both PREPA's financial position and its operations.  ECF No. 47 ¶ 3.

As the Puerto Rico Government observed, PREPA, for most of its existence, was a "monopoly that regulate[d] itself" leading to "Puerto Rico being among the top U.S. jurisdictions with the highest energy cost."  ECF No. 47 ¶ 10.  That changed in 2014, when the Government enacted Act 57–2014 ("Act 57"), also known as the Puerto Rico Energy Transformation and RELIEF Act.  ECF No. 47 ¶ 9.  As Act 57's author, then-Senator Eduardo Bhatia, stated in written testimony to Congress, PREPA's problems were the result of "reckless governance of PREPA and the lack of serious leadership," and PREPA had been exposed to "the negative dynamics of bureaucracy, patronage, corruption, political intervention, and special interests." ECF No. 47 ¶ 12.  He added that "significant energy decisions were taken, for decades, from the Governor's Office, using the utility's governing board and executive directors as mere proxies."  ECF No. 48-7 at 5.  In response to these issues, the Government enacted Act 57, which created the Energy Bureau (then known as the Puerto Rico Energy Commission) as an "independent government entity" to "oversee and ensure execution and implementation of the public policy on the electric power service of the Commonwealth of Puerto Rico."  ECF No. 47-2 at 9, § 6.3(a).  It was intended to be a "non-partisan, independent energy regulator, with fiscal autonomy from the government."  ECF No. 47 ¶ 13.  As Senator Bhatia testified, a "main concept of Act 57 is that PREPA and other energy stakeholders on the Island must conduct themselves in accordance with applicable energy

---

context and background, the Court may refer the *Statement of Uncontested Material Facts in Support of Financial Oversight and Management Board for Puerto Rico's Motion for Summary Judgement*, ECF No. 47.

policy and regulation; not by the seasonal wishes or 'public policy' of the administration from any political party in power."  ECF No. 48-7 at 6.

### B. Net Metering in Puerto Rico.

"Net metering" refers to a program that allows electricity customers with their own generation capacity to be financially compensated by their electrical utility for the energy they produce.  ECF No. 47 ¶ 15.  Puerto Rico's net metering program was established in 2007 by Act 114–2007 ("Act 114"), prior to the creation of the Energy Bureau.  ECF No. 47 ¶ 17.  Under the net metering program established by Act 114, which remains essentially unchanged, PREPA must purchase electricity from net metering program participants and provide them with a full kilowatt-hour credit on their electricity bill for every kilowatt-hour they export to PREPA (the "1:1 net metering rate") up to their monthly kilowatt-hour consumption of electricity from PREPA.  ECF No. 47 ¶ 18.  The net metering program requires PREPA to purchase electricity from net metering customers at all times and regardless of whether it needs the power.  RSOF ¶ 20.[4]

Net metering has positive effects, including reducing pollutants and greenhouse gases emitted from PREPA's fossil fuel-based generating units.  ECF No. 47 ¶ 22.  However, if not calibrated correctly, a net metering program could have undesired consequences.  For example, when there is a difference between the compensation paid to net metering customers and the value of service to the utility, it "results in a revenue shortfall to the grid operator."  RSOF ¶ 19.

---

[4] "RSOF" refers to the *Response of the Financial Oversight and Management Board for Puerto Rico to Statement of Uncontested Material Facts in Support of Defendant Jose Luis Dalmau's Motion for Summary Judgment and Statement of Additional Facts of the Financial Oversight and Management Board for Puerto Rico in Opposition to Hon. Jose Luis Dalmau's Motion for Summary Judgment*, filed concurrently with this memorandum.

6

Determining whether to maintain or modify the current net metering program in Puerto Rico requires experienced judgment taking into account many factors.  ECF No. 47 ¶ 25.

On April 11, 2019, the Government enacted Act 17–2019 ("Act 17").  ECF No. 47 ¶ 26. Among other things, Act 17 amended Act 114, and directed the Energy Bureau to "conduct a study, through an independent formal process and with participation of interested parties and the general public, to evaluate and consider the costs and benefits associated with . . . the net metering program . . . ."  ECF No. 47 ¶ 27.  The study (the "Act 17 Study") was to be completed within five years of "the approval of" Act 17 (*i.e.*, by April 11, 2024).  ECF No. 47 ¶ 28.  Act 17 empowered the Energy Bureau, following completion of the five-year study period (*i.e.*, April 11, 2024), to make decisions regarding the net metering program, including establishing "appropriate values for distributed energy and energy storage systems in accordance with the study," and "determine[] exclusively" the "rate applicable to net metering customers"—*i.e.*, whether to change the 1:1 net metering rate.  ECF No. 47 ¶¶ 29–30.

## C. The Fiscal Plans' Requirements Regarding the Energy Bureau's Independence and Net Metering.

On June 30, 2016, Congress enacted PROMESA to address the "fiscal emergency" in Puerto Rico that arose from a "combination of severe economic decline, and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing . . . ."  PROMESA § 405(m)(1).  Congress created the Oversight Board for the purpose of providing a method for Puerto Rico to "achieve fiscal responsibility and access to the capital markets."  *Id.* § 101(a).  To accomplish these statutory objectives, Congress encouraged the Oversight Board and the Commonwealth government to work together to formulate and implement Commonwealth fiscal plans and budgets for the Commonwealth and covered territorial instrumentalities, *id.* §§ 201–02, but granted the Oversight Board final say over such plans and

budgets and prohibited the Commonwealth from enacting, implementing, and/or enforcing laws impairing or defeating the purposes of PROMESA as determined by the Oversight Board.  *See id.* §§ 101, 104, 108(a)(2), 201(e)(2), 202(e)(3), 204.

The Oversight Board designated PREPA as a covered territorial instrumentality pursuant to PROMESA § 101(d), and has certified fiscal plans for the utility since April 28, 2017.  ECF No. 47 ¶ 35.[5]  As noted in the PREPA Fiscal Plan, "Puerto Rico's energy infrastructure lags national standards due to decades of operational and financial mismanagement."  ECF No. 47 ¶ 38.  The Oversight Board recognized that one cause of this mismanagement is that, before the Energy Bureau's establishment, PREPA's management decisions were "subject to political influence and instability, leading to high management turnover, discontinuity in capital investment plans, electric customer rates that were insufficient to cover operating and maintenance costs and the mounting costs of debt service."  ECF No. 47 ¶ 39.

The Oversight Board's fiscal plans have repeatedly recognized the importance of PREPA being regulated by an independent, professional, experienced regulator insulated from political interference.  ECF No. 47 ¶¶ 42–50.[6]  The PREPA Fiscal Plan continues to emphasize the need for independent regulation of PREPA, mandating the Energy Bureau "remain financially and operationally independent from the Commonwealth Government and its determinations must be free from any direct or indirect political influence or interference."  ECF No. 47 ¶ 45.  The 2024

---

[5] All fiscal plans certified by the Oversight Board for PREPA can be found at the Oversight Board's website: https://oversightboard.pr.gov/fiscal-plans/#link-PREPA.

[6] For example, the 2018 Commonwealth Fiscal Plan notes "the long-term sustainability of Puerto Rico's energy sector depends on having a strong, independent, and professional regulator," ECF No. 47 ¶ 43, and the 2021 Commonwealth Fiscal Plan states that "[a] strong and independent energy sector regulator is essential for injecting certainty and stability into the energy market, promoting much needed investments, and enforcing compliance with the energy sector transformation's objectives." ECF No. 47 ¶ 44.  The 2020 PREPA Fiscal Plan similarly notes the transformation of Puerto Rico's energy sector into a "safe, reliable, affordable, modern system depends on the presence and active involvement of a rational, politically independent, and professionally supported regulator" whose determinations "should be free of any political influence or interference."  ECF No. 47 ¶ 42.

Commonwealth Fiscal Plan similarly deems the Energy Bureau an "essential component of the energy transformation reforms," whose independence is a "necessary and common requirement to ensure properly functioning energy systems."  ECF No. 47 ¶ 47.[7]  The 2024 Commonwealth Fiscal Plan concludes "[the Energy Bureau's] independence, particularly in areas such as rate making . . . must not be subjected to political interference."  ECF No. 47 ¶ 48.

After enactment of Act 17, the 2019 PREPA Fiscal Plan recognized the importance of the Act 17 Study, listing it among its "Key Regulator Issues and Requirements."  ECF No. 47 ¶ 51.  Net metering and the Act 17 Study remain important components in the current PREPA Fiscal Plan, which recognizes net metering has an economic impact on PREPA.  Noting renewable distributed generation "provides benefits to rooftop solar customers," the PREPA Fiscal Plan also observes a "sub-optimal net metering program . . . may have unintended detrimental effects and risks, including an unequitable distribution of costs throughout the system."  ECF No. 47 ¶ 52.  For example, the PREPA Fiscal Plan notes that because LUMA Energy, LLC ("LUMA") is required under Act 17 "to purchase the excess energy produced by net metering customers at the prevailing energy rate, the effective cost to ratepayers of the renewable energy generated by net metering customers may be higher than the cost of purchasing that same quantity of electricity from other resources."  ECF No. 47 ¶ 53.  The cost to LUMA is "then passed on, in whole or in part, to all other remaining customers."  ECF No. 47 ¶ 54.

Accordingly, the PREPA Fiscal Plan requires the Energy Bureau to comply with Act 17 such that it "finalize[s] the [] net metering and distributed generation study" by June 30, 2023 and "initiate[s] a process for implementing recommendations and conclusions of the study and

---

[7] The 2023 Commonwealth Fiscal Plan, in effect at the time Act 10 was enacted, contained similar provisions.  ECF No. 47 ¶ 50 ("A strong and independent energy sector regulator is essential for injecting certainty and stability into the energy market.").

updating a net metering compensation and crediting structure, if it deems appropriate," by April

11, 2024.  ECF No. 47 ¶ 55.  The Energy Bureau did not meet the June 30, 2023 deadline to finalize

the study, but had begun work, including engaging a consultant, to prepare the Act 17 Study in

2023, prior to the enactment of Act 10.  ECF No. 47 ¶ 56.[8]

### D.  Act 10-2024.

Senate Bill 1064 (the "Bill"), which would eventually be enacted as Act 10, was filed on

October 21, 2022.  RSOF ¶ 1.[9]  The Bill was then referred to the Senate Committee on Strategic

Projects and Energy (the "Committee"), which requested comment from the Puerto Rico Fiscal

Agency and Financial Advisory Authority ("AAFAF" for its Spanish acronym") and the Energy

---

[8] As noted below, because of Act 10, the Energy Bureau did not complete the study mandated by Act 17—as Act 10 prohibits the study from being commenced before January 2030—but did publish a draft study it had commenced prior to Act 10's enactment pursuant to its broad general powers.  *See infra* at G; *see also* ECF No. 47 ¶¶ 98–102.

[9] The Senate President acknowledges Senate Bill 1064 "was presented by Senator Juan Zaragoza-Gómez upon petition of the environmental organization Sierra Club."  RSOF ¶ 1.  What he fails to acknowledge is that the consumer solar industry was heavily involved in efforts to pass Act 10 because its business relies on net metering to sell its products and services.  For example, Sunnova Energy International ("Sunnova"), a prominent commercial and residential solar company, identifies Puerto Rico as its second largest market and "rel[ies] on net metering and related policies to offer competitive pricing to . . . customers in most [current] markets."  Sunnova Energy International, Inc., Annual Report (Form 10-K), February 22, 2024 at 23, 44 (https://d18rn0p25nwr6d.cloudfront.net/CIK-0001772695%20/9b6ea5ef-b790-40bd-b6ef-6f03535e4cda.pdf).  As such, it candidly admits its "growth strategy depends in significant part on government policies and incentives," including net metering, "that promote and support solar energy and enhance the economic viability of distributed solar."  Sunnova Energy International, Inc., Quarterly Report (Form 10-Q), October 23, 2024 at 45 (https://d18rn0p25nwr6d.cloudfront.net/CIK-0001772695%20/e16ba8ac-9691-454c-ae01-b8100e181943.pdf).  Less than three months before Act 10's enactment, Sunnova warned investors that a "change in the value of net metering credits . . . or changes in other policies or a loss or reduction in such incentives could decrease the attractiveness of distributed solar to us, our dealers and our customers in applicable markets, which could reduce our customer acquisition opportunities," and that "[i]f any of these government regulations, policies or incentives are adversely amended, delayed, eliminated, reduced, retroactively changed or not extended beyond their current expiration dates or there is a negative impact from the recent federal law changes or proposals, our operating results and the demand for, and the economics of, distributed solar energy may decline, which could harm our business."  *Id.* at 45–46.

Sunnova is a member of the Solar Energy and Storage Association of Puerto Rico ("SESA"), "an association representing Puerto Rico's solar and energy storage industries" and committed to "advocat[ing] solar and storage technologies as a central solution to the energy needs of Puerto Rico, and promot[ing] public policy that will benefit the growth of these industries."  *See* SESA – Solar and Energy Storage Association of Puerto Rico, https://www.sesapr.org/.  Given the money at stake for these private companies, it is no surprise SESA was heavily involved in efforts to pass Act 10 and has mounted a furious campaign against the Oversight Board's efforts—including this litigation—to return regulatory authority over net metering to the Energy Bureau.  *See* Net Metering, SESA – Solar and Energy Storage Association of Puerto Rico, https://www.sesapr.org/netmetering; *see also* https://www.facebook.com/story.php/?story_fbid=748078830763960&id=100066855504227 (noting its "advocacy" for Act 10).

Bureau on the Bill. RSOF ¶ 6. The Bill reviewed by AAFAF and the Energy Bureau sought to delay the Act 17 Study until "distributed renewable energy generation has surpassed twenty-five percent (25%) of the country's energy consumption." ECF No. 53-1 at 6. The Bill also included existing Act 17 language that any then-current net metering customer at the time renewable energy surpassed 25 percent of the Island's energy consumption would be entitled to the existing 1:1 rate "for a term that shall not be less than twenty (20) years, counted as of the date of the execution of the net metering contract." *Id.* at 7.

AAFAF responded on February 24, 2023, noting the Bill's "amendments regarding the time to complete the net metering study are inconsistent with the text of PREPA's Fiscal Plan, which also opens the door for the [Oversight Board] to enforce such mechanism." ECF No. 53-2 at 5. AAFAF recommended the Committee "request comments on this measure from [PREPA] and the [Energy Bureau]." *Id*.

In response to the Committee's request for an "explanatory memorandum on [the Bill]," the Energy Bureau issued a letter and the requested memorandum on March 27, 2023. ECF No. 53-3 at 1. In its memorandum, the Energy Bureau noted that while extending the timeline for the Act 17 Study "until the growth of distributed renewable energy . . . has exceeded twenty-five percent (25%) of the country's energy consumption, could, in its practical application, benefit the net metering and distribution program," the Bill "would leave to an undetermined date when the Energy Bureau will evaluate and consider the costs and benefits associated with the net metering program" and suggested instead "reaching a consensus on the date that the study should be

11

conducted." *Id*. at 7, 8.  The explanatory memorandum did not approve of the Bill or encourage its passage.  *See generally* ECF No. 53-3.

The Bill was subsequently amended and passed the Senate and House of Representatives without additional written comment from the Energy Bureau.  RSOF ¶¶ 5, 7, 11, 24.  On January 10, 2024, the Governor signed Act 10 into law.  ECF No. 47 ¶ 57,  Act 10, as enacted, included text not contained in the version reviewed by AAFAF or the Energy Bureau in connection with its March 27, 2023 explanatory memorandum.  RSOF ¶¶ 24, 28.  Enacted just months before the deadline for the Energy Bureau to complete the Act 17 Study and potentially announce changes to the net metering program, Act 10—which was the product of months of lobbying efforts by special interest groups—prevents the Energy Bureau from *even beginning* the Act 17 Study for **nearly 6 years**.  ECF No. 47 ¶¶ 58–59.

Specifically, Act 10 bars the Energy Bureau from commencing the Act 17 Study until January 2030, and from changing the current net metering credit structure (*i.e.*, the 1:1 net metering rate) until the study is completed.  ECF No. 47 ¶¶ 59–61.  Moreover, even after the study's completion, Act 10 dictates any changes to the net metering credit structure can only take effect 12 months after the Energy Bureau "decides to make any such changes."  ECF No. 47 ¶ 61.  In short, Act 10 requires the current net metering rate structure remain in place until at least 2031.  ECF No. 47 ¶ 62.  This provision was not contained in the version of the Bill reviewed by the Energy Bureau.  RSOF ¶¶ 25, 27.

In addition, Act 10 compounds the consequences of this delay in making changes to the net metering program.  The Act requires the Energy Bureau to provide any customer that has a net metering contract and certain non-net metering customers who have a distributed generator at the time the Energy Bureau issues its final determination changing the net metering structure (which,

as noted above, cannot be before 2031), the option to continue to enjoy the 1:1 net metering rate for *at least* 20 years (or until at least 2051).[10]  ECF No. 47 ¶ 63.  This provision was not contained in the version of the Bill reviewed by the Energy Bureau.  RSOF ¶ 28.

### E.  The Governor's Deficient § 204 Submission for Act 10.

Section 204(a) requires the Governor to submit to the Oversight Board each newly enacted law, as well as a "formal estimate" of the law's impact on expenditures and revenues and a certification the law is or is not "significantly inconsistent" with the fiscal plan.  PROMESA § 204(a)(1–2).  On February 12, 2024, the Oversight Board received the Governor's § 204(a) submission for Act 10 (the "Submission").  ECF No. 47 ¶ 64.  The Oversight Board determined the Submission did not meet PROMESA's requirements because, among other reasons, the estimates submitted did not contain the level of analysis required by PROMESA and the Submission did not include a certification provided by an agency that prepared an estimate as required by PROMESA.  RSOF ¶ 29.

In a letter dated April 10, 2024, the Oversight Board provided AAFAF, the Governor, and the Legislature with a detailed assessment of the Submission and, pursuant to § 204(a)(3)(A–B), a notification that the Governor had not provided the required formal estimate and certification.  ECF No. 47 ¶ 79.  Pursuant to § 204(a)(4)(A), the Oversight Board directed the Governor to submit a revised submission, including a formal estimate and a certification in compliance with the requirements of § 204(a)(2), by April 19, 2024.  ECF No. 47 ¶ 80.  The Oversight Board also

---

[10] Act 10 provides that customers with a distributed generator, but who do not have a net metering contract, must retain the option to participate in net metering at the 1:1 rate if their generator has been installed and certified by a licensed professional and the customer notified the Energy Bureau of the installation by the time the Energy Bureau issues its final determination changing the net metering structure.  ECF No. 47 ¶ 63.

requested confirmation by April 15, 2024, that the Government would repeal or amend Act 10 and further requested a "concrete plan and timeline for doing so." ECF No. 47 ¶ 81.

No legislation has been passed repealing or amending Act 10 and the Governor has failed to comply with the Oversight Board's direction to provide a compliant formal estimate and certification for Act 10. ECF No. 47 ¶ 90.

### F. The Oversight Board's § 108(a)(2) Determinations.

After Act 10's enactment, the Oversight Board and its advisors examined the law. ECF No. 47 ¶ 91. On April 5, 2024, based on its review and analysis, the Oversight Board determined Act 10 impairs or defeats PROMESA's purposes of achieving fiscal responsibility and access to capital markets for multiple independent reasons, including because Act 10:

- violates the express terms of the PREPA Fiscal Plan and the 2023 Commonwealth Fiscal Plan that require the Energy Bureau to be politically independent;

- violates the express terms of the PREPA Fiscal Plan, which requires the Energy Bureau to conduct and complete its net metering study and implement any changes to PREPA's net metering program it deems appropriate by April 11, 2024; and

- impairs the Oversight Board's ability to carry out its statutory duties under § 201(b)(1)(B), (G), (H), and (J) to ensure funding of the essential public service of reliable electricity, to enable the achievement of fiscal targets, to create independent revenue forecasts, and to provide for capital expenditures and investments necessary to promote economic growth.

ECF No. 47 ¶ 92. The Oversight Board memorialized its determination in a resolution passed on April 5, 2024 (the "April Resolution"), and informed the Governor, Senate President, and Speaker of the House of Representatives of its determination and concerns regarding Act 10 on April 8, 2024. ECF No. 47 ¶¶ 93–94.

On June 5, 2024, the Oversight Board certified the 2024 Commonwealth Fiscal Plan, which includes similar provisions to the 2023 Commonwealth Fiscal Plan regarding the need for the Energy Bureau to operate independently and without political interference. ECF No. 47 ¶¶ 95–96. On June 21, 2024, the Oversight Board again determined that Act 10 impairs or defeats the

purposes of PROMESA for the same reasons as set forth in the April Resolution but taking into
account the certification of the 2024 Commonwealth Fiscal Plan and the Governor's violations of
§ 204(a) (discussed above), and memorialized its decision in a separate resolution.  ECF No. 47 ¶
97.

### G.  The Energy Bureau Publishes a Draft Study on Net Metering.

On June 14, 2024, the Energy Bureau approved a resolution (the "<u>Energy Bureau
Resolution</u>") authorizing the publication of an 82-page draft study on net metering and distributed
energy (the "<u>Draft Study</u>").  ECF No. 47 ¶ 98.  The Energy Bureau Resolution references the
requirement to conduct the Act 17 Study,[11] but notes the requirement was amended by Act 10.
ECF No. 47 ¶ 99.  Accordingly, the Energy Bureau published the Draft Study pursuant to its "broad
delegated powers and duties" under Act 57, and not Act 114, as amended by Act 17.  ECF No. 47
¶ 100.

The Draft Study was drafted by KeyLogic Systems, a company engaged by the Energy
Bureau to conduct the Act 17 Study, and includes an analysis of net metering programs generally,
the experience with such programs in different states, and Puerto Rico's program.  ECF No. 47
¶ 101.  While net metering has been "successful at energizing customer-sided" distributed energy
resources, its "reliance on retail rates" is not economically efficient.  RSOF ¶ 33.  The Draft Study
raised questions about how rates "will . . . need to be modified to eliminate cost shift" going
forward.  RSOF ¶ 34.  It concludes that "Puerto Rico will find [net metering] uns[us]tainable in
the long-run" and "[n]ew methods need to be explored and adopted."  RSOF ¶ 34.

---

[11] The Energy Bureau Resolution references Act 114, as amended.  ECF No. 47 ¶ 100.  As discussed above, Act 114
was amended by Act 17 to, among other things, require the net metering study.

**H. The Oversight Board Commences This Adversary Proceeding.**

Despite the Oversight Board's determinations and efforts, Act 10 remains in full effect, including its restrictions on the Energy Bureau's ability to regulate PREPA.  Therefore, on July 26, 2024, the Oversight Board filed this Adversary Proceeding against the Governor, seeking, among other relief, declaratory and injunctive relief to enjoin and nullify Act 10 pursuant to PROMESA §§ 108(a)(2) and 204(a)(5).  ECF No. 1.  On September 11, 2024, the Senate President was permitted to intervene in this matter pursuant to Fed. R. Civ. P. 24(b).  ECF No. 27.

On September 25, 2024, the Oversight Board filed a motion for summary judgment, seeking judgment in its favor nullifying Act 10.  ECF No. 46.  That motion remains pending.

## <u>LEGAL STANDARD</u>

Summary judgment is appropriate where the record presents no genuine issue of material fact and demonstrates the movant is entitled to judgment as a matter of law.  *Pierluisi v. Fin. Oversight & Mgmt. Bd. for P.R.*, 37 F.4th 746, 759 (1st Cir. 2022) ("*Five Laws Appeal*") (citing Fed. R. Civ. P. 56(a)).  Material facts are those that "possess[] the capacity to sway the outcome of the litigation under the applicable law," and there is a genuine dispute where an issue "may reasonably be resolved in favor of either party."  *Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008) (citations omitted); *Fin. Oversight & Mgmt. Bd. for P.R. v. Vázquez Garced*, 616 B.R. 238, 245 (D.P.R. 2020) ("*Law 29 II*").  As set forth herein, the Senate President's arguments fail on the facts and the law.  Therefore, his motion for summary judgment must be denied.  Indeed, the

undisputed facts and law require that the Oversight Board be granted summary judgment against the Senate and on its own motion before the Court.

## **ARGUMENT**

In his Motion, the Senate President seeks dismissal of the Complaint because it purportedly "infringes on the Senate's constitutionally mandated power to legislate over public policy issues." Mot. at 7. Specifically, the Senate President contends the Senate's "constitutional authority to legislate, particularly in areas of public policy like energy, is clear and inviolable," and the Complaint "should be dismissed as an undue infringement of the Senate's constitutional powers." *Id*. at 9. Further, he contends Act 10 reflects "non-economic policy," and therefore it is beyond the Oversight Board's powers. *Id*. at 11–12. As such, the Senate President argues the Oversight Board cannot invalidate or seek to invalidate enacted laws—at least to the extent such laws reflect non-economic policy.

The Senate President's arguments fail because they are based on erroneous interpretations and mischaracterizations of PROMESA and Act 10.

## I. PROMESA EMPOWERS THE OVERSIGHT BOARD TO PREVENT LAWS FROM TAKING EFFECT; ANY CONTRARY PUERTO RICO LAW IS PREEMPTED.

The Senate President is wrong when he contends the Oversight Board's efforts to nullify Act 10 "represent an overreach of its statutory authority under PROMESA." Mot. at 2–3. As Judge Gelpí observed, PROMESA "has given the [Oversight] Board ample veto power over actions by Puerto Rico's government that, in one way or another, have a fiscal impact (or lack thereof) on its coffers." *Fin. Oversight & Mgmt. Bd. for P.R. v. Hernández-Montañez*, 82 F.4th 57, 59 (1st Cir. 2023) ("*Act 41 En Banc Decision*"). Indeed, PROMESA expressly authorizes the Oversight Board to invalidate or seek the invalidation of Commonwealth laws when the Government or the law violates PROMESA. This is evident from the plain text of the two

17

provisions upon which the Oversight Board's claims are based.  Section 108(a) bars the Government from "enact[ing], implement[ing], or enforc[ing] any statute, resolution, policy, or rule that" the Oversight Board has determined "would impair or defeat the purposes of" PROMESA.  PROMESA § 108(a)(2).  And § 204(a) authorizes the Oversight Board to "take such actions as it considers necessary" to ensure new laws "will not adversely affect the territorial government's compliance with the Fiscal Plan, including preventing the enforcement or application of the law."  *Id.* § 204(a)(5).

As the First Circuit recently recognized, these provisions authorize the Oversight Board "to prevent laws inconsistent with PROMESA from taking effect," and this Court has the "concomitant authority to enforce the [Oversight] Board's mandates by nullifying such a law from its inception." *La Liga Appeal,* 110 F.4th at 326 (1st Cir. 2024).  Indeed, this Court has enjoined or nullified 30 laws pursuant to § 108(a)(2) and/or § 204(a)(5) in the past five years.  *See Fin. Oversight & Mgmt. Bd. for P.R. v. Pierluisi*, 650 B.R. 334, 357 (D.P.R. 2023) ("*Act 41*") (nullifying Act 41-2022 for violations of § 204(a)(5)); *Fin. Oversight & Mgmt. Bd. for P.R. v. Pierluisi Urrutia*, 634 B.R. 187, 207 (D.P.R. 2021) ("*Act 7*") (nullifying Act 7-2021 for violations of PROMESA §§ 108(a)(2) and 204(a)(5)[12]; *Five Laws*, 511 F. Supp. At 138 (enjoining four Commonwealth laws for violations of PROMESA §§ 108(a)(2) and 204(a)(5)[13]); *Law 29 II*, 616

---

[12] Act 7 was nullified in its entirety for violations of PROMESA § 204(a)(5), and partially nullified (and the implementation of those provisions enjoined) for violations of PROMESA § 108(a)(2). *Act* 7, 634 B.R. at 207.

[13] A fifth law, Act 181-2019, was enjoined for violating PROMESA § 204(c)'s bar on reprogramming absent Oversight Board approval. *Five Laws*, 511 F. Supp. 3d at 135.

B.R. at 248 (nullifying and ruling "unenforceable and of no effect" Law 29 for violations of §§ 108(a)(2) and 204(a)(5), and 23 joint resolutions for violations of § 108(a)(2)[14]).

The Senate President argues the Oversight Board's powers under PROMESA cannot override the Senate's "constitutional authority to legislate." Mot. at 9. He also contends that because the Legislature created the Energy Bureau, the Energy Bureau "is subject to legislative oversight and modification through the enactment of laws." *Id.* at 6–7 (citing CONST PR Art. IV § 6).[15] This argument fails because it ignores PROMESA's supremacy clause, which provides PROMESA prevails over "any general or specific provisions of territory law . . . that is inconsistent with" PROMESA. PROMESA § 4. As the First Circuit explained, "PROMESA accounts for the Legislative Assembly's power under the Constitution: Under PROMESA's preemption provision, the grants of authority to the [Oversight] Board . . . 'prevail over any general or specific provisions of territory law,' including provisions of Puerto Rico's Constitution that are 'inconsistent with [PROMESA].'" *Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R.*, 916 F.3d 98, 116 (1st Cir. 2019) (quoting PROMESA § 4); *see also Act 41 En Banc Decision*, 82 F.4th at 60 (Gelpí, J., concurring) (in response to a similar argument raised by the Speaker of the Puerto Rico House of Representatives, noting the Legislature "cannot count on the principle of the consent of the

---

[14] The Court also found these laws violated § 204(c).

[15] It is worth noting the Oversight Board's actions in this regard are fully consistent with the intent and purpose behind Act 57 and its creation of the Energy Bureau (and Act 10 and the Senate President's actions in this Adversary Proceeding are not). The Energy Bureau was created to operate as an "independent government entity" to address the fact PREPA's problems were the result of "the negative dynamics of bureaucracy, patronage, corruption, political intervention, and special interests," and the recognition that a "non-partisan, independent energy regulator, with fiscal autonomy from the government" was necessary to end that influence and improve PREPA's performance. ECF No. 47 ¶¶ 7–13. Indeed, contrary to the Senate President's arguments, there is nothing in Act 57 that supports legislative interference in the Energy Bureau's regulation of PREPA. The language from the Statement of Motives cited by the Senate President merely provides that the Legislature may "ensure [the Energy Bureau] fully complies with its duties and responsibilities"; it does not reflect an intent for the Legislature to impose energy policy on the "independent" regulator it created. Mot. at 6. The Oversight Board's efforts to preserve the Energy Bureau's independence and shield it from legislative and special interest interference are fully consistent with the legislative intent behind the creation of the Energy Bureau and the enactment of Act 57.

governed to invalidate PROMESA . . . .").  As such, to the extent the Senate's powers under the
Puerto Rico Constitution conflict with §§ 108(a)(2) and 204(a)(5), PROMESA expressly preempts
them.

Contrary to the Senate President's contention, PROMESA § 303 does not mandate a
different result.  He argues § 303 precludes the Oversight Board's claims, because it states that
PROMESA "does not limit or impair the power of a covered territory to control, by legislation or
otherwise, the territory or any territorial instrumentality thereof in the exercise of the political or
governmental powers of the territory."  Mot. at 12.  But the Senate President intentionally omits
key language from the provision, which makes clear it is "[s]ubject to the limitations set forth in
titles I and II of" PROMESA.  PROMESA § 303.  Because the Oversight Board's claims are
brought pursuant to, and seek to enforce provisions in, those titles that limit the Commonwealth
Government's powers, § 303 has no application to this matter.  *See La Liga Appeal,* 110 F.4th at
324 (finding same "subject to" language in PROMESA § 305 permitted court to hear claims under
PROMESA §§ 108 and 204 that otherwise may have been barred by § 305).

## II.    THE OVERSIGHT BOARD'S POWERS ARE NOT LIMITED TO "ECONOMIC" OR "FISCAL" LAWS AND POLICIES.

After contending the Oversight Board cannot interfere with the Senate's legislative
authority in any way, the Senate President proffers a more limited argument:  the Oversight
Board's powers under PROMESA are limited to "economic" or "fiscal" matters, and "PROMESA
does not authorize the [Oversight Board] to interfere with the Senate's legislative actions when
those actions pertain to non-economic policy matters."  Mot. at 14.  According to the Senate
President, because Act 10 is "non-fiscal legislation," this adversary proceeding "should be rejected

as an overreach of [the Oversight Board's] statutory authority under PROMESA. *Id.* at 13–14.
The Senate President's argument fails on multiple grounds.

The Oversight Board's powers are not limited to purely "economic" or "fiscal" matters,
whatever the Senate President means by those terms.[16]   As noted above, PROMESA provides
when the Oversight Board determines that "any statute, resolution, policy, or rule . . . would impair
or defeat the purposes of" PROMESA, the Governor and Legislature are barred from "enact[ing],
implement[ing], or enforc[ing]" the measure.   PROMESA § 108(a).[17]   The powers granted by
§ 108(a) are not limited to so-called "economic" or "fiscal" policies and statutes, but extend to
"***any*** statute, resolution, policy, or rule" that the Oversight Board determines would impair or
defeat PROMESA's purposes. *Id.* (emphasis added); *see also Act 41 En Banc Decision*, 82 F.4th
at 59 (Gelpí, J., concurring) (PROMESA "has given the [Oversight] Board ample veto power over

---

[16] The Senate President does not explain what he means by "fiscal" or "economic" laws and policies.  It appears,
however, that he believes the Oversight Board's authority is limited to laws that have "direct" economic impacts, and
laws that have "potential economic effects" do not fall within the scope of the Oversight Board's powers.  Mot. at 13.
This distinction is without merit, as this Court nullified Act 41-2022 despite the Governor's argument that the law had
only "'indirect' impacts on the Commonwealth's finances." *Act 41*, 650 B.R. at 357–58.  Similarly, this Court
enjoined another law—Act 138-2019—that "limit[ed] [Managed Care Organizations, also known as MCOs'] ability
to deny healthcare providers access to MCOs' preferred provider networks and to terminate contracts with such
providers" based on the Oversight Board's concerns over indirect fiscal impacts; specifically that "Act 138 will result
in increased healthcare costs which will ultimately be borne by the Commonwealth." *Five Laws*, 511 F. Supp. 3d at
128-29 (enjoining implementation of Act 138 pursuant to PROMESA § 204(a)(5)).  Further, as discussed below, there
is no basis in PROMESA for the Senate President's proposed "economic" limitation on the Oversight Board's powers.

[17] The express inclusion of "polic[ies]" in § 108(a) negates the Senate President's effort to shield Act 10 from
PROMESA by characterizing it as a "policy."  Further, in the *Act 7* case, this Court rejected the argument that
provisions of Act 7-2021, which the statute expressly identified as "public policy," were beyond the scope of
PROMESA § 108(a) because "whether viewed as directives to act or simple statements of policy," the provisions
"conflict with and impair PROMESA." *Act 7*, 634 B.R. at 205.  The same is true here.  Act 10 does far more than
simply articulate the Government's policy with respect to net metering; it restricts the Energy Bureau's ability to
regulate PREPA's net metering program in significant ways that conflict with the Fiscal Plans and impair or defeat
PROMESA's purposes. *See infra* at § III; *see also* ECF No. 46 at 27–29.

actions by Puerto Rico's government that, in one way or another, have a fiscal impact (*or lack thereof*) on its coffers." (emphasis added)).[18]

The absence of any "fiscal" limitation on this power reflects Congress's intent to provide the Oversight Board with broad powers to ensure the Commonwealth achieves fiscal responsibility and access to the capital markets. Although the Oversight Board's mission "is to provide a method for" Puerto Rico "to achieve fiscal responsibility and access to the capital markets," its powers to do so reflect Congress's assessment that solving Puerto Rico's fiscal crisis requires "[a] **comprehensive** approach to fiscal, management, and structural problems and adjustments that **exempts no part** of the Government of Puerto Rico . . . ." PROMESA § 405(m)(4) (emphases added).

Indeed, nowhere does PROMESA limit the Oversight Board in the manner the Senate President suggests. To the contrary, many provisions in PROMESA confirm Congress gave the Oversight Board broad authority to achieve its mission. PROMESA § 205, for example, reflects the breadth of the Oversight Board's mandate, providing the Oversight Board may make recommendations on "a non-exhaustive list of matters that implicate significant policy choices about the direction and operation of the government of Puerto Rico." *See Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R.*, 330 F. Supp. 3d 685, 698 (D.P.R. 2018) ("*Title III Budget Case*"), *aff'd*, 945 F.3d 3 (1st Cir. 2019). These policy choices expressly include, as pertinent to this matter, recommendations about "the effects of the territory's laws . . . on the operations of the territorial government." PROMESA § 205. The Oversight Board can include such recommendations in its fiscal plans, and in so doing make "binding policy choices for the

---

[18] Section 204(a)(5) similarly is not limited to "economic" laws. Rather, it provides the Oversight Board may take action to ensure laws will not adversely affect compliance with applicable fiscal plan(s). As discussed below, fiscal plans may contain provisions that are not strictly "economic."

Commonwealth." *Title III Budget Case*, 330 F. Supp. 3d at 700 (citing PROMESA § 201(b)(1)(K)).

Furthermore, the Oversight Board has broad discretion regarding what to include in certified fiscal plans. PROMESA provides fiscal plans must include a variety of components, which include § 205 recommendations determined to be "appropriate" by the Oversight Board,[19] but also a broad catch-all, stating fiscal plans "shall . . . include such additional information as the Oversight Board deems necessary." PROMESA § 201(b)(1)(L). Moreover, Congress protected the Oversight Board's decisions regarding the contents of fiscal plans, precluding any court from hearing challenges to its certification determinations. *Id*. § 106(e).

The Senate President's arguments to the contrary are unavailing. First, he understates the Oversight Board's powers, suggesting PROMESA limits the Oversight Board's "role . . . to oversee[ing] the development of fiscal plans and budgets . . . ." Mot. at 11. But the Oversight Board's role is far broader, extending to, among other things, the review and, as necessary, blocking of statutes, government contracts, rules, regulations, executive orders, and debt modifications. PROMESA §§ 204(a), 204(b), 207.

Second, the Senate President mischaracterizes the Oversight Board's powers regarding review of new laws. Addressing § 204(a), he suggests the Oversight Board's review of new laws "is limited to fiscal matters" because the provision discusses compliance with the fiscal plan. Mot. at 11–12. But, as discussed above, fiscal plans include more than purely fiscal or economic matters. Furthermore, § 204(a) requires the submission of all new laws for Oversight Board review, not just "fiscal" or "economic" laws. Under the Senate President's interpretation of

---

[19] *See Title III Budget Case*, 330 F. Supp.3d at 700 ("'[A]ppropriate,' as used in Section 201(b)(1)(K), means appropriate in the judgment of the Oversight Board, which has sole discretion as to fiscal plan and budget certification and the determination of whether and to what extent policies would impair or defeat the purposes of PROMESA, as informed by the Governor's articulated reasons for opposing the recommendation.").

23

PROMESA, the Government could elect not to make § 204(a) submissions to the Oversight Board because it unilaterally determines they are not "economic."  Further undermining the Senate President's argument, § 204(a) requires not only an economic assessment of new laws (*i.e.*, "formal estimates"), but also a separate assessment as to whether the law is or is not significantly inconsistent with the applicable fiscal plan.  PROMESA § 204(a).  This second analysis would be unnecessary if economic impact was the only aspect of laws that fell within the Oversight Board's authority.  Moreover, the Senate President's argument ignores § 108(a), which prevents the enactment, implementation, or enforcement of policies, statutes, and other measures the Oversight Board determines impair or defeat the purposes of PROMESA.  That provision is not tied to fiscal plans or expressly limited to economic matters.

Finally, the Senate President argues this Court's 2017 ruling regarding the installation of a chief transformation officer ("CTO") for PREPA, reporting only to the Oversight Board, supports his position.[20]  Mot. at 12–13 (discussing *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 583 B.R. 626 (D.P.R. 2017) ("*CTO Opinion*")).  While that decision did address the Oversight Board's powers, it did not find the Oversight Board's authority was limited to merely "fiscal matters."  Rather, the Court held only that the Oversight Board did not have the power "to impose changes in structure or reporting lines within PREPA by appointing a CTO, or to exercise the authority of a chief executive officer, much less to delegate that authority to an agent of the [Oversight Board]."  *CTO*

---

[20] The Senate President also cites to PROMESA § 303 in support of this argument, contending it "ensures that the Commonwealth government retains control over non-economic matters, preserving its authority to govern without interference from the FOMB in areas outside of fiscal concerns."  Mot. at 12.  As discussed above, while this provision addresses the powers of the Government, the Senate President's reading of the provision ignores its broad exception, providing the Government's powers are limited by Titles I and II of PROMESA.  *See supra* at § I.  That exception contains no "fiscal" or "economic" limitation, but rather makes clear Titles I and II override entirely any Commonwealth Government authority.

*Opinion*, 583 B.R. at 636.  Notably, central to the Court's decision was that the Oversight Board did not assert "that PREPA [was] non-compliant with a certified fiscal plan or budget."  *Id.*

This is a far cry from the issues presented here.  The *CTO Opinion* has no bearing on this matter.  The Oversight Board is not seeking to impose changes on any government bureaucracy through this Adversary Proceeding; rather, it only seeks to stop the changes mandated by Act 10 and return to the pre-Act 10 status quo in accordance with the terms of the Fiscal Plans, and to achieve PROMESA's purposes.

### III.    ACT 10 HAS CLEAR "FISCAL" OR "ECONOMIC" IMPACT.

Even if the Oversight Board's powers were limited to purely "fiscal" or "economic" matters as the Senate President contends (which, as discussed above, they are not), Act 10 comfortably falls within the scope of that category.  The Senate President's arguments to the contrary are based on a mischaracterization of Act 10.

Specifically, the Senate President argues "the only substantive modifications" to existing law effectuated by Act 10 "involved **extending the timeline** for the [net metering] study," and "Act 10 did not introduce any substantive alterations that would affect the economic structure of Puerto Rico's energy policies or the rights of current net metering participants."  Mot. at 9–10 (emphasis in original).  But Act 10 contains numerous substantive changes which have fiscal or economic implications for PREPA, as summarized in the table below:

| Pre-Act 10 Requirements | Act 10 Changes |
|---|---|
| Net metering study for purpose of making changes to the net metering program to be completed by April 11, 2024. RSOF ¶ 15. | Bars the net metering study necessary to change the net metering program from commencing before January 2030.  RSOF ¶ 25. |
| The Energy Bureau may implement new net metering rates immediately following completion of the study (*i.e.*, as early as April 11, 2024).  RSOF ¶ 23. | The Energy Bureau may not implement new net metering rates for at least one year following announcement of new rates—delaying implementation of any changes until at least January 2031.  RSOF ¶¶ 26–27. |
| Net metering customers and certain potential net metering customers have the right to retain their net metering compensation rate for 20 years from the date of execution of their net metering contract.  RSOF ¶ 28. | All net metering customers and certain potential net metering customers at the time the Energy Bureau changes the net metering compensation rate have the right to retain the current net metering compensation rate for an additional 20 years following the Energy Bureau setting a new net metering rate (*i.e.*, until at least 2051).  RSOF ¶ 28. |

As the chart above demonstrates, Act 10 does more than simply "extend[]" a deadline; it stops the Energy Bureau from making changes to the net metering program's rates before 2031, and mandates the Energy Bureau offer the current net metering compensation rate to existing and certain potential net metering customers for another two decades thereafter.[21]

It is indisputable that these referenced changes clearly have fiscal ramifications for PREPA. They impact the regulation of PREPA's net metering program, a program which the Senate President himself admits implicates a "myriad direct and indirect economic and socioeconomic benefits."  Senate President's Answer, ECF No. 31 ¶ 38.  Indeed, under the current net metering program, PREPA must purchase electricity from net metering customers by providing them credits offsetting their consumption of power from PREPA, without regard to whether PREPA needs the electricity or can produce it for less.  PREPA must purchase this electricity whether it needs the

---

[21] The Senate President's brief ignores these provisions, which belie his contention that Act 10 was motivated solely to "provide[] more time for careful study and analysis" of the net metering program.  Mot. at 11.

electricity or not and regardless of whether the costs of doing so makes economic sense for PREPA. On this basis alone, the program has a fiscal or economic impact on PREPA.[22] But beyond this, the restrictions Act 10 imposes on the Energy Bureau's ability to make changes to the program, including the requirement PREPA honor the 1:1 credit for all existing net metering customers (and some potential net metering customers) until at least 2051 most assuredly have an economic impact on PREPA.

Thus, under any analysis, Act 10 constitutes a "fiscal" or "economic" policy. The Senate President's arguments to the contrary are premised on a mischaracterization of the law and should be rejected.

## **CONCLUSION**

For the foregoing reasons, the Oversight Board has authority to trigger PROMESA's bar of Act 10 and seek its nullification. The Senate President's motion for summary judgment should be denied and the Oversight Board's pending motion for summary judgment should be granted.

[*Remainder of Page Intentionally Left Blank*]

---

[22] The PREPA Fiscal Plan specifically recognizes that net metering has an economic impact on PREPA. Noting that renewable distributed generation "provides benefits to rooftop solar customers," the PREPA Fiscal Plan also observes a "sub-optimal net metering program . . . may have unintended detrimental effects and risks, including an unequitable distribution of costs throughout the system." ECF No. 47 ¶ 52. For example, the PREPA Fiscal Plan notes that because LUMA is required "to purchase the excess energy produced by net metering customers at the prevailing energy rate, the effective cost to ratepayers of the renewable energy generated by net metering customers may be higher than the cost of purchasing that same quantity of electricity from other resources." *Id.* ¶ 53. The cost to LUMA is "then passed on, in whole or in part, to all other remaining customers." *Id.* ¶ 54.

Dated: October 23, 2024
San Juan, Puerto Rico

/s/  Miguel E. Gierbolini
Miguel E. Gierbolini
U.S.D.C. – P.R. No. 211,901
**GIERBOLINI & CARROLL LAW
OFFICES, PSC**
P.O. Box 9022936
San Juan, P.R. 00902-2936
Tel:  (787) 620-0685
Email:  miguelgierbolini@gmail.com

/s/ Martin J. Bienenstock
Martin J. Bienenstock (*pro hac vice*)
Timothy W. Mungovan (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900
Email:  mbienenstock@proskauer.com
            tmungovan@proskauer.com

/s/ Guy Brenner
Guy Brenner (*pro hac vice*)
**PROSKAUER ROSE LLP**
1001 Pennsylvania Ave., NW
Suite 600 South
Washington, DC 20004
Tel:     (202) 416-6800
Fax:     (202) 416-6899
Email:  gbrenner@proskauer.com

*Attorneys for the Financial Oversight and
Management Board in its own right and as
representative of the Puerto Rico Electric
Power Authority*

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

*/s/ Miguel E. Gierbolini*
Miguel E. Gierbolini
