# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>    Debtors.[1] | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as a representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>    Debtor. | PROMESA Title III<br><br>Case No. 17-BK-4780-LTS |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>Plaintiff<br><br>v.<br><br>HON. PEDRO PIERLUISI, in his official capacity as Governor of Puerto Rico,<br><br>Defendant<br><br>and | Adv. Proc. No. 24-00062-LTS |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

SENATE OF PUERTO RICO, through Hon. José Luis Dalmau, in his official capacity as President of the Senate of Puerto Rico,

Intervenor – Defendant

**THE GOVERNOR'S OPPOSITION TO FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO BANKRUPTCY RULE 7056 AND REQUEST FOR RELIEF UNDER RULE 56(D)**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND ............................................................................... 5

    A.    The Board's Limited Authority .............................................................. 5

        1.    The Commonwealth Fiscal Plan ............................................... 5

        2.    Instrumentalities' Fiscal Plans ................................................. 5

        3.    Section 204(a)'s procedures for newly-enacted legislation ...................... 6

    B.    Puerto Rico's Net-Metering Program ................................................... 7

    C.    The 2023 Commonwealth Fiscal Plan ................................................. 8

    D.    The 2023 PREPA Fiscal Plan ............................................................. 9

    E.    Act 10 ................................................................................................ 10

    F.    PREB's Net-Metering Study.............................................................. 13

    G.    The Government's Act 10 Certification .............................................. 13

    H.    This Action......................................................................................... 15

ARGUMENT .................................................................................................... 16

I.    BOARD DECISIONS SHOULD BE REVIEWED UNDER AN ARBITRARY-
AND-CAPRICIOUS STANDARD. ................................................................. 17

    A.    The Board Is Collaterally Estopped from Advocating *Ultra-Vires* Review........ 17

    B.    Even If the Board Were Not Collaterally Estopped, It Is Judicially
Estopped from Advocating *Ultra-Vires* Review.................................. 19

        1.    The Board's Positions Are Clearly Inconsistent. ..................................... 19

        2.    The Board's Advocacy for the Arbitrary-and-Capricious Standard
Was Successful. ....................................................................... 20

        3.    The Board Would Derive an Unfair Advantage If Allowed to
Reverse Course. ...................................................................... 21

    C.    The Board's *Ultra-Vires* Argument Is Precluded Under the Law-of-the-
Case Doctrine..................................................................................... 22

    D.    PROMESA's Language Also Provides That the Board's Decisions Are
Subject to Judicial Review Under the Arbitrary-and-Capricious Standard. ........ 23

II.    THE BOARD'S REJECTION OF THE ACT 10 CERTIFICATION IS
ARBITRARY AND CAPRICIOUS. ................................................................. 24

        A.    Act 10 Is Not Significantly Inconsistent with the Commonwealth
Fiscal Plan.............................................................................. 24

    A.    Act 10 Is Not "Significantly Inconsistent" with the 2023 PREPA Fiscal
Plan. ................................................................................................... 25

i

**TABLE OF CONTENTS**

*(continued)*

**Page**

1. The Only Relevant Inconsistency Under PROMESA Section 204(a) Is Fiscal Inconsistency. .................................................. 25

2. In Any Event, Act 10 Does Not Interfere with PREB's Regulatory Authority. .................................................. 27

B. The Act 10 Estimates and Certification Otherwise Satisfy PROMESA Section 204(a). .................................................. 32

1. The Act 10 Estimates Are Compliant. .................................................. 33

2. AAFAF Is an Appropriate Entity to Provide a PROMESA Section 204(a) Certification. .................................................. 35

III. THE BOARD HAS NOT BORNE ITS BURDEN OF PROVING THAT ITS DETERMINATIONS UNDER PROMESA SECTION 108(a) WERE NOT ARBITRARY AND CAPRICIOUS. .................................................. 36

IV. ALTERNATIVELY, SUMMARY JUDGMENT IS PREMATURE. .................................................. 37

A. Rule 56(d) Prohibits Summary Judgment Where a Party Has Not Had Adequate Opportunity for Discovery. .................................................. 37

B. The Governor Has Satisfied Rule 56(d). .................................................. 39

1. The Governor Has Submitted a Timely, Authoritative Declaration, Satisfying the First Two Factors. .................................................. 39

2. The Governor Has Good Cause for Not Seeking Discovery Sooner. ....... 39

3. The Discovery Requests Target Facts That Probably Exist and Are Material to the Parties' Dispute. .................................................. 39

CONCLUSION .................................................. 41

## TABLE OF AUTHORITIES

**Cases**

**Page(s)**

*In re 150 N. St. Assocs. Ltd. P'ship*,
184 B.R. 1 (Bankr. D. Mass. 1995) ....................................................... 23

*Alon Refining Krotz Springs, Inc. v. EPA*,
936 F.3d 628 (D.C. Cir. 2019) ............................................................ 34

*Am. Fed. of Labor & Congress of Indus. Orgs. v. Chao*,
297 F. Supp. 2d 155 (D.D.C. 2003) ..................................................... 33

*In re AMR Corp.*,
567 B.R. 247 (Bankr. S.D.N.Y. 2017), *aff'd sub nom. In re AMR Corp.*, 834 F.
App'x 660 (2d Cir. 2021) ................................................................... 22

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ......................................................................... 38

*Angelo v. USA Triathlon*,
2016 WL 126248 (D. Mass. Jan. 12, 2016) ........................................... 17

*Aracely, R. v. Nielsen*,
319 F. Supp. 3d 110 (D.D.C. 2018) ...................................................... 25

*Arizona v. California*,
460 U.S. 605 (1983) ......................................................................... 22

*Assured Guar. Corp. v. Commonwealth of P.R. (In re Fin. Oversight and Mgmt.
Bd. for P.R.)*,
582 B.R. 579 (D.P.R. 2018) ............................................................... 24

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962) ......................................................................... 40

*In re Brizinova*,
588 B.R. 311 (Bankr. E.D.N.Y. 2018) ................................................... 22

*Cap. Area Immigrant's Rights Coal. v. DOJ*,
264 F. Supp. 2d 14 (D.D.C. 2003) ....................................................... 33

*Cause of Action Inst. v. Eggleston*,
224 F. Supp. 3d 63 (D.D.C. 2016) ....................................................... 23

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................. 17, 28, 37, 38

*CenTra, Inc. v. Estrin*,
538 F.3d 402 (6th Cir. 2008) .............................................................. 38

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ............................................................ 23

*Cnty. of Los Angeles v. Shalala*,
192 F.3d 1005 (D.C. Cir. 1999) ...................................................... 34, 35

## TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*Cortés–Irizarry v. Corporación Insular*,
111 F.3d 184 (1st Cir. 1997) .................................................................... 17

*Cruz Vargas v. R.J. Reynolds Tobacco Co.*,
218 F. Supp. 2d 109 (D.P.R. 2002), *aff'd*, 348 F.3d 271 (1st Cir. 2003) ................................. 17

*Desa Grp., Inc. v. U.S. Small Bus. Admin.*,
190 F. Supp. 3d 61 (D.D.C. 2016) ............................................................ 40

*Dunkin' Donuts of America, Inc. v. Metallurgical Exoproducts Corp.*,
840 F.2d 917 (Fed. Cir. 1988) .................................................................. 38

*Educ. Credit Mgmt. Corp. v. Mersmann (In re Mersmann)*,
505 F.3d 1033 (10th Cir.2007) ................................................................ 22

*Ellis v. United States*,
313 F.3d 636 (1st Cir. 2002) .................................................................... 23

*Emigrant Residential LLC v. Pinti*,
37 F.4th 717 (1st Cir. 2022) .................................................................... 38

*Fin. Oversight & Mgmt. Bd. For P.R. v. Pierluisi (In re Fin. Oversight & Mgmt.
Bd. For P.R.)*,
650 B.R. 334 (D.P.R. 2023) ............................................................... 25, 27

*Fin. Oversight & Mgmt. Bd. for P.R. v. Pierluisi (In re Fin. Oversight & Mgmt.
Bd. for P.R.)*,
634 B.R. 187 (D.P.R. 2021) ........................................................... 18, 19, 21

*Fin. Oversight & Mgmt. Bd. for P.R. v. Vásquez Garced (In re Fin. Oversight &
Mgmt. Bd. for P.R.)*,
403 F. Supp. 3d 1 (D.P.R. 2019) .............................................................. 26

*Fin. Oversight & Mgmt. Bd. for P.R. v. Vázquez Garced (In re Fin. Oversight &
Mgmt. Bd. for P.R.)*,
616 B.R. 238 (D.P.R. 2020) ............................................................... 19, 21

*Finnegan v. Matthews*,
641 F.2d 1340 (9th Cir. 1981) ................................................................. 31

*Gil de la Madrid*,
524 B.R. 7 (Bankr. D.P.R. 2014) ............................................................. 22

*Greenburg v. Puerto Rico Maritime Shipping Auth.*,
835 F.2d 932 (1st Cir. 1987) ............................................................... 17, 37

*Grella v. Salem Five Cent Sav. Bank*,
42 F.3d 26 (1st Cir. 1994) ...................................................................... 18

*Griffith v. Fed. Lab. Rel. Auth.*,
842 F.2d 487 (D.C. Cir. 1988) ................................................................. 23

*Hootstein v. Town of Shutesbury*,
2024 WL 3538820 (D. Mass. July 24, 2024) ............................................... 38

# TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*Jones v. Montachusett Reg'l Transit Auth.*,
 525 F. Supp. 3d 256 (D. Mass. 2021) ................................................. 38

*Jordan v. Town of Waldoboro*,
 943 F.3d 532 (1st Cir. 2019) ................................................. 16

*Krakowski v. Am. Airlines, Inc.*,
 610 B.R. 714 (S.D.N.Y. 2019) ................................................. 22

*Lincoln-Dodge, Inc. v. Sullivan*,
 588 F. Supp. 2d 224 (D.R.I. 2008) ................................................. 18

*Lipsett v. Univ. of Puerto Rico*,
 864 F.2d 881 (1st Cir. 1988) ................................................. 17

*Loper Bright Enterprises v. Raimondo*,
 144 S. Ct. 2244 (2024) ................................................. 24

*Lussier v. Runyon*,
 50 F.3d 1103 (1st Cir. 1995) ................................................. 6

*MAZ Partners LP v. PHC, Inc. (In re PHC Inc. S'holder Litig.)*,
 762 F.3d 138 (1st Cir. 2014) ................................................. 38, 39, 40

*In Re Moise*,
 575 B.R. 191 (Bankr. E.D.N.Y. 2017) ................................................. 22

*Montana v. United States*,
 440 U.S. 147 (1979) ................................................. 18

*Naser Jewelers, Inc. v. City of Concord, N.H.*,
 538 F.3d 17 (1st Cir. 2008) ................................................. 22

*New Hampshire v. Maine*,
 532 U.S. 742 (2001) ................................................. 19

*P.R. Sun Oil Co. v. EPA*,
 8 F.3d 73 (1st Cir. 1993) ................................................. 34

*Pac. Gas & Elec. Co. v. FERC*,
 306 F.3d 1112 (D.C. Cir. 2002) ................................................. 37

*Panhandle E. Pipe Line Co. v. Madison Cnty. Drainage Bd.*,
 898 F. Supp. 1302 (S.D. Ind. 1995) ................................................. 25

*Perry v. Blum*,
 629 F.3d 1 (1st Cir. 2010) ................................................. 19

*Pierluisi v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt.
 Bd. for Puerto Rico)*,
 37 F.4th 746 (1st Cir. 2022) ................................................. 21, 26

*Pierluisi v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt.
 Bd. for Puerto Rico)*,
 77 F.4th 49 (1st Cir. 2023) ................................................. 34

**TABLE OF AUTHORITIES**

*(continued)*

**Page(s)**

*Pina v. Children's Place,*
    740 F.3d 785 (1st Cir. 2014)..................................................................... 38

*Puerto Rico Tel. Co. v. Telecommunications Regul. Bd. of Puerto Rico,*
    665 F.3d 309 (1st Cir. 2011)..................................................................... 19

*Ramallo Bros. Printing v. El Dia, Inc.,*
    490 F.3d 86 (1st Cir. 2007)................................................................ 18, 19

*Reid v. State of N.H.,*
    56 F.3d 332 (1st Cir. 1995)..................................................................... 39

*RFF Fam. P'ship, LP v. Ross,*
    814 F.3d 520 (1st Cir. 2016)..................................................................... 20

*Rivera-Almodóvar v. Instituto Socioeconómico Comunitario, Inc.,*
    730 F.3d 23 (1st Cir. 2013)..................................................................... 38

*Ruskai v. Pistole,*
    775 F.3d 61 (1st Cir. 2014)..................................................................... 23

*Sinclair Broadcast Grp., Inc. v. FCC,*
    284 F.3d 148 (D.D.C. 2002)..................................................................... 31

*Sioux Honey Ass'n v. Hartford Fire Ins. Co.,*
    672 F.3d 1041 (Fed. Cir. 2012) ............................................................... 24

*Sklar v. Byrne,*
    727 F.2d 633 (7th Cir. 1984) ................................................................... 31

*SPRINTCOM, Inc. v. P.R. Reguls. & Permits Admin.,*
    553 F. Supp. 2d 87 (D.P.R. 2008)........................................................... 41

*In Re Terrestar Corp.,*
    No. 16-CV-1421-ER, 2017 WL 1040448 (S.D.N.Y. Mar. 16, 2017) ....... 22

*United States v. Patriot Marine, LLC,*
    No. 21-CV-10243-AK, 2023 WL 2814550 (D. Mass. Apr. 6, 2023)........ 18

*Vázquez Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*
*Mgmt. Bd. for P.R.),*
    511 F. Supp. 3d 90 (D.P.R. 2020), *aff'd,* 37 F.4th 746 (1st Cir. 2022) .............. 21, 27

*Vélez v. Awning Windows, Inc.,*
    375 F.3d 35 (1st Cir. 2004)..................................................................... 17

*Venetian Casino Resort, L.L.C. v. E.E.O.C.,*
    530 F.3d 925 (D.C. Cir. 2008)................................................................. 25

*Westar Energy, Inc. v. FERC,*
    473 F.3d 1239 (D.C. Cir. 2007)............................................................... 34

*WorldNet Telecommunications, Inc. v. Telecommunications Regul. Bd. of Puerto*
*Rico,*
    707 F. Supp. 2d 163 (D.P.R. 2009).......................................................... 19

## TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

**Statutes**

42 U.S.C. § 18061 ................................................................................................ 32

48 U.S.C. § 2126(e) ............................................................................................. 23

48 U.S.C. § 2141 ................................................................................................... 5

48 U.S.C. § 2144(a)(2)(A) ............................................................................... 6, 26

48 U.S.C. § 2144(a)(2)(B) ............................................................... 25, 26, 35, 36

48 U.S.C. § 2144(a)(2)(C) ......................................................................... 6, 26, 35

48 U.S.C. § 2144(a)(3) .......................................................................................... 6

48 U.S.C. § 2144(a)(3)(B) ..................................................................................... 6

48 U.S.C. § 2144(a)(3)(C) ..................................................................................... 6

48 U.S.C. § 2144(a)(4)(A) ..................................................................................... 6

48 U.S.C. § 2144(a)(4)(B) ..................................................................................... 6

48 U.S.C. § 2144(a)(5) .......................................................................................... 7

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................... 16

**Regulations**

12 C.F.R. § 237.22 .............................................................................................. 32

**Constitutional Provisions**

Puerto Rico Const. Art. III, § 1 ............................................................................ 9

## PRELIMINARY STATEMENT[2]

PROMESA sections 204(a) and 108(a)(2) grant the Board the power to nullify new legislation only where the new law is "significantly inconsistent" with the governing fiscal plan or is so utterly at odds with the goal of returning Puerto Rico to fiscal responsibility that the new law "impairs or defeats" PROMESA's purposes.  In this case, the Board seeks to nullify Act 10—a narrow law that preserves the status quo for one aspect of PREPA's net-metering program—even though the 2023 PREPA Fiscal Plan provisions the Board identifies as "significantly inconsistent" with Act 10 are not inconsistent at all.  This is because (among other

---

[2] As used in this Opposition, (i) "2019 PREPA Fiscal Plan" means the June 27, 2019 fiscal plan for PREPA, as certified by the Board; (ii) "2023 Commonwealth Fiscal Plan" means the April 3, 2023 fiscal plan for the Commonwealth of Puerto Rico, as certified by the Board; (iii) "2023 PREPA Fiscal Plan" means the June 23, 2023 fiscal plan for PREPA, as certified by the Board; (iv) "2024 Commonwealth Fiscal Plan" means the June 5, 2024 fiscal plan for the Commonwealth of Puerto Rico, as certified by the Board; (v) "Act 114" means Act 114-2007, also known as the "Puerto Rico Net Metering Program Act"; (vi) "Act 57" means Act 57-2014, also known as the "Puerto Rico Energy Transformation and RELIEF Act"; (vii) "Act 17" means Act 17-2019, also known as the "Puerto Rico Energy Public Policy Act"; (viii) "Act 10" means Act 10-2024; (ix) "Amended Article 4(a)" refers to Article 4(a) of Act 114, as amended by Act 10; (x) "Amended Article 4(b)" means Article 4(b) of Act 114, as amended by Act 10; (xi) "Brenner Decl. Ex. __" means the exhibits attached to the *Declaration of Guy Brenner*, ECF No. 48; (xii) "Board" means the Financial Oversight and Management Board for Puerto Rico; (xiii) "Certification" means the Government's section 204(a) certification regarding Act 10, submitted to the Board on February 12, 2024; (xiv) "Discovery Requests" means the Governor's discovery requests attached as Exhibits 1–2 to the Yassin Declaration, filed with this Opposition; (xv) "Government" means the duly elected government of the Commonwealth of Puerto Rico; (xvi) "kWh" means kilowatt-hour; (xvii) "Mot. Submitting Certified English Trans." means the Senate's *Motion Submitting Certified English Translations,* ECF No. 53; (xviii) "MSJ" refers to the *Memorandum in Support of Financial Oversight and Management Board for Puerto Rico's Motion for Summary Judgment Pursuant to Bankruptcy Rule 7056*, ECF No. 46; (xix) "Mujica Decl." and "Mujica Decl. Ex. __" refer to the *Declaration of Robert F. Mujica, Jr. in Support of Financial Oversight and Management Board for Puerto Rico's Motion for Summary Judgment Pursuant to Bankruptcy Rule 7056*, ECF No. 49, and exhibits thereto; (xx) "Net-Metering Study" means PREB's draft study regarding Puerto Rico's net-metering program, available as Mujica Decl. Ex. 9; (xxi) "OMB" means the Puerto Rico Office of Management and Budget; (xxii) "Porter Decl." refers to the *Declaration of Lucas Porter in Connection with the Governor's Opposition to Financial Oversight and Management Board for Puerto Rico's Motion for Summary Judgment*, filed with this Opposition; (xxiii) "PREB" refers to the Puerto Rico Energy Bureau; (xiv) "PREPA" means the Puerto Rico Electric Power Authority; (xv) "RSOUF" means the *Governor's Response to Statement of Allegedly Uncontested Material Facts in Support of Financial Oversight and Management Board for Puerto Rico's Motion for Summary Judgment*, filed with this Opposition; (xvi) "Yassin Decl." and "Yassin Decl. Ex. __" refer to the *Declaration of Mohammad Saleh Yassin, Esq. in Opposition to Financial Oversight and Management Board for Puerto Rico's Motion for Summary Judgment Under Bankruptcy Rule 7056 and in Support of Governor Pierluisi's Request for Relief Under Fed. R. Civ. P. 56(d)*, and exhibits thereto, filed with this Opposition.

       Page numbers in citations to ECF documents refer to the page numbers in the original document, if any, or, if not available, to the page numbers automatically stamped in the ECF header.

       Unless otherwise specified, all emphasis is added and all quotation marks and citations are omitted.

things), the 2023 PREPA Fiscal Plan assumes—consistent with Act 10's effects—that PREPA's net-metering program will continue unaltered for at least five years. The Board has therefore failed to show its entitlement to judgment on the undisputed facts, and its summary judgment motion must be denied.

As the Court is well aware, Puerto Rico's electrical system is in dire need of improvement. Among the initiatives designed to strengthen the grid, improve resiliency, and reduce reliance on fossil fuels, the Government and PREPA have adopted a policy of encouraging electric customers to adopt renewable energy sources, including installing rooftop solar panels. To promote this goal, the Government enacted Act 114-2007, which created a net-metering program that provides PREPA's ratepayers a credit for electricity that they export to the grid. The Government subsequently amended Act 114 to require the Puerto Rico Energy Bureau, or PREB, to (i) conduct a net-metering study "to evaluate and consider the costs and benefits associated with" the net-metering program by April 11, 2024, and (ii) to maintain the program's crediting structure for a minimum of five years. (*See* Brenner Decl. Ex. 3 at 69.) In 2022 and 2023, the Legislature drafted legislation, SB 1064, to encourage continued adoption of renewable energy. After an open legislative process that included comments from public and private stakeholders—including PREB—the Senate revised SB 1064 to include a five-year extension of the net-metering status quo to accommodate PREB's comments. On January 8, 2024, the Legislature enacted SB 1064, thereafter signed into law as Act 10-2024, which promotes Puerto Rico's renewable-energy objectives by, among other things, (i) establishing a new date—January 2030—for PREB to begin its net-metering study, and (ii) maintaining the metric PREPA currently uses for determining whether a net-metering customer receives a credit until at least 2031. Act 10 otherwise expressly provides that PREB may, at any time, make

2

whatever rate changes or other regulatory reforms it deems appropriate under its existing

regulatory powers.  Act 10 was passed with broad support—not a single member of the

Legislature voted against it.

*Section 204(a)*:  The Board has sued (and now seeks summary judgment) to nullify Act

10 under section 204(a) on the grounds that it is supposedly inconsistent with PREPA's 2023

Fiscal Plan because, the Board says:

- Act 10 prevents PREB from conducting the net-metering study by the April 11, 2024 deadline in the 2023 PREPA Fiscal Plan;

- The new law effectively prohibits PREB from making changes to the net-metering program until at least 2031; and

- Act 10 "conflicts with the requirement . . . that the Energy Bureau must be able independently to regulate PREPA" (MSJ at 27).

The Board has failed to muster undisputed facts showing that Act 10 is significantly

inconsistent with that fiscal plan:

- Act 10 is consistent with the 2023 PREPA Fiscal Plan's fiscal projections, because the 2023 PREPA Fiscal Plan's financial model already assumes that the net-metering program's crediting structure will continue unaltered for the entire duration of the fiscal plan.

- Far from interfering with PREB's regulatory authority, Act 10 was enacted after the Senate heard testimony from PREB concerning the Act and adopted the five-year extension at PREB's urging.  In fact, PREB is on record saying that a continuation of the current net-metering program until Puerto Rico reaches its goal of generating 25% of its electricity from distributive-generation resources (such as rooftop solar) could benefit the net-metering program.

- Act 10 did not prevent PREB from conducting its net-metering study, as the Board contends.  In fact, PREB published its draft net-metering study in June 2024.

- Similarly, Act 10 does not prohibit PREB from making changes to the net-metering program until 2031.  Rather, Act 10 preserves PREB's power to make changes to rates and other aspects of the program, provided that the methodology for determining whether a net-metering customer is entitled to a credit remains unchanged.

- Because Act 10 (i) leaves PREB with broad discretion over the net-metering program and does not alter PREB's finances, and (ii) was amended to accommodate PREB's concerns

3

with the initial draft, it does not threaten PREB's independence as Puerto Rico's utility regulator.

The Board's remaining attacks on the Act 10 estimates and certification are equally meritless.  While the Board criticizes the estimates for lacking "analysis," the Board fails to explain what analysis would be necessary to show the absence of fiscal effects when Act 10 has no effect on the 2023 Commonwealth Fiscal Plan financial model and simply enshrines the very fiscal assumptions that underly the 2023 PREPA Fiscal Plan.  And the Board's contention that AAFAF somehow cannot be the entity that provides the requisite certification concerning Act 10's consistency with the relevant fiscal plan is squarely at odds with both (i) the Board's longstanding practice of accepting other section 204(a) certifications from AAFAF and (ii) the Governor's executive order issued in 2019 appointing AAFAF, the OMB, and the Department of Treasury collectively as the entity section 204(a) requires make the estimates and certification.

***Section 108(a)(2)***:  The Board fares no better with its effort to invalidate Act 10 under PROMESA section 108(a)(2).  The Board argues that Act 10 "impairs or defeats" PROMESA's purposes primarily because the Act is inconsistent with the 2023 Commonwealth and PREPA Fiscal Plans.  But as shown immediately above, this is simply not so.  The Board also contends that Act 10 impairs or defeats PROMESA's purposes because it threatens PREB's independence; yet again, the Board is wrong as explained above.

And even if the Board had some legitimate point (and it does not), the Board has failed to provide any evidence of the process it followed in determining that Act 10 "impairs or defeats" PROMESA's purposes.  It submits no evidence of documents or reports it considered; it identifies no experts it consulted; it makes no effort to document the meetings at which it made its determinations.  The Board has thus failed to bear its burden of showing that its decision-making was not arbitrary and capricious.  Instead, the Board appears to rely heavily on its thrice-

rejected argument that its section 108(a) determinations are subject to toothless *ultra-vires* review.  But the Board is foreclosed by doctrines of collateral estoppel, judicial estoppel, and the law of the case from trying to resurrect this argument.

**Rule 56(d)**:  If the Court were somehow to conclude, notwithstanding the sparse factual record here, that the Board has made a prima facie showing that it is entitled to summary judgment, that relief should still be denied because the Board has refused to provide any discovery to the Governor.  Without discovery into the Board's process the Governor is hamstrung in his efforts to show that the Board's determinations were arbitrary and capricious.

## FACTUAL BACKGROUND

**A.      The Board's Limited Authority**

### 1.      *The Commonwealth Fiscal Plan*

The Commonwealth Fiscal Plan "provides. . . a summary of economic trends and financial forecasts for the Commonwealth, and highlights key priorities aimed at boosting economic growth and restoring Puerto Rico's market access."  (Mujica Decl. Ex. 7 at vol. 1, p. 5.)  It provides the Government's revenue and expenditure forecasts and establishes broad fiscal policies to promote economic development for Puerto Rico.  (*Id*. at vol. 2.)  The Commonwealth Fiscal Plan must be certified by the Board.  (*See* 48 U.S.C. § 2141.)

### 2.      *Instrumentalities' Fiscal Plans*

Some instrumentalities are not covered by the Commonwealth Fiscal Plan.  Those instrumentalities each have their own fiscal plans outlining entity-specific projections, directives, milestones, and reporting requirements.[3]  Those entities include PREPA.  (*See, e.g.*, Mujica Decl. Ex. 2.)

---

[3] *See* Financial Oversight and Management Board for Puerto Rico, *Certified Fiscal Plans*, https://oversightboard.pr.gov/fiscal-plans/ (last visited Oct. 23, 2024) (Board's website showing all certified

### 3.   Section 204(a)'s procedures for newly-enacted legislation

PROMESA protects the Government's power to legislate, requiring in section 204(a) that Puerto Rico's new laws not be *significantly inconsistent* with the governing fiscal plan.  (48 U.S.C. § 2144(a)(2)(C).)  Section 204(a) requires the Government to send the Board newly enacted laws, along with (i) a "formal estimate prepared by an appropriate entity of the territorial government with expertise in budgets and financial management of the impact, if any, that the law will have on expenditures and revenues," and (ii) a certification by that entity stating that the law is or is not "significantly inconsistent with the Fiscal Plan."  (48 U.S.C. § 2144(a)(2)(A), (C).)

If a new law that affects revenues or expenditures is submitted without the requisite estimate or certification (*id.* § 2144(a)(3)(B)), or with a certification that the law is significantly inconsistent with the Fiscal Plan (*id.* § 2144(a)(3)(C)), the Board must notify the Governor (*id.* § 2144(a)(3).)  If a certification or estimate is "missing," the Board "may direct the Governor to provide the missing estimate or certification (as the case may be)."  (*Id.* § 2144(a)(4)(A).)  If the Government has certified that a law *is* significantly inconsistent with the fiscal plan, the Board "shall direct the territorial government to (i) correct the law to eliminate the inconsistency; or (ii) provide an explanation for the inconsistency that the Oversight Board finds reasonable and appropriate."  (*Id.* § 2144(a)(4)(B).)

If the Government "fails to comply with a direction given by the Board under paragraph (4)," the Board may "take such actions as it considers necessary, consistent with this Act, to ensure that the enactment or enforcement of the law will not adversely affect the territorial

---

Commonwealth and instrumentality fiscal plans).  The Court may take judicial notice of this and other Board and Government documents.  *See Lussier v. Runyon*, 50 F.3d 1103, 1114 (1st Cir. 1995) (courts may take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

government's compliance with the Fiscal Plan, including preventing the enforcement or application of the law." (*Id.* § 2144(a)(5).)

## B.     Puerto Rico's Net-Metering Program

In 2007, to encourage residents to install their own renewable energy sources, the Legislature passed Act 114, which (among other things) created a net-metering program. (*See* Brenner Decl. Ex. 1 at 2.)  The net-metering program enables customers with renewable energy sources, such as solar panels or wind turbines, to connect to the electric grid and receive bill credits for any unused excess energy they produce, which is "exported" to the grid.  (*Id.* at 2–3.)

The mechanics of the net-metering program are as follows:

- **Monthly Determination**:  For each billing period, a net-metering customer is considered either a net importer of electricity from the grid (when the customer's consumption equals or exceeds its solar generation) or a net exporter of electricity to the grid (when the customer's consumption is less than its solar generation).  (*See* Mujica Decl. Ex. 9 at 72–73.)

- **Monthly Billings and Credits**:  During each billing period, PREPA bills net-metering customers at the retail rate for all electricity that the customer consumes in excess of the electricity the customer generates.  PREPA "banks" the surplus electricity for customers who are net exporters and subsequently applies that excess electricity as a credit in the following billing period.  These credits are applied using a 1:1 ratio, which means that the customer's bill is reduced by one kWh for each kWh that customer exported in the previous month.  If a customer exported more electricity in the previous month than the customer imports in the current month, the unapplied credits will roll over to the next month.  As a result, net-metering customers do not receive "negative" electricity bills and are not compensated monthly for their exports to the grid.  (*Id.*)

- **Potential Year-End Compensation**:  At the end of PREPA's fiscal year (June 30th), PREPA determines a net-metering customer's "unapplied" banked kWh credits, if any. The grid operator then computes the customer's reimbursement amount by multiplying the applicable rate—which is the greater of (i) $0.10/kWh; or (ii) the applicable retail rate less fuel and purchased power charges—and multiplying that by 75%[4] of the customer's unapplied credits.  As a result, net-metering customers are reimbursed for only 75% of the unapplied credits using a heavily discounted rate when compared to the full retail rate, resulting in much less than a 1:1 ratio.  (*Id.*)  For example, the average retail rate in

---

[4] The remaining 25% of the unapplied credits are distributed by the grid operator as credits to public school accounts.

Puerto Rico for the most recent quarter ending in on June 30, 2024, is $0.25, and 75% of $0.10 (i.e., $0.075) is only one-third of that.  (*See* Porter Decl. ¶ 10.)

In 2014, the Government enacted Act 57, which created PREB (then known as the Energy Commission) as a specialized entity in charge of regulating, overseeing, and enforcing Government's energy public policy.  (*See* Brenner Decl. Ex. 2 at 10.)  PREB must also "oversee compliance with any mandatory standard or goal under the renewable energy portfolio imposed by legislation or regulations" (*id.* at 108), which include achieving the renewable portfolio standard of 100% by 2050 as established by Act 17 (*see id.* Ex. 3 at 23.)  While Act 57 created PREB as an "independent government entity," the Act makes clear that PREB is "subject to the Legislative Assembly's strict scrutiny" (*id.* Ex. 2 at 10–11) and that PREB's regulations must "be consistent with the public policy on energy set forth through legislation" (*id.* at 106). Consistent with its obligation to oversee PREB, the Legislature is required to "evaluate periodically . . . through the committees with jurisdiction over such matters of each Legislative House, every aspect related to the operations of [PREB]."  (*Id.* at 157.)

In 2019, the Government enacted Act 17, which amended Act 114 to (i) require PREB to evaluate the costs and benefits of the net-metering program within five years of the Act's effective date; (ii) provide that PREB could not make any changes to the program's crediting structure for at least five years; and (iii) preserve net-metering customers' rates for at least 20 years under a "grandfathering clause."  (*See id.* Ex. 3 at 68–71.)

### C.      The 2023 Commonwealth Fiscal Plan

The Board certified the 2023 Commonwealth Fiscal Plan on April 3, 2023.  (Mujica Decl. Ex. 7 at vol. 1.)  The 2023 Commonwealth Fiscal Plan includes the Energy Commission (*see id.* at vol. 3, p. 143), which is also known as PREB (*see* Brenner Decl. Ex. 3 at 12), but explicitly excludes PREPA (*see* Mujica Decl. Ex. 7 at vol. 3, p. 143).

8

The 2023 Commonwealth Fiscal Plan includes a section entitled "Power sector/energy reform" that discusses structural changes the Board suggested for PREB to become "a best-in-class regulator." (*Id.* at vol. 1, p. 32–36.)  These suggestions include (i) mandating staggered terms for PREB commissioners; (ii) providing for an "independent ratepayer advocate for adjudicatory proceedings"; (iii) requiring PREB to "comply with the career employee structure required by Act 17-2019"; (iv) mandating that PREB "ensure proactive transparency"; and (v) requiring PREB to be financially independent.  (*Id.* at vol. 1, p. 34.)  A separate section of the 2023 Commonwealth Fiscal Plan discusses the Government's progress against these goals.  (*Id.* at vol. 3, p. 44.)  While the 2023 Commonwealth Fiscal Plan includes provisions recommending that the Government ensure PREB's financial independence, nothing in the 2023 Commonwealth Fiscal Plan prohibits the Legislature from exercising its powers to alter PREB's authority to conduct a net-metering study or adopt new regulations governing net metering or distributed generation.  (*See* Puerto Rico Const. Art. III, § 1.)

## D.     The 2023 PREPA Fiscal Plan

The Board certified the 2023 PREPA Fiscal Plan on June 23, 2023.  (Mujica Decl. Ex. 2 at 2.)  The 2023 PREPA Fiscal Plan recognizes that "the comprehensive transformation of Puerto Rico's energy system [includes] reaching public policy renewable energy targets" (*id.* at 21), and provides that the Government's objectives to transform the energy sector encompass "diversify[ing] energy resources by prioritizing clean renewable energy deployment" (*id.* at 50)—including rooftop solar power—acknowledging that renewables are a vital component in the transition towards a sustainable and resilient energy system.  Consistent with the goal of a sustainable and resilient energy system, the 2023 PREPA Fiscal Plan assumes that the monthly credits that ratepayers receive under the net-metering program will remain in place over the

entire five-year duration of the 2023 PREPA Fiscal Plan.  (*See* Porter Decl. ¶ 14; Bondholders'

Trial Ex. 1088, Case No. 17-4780 [ECF No. 4716-92].[5])

**E.      Act 10**

On October 21, 2022, the Senate introduced a draft of SB 1064 (*see* ECF No. 53-1 at 1;

*see also* Yassin Decl. Ex. 7), which provided that PREB should begin the net-metering study

under Act 17 by the date that Puerto Rico achieves its goal of having 25% of its electricity

produced by distributed-generation sources, such as rooftop solar panels.  (*See id.* at 6.)  The

Senate requested and received comments on the new bill from public and private stakeholders,

including PREB.  (*See* ECF No. 53-3.)  *In its statement, PREB testified that delaying its net-*

*metering study until Puerto Rico reached its goal of generating 25% of its electricity through*

*distributive-generation sources "could, in its practical application, benefit the net metering*

*program."*  (*Id.* at 7.)  PREB requested a date certain for the commencement of its net-metering

study, however, because tying the start of the study to the satisfaction of the 25% goal could

result in ambiguity.  (*See id.* at 7–8.)  To accommodate PREB's concern, the Senate revised SB

1064 to set a firm start date for the net-metering study.  (*See* Yassin Decl. Ex. 6 at 6.)  The

Senate set a start date of January 2030 for conducting the net-metering study (*see id.*), at which

point Puerto Rico is expected to have increased its generation from distributed-generation

resources to 11% (*see* Porter Decl. ¶ 17.).  The Senate thereby provided PREB with *an earlier*

*start date* for the net-metering study than under the initial draft of the bill, since Puerto Rico is

not expected to reach its 25% distributed-generation goal until several years after 2030.

On January 8, 2024, the Legislature enacted the revised draft of SB 1064 as Act 10,

which the Governor signed into law on January 10, 2024, to amend Act 114 (as detailed below),

---

[5] The Court can take judicial notice of its own dockets.

including to extend the date set by Act 17 for PREB to make changes to the net-metering
creting structure.

The Explanatory Memorandum accompanying Act 10 makes clear its purpose is to
encourage continued adoption of renewable energy to advance Puerto Rico's renewable-energy
goals:

- "Rooftop solar energy provides resilience and self-sufficiency for tens of thousands of
  consumers, while contributing to the reduction of the treasury's investment in the
  purchase of imported fossil fuels . . . ." (Brenner Decl. Ex. 4 at 1.)

- "Net metering is key for consumers to have the right to take advantage of clean, local
  energy in order to achieve self-sufficiency while at the same time providing benefits to
  the grid." (*Id.* at 2.)

- "The net metering program plays a key role in the implementation of the public policy
  objectives established in Act 17-2019, including 'facilitating the interconnection of
  distributed energy to the power grid' and 'making it viable for energy service consumers
  to become prosumers.' Currently there are no other incentives available to the various
  consumer groups that choose to install solar systems." (*Id.*)

- "[The] Legislative Assembly encourages the continued development of policies that
  evaluate and implement a variety of renewable energy alternatives. Therefore, any effort
  to weaken the net metering program would be counterproductive for the country." (*Id.*)

- "[The] Legislature deems it proper to amend Act 114-2007, as amended, so that the letter
  of the Act is consistent with legislative intent, namely that customers who install their
  [solar panels] should be fairly compensated for the energy they contribute to the power
  grid." (*Id.* at 3.)

To accomplish these goals, Act 10 extends until 2030 the date for PREB to begin its net-
metering study. (*See id.*) Amended Article 4(a) further provides that after the Net-Metering
Study is completed, PREB may make any changes to the net-metering program it deems
appropriate, with the current net-metering policy remaining in effect for a transition period of at
least 12 months after PREB adopts any changes. (*See id.* at 3–4.)

Section 1 of Act 10 also amends Article 4(b) of Act 114 which determines the applicable
rates for the net-metering program. Amended Article 4(b) seeks to (i) ensure that solar-

11

generated electricity exported to the grid is measured in the same way as electricity imported
from the grid for one year after the Net-Metering Study's completion, before any changes take
effect[6]; (ii) preserve PREB's regulatory power to exclusively determine the mechanism through
which net-metering customers receive compensation for energy they supply to the electric
network, including when that determination becomes effective[7]; and (iii) avoid retroactive
rulemaking that could potentially give rise to impairment-of-contract claims, by instituting a
"grandfathering clause" for eligible net-metering customers.[8]

Just like Act 17, nothing in Act 10 prohibits PREB from amending the net-metering
program or establishing new values for distributed energy or storage systems on a different basis.
On the contrary, Act 10 preserves PREB's exclusive right to establish rates and applicable
mechanisms under Act 57's rate-review procedures or such other "separate administrative
procedure" that PREB deems "necessary or appropriate."  (*Id.* at 7.)

In sum, Act 10 protects PREB's exclusive rulemaking authority under Act 57, helps
Puerto Rico achieve the renewable portfolio standard of 100% by 2050, as mandated by Act 17,
and ensures that the residents of Puerto Rico have access to low-priced solar power, improving
their quality of life, particularly during the lengthy period of electric grid reconstruction.

---

[6] Amended Article 4(b) states that "the credit for energy exported by net metering customers shall be equal to the
value of such energy in accordance with the rate applicable to the customer, and any charge applicable to net
metering customers shall be based on their net consumption, *for a period of at least 12 additional months* before any
change in such values is applied by the Bureau of Energy."  (Brenner Decl. Ex. 4 at 3–4.)
[7] Amended Article 4(b) states:  "The rate applicable to net metering customers, including the rate or mechanism
through which the customer will be compensated for the energy supplied to the electric network, shall be *determined
exclusively by the Bureau of Energy* as part of the rate review procedure for electric service provided in Act 57-
2014, or through a separate administrative procedure, when it deems such procedure to be necessary or appropriate.
Any determination with respect to the net metering program *shall enter into force within the term set by the
Bureau*."  (*Id.* at 4.)
[8] Amended Article 4(b) states that an eligible customer "*shall automatically be considered a grandfathered net
metering customer . . . .*  In such cases, the net metering customer shall be entitled to the rate or compensation
mechanism in effect at that time for a term of not less than twenty (20) years, counted from the date of such final
determination related to net metering."  (*Id.*)

### F.      PREB's Net-Metering Study

After Act 10 was enacted, PREB ordered the publication of a draft of its net-metering study under its broad Act 57 rate-making powers.  (*See* Mujica Decl. Ex. 9.)  In its accompanying June 14, 2024 resolution, PREB affirmatively acknowledged Act 114's mandate for publishing the Net-Metering Study and Act 10's amendment of Articles 4(a) and 4(b) of Act 119, but determined that PREB has the power to carry out any inspections, investigations, and audits it deems necessary to achieve the purposes of Act 57-2014.  (*See* Brenner Decl. Ex. 9 at 2.)

### G.      The Government's Act 10 Certification

On February 12, 2024, the Government submitted its 204(a) estimate and certification for Act 10.  (*See* Mujica Decl. Ex. 11.)  It included an estimate from OMB—responsible for Government spending—stating that after careful consideration, the OMB concluded that Act 10 "would not have a fiscal impact and, if any, it would have a minimal impact on the certified budget for fiscal year 2023–24.  Nor does it imply any budgetary impact for the subsequent fiscal years contained in the Certified Fiscal Plan."  (Brenner Decl. Ex. 5 at 2.)  The certification also included an estimate from the Department of Treasury, responsible for Government revenues, indicating that Act 10 "does not have a fiscal impact."  (*Id.* Ex. 6 at 2.)

The certification itself was submitted by AAFAF and explains that:

> After conducting the pertinent analysis and based on the discussion above, in accordance with Section 204(a) of PROMESA, the Government has determined that Act 10 is not significantly inconsistent with the Certified Fiscal Plan. As mentioned above, Act 10 does not represent an adverse impact on the Government's revenues and expenditures and does not impose any additional burdens or responsibilities on PREPA, or any other Government entity like PREB. More importantly, the implementation of Act 10 (in particular, the extension of net metering policy) as compared to PREPA's Certified Fiscal Plan revenue and cost projections is expected to be neutral and will help reach the Renewable Portfolio Standard of 100% by 2050.

(*See* Mujica Decl. Ex. 11 at 6.)

Nevertheless, on April 5, 2024, the Board adopted a resolution that the section 204(a) certification for Act 10 did not "include a formal estimate of the impact Act 10 will have on expenditures and revenues that is compliant with PROMESA § 204(a)(2)(A)" or "a certification of the Act's consistency with either of the Fiscal Plans compliant with PROMESA § 204(a)(2)(B)." (Mujica Decl. Ex. 19 at 3.)  The Board concluded that "Act 10 impairs or defeats the purposes of PROMESA" and as a result "direct[ed] the Legislature and Governor to repeal the Act or amend it in a manner consistent with the Fiscal Plans." (*Id.* at 4.)  On April 8, 2024, the Board sent a letter to the Governor, Senate President, and Speaker of the House of Representatives informing them of the Board's April 5, 2024 resolution and the Board's "concerns about the implications of the Act on Puerto Rico's energy transformation under the Fiscal Plans, namely its effect on PREB." (*Id.* Ex. 20 at 2.)  On April 10, 2024, the Board adopted a revised resolution regarding Act 10 that included more detail on the alleged inconsistencies. (*See id.* Ex. 15.)

On April 15, 2024, AAFAF responded to the Board's April 10 letter. (*See id.* Ex. 16.) The Government noted it "remain[ed] committed towards the transformation of Puerto Rico's energy system and its transition into clean and renewable energy," emphasizing that "Act 10 is consistent with such a goal, as it will encourage the rooftop solar PV installation and capacity expansion in Puerto Rico." (*Id.* at 3.)  AAFAF further explained that "Governor Pierluisi and the Executive Branch have no constitutional authority to repeal or amend legislation absent specific legislative action . . . much less in the limited [time] within which the Government was required to respond." (*Id.*)  Nevertheless, the Government agreed to "not implement the Act while [it]

assesse[d] any potential changes to the 204 [s]ubmission, or to Act 10, (if any) that may be warranted" and requested additional time to evaluate the situation. (*Id.*)

On May 2, 2024, the Board responded to AAFAF's April 15 letter, stating in conclusory fashion that AAFAF's responses "[did] not resolve the issues raised by the Oversight Board." (*Id.* Ex. 17 at 2.) The Board "urge[d] the Executive Branch to take immediate action and work with the Legislative Assembly to repeal or amend Act 10 to restore PREB's full statutory oversight over Puerto Rico's energy system." (*Id.* at 3.)

On May 7, 2024, AAFAF replied to the Board's May 2 letter, stating that, while the Legislature had expressed its willingness to continue discussions on this subject, the changes the Board demanded could not be finalized in a few days and thus requested additional time to engage in discussion and assess potential changes. (*See* Mujica Decl. Ex. 18 at 1.)

## H.    This Action

On July 26, 2024, the Board filed the complaint seeking to nullify Act 10. (*See* ECF No. 1.) The Governor filed his answer on September 11, 2024. (*See* ECF No. 28.)

On September 23, 2024, the Governor served document requests and interrogatories on the Board. (*See* Yassin Decl. Exs. 1–2.) These discovery requests seek documents and information about issues the Court must decide, namely, whether the Board's decision to reject the Act 10 section 204(a) estimates and certification were arbitrary and capricious. (*See, e.g.*, Yassin Decl. Ex. 1, RFP Nos. 2–3, 5–8; Yassin Decl. Ex. 2, ROG Nos. 2–4, 6–8, 11–15.)

On September 25, 2024, the Board filed its motion for summary judgment. On September 30, the Board's counsel wrote the Governor's counsel, refusing to engage in discovery before a Rule 26(f) conference and arguing that discovery is not "necessary." (*See* Yassin Decl. ¶ 10; Ex. 3 at 2.) The Governor's counsel responded on October 8, pointing out that voluntary discovery is particularly appropriate in this case because the requested documents

and information go to the heart of the issues presented by the Board's summary judgment motion and this case. (*See* Yassin Decl. ¶ 11; Ex. 4 at 1.) On October 15, the Board's counsel wrote another letter, repeating the Board's argument that discover is unnecessary and would impose a significant burden. The Board's counsel refused to respond to the Discovery Requests and stated that he believed there was no reason to meet and confer. (*See* Yassin Decl. ¶ 12; Ex. 5 at 2–3.)

## ARGUMENT

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[9] Notably, "[t]he burden of establishing the nonexistence of a genuine issue as to a material fact is on the moving party."[10] To warrant summary judgment, a fact must be truly undisputed: "[there is] no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood."[11] The moving party may not rely on conclusory statements of law, but bears the burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[12] "An issue concerning . . . a fact is 'genuine' if a reasonable factfinder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor."[13] Ultimately, if after "canvassing of the material presented, the district court finds that *some* genuine factual issue remains in the case, whose resolution one way or another

---

[9] *Jordan v. Town of Waldoboro*, 943 F.3d 532, 540 (1st Cir. 2019) (quoting Fed. R. Civ. P. 56(a)).
[10] *Cruz Vargas v. R.J. Reynolds Tobacco Co.*, 218 F. Supp. 2d 109, 113 (D.P.R. 2002), *aff'd*, 348 F.3d 271 (1st Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986)).
[11] *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987).
[12] *Celotex*, 477 U.S. at 323.
[13] *Cortés–Irizarry v. Corporación Insular*, 111 F.3d 184, 187 (1st Cir. 1997).

*could* affect its outcome, the court must deny the motion."[14]  "The First Circuit has cautioned that trial courts should refrain from entertaining summary judgment motions until after the parties have had a sufficient opportunity to conduct necessary discovery."[15]

## I.  BOARD DECISIONS SHOULD BE REVIEWED UNDER AN ARBITRARY-AND-CAPRICIOUS STANDARD.

While the Board tacitly concedes that its decision to accept or reject a section 204(a) estimate and certification is subject to "arbitrary and capricious" review, the Board has yet again advanced its thrice-rejected argument that its determinations under section 108(a)(2) should be subject to toothless *ultra-vires* review.  (MSJ at 21.)  Having successfully advocated for arbitrary-and-capricious review in the first instance, and having lost on this precise issue in prior litigation with the Governor, the Board is prohibited from relitigating this issue under principles of collateral estoppel, judicial estoppel, and the law-of-the-case doctrine.

### A.  The Board Is Collaterally Estopped from Advocating *Ultra-Vires* Review.

Under collateral estoppel, or issue preclusion, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."[16]  In the First Circuit, collateral estoppel "bars relitigation of any factual or legal issue that was actually decided in previous litigation between the parties, whether on the same or a different claim."[17]

Collateral estoppel applies where "(1) The issue sought to be precluded in the later action is the same as that involved in the earlier action; (2) the issue was actually litigated; (3) the issue

---

[14] *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 895 (1st Cir. 1988) (emphasis in original).
[15] *Angelo v. USA Triathlon*, 2016 WL 126248, at *2 (D. Mass. Jan. 12, 2016) (quoting *Vélez v. Awning Windows, Inc.*, 375 F.3d 35, 39 (1st Cir. 2004)).
[16] *Montana v. United States*, 440 U.S. 147, 153 (1979).
[17] *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 30 (1st Cir. 1994).

was determined by a valid and binding final judgment; and (4) the determination of the issue was

essential to the judgment."[18]  Each of those elements is indisputably satisfied here:

- *Identity of Issue*:  In litigation regarding Act 7-2021, the Board "argue[d] that the more lenient '*ultra vires*' review is the correct standard by which to judge its determinations under § 108(a) and § 204(a)."[19]  Here, the Board argues that "*[u]ltra vires* is the correct standard of review for the Oversight Board's § 108(a) determination."  (MSJ at 21.)

- *Actually Litigated*:  In the Act 7-2021 action, the Board submitted briefing on the issue, as did the Governor.  *See* Adv. Pro. 21-00072-LTS, ECF No. 17 at 21 n. 9 ("[T]he Oversight Board believes the standard should be *ultra vires*, and argues accordingly."); *id.*,  ECF No. 44 at 18 n.3 (opposing reconsideration of arbitrary-and-capricious review as "the appropriate standard of review for Oversight Board determinations").

- *Issue Determined by Binding Final Judgment*:  In its decision, this Court held "that the arbitrary and capricious standard is the appropriate lens through which to assess the Oversight Board's determinations under these sections of PROMESA."[20]  The Court subsequently entered judgment in accordance with that decision and in favor of the Board.  (*See* Adv. Pro. 21-00072-LTS, ECF No. 80.)

- *Issue Essential to the Judgment*:  The appropriate standard of review to apply is a textbook example of a threshold issue that must be addressed in deciding any summary judgment motion.[21]

Given these indisputable facts, the Board's contention that this issue was not actually

litigated and decided because the Board waived the argument in an earlier action (MSJ at 21) is

---

[18] *Lincoln-Dodge, Inc. v. Sullivan*, 588 F. Supp. 2d 224, 229 (D.R.I. 2008) (quoting *Ramallo Bros. Printing, Inc. v. El Dia, Inc.* 490 F.3d 86, 90 (1st Cir. 2007)); *see also United States v. Patriot Marine, LLC*, No. 21-CV-10243-AK, 2023 WL 2814550, at *5 (D. Mass. Apr. 6, 2023) (same).

[19] *Fin. Oversight & Mgmt. Bd. for P.R. v. Pierluisi (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 634 B.R. 187, 202 n.10 (D.P.R. 2021).

[20] *Fin. Oversight & Mgmt. Bd. for P.R. v. Pierluisi*, 634 B.R. at 202 n.10.

[21] *See, e.g.*, *Fin. Oversight & Mgmt. Bd. for P.R. v. Vázquez Garced (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 616 B.R. 238, 252 (D.P.R. 2020) ("In order to resolve the pending Motion for Summary Judgment, the Court must determine what weight to give the Oversight Board's underlying section 108(a)(2) determinations [because] [i]n enacting PROMESA, Congress did not specify a standard for this Court's review of such determinations."); *WorldNet Telecommunications, Inc. v. Telecommunications Regul. Bd. of Puerto Rico*, 707 F. Supp. 2d 163, 182 (D.P.R. 2009), *aff'd sub nom. Puerto Rico Tel. Co. v. Telecommunications Regul. Bd. of Puerto Rico*, 665 F.3d 309 (1st Cir. 2011) (where parties cross-moved for summary judgment, stating that "[a]s a preliminary matter, the court must determine what standard of review applies to this issue.").

beside the point.  The Board is thus collaterally estopped from relitigating the application of

arbitrary-and-capricious review to its PROMESA section 108(a) determinations.[22]

> **B.      Even If the Board Were Not Collaterally Estopped, It Is Judicially Estopped
> from Advocating *Ultra-Vires* Review.**

Even if issue preclusion did not apply, the Board would still be barred from making its

*ultra-vires* argument under the judicial estoppel doctrine.  Judicial estoppel "prevent[s] a litigant

from taking a litigation position that is inconsistent with a litigation position successfully

asserted by him in an earlier phase of the same case or in an earlier court proceeding."[23]  The

doctrine's purpose is "to protect the integrity of the judicial process" by "prohibiting parties from

deliberately changing positions according to the exigencies of the moment."[24]

The First Circuit has identified three elements of judicial estoppel:

> First, a party's earlier and later positions must be clearly inconsistent.  Second, the
> party must have succeeded in persuading a court to accept the earlier position. . . .
> Third, the party seeking to assert the inconsistent position must stand to derive an
> unfair advantage if the new position is accepted by the court.[25]

> *1.      The Board's Positions Are Clearly Inconsistent.*

The Board openly acknowledges its change of course:  "Previously . . . the Oversight

Board urged the Court to review its determinations based on the arbitrary and capricious

standard."  (MSJ at 20–21.)  The Board likewise concedes that the Court adopted this standard at

the Board's "urg[ing]," and the First Circuit affirmed that decision.  (*Id.* at 21.)  In fact, the

Board has frequently argued that this Court should evaluate its PROMESA determinations under

---

[22] *Ramallo Bros. Printing v. El Dia, Inc.*, 490 F.3d 86, 92 (1st Cir. 2007) (denying "attempt to resurrect the already-decided issue" because a litigant "deserves no rematch . . . in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise").
[23] *Perry v. Blum*, 629 F.3d 1, 8 (1st Cir. 2010); *see also New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).
[24] *New Hampshire*, 532 U.S. at 749–50.
[25] *RFF Fam. P'ship, LP v. Ross*, 814 F.3d 520, 527–28 (1st Cir. 2016).

the arbitrary-and-capricious standard.[26]  But now, the Board contends that *ultra-vires* review is

the correct standard, and describes its dramatically narrower scope of review compared to

arbitrary-and-capricious review.  (*See id.* at 22–24.)  It is hard to conceive of a more clearly

inconsistent position.

       2.      *The Board's Advocacy for the Arbitrary-and-Capricious Standard Was*
                 *Successful.*

Again, the Board acknowledges not only that this Court has applied the arbitrary-and-

capricious standard at the Board's own urging, but also that "the Court's use of that standard has

been affirmed."  (*Id.* at 21.)  Because of the Board's advocacy, this Court consistently has

reviewed the Board's determinations under the arbitrary-and-capricious standard, rather than a

more stringent standard.[27]  Moreover, the First Circuit has affirmed this Court's use of the

arbitrary-and-capricious standard.[28]

---

[26] *See, e.g., Hearing Transcript*, No. 3:17-BK-3283 (Mar. 5, 2020) at 20:20–21:24 (asserting in response to Court's question at oral argument that arbitrary-and-capricious review is appropriate); *Memorandum of Law In Support Of Financial Oversight and Management Board For Puerto Rico's Motion for Summary Judgment on All Claims and Counterclaims Related To Acts 47, 82, And 181*, Adv. Proc. No. 20-00080 in 3:17-BK-3283, ECF No. 16 at 15 (arguing that "the Oversight Board's determination that a law impairs or defeats the purposes of PROMESA must be upheld unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'"); *Memorandum of Law In Support of Financial Oversight and Management Board for Puerto Rico's Cross-Motion for Summary Judgment and in Opposition to Defendants' Motions for Summary Judgment on all Claims and Counterclaims Related to Acts 138 and 176*, Adv. Proc. No. 20-00082 in 3:17-BK-3283, ECF No. 29 at 7 (same); *Reply Memorandum of Law in Support of Financial Oversight and Management Board for Puerto Rico's Motion for Summary Judgment on all Claims and Counterclaims Related to Acts 47, 82, and 181*, Adv. Proc. No. 20-00080 in 3:17-BK-3283, ECF No. 49 at 9 (same).
[27] *See Fin. Oversight & Mgmt. Bd. for P.R. v. Vázquez Garced (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 616 B.R. 238, 252–53 (D.P.R. 2020) ("The question, therefore, is whether the Oversight Board's determinations that Law 29 and the Joint Resolutions impair or defeat the purposes of PROMESA should be set aside as *arbitrary, capricious*, or manifestly contrary to the statute."); *Vázquez Garced v. Fin. Oversight & Mgmt. Bd. for P.R.*, 511 F. Supp. 3d at 124 (same); *Fin. Oversight & Mgmt. Bd. for P.R. v. Pierluisi*, 634 B.R. at 204 (same).
[28] *See Pierluisi v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, 37 F.4th 746, 761 (1st Cir. 2022) ("It stands to reason that the principles used to review whether a federal agency decision is *arbitrary or capricious* could also be useful in evaluating a decision by the Board.").

3.      *The Board Would Derive an Unfair Advantage If Allowed to Reverse Course.*

The standard of review is an essential component of litigation over the Board's decisions under PROMESA, and for more than four years, arbitrary-and-capricious review has governed those decisions.  The Board now asks the Court to shield its section 108(a)(2) decisions from even basic judicial scrutiny.  Such a striking change in the applicable standard of review this far into the bankruptcy case would affect nearly every facet of the Governor's legal strategy and dramatically shift the balance of power between the elected Government and the Board, giving the Board a nearly unlimited veto power over duly-enacted laws with minimal oversight from the Court.  The First Circuit rejected the Board's belated request for *ultra-vires* review in part because "raising a new standard of review for the first time on appeal . . . does not reflect well on the Board and is inconsistent with the respect it should display in its interactions with the Commonwealth and the district court."[29]  That principle holds equally true for requesting a new standard of review at this late stage in the bankruptcy case.  The Board's request should be rejected.

The Board may try to argue that judicial estoppel does not apply here because its prior advocacy for arbitrary-and-capricious review occurred in a different adversary proceeding.  Any such argument would be unavailing.  For judicial estoppel purposes, distinct adversary proceedings are merely "subpart[s]" of a single "bankruptcy case."[30]

---

[29] *Id.* at 760 n.12.
[30] *Educ. Credit Mgmt. Corp. v. Mersmann (In re Mersmann)*, 505 F.3d 1033, 1043 (10th Cir.2007); *see also In re AMR Corp.*, 567 B.R. 247, 256 (Bankr. S.D.N.Y. 2017), *aff'd sub nom. In re AMR Corp.*, 834 F. App'x 660 (2d Cir. 2021) ("[D]ifferent adversary proceedings in the same main case do not constitute different cases.").

### C.  The Board's *Ultra-Vires* Argument Is Precluded Under the Law-of-the-Case Doctrine.

In addition to collateral and judicial estoppel, the Board is barred from advocating *ultra vires* under the law-of-the-case doctrine.  Under the law-of-the-case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."[31]  The doctrine "precludes relitigation of the legal issues presented in successive stages of a single case once those issues have been decided."[32]

In a bankruptcy setting, courts routinely apply the law-of-the case doctrine to "different adversary proceedings brought in the same bankruptcy case."[33]  "Since different adversary proceedings in the same main case do not constitute different 'cases,' it [follows] that the law of the case doctrine as articulated in one adversary proceeding would apply in another adversary proceeding filed in the same case."[34]

This Court's repeated application of the arbitrary-and-capricious standard to the Board's decisions is now the law of the case.  First Circuit courts apply the law-of-the case doctrine unless "(1) evidence on a subsequent trial was substantially different; (2) controlling authority has since made a contrary decision of law applicable to such issues, or (3) the decision was clearly erroneous and would work a manifest injustice."[35]  None of these exceptions are present here.

---

[31] *Naser Jewelers, Inc. v. City of Concord, N.H.*, 538 F.3d 17, 20 (1st Cir. 2008) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).

[32] *In re Gil de la Madrid*, 524 B.R. 7, 16 (Bankr. D.P.R. 2014).

[33] *In re Brizinova*, 588 B.R. 311, 324 (Bankr. E.D.N.Y. 2018).

[34] *In re AMR Corp.*, 567 B.R. 247, 256 (Bankr. S.D.N.Y. 2017), *aff'd sub nom. Krakowski v. Am. Airlines, Inc.*, 610 B.R. 714 (S.D.N.Y. 2019), *aff'd sub nom. In re AMR Corp.*, 834 F. App'x 660 (2d Cir. 2021).  *See also In re Moise*, 575 B.R. 191, 205 (Bankr. E.D.N.Y. 2017) (same); *In re Terrestar Corp.*, No. 16-CV-1421-ER, 2017 WL 1040448, at *4 (S.D.N.Y. Mar. 16, 2017) (same).

[35] *In re 150 N. St. Assocs. Ltd. P'ship*, 184 B.R. 1, 6 (Bankr. D. Mass. 1995); *accord Ellis v. United States*, 313 F.3d 636, 647–48 (1st Cir. 2002).

### D.     PROMESA's Language Also Provides That the Board's Decisions Are Subject to Judicial Review Under the Arbitrary-and-Capricious Standard.

Even if the Board were not precluded from arguing that *ultra-vires* review applies, the Board's *ultra-vires* argument would fail on the merits.  PROMESA's text and applicable precedent make clear that the Board's decisions are subject to judicial review except in very limited, expressly-enumerated provisions.  Courts assume that absent a specific statutory command, arbitrary-and-capricious review applies to federal agency action.[36]  Courts apply *ultra-vires* review only where Congress has explicitly *precluded* judicial review.[37]  The cases the Board cites are not to the contrary.[38]

PROMESA gives no indication that Congress meant to insulate from review the Board's determinations under section 108(a)(2), and PROMESA's structure indicates that Congress intended such determinations to be subject to judicial review.  Congress knew how to exempt Board decisions from review; it did so for the Board's fiscal plan "certification determinations." (*Cf.* 48 U.S.C. § 2126(e) ("There shall be no jurisdiction in any United States district court to review challenges to the Oversight Board's [fiscal plan] certification determinations under" PROMESA).)  But PROMESA has no analogous protection for Board determinations under section 108(a)(2).  Congress's decision to insulate from judicial review the Board's decisions under other provisions of PROMESA, but not under section 108(a)(2), is powerful evidence that Congress intended the Board's decisions under section 108(a)(2) to be subject to ordinary

---

[36] *See Ruskai v. Pistole*, 775 F.3d 61, 67–68 (1st Cir. 2014) ("Because [the statute] does not specify a standard of review . . . the Administrative Procedures Act ('APA') fills that gap, such that we review questions of law de novo and set aside [the agency's] decision if it is 'arbitrary and capricious.'").

[37] *See, e.g.*, *Griffith v. Fed. Lab. Rel. Auth.*, 842 F.2d 487, 492 (D.C. Cir. 1988) ("Even where Congress is understood generally to have precluded review, the Supreme Court has found an implicit but narrow exception, closely paralleling the historic origins of judicial review for agency actions in excess of jurisdiction.").

[38] *See Cause of Action Inst. v. Eggleston*, 224 F. Supp. 3d 63, 76 (D.D.C. 2016) (*ultra-vires* review applies only in "limited circumstances"); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1326–27 (D.C. Cir. 1996) (applying *ultra-vires* review to executive order because the President is not an "agency" and no statutory judicial review provision applied).

judicial review, not a circumscribed *ultra-vires* standard.[39]  The Board's appeal to "great deference" to its determinations (MSJ at 22), is at odds with the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, which held that "courts, not agencies, will decide *all* relevant questions of law arising on review of agency action."[40]

## II.    THE BOARD'S REJECTION OF THE ACT 10 CERTIFICATION IS ARBITRARY AND CAPRICIOUS.

### A.    Act 10 Is Not Significantly Inconsistent with the Commonwealth Fiscal Plan.

The Board does not even attempt to show that Act 10 is significantly inconsistent with the 2023 Commonwealth Fiscal Plan.  And little wonder.  That fiscal plan contains none of the provisions that the Board contends are significantly inconsistent with Act 10.  The 2023 Commonwealth Fiscal Plan does not "state[] unequivocally [that] the Energy Bureau 'must' complete the Act 17 Study and determine whether to make changes to the net metering program and initiate those changes by April 11, 2024."  (MSJ at 37.)  Only the 2023 PREPA Fiscal Plan does that.  Nor does the 2023 Commonwealth Fiscal Plan include any PREPA fiscal projections.

The Board has contended that Act 10 is significantly inconsistent with provisions of the *2024* Commonwealth Fiscal Plan.  But that cannot be a valid basis for nullifying Act 10, which was passed nearly six months *before* the 2024 Commonwealth Fiscal Plan was certified.  PROMESA section 204(a) provides that the Government must supply a certification concerning the significant consistency of a new law with "*the* Fiscal Plan for *the fiscal year*."  (48 U.S.C. § 2144(a)(2)(B).)  The only conceivable construction of this phrase is that it refers to the fiscal plan in effect when the certification is made.  Any other interpretation would be irrational.  It

---

[39] *See Assured Guar. Corp. v. Commonwealth of P.R. (In re Fin. Oversight and Mgmt. Bd. for P.R.)*, 582 B.R. 579, 589 (D.P.R. 2018) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *Sioux Honey Ass'n v. Hartford Fire Ins. Co*., 672 F.3d 1041, 1052 (Fed. Cir. 2012)).
[40] 144 S. Ct. 2244, 2261 (2024).

would leave the Government exposed to a situation in which the Board could certify a new fiscal plan directly contrary to the fiscal plan in effect when the Government supplied its section 204(a) certification—giving the Board carte blanche *ex post* to seek to nullify a new law for being inconsistent with *either* the governing fiscal plan *or* the later contradictory fiscal plan. Courts will not adopt such "heads I win, tails you lose" statutory interpretations.[41]

### A. Act 10 Is Not "Significantly Inconsistent" with the 2023 PREPA Fiscal Plan.

The Board contends that Act 10 is significantly inconsistent with the 2023 PREPA Fiscal Plan because the Act allegedly (i) prevents PREB from conducting the net-metering study by the April 11, 2024 deadline in the 2023 PREPA Fiscal Plan (MSJ at 37); (ii) effectively prohibits PREB from making changes to the net-metering program until at least 2031 (*id.*); and (iii) "conflicts with the requirement . . . that [PREB] must be able independently to regulate PREPA" (*id.* at 27). The Board is wrong on all counts.

#### 1. The Only Relevant Inconsistency Under PROMESA Section 204(a) Is Fiscal Inconsistency.

As an initial matter, section 204(a)'s certification requirement does not require the Government to certify that a new law is not significantly inconsistent with a fiscal plan's provisions that have no fiscal impact. This is plain from section 204(a)'s text and structure. The statute requires the Government to "estimate . . . the impact, if any, that the [new] law will have

---

[41] *See Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925, 934–35 (D.C. Cir. 2008) ("To maintain two irreconcilable policies, one of which—the Compliance Manual section relating to the Privacy Act—apparently enables the agency or, for that matter, any person asking for information, to circumvent the other, viz., the regulation implementing the FOIA and requiring pre-release notification, is arbitrary and capricious agency action."); *see also Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 153–54 (D.D.C. 2018) ("Because Plaintiffs have demonstrated the incompatibility of the [two conflicting policies], they have met their burden of showing a likelihood of success on the merits of their APA challenge."); *cf. Panhandle E. Pipe Line Co. v. Madison Cnty. Drainage Bd.*, 898 F. Supp. 1302, 1314 (S.D. Ind. 1995) ("Regulations are inconsistent . . . when one regulating authority requires conduct that another regulating authority forbids, such that the regulated entity cannot comply with both."); *cf. Fin. Oversight & Mgmt. Bd. For P.R. v. Pierluisi (In re Fin. Oversight & Mgmt. Bd. For P.R.)*, 650 B.R. 334, 355 (D.P.R. 2023) (holding that the Governor must certify whether a law is or is not "significantly inconsistent with the *governing fiscal plan*" (emphasis added)).

25

*on expenditures and revenues*." (48 U.S.C. § 2144(a)(2)(A).)  It further requires that this

estimate be prepared by "an appropriate entity of the territorial government with expertise in

*budgets* and *financial management*." (*Id.*)  And as the Board points out (MSJ at 36), it is this

*same* entity—"with expertise in *budgets* and *financial management*"—that must provide the

certification that the new law is "not significantly inconsistent with the Fiscal Plan." (48 U.S.C.

§ 2144(a)(2)(B) and (C) (each providing that the certification must be made by "the appropriate

entity described in subparagraph A").)  This is why both the First Circuit and this Court have

held that PROMESA section 204(a) concerns "'revenue and expenditure effects of new

legislation' over the entire period of the fiscal plan."[42]

    None of the alleged "significant inconsistencies" the Board has identified are fiscal in

nature.  Rather, those supposed "significant inconsistencies" concern policy preferences—the

independence of PREB and the deadline for its preparation of a study—that the Board does not

contend have a fiscal effect.  Why has the Board neglected to identify a significant *fiscal*

inconsistency between Act 10 and the 2023 PREPA Fiscal Plan?  The simple answer is that the

Board cannot.  Even accepting as true the Board's assertion that Act 10 maintains until 2031 the

current net-metering program's crediting regime, maintaining the status quo is not significantly

inconsistent with the 2023 PREPA Fiscal Plan because that fiscal plan rests on the assumption

that the net-metering program will continue under the status quo for the entirety of the 2023

PREPA Fiscal Plan period.  (*See* Porter Decl. ¶ 14–15.)

    To be sure, the Court has found in the past that laws were significantly inconsistent with

Commonwealth fiscal plans where the laws were at odds with proscriptions in the fiscal plans,

---

[42] *Pierluisi*, 37 F.4th at 752 (quoting *Fin. Oversight & Mgmt. Bd. for P.R. v. Vásquez Garced (In re Fin. Oversight
& Mgmt. Bd. for P.R.)*, 403 F. Supp. 3d 1, 13 (D.P.R. 2019)).

such as Act 41-2022 and Act 138-2019.[43] But in each instance, failing to abide by the fiscal plan

provisions the Board identified would inevitably have a fiscal impact. In the Act 41 litigation,

the Board presented evidence that the Act—by introducing labor market reforms inconsistent

with policies set forth in the fiscal plan—would have a negative fiscal effect.[44] Similarly,

regarding Act 138, the Court credited the Board's factual showing that the Act would increase

healthcare costs—a fiscal effect that unaccounted for in the fiscal plan.[45] Here, by contrast, the

Board does not—because it cannot—identify any fiscal inconsistency between Act 10 and the

2023 PREPA Fiscal Plan.

     2.     *In Any Event, Act 10 Does Not Interfere with PREB's Regulatory
          Authority.*

     a.     **Act 10 does not threaten PREB's independence.**

The Board has not shouldered its burden of proving indisputably that Act 10 somehow

threatens PREB's independence. Before the Legislature enacted SB 1064, signed into law as Act

10, it revised the bill specifically to address PREB's comments in its written testimony before the

Senate's Committee on Strategic Projects and Energy. (*See* pp. 10–11, *supra*.) Indeed, PREB

did not object to SB 1064 or argue that the law somehow impinged on PREB's regulatory

powers. *To the contrary, PREB indicated that Act 10 "could, in its practical application, benefit*

*the net metering and distribution program."* (ECF No. 53-3 at 7.) Act 10 is the result of the

---

[43] *See Fin. Oversight & Mgmt. Bd.*, 650 B.R. at 358 (finding that Act 41 was inconsistent with "the 2022 Fiscal Plan's direction that the Government refrain from repealing the LTFA [Labor Transformation and Flexibility Act] or enacting new legislation that would negatively affect Puerto Rico's labor market flexibility" and granting the Board's motion for summary judgment on the PROMESA section 204(a) claim); *Vásquez Garced v. Fin. Oversight & Mgmt. Bd. for P.R.*, 511 F. Supp. 3d at 129, 129 n.25, 130 (granting summary judgment under section 204(a) and holding that the Government did not properly "address the pertinent fiscal issues identified by the Oversight Board" for Act 138, such as purported "increased healthcare costs" that "are not accounted for in the Fiscal Plan").
[44] *See Fin. Oversight & Mgmt. Bd.*, 650 B.R. at 358 (citing the Board's exhibits allegedly showed that the labor market reforms would have a negative fiscal impact).
[45] *Fin. Oversight & Mgmt. Bd.*, 511 F. Supp. 3d at 129–30 ("[T]he Oversight Board has submitted evidence supporting its proffer that the Oversight Board has determined that Act 138 will result in increased healthcare costs which will ultimately be borne by the Commonwealth, as well as additional evidence that substantiates its theory.").

Legislature honoring PREB's request for a date certain on which it may begin its net-metering study. Further, Act 10 leaves intact PREB's powers to conduct and publish studies—including the net-metering study—and make sweeping changes to the net-metering program as PREB sees fit. The Board has produced no evidence to show that anyone from PREB feels that PREB's regulatory authority has been usurped, and so has failed to carry the summary-judgment burden.[46]

### b. **PREB has published a draft of the net-metering study.**

Nor do Act 10's practical effects trench on PREB's considerable regulatory powers. The Board contends that Act 10 "prohibits" PREB from promptly completing its net- metering study. (MSJ at 29.) Not so. PREB *did* publish a draft of its net-metering study in June 2024. (*See* Mujica Decl. Ex. 9.) In the resolution issuing the study, PREB noted that Act 114 required PREB to "evaluate and consider the costs and benefits associated with: (1) the net-metering program, (2) distributed generation technologies, (3) smaller scale solar energy, and (4) energy storage systems." (Brenner Decl. Ex. 9.) After acknowledging that Act 10 amended Act 114, PREB went on to explain that it has "broad delegated powers and duties" under Act 57-2014, including the power to "conduct periodic studies and research on the generation, transmission, and distribution, use, and consumption of energy," including "renewable energy resources" and "any other mechanism or technology that may be used an energy resource." (*Id.*)

The report itself addresses the very issues that Act 114 requires PREB to examine. The report found, for example, that:

---

[46] *See Celotex*, 477 U.S. at 323 (holding that the party that moves for summary judgment cannot rely on conclusory statements of law but instead bears the burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.").

- net metering encourages participation in distributed generation, especially solar energy (Mujica Decl. Ex. 9 at 20);

- distributed generation technologies increase resilience (Mujica Decl. Ex. 9 at 11);

- rooftop solar continues to grow in Puerto Rico (Mujica Decl. Ex. 9 at 92); and

- energy storage systems can benefit the grid as a whole (Mujica Decl. Ex. 9 at 89).

Only one party has raised concerns with the report to date but did not object to PREB's power to issue the report or the report's contents. Rather, the objector suggested that the report be delayed until completion of a PREPA cost-of-service study.[47] There is therefore at least a dispute of material fact whether Act 10 prohibited PREB from issuing the report.

### c.    PREB retains the authority to change the net-metering rate at any time.

The Board also contends that Act 10 "prohibits" PREB from altering the "1:1 net metering rate" until at least 2031. (MSJ at 27.) The Board is wrong on both counts. *First*, the current net-metering program does not pay net-metering customers under a "1:1 net metering rate," and so Act 10 cannot perpetuate such a ratio. As currently designed, the net-metering program uses a 1:1 ratio to determine whether a net-metering customer is a "net importer" or "net exporter" of electricity to the grid for a given month. (*See* Mujica Decl. Ex. 9 at 82–83.) If a customer is a net exporter, she will receive a credit against next month's electricity bill for each kWh it exported this month. If a customer has unapplied credits at the end of PREPA's fiscal year (currently June 30th), she is eligible to receive a year-end reimbursement for the excess electricity she exported to the grid. (*Id*.) But that reimbursement is not on a 1:1 basis, as the Board suggests. Rather, a net exporting customer receives a year-end payment for only 75% of her unused credits, if any, and the rate used to calculate the reimbursement is typically much

---

[47] Mot. Regarding COSS Study Necessity, *In re Puerto Rico Net Energy Metering Draft Study*, Case No. NEPR-MI-2024-0006, at 4–5 (PREB Aug. 6, 2024), https://energia.pr.gov/wp-content/uploads/sites/7/2024/08/20240806-MI20240006-Corrected-Motion-COSS-Study-Necessity.pdf.

lower than the rate the customer pays—the greater of ten cents per kilowatt-hour or the

applicable electric rate less fuel and purchase power charges.  (*Id.*)  In previous years, the rate

typically has been $0.10 per kWh, which means that net-metering customers have received

$0.075 per kWh at the end of the fiscal year for their unused credits.  (*See* Porter Decl. ¶ 11.)

The average retail rate in Puerto Rico for the most recent quarter ending on September 30, 2024,

is approximately $0.25—more than three times as much.  (*See id.*)  Consequently, net-metering

customers receive payments for unused credits at far less than a "1:1 rate," and many customers

receive none at all because they have no unused credits at the end of the fiscal year.

*Second*, the Board also incorrectly contends that Act 10 "prohibits" PREB "from making

changes to the net metering program before 2031 (at the earliest)."  (MSJ at 37.)  Nothing in Act

10 forecloses PREB from making significant changes before 2031.  In fact, Article 1 of Act 10

explicitly preserves PREB's power to make any rate adjustments it sees fit:

> The rate applicable to net metering customers, including the rate or mechanism
> through which the customer will be compensated for the energy supplied to the
> electric network, *shall be determined exclusively by the Bureau of Energy* as part
> of the rate review procedure for electric service as set out in Act 57-2014, *or
> through a separate administrative procedure, when it deems such procedure to be
> necessary or appropriate.*  (Brenner Decl. Ex. 4 at 4.)

Moreover, Act 10 expressly provides that PREB's changes will become effective on a schedule

set by PREB:  "Any determination with respect to the net metering program shall enter into force

*within a term set by the Bureau.*"  (*Id.*)

Similarly, the Board incorrectly alleges that the "grandfathering clause" limits PREB's

ability to modify the net-metering program, thus "enshrining the current program's terms for

program participants for the following twenty years."  (MSJ at page 32.)  Again, the Board is

wrong.  Rather than constraining PREB, or allegedly diminishing PREPA's revenues, Act 10's

"grandfathering clause" represents a common legislative feature that aims to avoid "retroactive

rulemaking" that could unleash thousands of impairment of contract claims against PREB and PREPA.[48] The Board also ignores the fact that Act 17—which the Board-certified 2019 PREPA Fiscal Plan listed as a "Noteworthy Accomplishment[]" the year it was passed[49]—also has 20-year "grandfathering clause"[50] to which the Board apparently did not object.

Furthermore, Act 10 does not require qualified net-metering users to keep their existing net-metering contract. The Act also provides that a grandfathered customer can "choose to avail itself of the new rate or compensation mechanism . . . ." (Brenner Decl. Ex 4 at 4.) As discussed above, opting to remain in the current net-metering program locks the customer into a regime that discounts his excess kilowatt-hours by 25% and applies a rate formula that historically has reduced the crediting rate well below the rates paid by customers. (*See* pp. 7–8, *supra*.) Hence, Act 10 does not grandfather a specific rate but rather a formula whose applicable discounted rate is still based on "applicable rates" that are established by PREB. For example, PREB's adoption of alternative rate structure (like dynamic rates or time-of-use pricing) would affect the applicable rates used in calculating the credit amount a grandfathered customer receives.

The only limitation under Act 10 on PREB is its power to change the net-metering program with respect to the rate at which net-metering customers exports to the grid are credited, which Act 10 extends from 2024 to at least a 12-month transition period following any changes to the net-metering program. (*See* Brenner Decl. Ex. 4 at 4 ("In the event that the Bureau of

---

[48] *See, e.g.*, *Finnegan v. Matthews*, 641 F.2d 1340, 1346 (9th Cir. 1981) ("The sole function of a grandfather clause is to prevent the harsh and often unfair operation of a statutory change."); *Sklar v. Byrne*, 727 F.2d 633, 639 (7th Cir. 1984) ("[G]randfather provisions are a familiar means in the law for protecting reliance interests, and we are reluctant to unsettle these provisions by applying an unnecessarily demanding standard of review."); *Sinclair Broadcast Grp., Inc. v. FCC*, 284 F.3d 148, 166 (D.D.C. 2002) (finding a grandfathering decision permissible where "[t]he Rule [did] not either alter the past legality of LMAs or impose any liability for having engaged in LMAs that now constitute an impermissible duopoly or introduce any retrospective duties for past conduct.").

[49] Mujica Decl. Ex. 3 at 7.

[50] *See* Brenner Decl. Ex. 3 at 70 (providing that "the net metering customer shall have the right to the rate or compensation mechanism in effect at the time *for a term of not less than twenty (20) years* as of the execution of the net metering contract").

Energy chooses to establish new values for distributed energy and energy storage systems on the basis of the study . . . the credit for energy exported by net metering customers shall be equal to the value of such energy in accordance with the rate applicable to the customer, and any charge applicable to net metering customers shall be based on their net consumption, for a period of at least 12 additional months before any change in such values is applied by the Bureau of Energy.").)  Transition periods such as this are a customary legislative tool in Puerto Rico and elsewhere to allow for orderly implementation.  (*See* Affordable Care Act, 42 U.S.C. § 18061 (providing for a transitional policy where health insurers paid into reinsurance entities for a three-year period to ease the transition to different risk pools); 12 C.F.R. § 237.22 (providing for a transition period for insured depository institutions to confirm swaps activities to the requirements of the Dodd-Frank Act).)  This period provides the grid operator, regular customers, net-metering customers, businesses, and organizations time necessary to adjust to new regulatory requirements before they become enforceable.  Thus, this 12-month tail period seeks to minimize disruption to the net-metering program, ensure compliance with the new regulatory requirements, and provides PREB additional time to provide necessary technical guidance and address ambiguities, reducing the risks of unintended consequences.[51]

**B.      The Act 10 Estimates and Certification Otherwise Satisfy PROMESA Section 204(a).**

The Board also contends that the Act 10 estimates and certification fail to satisfy section

---

[51] *Cf. Cap. Area Immigrant's Rights Coal. v. DOJ*, 264 F. Supp. 2d 14, 37 (D.D.C. 2003) (finding that six-month transition period provided time to resolve backlog of cases); *Am. Fed. of Labor & Congress of Indus. Orgs. v. Chao*, 297 F. Supp. 2d 155, 164 (D.D.C. 2003) (finding that a transition period of seven weeks was too short for unions to make necessary changes to their accounting, computer, software, and staff training to comply with the new rule and that it was arbitrary and capricious because the agency could not justify the short transition period); *see also, e.g.*, 2023 Commonwealth Fiscal Plan § 7.3.5.1 (describing the LUMA Energy Efficiency and Demand Response Plan submitted to PREB which outlined "a series of actions and approaches to facilitate the smooth ramp-up of Energy Efficiency and Demand Response programs to build market readiness prior to beginning a full-scale comprehensive portfolio of Energy Efficiency and Demand Response programs.").

204(a) because the estimates are insufficiently "formal," and the certification is not from the appropriate entity. Yet again, the Board is incorrect.

### 1. The Act 10 Estimates Are Compliant.

The Board maintains that the Act 10 estimates are inadequate because they fail to "take into account that net metering impacts PREPA's revenues and expenses and the possibility PREB would have made changes to the program prior to 2030 in the absence of Act 10." (MSJ at 32.) This is wrong for at least two reasons.

*First*, Act 10 has no effect on PREPA's projected revenues and expenses in its fiscal plan. As explained above, the 2023 PREPA Fiscal Plan projects PREPA's revenues and expenses for the next five years with the assumption that the current net-metering regulations will continue unaltered. (*See* pp. 9–10, 26–27, *supra*.) The Board's suggestion—that the estimates should guess at what changes PREB would have made to the net-metering scheme, and then try to determine how continuing the status quo would depart from the speculation as to what changes would be made—runs headlong into this indisputable fact. And given PREB's testimony that maintaining the status quo for the next five years could be "beneficial" to the net-metering program (*see* pp. 10, 27–28, *supra*), PREB might not make *any* changes to the net-metering program during this time. Thus, given that Act 10's only substantive effect is to extend that status quo, there is again no reason to go beyond the face of the statute to determine that it has no fiscal effects on PREPA, either.[52]

The Board also argues that the estimates are deficient because they do not cover the entire five-year period of the Fiscal Plan. But again, given that the only effect of Act 10 is to

---

[52] *See Pierluisi v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, 77 F.4th 49, 64 (1st Cir. 2023) ("[W]e do not reject the possibility that some laws will indeed have no effect that can be estimated.").

maintain the status quo for a narrow provision in the existing net-metering program over the

entire five-year period, there is no need to repeat the same statement over and over for each year.

Imposing such a requirement in these circumstances would be a textbook example of arbitrary

and capricious decision-making.[53]

*Second*, the Board's rejection of the Act 10 certification is also arbitrary and capricious

because it violates the "fundamental norm of administrative procedure" that an agency must

"treat like cases alike."[54]  As the Board itself recognizes, Act 17 preserved the current net-

metering crediting structure for at least five years after it was passed.  (*See* MSJ at 8.)  Act 10

merely extended the Act 17 timeline by at least another six years.  (*See* pp. 10–12, 26–27, *supra*.)

Similarly, both Act 17 and Act 10 contain "grandfathering clauses" that preserve net-metering

customers' rates for at least 20 years.  (*See supra* pp. 8, 12.)  Yet, while Act 17 was passed with

the Board's blessing, Act 10 was not.  According to the Board, Act 17 "[c]onfirms" PREB's

independence,[55] yet somehow Act 10 "interferes" with PREB's independence.[56]  "[A]n agency

action is arbitrary when the agency offers insufficient reasons for treating similar situations

differently."[57]  Here, the Board has offered no reasons at all for treating Act 10 differently, and it

---

[53] *See, e.g.*, *P.R. Sun Oil Co. v. EPA*, 8 F.3d 73, 77 (1st Cir. 1993) ("[I]n the end an agency decision must also be rational—technically speaking, it must not be 'arbitrary or capricious' . . . ."); *Alon Refining Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 658 (D.C. Cir. 2019) (declining to require the EPA to "repeatedly go through a regulatory process on an issue that promises to draw a regular parade of criticism from interest groups with ample resources" because it was "itself burdensome" and "it would not be feasible or worthwhile to undertake such reconsideration annually").
[54] *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007); *accord Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999) ("[A]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.").
[55] Mujica Decl. Ex. 3 at 7, 47–48 (Board-certified 2019 PREPA Fiscal Plan praising the "[s]uccessful enactment of Act 17-2019" as a "Noteworthy Accomplishment[]," discussing the five-year net-metering study, and stating that *Act 17 "[c]onfirms PREB's role as an independent, apolitical regulator"*).
[56] MSJ at 3 ("*Act 10 interferes with [PREB]'s ability to regulate PREPA independently*—by, among other things, prohibiting [PREB] from making any changes to the 1:1 net metering rate until at least 2030, dictating when such changes may take effect, and mandating that the 1:1 net metering rate be honored for existing and certain potential participants for decades.").
[57] *Shalala*, 192 F.3d at 1022.

34

therefore acted arbitrarily.

> 2.     *AAFAF Is an Appropriate Entity to Provide a PROMESA Section 204(a)*
>         *Certification.*

That leaves the Board's final argument that the Government's Act 10 Certification was
deficient—that AAFAF somehow is not an appropriate entity to provide the certification.  (MSJ
at 36–37.)  The Board correctly observes that PROMESA requires the section 204(a)
certification come from the same "appropriate entity" that supplies the estimates of fiscal effects.
(48 U.S.C. § 2144(a)(2)(B)–(C).)  But in its zeal to reject the Act 10 Certification, the Board
badly misreads Executive Order 2019-057 to contend that AAFAF cannot be that entity because
it does not prepare the underlying estimates.  (*See* MSJ at 37 n.18 and 14 n.9.)  In fact, Executive
Order 2019-057 authorized AAFAF, the Treasury, and the OMB *collectively* to operate as the
appropriate entity to provide section 204(a) certifications.  (*See* Brenner Decl. Ex. 8 at 3–4.)
Indeed, this is precisely what AAFAF made clear in the June 16, 2023 letter on which the Board
relies to make its erroneous argument:  "Executive Order 2019-057 [] established procedures
designed to promote compliance with PROMESA section 204(a) by . . . authorizing AAFAF,
Treasury, and the Office of Management and Budget (OMB) *to collectively operate as the
'appropriate entity with expertise in budgets and financial management'* responsible for
providing Section 204 analyses and certifications."  (Mujica Decl. Ex. 14 at 2.)  While AAFAF's
authority to certify laws has been established since 2019, the Board only recently raised this
argument in a last-ditch attempt to challenge the Government's authority to certify laws.  In light
of AAFAF's unequivocal certification that "Act 10 is not significantly inconsistent with the
Certified Fiscal Plan," (Mujica Decl. Ex. 11 at 6), the Board's gripe that Treasury failed to
"check the box" concerning fiscal-plan compliance is beside the point.  PROMESA requires only
one certification concerning significant consistency.  (*See* 48 U.S.C. § 2144(a)(2)(B) (requiring

only "*a* certification" that a new law is not significantly inconsistent with the Fiscal Plan).)

## III.  THE BOARD HAS NOT BORNE ITS BURDEN OF PROVING THAT ITS DETERMINATIONS UNDER PROMESA SECTION 108(a) WERE NOT ARBITRARY AND CAPRICIOUS.

The Board argues that Act 10 impairs or defeats PROMESA's purposes because the Act "is directly contrary to the express terms" of a grab-bag of fiscal plans, in particular requirements that (i) PREB be independent and (ii) PREB conduct the net-metering study by April 11, 2024. (MSJ at 25, 27–29.)  But as discussed above, the Board has failed to supply indisputable evidence of these so-called "direct" contradictions:

- Act 10 hardly threatens PREB's independence.  The Act was adopted after an open legislative process in which PREB provided comments to the bill and did not object to an extension of the net-metering program.  In fact, the decision to adopt a five-year extension reflects PREB's input.  (*See* pp. 10–11, *supra*.)

- Act 10 leaves PREB's regulatory powers intact with the sole exception of extending the status quo for the rate of credits to net-metering customers during a 12-month transition period after any changes to the program.  (*See* pp. 31–32, *supra*.)

- Act 10 does not prohibit PREB from publishing the net-metering study, because PREB in fact already did publish a draft of it.  (*See* pp. 28–29, *supra*.)

That leaves the Board with its argument that Act 10 impairs or defeats PROMESA's purposes because the Government supposedly failed to submit a compliant Act 10 estimate and certification.  (MSJ at 29–30.)  Setting aside that Act 10 itself does not compel the Government to submit any particular estimate or certification (and therefore could not cause any conduct that allegedly impaired or defeated PROMESA's purposes), as shown above, the Act 10 estimate and certification were materially compliant with PROMESA section 204(a).  (*See* pp. 33–35, *supra*.)

And even if it were possible for the Board's determinations to be correct, the Board has presented no evidence of what it considered, who it consulted, or how it otherwise came to the

conclusion that Act 10 impairs or defeats PROMESA's purposes, notwithstanding these facts.[58]

Instead, the Board relies on conclusory statements by Mr. Mujica, such as:

- "On April 5, 2024, based on its review and analysis, the Oversight Board determined Act 10 impairs or defeats PROMESA's purposes of achieving fiscal responsibility and access to capital markets for multiple independent reasons."  (Mujica Decl. ¶ 26)

- "On June 21, 2024, the Oversight Board again determined that Act 10 impairs or defeats the purposes of PROMESA for the same reasons set forth in the April Resolution but taking into account the certification of the 2024 Commonwealth Fiscal Plan and the Governor's violations of PROMESA § 204(a), and memorialized its decision in a separate resolution approved that same day."  (Mujica Decl. ¶ 31)

In the face of the Governor's substantial showing, these conclusory statements by a single member of the Board cannot discharge the Board's burden under Rule 56.[59]  Summary judgment under Section 108(a)(2) should likewise be denied.

## IV.    ALTERNATIVELY, SUMMARY JUDGMENT IS PREMATURE.

### A.    Rule 56(d) Prohibits Summary Judgment Where a Party Has Not Had Adequate Opportunity for Discovery.

"The Supreme Court has made clear that summary judgment is inappropriate unless a tribunal permits the parties adequate time for discovery."[60]  Under Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," the court may:  "(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate

---

[58] *Cf. Pac. Gas & Elec. Co. v. FERC*, 306 F.3d 1112, 1121 (D.C. Cir. 2002) (holding that agency acted arbitrarily and capriciously because it "provided no explanation as to how or why" it reached its determinations).

[59] *See Greenburg*, 835 F.2d at 936 (holding that summary judgment requires that a fact be genuinely undisputed, without room for credibility determinations.); *see also Celotex*, 477 U.S. at 323 (Parties that move for summary judgment have the burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.").

[60] *Dunkin' Donuts of Am., Inc. v. Metallurgical Exoproducts Corp.*, 840 F.2d 917, 919 (Fed. Cir. 1988) (citing *Celotex*, 477 U.S. at 326); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n. 5 (1986) (holding that summary judgment should "be refused where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition").

order."  In the First Circuit, "Rule 56(d) motions for continuances are liberally granted."[61]

Rule 56(d) "protects a litigant who justifiably needs additional time to respond in an effective manner to a summary judgment motion."[62]  "In the First Circuit, district courts are instructed to construe motions that invoke the rule *generously*, holding parties to the rule's spirit rather than its letter."[63]  Furthermore, "when the parties have no opportunity for discovery, denying the Rule 56(f) [now renumbered 56(d)] motion and ruling on a summary judgment motion is likely to be an abuse of discretion."[64]

A Rule 56(d) proffer (i) must be "authoritative," meaning in the form of a sworn affidavit or declaration; (ii) must be "advanced in a timely manner" in response to the motion for summary judgment; and (iii) "should explain why the party is unable currently to adduce the facts essential to opposing summary judgment."[65]  In a case like this one, where discovery is incomplete, the party seeking 56(d) relief should under the third requirement (a) "show good cause for the failure to have discovered the facts sooner"; (b) "set forth a plausible basis for believing that specific facts . . . probably exist"; and (c) "indicate how the emergent facts . . . will influence the outcome of the pending summary judgment motion."[66]  Those requirements are flexible, and "one or more of the requirements may be relaxed, or even excused, to address the exigencies of a given case."[67]  "When all the requirements are satisfied, a strong presumption

---

[61] *Jones v. Montachusett Reg'l Transit Auth.*, 525 F. Supp. 3d 256, 257–58 (D. Mass. 2021) (citing *Pina v. Children's Place,* 740 F.3d 785, 794 (1st Cir. 2014)).

[62] *Rivera-Almodóvar v. Instituto Socioeconómico Comunitario, Inc.*, 730 F.3d 23, 28 (1st Cir. 2013); *see also MAZ Partners LP v. PHC, Inc. (In re PHC Inc. S'holder Litig.),* 762 F.3d 138, 144 (1st Cir. 2014) (reversing summary judgment as prematurely granted and ordering discovery under Rule 56(d)).

[63] *Hootstein v. Town of Shutesbury*, 2024 WL 3538820, at *2 (D. Mass. July 24, 2024) (quoting *Emigrant Residential LLC v. Pinti*, 37 F.4th 717, 724 (1st Cir. 2022)).

[64] *In re PHC Inc. S'holder Litig.*, 762 F.3d at 144 (quoting *CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008)).

[65] *PHC Inc.*, 762 F.3d at 143.

[66] *Id*.

[67] *Id*. at 144.

arises in favor of relief."[68]  Each of the requirements is satisfied here.

**B.     The Governor Has Satisfied Rule 56(d).**

*1.     The Governor Has Submitted a Timely, Authoritative Declaration, Satisfying the First Two Factors.*

The first and second factors, "authoritativeness" and "timeliness," are satisfied where the non-movant "promptly invoked Rule 56 shortly after defendants moved for summary judgment, and they did so by filing an authoritative affidavit."[69]  The Yassin Declaration, filed timely with this brief, explains in sworn testimony the elected Government's need for discovery to demonstrate material disputed fact issues.

*2.     The Governor Has Good Cause for Not Seeking Discovery Sooner.*

The Governor served the Discovery Requests before the Motion was filed.  (Yassin Decl. ¶¶ 8–9; Exs. 1–2.)  The Board has refused to respond to the Discovery Requests on the grounds that the parties have not yet conducted a Rule 26(f) conference and that discovery is unnecessary. (*See* Yassin Decl. ¶¶ 10–13; Exs. 3–5.)  More time is warranted to permit the Governor the opportunity for discovery necessary to oppose this motion.

*3.     The Discovery Requests Target Facts That Probably Exist and Are Material to the Parties' Dispute.*

The last two factors ask whether facts "probably exist" that "will influence the outcome of the pending summary judgment motion."[70]  The answer is yes.

The Discovery Requests seek documents and testimony regarding the following categories of information that go to the heart of the issues presented by the Board's summary judgment motion:

---

[68] *Id.*
[69] *Id.*; *see also Reid v. State of N.H.*, 56 F.3d 332, 341 (1st Cir. 1995) (same).
[70] *PHC Inc.*, 762 F.3d at 143.

- Board analyses and meetings regarding the consistency of Act 10 with the Commonwealth Fiscal Plans or the 2023 PREPA Fiscal Plan (RFP Nos. 2, 6, 8; ROG Nos. 2, 3, 4, 6, 8).

- Evidence concerning the Board's assumptions in the 2023 PREPA Fiscal Plan regarding the net-metering program, including projections of the program's operations and fiscal impact (RFP Nos. 3, 5; ROG Nos. 11, 12, 13, 14, 15).

- Documents supporting the Board's determination that Act 10 impairs or defeats the purposes of PROMESA (RFP No. 7; ROG No. 7).

The documents and information almost certainly exist, because the Board cannot have made its section 108(a) and section 204(a) decisions without any evidence or basis.  If it did, that itself would be evidence that its decisions were arbitrary and capricious.[71]

The Board opposes discovery, though it is unclear on what grounds.  (*See* Yassin Decl. Ex. 3 (Board's counsel concluding summarily that "there is no need for discovery to resolve the Oversight Board's motion for summary judgment.").)  But arbitrary-and-capricious review requires the Board to support its decisions with substantial evidence in the record.  That means the Board has an obligation not just to make determinations, but to produce and explain the analysis and evidence on which it relies.[72]

The Board has produced none of the information necessary to assess whether it acted in an arbitrary and capricious manner.  It has supplied no analyses or materials supporting its conclusion that Act 10 is inconsistent with the Commonwealth Fiscal Plan and 2023 PREPA Fiscal Plan under section 204(a).  The Board's April 5 and June 21, 2024 resolutions refer to certain consultations with its "financial[] and other advisors" (Mujica Decl. Ex. 19 at 4 and Ex. 21 at 4), but the Board has refused to provide the identities of those advisors and information

---

[71] *Desa Grp., Inc. v. U.S. Small Bus. Admin.*, 190 F. Supp. 3d 61, 68 (D.D.C. 2016) ("Agency fact finding, even in an informal adjudication, must be supported by substantial evidence—otherwise it would be arbitrary and capricious."); *accord Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–68 (1962).
[72] *See SPRINTCOM, Inc. v. P.R. Reguls. & Permits Admin.*, 553 F. Supp. 2d 87, 91–93, 95 (D.P.R. 2008) (granting summary judgment because the agency did "not sufficiently discuss[] or develop[]" appropriate evidence to support its decision).

about what, if any, evidence they supplied regarding Act 10's fiscal impact, or lack thereof.  Nor

has the Board provided any evidence supporting its determination that Act 10 impairs or defeats

the purposes of PROMESA under section 108(a).

Whether the Board's decision was reasonable and supported by substantial evidence in

the record can only be determined if the Board produces that evidence.  The Discovery Requests

thus seek material information that will influence the outcome of the Motion.

## CONCLUSION

The Board seeks to nullify Act 10 as significantly inconsistent with PREPA's 2023 Fiscal

Plan.  That gambit fails because Act 10 is entirely consistent with PREPA's 2023 Fiscal Plan,

which is founded on the assumption that PREB will leave undisturbed PREPA's net-metering

program for at least five years, and does not displace PREB's regulatory authority.  In the

alternative, summary judgment should be denied to provide the Governor an opportunity to take

discovery under Rule 56(d).

Dated: October 23, 2024
San Juan, Puerto Rico

Respectfully,

**O'MELVENY & MYERS LLP**

*/s/ William J. Sushon*
John J. Rapisardi
William J. Sushon
(Admitted *Pro Hac Vice*)
1301 Avenue of the Americas,
17th Floor,
New York, NY 10019
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
Email: jrapisardi@omm.com
        wsushon@omm.com

-and-

Peter Friedman
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
Email: pfriedman@omm.com

*Attorneys for Governor Pedro R. Pierluisi*

**MARINI PIETRANTONI MUÑIZ LLC**

*/s/ Luis C. Marini-Biaggi*
Luis C. Marini-Biaggi
USDC No. 222301
Carolina Velaz-Rivero
USDC No. 300913
Ignacio J. Labarca-Morales
USDC No. 303307
250 Ponce de León Ave., Suite 900
San Juan, Puerto Rico 00918
Telephone: (787) 705-2171
Facsimile: (787) 936-7494
Email: lmarini@mpmlawpr.com
        cvelaz@mpmlawpr.com
        ilabarca@mpmlawpr.com

*Attorneys for Governor Pedro R. Pierluisi*