# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as a representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA Title III<br><br>Case No. 17-BK-4780-LTS |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>Plaintiff<br><br>v.<br><br>HON. PEDRO PIERLUISI, in his official capacity as Governor of Puerto Rico,<br><br>Defendant<br><br>and | Adv. Proc. No. 24-00062-LTS |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

i

SENATE OF PUERTO RICO, through Hon. José Luis
Dalmau, in his official capacity as President of the Senate
of Puerto Rico,

     Intervenor – Defendant

**THE GOVERNOR'S RESPONSE TO STATEMENT OF ALLEGEDLY UNCONTESTED
MATERIAL FACTS IN SUPPORT OF THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO'S MOTION FOR SUMMARY
JUDGMENT UNDER BANKRUPTCY RULE 7056**

**To the Honorable United States District Judge Laura Taylor Swain:**[2]

Under Rule 56(c) of the Local Civil Rules of the United States District Court for the District of Puerto Rico, applicable to this proceeding through Local Bankruptcy Rule 1001-1(d), the Governor respectfully submits the following response to the *Statement of Uncontested Material Facts in Support of the Financial Oversight and Management Board for Puerto Rico's Motion for Summary Judgment* (the "SOUF") [ECF No. 47].  By responding, the Governor does not concede that any of the "statements" in the SOUF are (i) facts, (ii) supported by evidence that is admissible at trial, (iii) proper statements under Rule 56(b) of the Local Civil Rules of the United States District Court for the District of Puerto Rico or the Federal Rules of Civil Procedure, or (iv) material or relevant to any issue in this action.  Nor does the Governor concede that any of the documents and testimony that the Board cites are relevant or admissible. The Governor also does not concede that the statements of fact set forth are all facts material to the Motion.  The Governor expressly reserves all rights and preserves all objections to the Board's use on summary judgment and at trial of any SOUF statements or evidence cited therein. The Governor submits these responses solely to respond to the Board's motion for summary judgment and the SOUF, and nothing in this response shall be deemed an admission or a waiver of the Governor's right to dispute—including with record evidence not cited in this response— any fact at trial or in any other matters or proceedings.

The Governor objects to the entire SOUF on the ground that it consists of legal arguments, conclusory allegations, and unsupported speculation rather than a "statement of

---

[2] All capitalized terms used herein have the meanings set forth and defined in *The Governor's Opposition to Financial Oversight and Management Board for Puerto Rico's Motion for Summary Judgment Pursuant to Bankruptcy Rule 7056 and Request for Relief Under Rule 56(d)*, filed with this Response.
    Page numbers in citations to ECF documents refer to the page numbers in the original document, if any, or, if not available, to the page numbers automatically stamped in the ECF header.
    Unless otherwise specified, all emphasis is added and all quotation marks and citations are omitted.

material facts," as Local Civil Rule 56(b) requires. *See* Local Civil Rule 56(b) ("A motion for summary judgment shall be supported by a separate, short, and concise statement of material facts, . . . as to which the moving party contends there is no genuine issue of material fact to be tried."); *Oquendo-Rivera v. Toledo*, 736 F. Supp. 2d 434, 436 (D.P.R. 2010) ("As a general principle, parties may not include legal arguments or conclusions in their statement of facts."); *P.R. Tel. Co. v. San Juan Cable Co. LLC*, 196 F. Supp. 3d 248, 314 (D.P.R. 2016) ("[T]he Court 'afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'") (quoting *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

## RESPONSE TO STATEMENT OF UNCONTESTED FACTS

**A.      PREPA and the Energy Bureau.**

1.      PREPA was created in 1941.  Mujica Decl. Ex. 2 at 23; Governor's Answer, ECF No. 28, ¶ 25; Senate President's Answer, ECF No. 31, ¶ 25.

**Response to Paragraph 1:**  It is undisputed that PREPA was created in 1941.  The Governor respectfully refers the Court to PREPA's Enabling Act, P.R. Laws Ann. tit. 22, § 191.

2.      PREPA is the sole electric utility provider for Puerto Rico.  Mujica Decl. ¶ 2 & Ex. 2 at 23; Governor's Answer, ECF No. 28, ¶ 25; Senate President's Answer, ECF No. 31, ¶ 25.

**Response to Paragraph 2:**  It is undisputed that PREPA is the sole electric utility provider for Puerto Rico.  The Governor respectfully refers the Court to PREPA's Enabling Act, P.R. Laws Ann. tit. 22, § 191.

3.      The PREPA Fiscal Plan details PREPA's current challenges and the impact those issues have on the people of Puerto Rico and the Island's economy.  Mujica Decl. ¶ 7.

**Response to Paragraph 3:**  It is undisputed that the 2023 PREPA Fiscal Plan details,

among other things, PREPA's finances, operations, and challenges it has historically faced.  The

Governor disputes that this paragraph provides an accurate, complete description of the 2023

PREPA Fiscal Plan and respectfully refers the Court to the text of that fiscal plan for its complete

contents.  *See* Mujica Decl. Ex. 2.

> 4.     The PREPA Fiscal Plan focuses on the rehabilitation of both
> PREPA's financial position and its operations.  Mujica Decl. ¶ 7.

**Response to Paragraph 4:**  It is undisputed that the 2023 PREPA Fiscal Plan addresses,

among other things, PREPA's finances and operations.  The Governor disputes that this

paragraph provides an accurate, complete description of the 2023 PREPA Fiscal Plan and

respectfully refers the Court to the text of that fiscal plan for its complete contents.  *See* Mujica

Decl. Ex. 2.

> 5.     PREPA's customers pay substantially more for electricity than the
> average ratepayer in the mainland United States.  Mujica Decl. ¶ 3 & Ex. 2 at 43;
> Senate President's Answer, ECF No. 31, ¶ 26; *see also* Governor's Answer, ECF
> No. 28, ¶ 26.

**Response to Paragraph 5:**  It is undisputed that PREPA's customers often pay

substantially more for electricity than customers of some mainland United States electric

utilities.  The Government seeks to increase residents' access to reliable, renewable, and

affordable energy sources and enacted Act 10 in furtherance of these goals.  *See, e.g.*, Brenner

Decl. Ex. 4 at 2 (Act 10's Explanatory Memorandum stating that "[n]et metering is key for

consumers to have the right to take advantage of clean, local energy in order to achieve self-

sufficiency while at the same time providing benefits to the grid.").

> 6.     PREPA provides among the least reliable, most volatile, and most
> fossil-fuel dependent electricity service among its peers.  Mujica Decl. Ex. 2 at
> 21; Senate President's Answer, ECF No. 31, ¶ 26; *see also* Governor's Answer,
> ECF No. 28, ¶ 26.

**Response to Paragraph 6:**  It is undisputed that (i) PREPA's generation mix includes

fossil-fuel-powered generators; (ii) PREPA's customers have experienced more frequent outages than those of electricity customers in the mainland United States; and (iii) PREPA's facilities include outdated equipment.  The Government enacted Act 10, in part, to promote access to more reliable, less volatile, and renewable energy sources.  *See, e.g.*, Brenner Decl. Ex. 4 at 2 (Act 10's Explanatory Memorandum stating that "[n]et metering is key for consumers to have the right to take advantage of clean, local energy in order to achieve self-sufficiency while at the same time providing benefits to the grid.").

7. PREPA's rates fluctuate due, in part, to PREPA's reliance on fossil fuels and changes in the price of oil.  Mujica Decl. Ex. 2 at 21, 36; Senate President's Answer; ECF No. 31, ¶ 26; *see also* Governor's Answer, ECF No. 28, ¶ 26.

**Response to Paragraph 7:**  It is undisputed that PREPA's rates fluctuate from time to time based on, among other things, the price of oil that is used in some of PREPA's generators.

8. PREPA customers experience many more service interruptions than the median stateside customer.  Mujica Decl. ¶ 3 & Ex. 2 at 23–24; Senate President's Answer, ECF No. 31, ¶ 26; *see also* Governor's Answer, ECF No. 28, ¶ 26.

**Response to Paragraph 8:**  It is undisputed that PREPA customers experience many more service interruptions than the median customer in the mainland United States.

9. In 2014, the Government enacted Act 57, also known as the Puerto Rico Energy Transformation and RELIEF Act.  Brenner Decl. Ex. 2 at 1; Governor's Answer, ECF No. 28, ¶ 28; Senate President's Answer, ECF No. 31, ¶ 28.

**Response to Paragraph 9:**  It is undisputed that in 2014, the Government enacted Act 57, also known as the Puerto Rico Energy Transformation and RELIEF Act, which has been subject to various amendments since then.  *See e.g.*, Brenner Decl. Ex. 3 at 94–163.

10. The Government, in enacting Act 57, found in 2014 that, for most of its existence, PREPA was a "monopoly that regulate[d] itself" leading to "Puerto Rico being among the top U.S. jurisdictions with the highest energy cost."  Brenner Decl. Ex. 2 at Statement of Motives.

**Response to Paragraph 10:**  It is undisputed that this paragraph quotes, in part, Act 57's Statement of Motives.  The Governor disputes that paragraph 10 provides an accurate, complete description of Act 57's Statement of Motives and respectfully refers the Court to Act 57-2014 for its complete contents.  *See* Brenner Decl. Ex. 2.

11.    Then-Senator Eduardo Bhatia authored Act 57.  Brenner Decl. Ex. 7.

**Response to Paragraph 11:**  It is undisputed that then-Senator Eduardo Bhatia was one of the authors of Act 57.

12.    Then-Senator Eduardo Bhatia submitted written testimony to Congress in 2018 stating that:

a.  PREPA's problems were the result of "reckless governance of PREPA and the lack of serious leadership";

b.  PREPA had been exposed to "the negative dynamics of bureaucracy, patronage, corruption, political intervention, and special interests," and that "significant energy decisions were taken, for decades, from the Governor's Office, using the utility's governing board and executive directors as mere proxies"; and

c.  the "main concept of Act 57 is that PREPA and other energy stakeholders on the Island must conduct themselves in accordance with applicable energy policy and regulation; **not** by the seasonal wishes or 'public policy' of the administration from any political party in power."

Brenner Decl. Ex. 7 at 3–5 (emphasis in original).

**Response to Paragraph 12:**  It is undisputed that this paragraph quotes, in part, then-Senator Eduardo Bhatia's written testimony.  This paragraph, however, contains opinions, characterizations, and value judgments to which no response is necessary.  The Governor further disputes that paragraph 12 provides an accurate, complete description of then-Senator Eduardo Bhatia's written and personal testimony and respectfully refers the Court to that testimony for its complete contents.  *See* Brenner Decl. Ex. 7.

13.    Act 57 created the Energy Bureau (then known as the Puerto Rico Energy Commission) as a "non-partisan, independent energy regulator, with fiscal

autonomy from the government."  Brenner Decl. Ex. 7 at 3; *see also* Brenner
Decl. Ex. 2 at 9 (Act 57 establishing the Energy Commission as an "independent
government entity"); Senate President's Answer, ECF No. 28, ¶ 29.

**Response to Paragraph 13:**  It is undisputed that PREB was created as an independent

government entity.  However, the Act also makes clear that PREB is "subject to the Legislative

Assembly's strict scrutiny," Brenner Decl. Ex. 2 at 10–11, and that PREB's regulations must "be

consistent with the public policy on energy set forth through legislation[,]" *id.* at 106.  Consistent

with its obligation to oversee PREB, the Legislature is required to "evaluate periodically . . .

through the committees with jurisdiction over such matters of each Legislative House, every

aspect related to the operations of [PREB]."  *Id.* at 157.

> 14.    The Energy Bureau's mandate includes the duty to "[e]stablish and
> implement regulations and the necessary regulatory actions to guarantee the
> capacity, reliability, safety, efficiency, and reasonability of electricity rates of
> Puerto Rico . . . . "  *See* Brenner Decl. Ex. 2 § 6.3(c); Senate President's Answer,
> ECF No. 28, ¶ 29.

**Response to Paragraph 14:**  It is undisputed that this paragraph quotes, in part, from Act

57.  The Governor disputes that paragraph 14 provides an accurate, complete description of Act

57 and respectfully refers the Court to Act 57-2014 for its complete contents.  *See* Brenner Decl.

Ex. 2.

**B.      Net Metering in Puerto Rico.**

> 15.    Net metering refers to the "policy that allows electricity customers
> with their own generation capacity to be financially compensated for the energy
> they produce."  Brenner Decl. Ex. 10 at Summary; *see also* Brenner Decl. Ex. 9 at
> 4; Mujica Decl. ¶ 10.

**Response to Paragraph 15:**  It is undisputed that paragraph 15 quotes, in part, a

November 14, 2019 report regarding net metering by the Congressional Research Service.  The

Governor, however, disputes that paragraph 15 provides an accurate and complete description of

the Congressional Research Service's report and respectfully refers the Court to that report for its

complete contents. *See* Brenner Decl. Ex. 10. The Governor also disputes this paragraph to the extent it implies that any of the selective quotations necessarily apply to Puerto Rico since the report does not mention Puerto Rico. Further, it is disputed that this paragraph provides a complete and accurate representation of net-metering programs because it selectively quotes from the Congressional Research Service's report.

16. U.S. jurisdictions "differ in the way net metering customers are compensated." Brenner Decl. Ex. 10 at 1. Some net metering programs employ a method whereby "energy from net metering capacity offsets energy consumed from the grid in a one-to-one fashion." Brenner Decl. Ex. 10 at 1; Mujica Decl. Ex. 9 at 4–5. Others have "adopted alternative compensation approaches" to address concerns that "[i]f a sufficiently large number of customers participate in net metering, costs might increase for non-net metering customers in order to pay for the grid benefits." Brenner Decl. Ex. 10 at 1; *see also* Mujica Decl. Ex. 9 at 14–16. Those alternative methods include, among others, "a fixed charge to net metering customers' bills" or "avoided cost rates, which reflect primarily the utility's cost of producing electricity, and value of solar . . . rates, which additionally consider societal benefits such as reduced air emissions." Brenner Decl. Ex. 10 at 2; *see also* Mujica Decl. Ex. 9 at 14–16.

**Response to Paragraph 16:** It is undisputed that paragraph 16 quotes, in part, a November 14, 2019 report regarding net metering by the Congressional Research Service. The Governor, however, disputes that paragraph 16 provides an accurate and complete description of the Congressional Research Service's report and respectfully refers the Court to that report for its complete contents. *See* Brenner Decl. Ex. 10. The Governor also disputes this paragraph to the extent it implies that any of the selective quotations necessarily apply to Puerto Rico since the report does not mention Puerto Rico. Further, it is disputed that this paragraph provides a complete and accurate representation of net-metering programs because it selectively quotes from the Congressional Research Service's report. Net metering is important for enabling consumers to harness clean, local energy to become more self-sufficient and does provide benefits to the grid. *See* Brenner Decl. Ex. 4 at 2. In addition, paragraph 16 does not acknowledge that net metering contributes to the reduction of PREPA's investment in the

purchase of imported fossil fuels, which results in an economic benefit to the various classes of

consumers that still depend on the generation system provided by PREPA.  *Id.* at 1.  For these

reasons, among others, any efforts to weaken the net-metering program would be

counterproductive for Puerto Rico.  *Id.*

> 17.     Puerto Rico's net metering program was established in 2007 by Act 114 prior to the creation of the Energy Bureau.  *See* Brenner Decl. Ex. 1; Governor's Answer, ECF No. 28, ¶ 35; *see also* Senate President's Answer, ECF No. 31, ¶ 35.

**Response to Paragraph 17:**  It is undisputed that Puerto Rico's net-metering program

was established in 2007 by Act 114 prior to the creation of PREB.  Since then, Act 114 has been

subject to amendments including those in Acts 57-2014 and 17-2019.

> 18.     Under the net metering program established by Act 114, which remains essentially unchanged, program participants are "entitled to offset the energy they purchase from PREPA with the energy they export to the grid on a one-to-one basis, at the prevailing retail rate."  Brenner Decl. Ex. 1 at 45–46; Senate President's Answer, ECF No. 31, ¶ 37.

**Response to Paragraph 18:**  The Governor disputes the allegation that Act 114 "remains

essentially unchanged."  Act 114 has been amended by Acts 57-2014 and 17-2019.  The

Governor respectfully refers the Court to Acts 57 and 17 for their complete contents.  *See*

Brenner Decl. Exs. 2 and 3.  The Governor further disputes paragraph 18 to the extent the Board

implies that the current net-metering program provides compensation based on a "1:1 net

metering rate."  As currently designed, the net-metering program uses a 1:1 ratio to determine

whether a net-metering customer is a "net importer" or "net exporter" of electricity to the grid.

*See* Mujica Decl., Ex. 9 at 72–73.  If a customer is a net exporter, that customer becomes eligible

to receive a monthly credit for the excess electricity the customer exported to the grid in the

previous month.  *See id.*  If a customer exported more electricity in the previous month than the

customer imports in the current month, the unused credits will roll over to the next month.  *See*

*id.*  If a customer by the end of PREPA's fiscal year (on June 30) has any unused credits left, the customer will be compensated for those credits.  *See id.*  But that compensation is not on a 1:1 basis.  Rather, a net exporting customer receives a year-end compensation for only 75% of the exported electricity, and the rate used to calculate the credit is typically much lower than the rate the customer pays—the greater of ten cents per kilowatt-hour or the applicable electric rate less fuel and purchase power charges.  *See id.*

19.     Customers who export the same or more electricity to the grid than they consume from PREPA are charged only PREPA's monthly service fee (*i.e.*, their consumption or volumetric charges are zero).  Mujica Decl. ¶ 10 & Ex. 2 at 143–44; Senate President's Answer, ECF No. 31, ¶ 37.

**Response to Paragraph 19:**  It is undisputed that customers who export the same or more electricity to the grid than they consume from PREPA are charged only PREPA's monthly service fee.

20.     PREPA recoups its energy transmission costs through its volumetric (*i.e.*, usage) charges.  Mujica Decl. ¶ 10; *see also* Mujica Decl. Ex. 9 at 71.

**Response to Paragraph 20:**  It is disputed that this paragraph accurately characterizes PREPA's rate structure and operational mechanics.  It is speculative to assert that any specific portion of the rate directly covers energy transmission costs.  At most, it should state that *part of* the transmission costs is recovered through volumetric charges.  *See* Final Resolution and Order, *In re Puerto Rico Electric Power Authority Rate Review*, No. CEPR-AP2015-0001 at 6, 121 (PREB Jan. 10, 2017), https://energia.pr.gov/wp-content/uploads/sites/7/2017/01/Final-Resolution-and-Order.pdf.

21.     PREPA's fixed monthly charges are designed to recover PREPA's costs of producing electricity as well as the costs associated with operating and maintaining PREPA's transmission and distribution system.  Mujica Decl. Ex. 9 at 72.

**Response to Paragraph 21:**  It is disputed that this paragraph accurately characterizes

PREPA's rate structure and operational mechanics.  It is speculative to assert that any specific

portion of charges directly covers any specific costs.  At most, it should state that *part of*

PREPA's fixed monthly charges are designed to recover PREPA's costs of producing electricity

as well as the costs associated with operating and maintaining PREPA's transmission and

distribution system.  *See* Final Resolution and Order, *In re Puerto Rico Electric Power Authority*

*Rate Review*, No. CEPR-AP2015-0001 at 119–21 (PREB Jan. 10, 2017),

https://energia.pr.gov/wp-content/uploads/sites/7/2017/01/Final-Resolution-and-Order.pdf

> 22.    Net metering customers' use of green energy sources, such as
> solar, to produce electricity can also provide benefits, including reducing
> pollutants and greenhouse gases emitted from PREPA's fossil based generating
> units, as well as positive contributions to the achievement of Puerto Rico's
> renewable energy goals.  Mujica Decl. ¶ 10; *see also* Governor's Answer, ECF
> No. 28, ¶ 39.

**Response to Paragraph 22:**  It is undisputed that net-metering customer's use of green

energy sources provides a number of benefits, including those listed in paragraph 22.  Consistent

with these benefits, the Explanatory Memorandum accompanying Act 10 makes clear its purpose

is to encourage continued adoption of renewable energy to advance the Puerto Rico

government's renewable-energy goals.  *See* Brenner Decl. Ex. 4 at 4–6.

> 23.    A report from the Congressional Research Service found "[n]et
> metering customers generate electricity for their own consumption, which reduces
> the amount of utility-provided electricity they need (and, consequentially, the
> utility's costs to produce electricity).  However, self-generation does not
> necessarily reduce the amount of other utility-provided services a customer uses
> (or, generally, the utility's costs to provide those services, such as maintaining the
> grid)."  Brenner Decl. Ex. 10 at 6.

**Response to Paragraph 23:**  It is undisputed that paragraph 23 quotes, in part, a

November 14, 2019 report regarding net metering by the Congressional Research Service.  The

Governor, however, disputes that paragraph 23 provides an accurate and complete description of

the Congressional Research Service's report and respectfully refers the Court to that report for its

complete contents.  *See* Brenner Decl. Ex. 10.  The Governor also disputes this paragraph to the

extent it implies that any of the selective quotations necessarily apply to Puerto Rico since the

report does not mention Puerto Rico.  Further, it is disputed that this paragraph provides a

complete and accurate representation of net-metering programs because it selectively quotes

from the Congressional Research Service's report.

> 24.     If not calibrated correctly, a net metering system could create
> greater inequality among customers.  For example, it could lead to significant
> costs shifts, where non-net metering customers (who may not have the funds to
> obtain solar panels or live in structures such as multiunit dwellings or urban areas
> that are not conducive to solar energy generation) essentially subsidize the costs
> of a utility's fixed costs for net metering users.  Mujica Decl. ¶ 10.

**Response to Paragraph 24:**  It is undisputed that if calibrated incorrectly, a net-metering

system could create inequality among customers.  But the Government has undertaken efforts to

design an efficient net-metering program, *see* Brenner Decl. Exs. 1 and 4, and the Board has not

offered evidence that Puerto Rico's net-metering program is incorrectly calibrated.  Further,

under Act 57, PREB has had the authority to change the applicable rates and elements of the net-

metering program but has chosen not to exercise it.

> 25.     Determining whether to maintain or modify Puerto Rico's current
> net metering program involves balancing many important, complex financial and
> policy factors.  Mujica Decl. ¶ 10; Governor's Answer, ECF No. 28, ¶ 39; Senate
> President's Answer, ECF No. 31, ¶ 39.

**Response to Paragraph 25:**  This paragraph contains opinions, characterizations, and

value judgments to which no response is necessary.  It is undisputed, however, that in

determining whether to maintain or modify Puerto Rico's current net-metering program involves

balancing many important, complex financial and policy factors.  Importantly, under Act 57,

PREB has had the authority to change the applicable rates and elements of the net-metering

program but has chosen not to exercise it.

26.     On April 11, 2019, the Government enacted Act 17, known as the
Puerto Rico Energy Public Policy Act of 2019.  Brenner Decl. Ex. 3; *see also*
Senate President's Answer, ECF No. 28, ¶ 40.

**Response to Paragraph 26:**  It is undisputed that the Government enacted Act 17 on

April 11, 2019.

27.     Among other things, Act 17 amended Act 114, and directed the
Energy Bureau to "conduct a study, through an independent formal process and
with participation of interested parties and the general public, to evaluate and
consider the costs and benefits associated with . . . the net metering program . . . ."
Brenner Decl. Ex. 3 § 3.4(a).

**Response to Paragraph 27:**  It is undisputed that Act 17 amended Act 114 and, among

other things, directed PREB to conduct a net-metering study to be completed within five years of

the act's effective date (i.e., by April 11, 2024), and provided that PREB could not make any

changes to the program's crediting structure for at least five years.  *See* Brenner Decl. Ex. 3 at

68–71 (Act 17 providing that (i) "[s]aid study must be completed within five (5) years as of the

effective date of the [] Act" and (ii) "[f]ive (5) years after the approval of the [] Act, the Bureau

may issue any determination concerning the net metering program while taking into account the

results of such study").  Act 17 thereby preserved the net-metering crediting structure for at least

five years.  The Governor further avers that Act 17 was passed with the Board's blessing.  *See*

Mujica Decl. Ex. 3 at 7, 47–48 (Certified 2019 PREPA Fiscal Plan praising the "[s]uccessful

enactment of Act 17-2019," discussing the five-year net-metering study, and stating that Act 17

"[c]onfirms PREB's role as an independent, apolitical regulator").

28.     Act 17 required the Act 17 Study to be completed within five years
of the effective date of Act 17 (*i.e.*, by April 11, 2024).  Brenner Decl. Ex. 3 §
3.4(a).

**Response to Paragraph 28:**  It is undisputed that Act 17 required the net-metering study

to be completed within five years of the act's effective date, and provided that PREB, after

completing this study (i.e., in 2024), could determine whether any changes to the program's

crediting structure were necessary, with no adjustments permitted beforehand.  *See* Brenner

Decl. Ex. 3 at 68–71.

> 29.     Act 17 further empowered the Energy Bureau, following
> completion of the five-year study period (*i.e.*, April 11, 2024), to make decisions
> regarding the net metering program taking into account the results of the Act 17
> Study, including establishing "appropriate values for distributed energy and
> energy storage systems in accordance with the study," and "determin[ing]
> exclusively" the "rate applicable to net metering customers."  Brenner Decl. Ex. 3
> § 3.4(a–b).

**Response to Paragraph 29:**  It is undisputed that Act 17 empowered PREB to determine

whether any changes to the net-metering program were necessary following completion of the

net-metering study.

> 30.     Act 17 provides that until the Energy Bureau completes the Act 17
> Study and authorizes new net metering rates, the existing rate (*i.e.*, the 1:1 net
> metering rate) would remain in effect.  Brenner Decl. Ex. 3 § 3.4(b).

**Response to Paragraph 30:**  It is undisputed that Act 17 provides that until PREB

completes the net-metering study and authorizes new net-metering rates, the existing rate will

remain in effect.  The Governor disputes paragraph 30 to the extent the Board implies that the

current net-metering program provides compensation based on a "1:1 net metering rate."  As

currently designed, the net-metering program uses a 1:1 ratio to determine whether a net-

metering customer is a "net importer" or "net exporter" of electricity to the grid.  *See* Mujica

Decl., Ex. 9 at 72–73.  If a customer is a net exporter, that customer becomes eligible to receive a

monthly credit for the excess electricity the customer exported to the grid in the previous month.

*See id.*  If a customer exported more electricity in the previous month than the customer imports

in the current month, the unused credits will roll over to the next month.  *See id.*  If a customer

by the end of PREPA's fiscal year (on June 30) has any unused credits left, the customer will be

compensated for those credits.  *See id.*  But that compensation is not on a 1:1 basis.  Rather, a net

exporting customer receives a year-end compensation for only 75% of the exported electricity,

and the rate used to calculate the credit is typically much lower than the rate the customer pays—

the greater of ten cents per kilowatt-hour or the applicable electric rate less fuel and purchase

power charges.  *See id.*

### C.      The Fiscal Plans' Requirements Regarding the Energy Bureau's Independence and Net Metering.

31.      On June 30, 2016, Congress enacted PROMESA to address the "fiscal emergency" in Puerto Rico that arose from a "combination of severe economic decline, and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing . . . ." PROMESA § 405(m)(1).

**Response to Paragraph 31:**  It is undisputed that this paragraph quotes, in part, from

PROMESA.  The Governor respectfully refers the Court to PROMESA for its complete contents.

32.      Congress created the Oversight Board for the purpose of providing a method for Puerto Rico to "achieve fiscal responsibility and access to the capital markets."  PROMESA § 101(a); *see also* Senate President's Answer, ECF No. 28, ¶ 30.

**Response to Paragraph 32:**  It is undisputed that this paragraph quotes, in part, from

PROMESA.  The Governor respectfully refers the Court to the text of PROMESA for its

complete contents.

33.      To accomplish these statutory objectives, Congress encouraged the Oversight Board and the territorial government to work together to formulate and implement fiscal plans and budgets, PROMESA §§ 201–202, but granted the Oversight Board final say over such plans and budgets and prohibited the Governor and Legislature from enacting, implementing, and/or enforcing laws impairing or defeating the purposes of PROMESA as determined by the Oversight Board.  *See* PROMESA §§ 101, 104, 108(a)(2), 201(e)(2), 202(e)(3), 204.

**Response to Paragraph 33:**  It is undisputed that PROMESA sections 201 and 202 set

forth the process for the Puerto Rico government and the Board to work together to develop and

implement fiscal plans and budgets, but the remainder of the statement is disputed.  This

paragraph contains legal conclusions and characterizations, and the Board's use of the term

"final say" is vague and misleading.  The Governor respectfully refers the Court to PROMESA

and related court decisions interpreting the scope of the Puerto Rico government and Board's

respective fiscal plan and budgetary powers for a complete and accurate description of

PROMESA, its purpose, and effects.

> 34.    One purpose of the fiscal plans is to provide "a method" for the
> Commonwealth and covered territorial instrumentalities "to achieve fiscal
> responsibility and access to the capital markets."  PROMESA § 201(b).

**Response to Paragraph 34:**  It is undisputed that this paragraph quotes, in part, from

PROMESA.  The Governor respectfully refers the Court to the text of PROMESA for its

complete contents.

> 35.    PREPA has been designated by the Oversight Board as a covered
> territorial instrumentality pursuant to PROMESA § 101(d).  Mujica Decl. ¶ 5.

**Response to Paragraph 35:**  It is undisputed that PREPA is a covered territorial

instrumentality under PROMESA.  The Governor respectfully refers the Court to the text of

PROMESA for its complete contents.

> 36.    The PREPA Fiscal Plan states that "Puerto Rico's economic
> recovery depends on . . . a comprehensive transformation of its energy sector to
> deliver the safe, reliable, and affordable service that Puerto Rico's residents and
> businesses deserve."  Mujica Decl. Ex. 2 at 19.

**Response to Paragraph 36:**  It is undisputed that this paragraph quotes, in part, the 2023

PREPA Fiscal Plan.  The Governor disputes that this paragraph provides an accurate, complete

description of the 2023 PREPA Fiscal Plan and respectfully refers the Court to the text of that

fiscal plan for its complete contents.  *See* Mujica Decl. Ex. 2.

> 37.    The 2024 Commonwealth Fiscal Plan states that "[t]he
> Commonwealth must continue its efforts to implement a comprehensive energy
> sector reform to enable a successful transformation and unlock the resulting
> growth from the 2024 Fiscal Plan projections."  Mujica Decl. Ex. 8 at 137.

**Response to Paragraph 37:**  It is undisputed that this paragraph quotes, in part, the 2024 Commonwealth Fiscal Plan for Puerto Rico.  But that is not the operative fiscal plan for the Puerto Rico government for the purposes of this adversary proceeding, because the 2024 Commonwealth Fiscal Plan was not adopted until nearly six months after Act 10's enactment.  *See* Mujica Decl. Ex. 8.  Even if the 2024 Commonwealth Fiscal Plan were somehow relevant, the Governor disputes that this paragraph provides an accurate, complete description of the 2024 Commonwealth Fiscal Plan and respectfully refers the Court to the text of that fiscal plan for its complete contents.  *See* Mujica Decl. Ex. 8.

38.     The PREPA Fiscal Plan states that "Puerto Rico's energy infrastructure lags national standards due to decades of operational and financial mismanagement."  Mujica Decl. Ex. 2 at 21.

**Response to Paragraph 38:**  It is undisputed that this paragraph quotes, in part, the 2023 PREPA Fiscal Plan.  The Governor disputes that this paragraph provides an accurate, complete description of the 2023 PREPA Fiscal Plan and respectfully refers the Court to the text of that fiscal plan for its complete contents.  *See* Mujica Decl. Ex. 2.

39.     The PREPA Fiscal Plan states that "[d]ecisions about the management of the Puerto Rican grid have historically been subject to political influence and instability, leading to high management turnover, discontinuity in capital investment plans, electric customer rates that were insufficient to cover operating and maintenance costs and the mounting costs of debt service."  Mujica Decl. Ex. 2 at 36.

**Response to Paragraph 39:**  It is undisputed that this paragraph quotes, in part, the 2023 PREPA Fiscal Plan.  The Governor disputes that this paragraph provides an accurate, complete description of the 2023 PREPA Fiscal Plan and respectfully refers the Court to the text of that fiscal plan for its complete contents.  *See* Mujica Decl. Ex. 2.

40.     The PREPA Fiscal Plan states that the "decision to transform Puerto Rico's energy system . . . was in large part an answer to this issue and to depoliticize decisions of the energy service."  Mujica Decl. Ex. 2 at 36.

**Response to Paragraph 40:**  It is undisputed that this paragraph quotes, in part, the 2023 PREPA Fiscal Plan.  The Governor disputes that this paragraph provides an accurate, complete description of the 2023 PREPA Fiscal Plan and respectfully refers the Court to the text of that fiscal plan for its complete contents.  *See* Mujica Decl. Ex. 2.

41.   Additional consequences of PREPA's politicized decision-making identified by the PREPA Fiscal Plan include:  PREPA repeatedly "issu[ing] more debt to cover current debt service rather than [setting] rates at a level sufficiently high" to support its costs; "operat[ing] under a fiscal deficit since the early 2000s"; and "historically underinvest[ing]" in its electrical grid, resulting in "reliability metrics drastically lower than other U.S. peers."  Mujica Decl. Ex. 2 at 36, 100.

**Response to Paragraph 41:**  It is undisputed, that this paragraph quotes, in part, the 2023 PREPA Fiscal Plan.  The Governor disputes that this paragraph provides an accurate, complete description of the 2023 PREPA Fiscal Plan and respectfully refers the Court to the text of that fiscal plan for its complete contents.  *See* Mujica Decl. Ex. 2.

42.   The 2020 PREPA Fiscal Plan states the transformation of Puerto Rico's energy sector into a "safe, reliable, affordable, modern system depends on the presence and active involvement of a rational, politically independent, and professionally supported regulator" whose determinations "should be free of any political influence or interference."  Mujica Decl. Ex. 4 at 36.

**Response to Paragraph 42:**  It is undisputed, that this paragraph quotes, in part, the 2020 PREPA Fiscal Plan.  The Governor disputes that the 2020 PREPA Fiscal Plan is relevant because the 2020 PREPA Fiscal Plan was superseded by intervening fiscal plans in 2021, 2022, and 2023.[3]  In any event, the Governor further disputes that this paragraph provides an accurate, complete description of the 2020 PREPA Fiscal Plan and respectfully refers the Court to the text

---

[3]   *See* Financial Oversight and Management Board for Puerto Rico, *Certified Fiscal Plans*, https://oversightboard.pr.gov/fiscal-plans/ (last visited Oct. 23, 2024) (Board's website showing all certified Commonwealth and instrumentality fiscal plans).  The Court may take judicial notice of this and other Board and Government documents.  *See Lussier v. Runyon*, 50 F.3d 1103, 1114 (1st Cir. 1995) (courts may take judicial notice of facts that can be accurately and readily determined from "sources whose accuracy cannot reasonably be questioned").

of that fiscal plan for its complete contents.  *See* Mujica Decl. Ex. 4.

      43.    The October 2018 Commonwealth Fiscal Plan states that "[a]
strong and independent regulator of the power sector is required and will
additionally support the success of the power sector transformation" and is key to
the "the long-term sustainability of Puerto Rico's energy sector."  Mujica Decl.
Ex. 5 at 56.

**Response to Paragraph 43:**  It is undisputed that this paragraph quotes, in part, the

October 2018 Commonwealth Fiscal Plan.  But that is not the operative fiscal plan for the Puerto

Rico government because the 2018 Commonwealth Fiscal Plan was superseded by intervening

fiscal plans in 2019, 2020, 2021, 2022, and 2023.[4]  Even if the 2018 Commonwealth Fiscal Plan

were somehow relevant, the Governor disputes that this paragraph provides an accurate,

complete description of the 2018 Commonwealth Fiscal Plan and respectfully refers the Court to

the text of that fiscal plan for its complete contents.  *See* Mujica Decl. Ex. 5.

      44.    The 2021 Commonwealth Fiscal Plan states that "[a] strong and
independent energy sector regulator is essential for injecting certainty and
stability into the energy market, promoting much needed investments, and
enforcing compliance with the energy sector transformation's objectives."  Mujica
Decl. Ex. 6 at 129.

**Response to Paragraph 44:**  It is undisputed that this paragraph quotes, in part, the 2021

Commonwealth Fiscal Plan.  But that is not the operative fiscal plan for the Puerto Rico

government because the 2021 Commonwealth Fiscal Plan was superseded by intervening fiscal

plans in 2022 and 2023.[5]  Even if the 2021 Commonwealth Fiscal Plan were somehow relevant,

the Governor disputes that this paragraph provides an accurate, complete description of the 2021

Commonwealth Fiscal Plan and respectfully refers the Court to the text of that fiscal plan for its

---

[4]  *See* Financial Oversight and Management Board for Puerto Rico, *Certified Fiscal Plans*, https://oversightboard.pr.gov/fiscal-plans/ (last visited Oct. 23, 2024) (Board's website showing all certified Commonwealth and instrumentality fiscal plans).

[5]  *See* Financial Oversight and Management Board for Puerto Rico, *Certified Fiscal Plans*, https://oversightboard.pr.gov/fiscal-plans/ (last visited Oct. 23, 2024) (Board's website showing all certified Commonwealth and instrumentality fiscal plans).

complete contents.  *See* Mujica Decl. Ex. 6.

45.     The PREPA Fiscal Plan mandates the Energy Bureau "remain financially and operationally independent from the Commonwealth Government and its determinations must be free from any direct or indirect political influence or interference."  Mujica Decl. Ex. 2 at 74.

**Response to Paragraph 45:**  It is undisputed that this paragraph quotes, in part, the 2023 PREPA Fiscal Plan.  The Governor disputes that this paragraph provides an accurate, complete description of the 2023 PREPA Fiscal Plan and respectfully refers the Court to the text of that fiscal plan for its complete contents.  *See* Mujica Decl. Ex. 2.

46.     The PREPA Fiscal Plan mandates the Energy Bureau "remain financially and operationally independent from the Commonwealth Government and its determinations must be free from any direct or indirect political influence or interference."  Mujica Decl. Ex. 2 at 74.

**Response to Paragraph 46:**  It is undisputed that this paragraph quotes, in part, the 2023 PREPA Fiscal Plan.  The Governor disputes that this paragraph provides an accurate, complete description of the 2023 PREPA Fiscal Plan and respectfully refers the Court to the text of that fiscal plan for its complete contents.  *See* Mujica Decl. Ex. 2.  The Governor further avers that Act 10 was passed after an open legislative process during which PREB provided comments on the bill and did not raise any concerns that the bill allegedly would interfere with PREB's independence.  *See* ECF No. 53-3.

47.     The 2024 Commonwealth Fiscal Plan deems the Energy Bureau an "essential component of the energy transformation reforms," as "the existence of an independent energy regulator is a necessary and common requirement to ensure properly functioning energy systems."  Mujica Decl. Ex. 8 at 76.

**Response to Paragraph 47:**  It is undisputed that this paragraph quotes, in part, the 2024 Commonwealth Fiscal Plan for Puerto Rico.  But that is not the operative fiscal plan for the Puerto Rico government for the purposes of this adversary proceeding, because the 2024 Commonwealth Fiscal Plan was not adopted until nearly six months after Act 10's enactment.

*See* Mujica Decl. Ex. 8. Even if the 2024 Commonwealth Fiscal Plan were somehow relevant,

the Governor disputes that this paragraph provides an accurate, complete description of the 2024

Commonwealth Fiscal Plan and respectfully refers the Court to the text of that fiscal plan for its

complete contents. *See* Mujica Decl. Ex. 8. The Governor further avers that Act 10 was passed

after an open legislative process during which PREB provided comments on the bill and did not

raise any concerns that the bill allegedly would interfere with PREB's independence. *See* ECF

No. 53-3.

> 48.    The 2024 Commonwealth Fiscal Plan states that "[the Energy
> Bureau's] independence, particularly in areas such as rate making . . . must not be
> subjected to political interference." Mujica Decl. Ex. 8 at 76.

**Response to Paragraph 48:** It is undisputed that this paragraph quotes, in part, the 2024

Commonwealth Fiscal Plan for Puerto Rico. But that is not the operative fiscal plan for the

Puerto Rico government for the purposes of this adversary proceeding, because the 2024

Commonwealth Fiscal Plan was not adopted until nearly six months after Act 10's enactment.

*See* Mujica Decl. Ex. 8. Even if the 2024 Commonwealth Fiscal Plan were somehow relevant,

the Governor disputes that this paragraph provides an accurate, complete description of the 2024

Commonwealth Fiscal Plan and respectfully refers the Court to the text of that fiscal plan for its

complete contents. *See* Mujica Decl. Ex. 8.

> 49.    The 2023 Commonwealth Fiscal Plan was in effect at the time Act
> 10 was enacted. Mujica Decl. Ex. 7.

**Response to Paragraph 49:** It is undisputed that the 2023 Commonwealth Fiscal Plan

was in effect at the time Act 10 was enacted. The Governor respectfully refers the Court to the

2023 Commonwealth Fiscal Plan for its complete contents. *See* Mujica Decl. Ex. 7.

> 50.    The 2023 Commonwealth Fiscal Plan states:  "A strong and
> independent energy sector regulator is essential for injecting certainty and
> stability into the energy market." Mujica Decl. Ex. 7 at vol. 3, p. 42.

**Response to Paragraph 50:**  It is undisputed that this paragraph quotes, in part, the 2023 Commonwealth Fiscal Plan.  The Governor respectfully refers the Court to the 2023 Commonwealth Fiscal Plan for its complete contents.  *See* Mujica Decl. Ex. 7.

51.     The 2019 PREPA Fiscal Plan lists the Act 17 Study as one of its "Key Regulator Issues and Requirements."  Mujica Decl. Ex. 3 at 48.

**Response to Paragraph 51:**  It is undisputed that the 2019 PREPA Fiscal Plan lists the net-metering study as a "Key Regulator Issue[] and Requirement[]."  The 2019 PREPA Fiscal Plan was superseded by intervening fiscal plans in 2020, 2021, 2022 and 2023 before Act 10's enactment in 2021, 2022, and 2023.[6]  In any event, the Governor disputes that this paragraph provides an accurate, complete description of the 2019 PREPA Fiscal Plan and respectfully refers the Court to the text of that fiscal plan for its complete contents.  *See* Mujica Decl. Ex. 3.

52.     The PREPA Fiscal Plan states that renewable distributed generation "provides benefits to rooftop solar customers," and that a "sub-optimal net metering program . . . may have unintended detrimental effects and risks, including an unequitable distribution of costs throughout the system."  Mujica Decl. Ex. 2 at 58.

**Response to Paragraph 52:**  It is undisputed that this paragraph quotes, in part, the 2023 PREPA Fiscal Plan.  The Governor disputes that this paragraph provides an accurate, complete description of the 2023 PREPA Fiscal Plan and respectfully refers the Court to the text of that fiscal plan for its complete contents.  *See* Mujica Decl. Ex. 2.

53.     The PREPA Fiscal Plan notes that because LUMA is required "to purchase the excess energy produced by net metering customers at the prevailing energy rate, the effective cost to ratepayers of the renewable energy generated by net metering customers may be higher than the cost of purchasing that same quantity of electricity from other resources."  Mujica Decl. Ex. 2 at 58.

**Response to Paragraph 53:**  It is undisputed that this paragraph quotes, in part, the 2023

---

[6]  *See* Financial Oversight and Management Board for Puerto Rico, *Certified Fiscal Plans*, https://oversightboard.pr.gov/fiscal-plans/ (last visited Oct. 23, 2024) (Board's website showing all certified Commonwealth and instrumentality fiscal plans).

PREPA Fiscal Plan.  The Governor disputes that this paragraph provides an accurate, complete

description of the 2023 PREPA Fiscal Plan and respectfully refers the Court to the text of that

fiscal plan for its complete contents.  *See* Mujica Decl. Ex. 2.

> 54.    The PREPA Fiscal Plan states that the cost to LUMA of the net
> metering program is "then passed on, in whole or in part, to all other remaining
> customers."  Mujica Decl. Ex. 2 at 58.

**Response to Paragraph 54:**  It is undisputed that this paragraph quotes, in part, the 2023

PREPA Fiscal Plan.  The Governor disputes that this paragraph provides an accurate, complete

description of the 2023 PREPA Fiscal Plan and respectfully refers the Court to the text of that

fiscal plan for its complete contents.  *See* Mujica Decl. Ex. 2.  The Governor further disputes that

paragraph 54 provides an accurate, complete description of the net-metering program's

mechanics and respectfully refers the Court to the text of Act 114-2007 for its complete contents.

*See* Brenner Decl. Ex. 1.

> 55.    The PREPA Fiscal Plan requires the Energy Bureau to "finalize the
> [Act 17] net metering and distributed generation study" by June 30, 2023 and
> "initiate a process for implementing recommendations and conclusions of the
> study and updating a net metering compensation and crediting structure, if it
> deems appropriate," by April 11, 2024, and lists the study and proposed new
> crediting structure as a regulatory milestone.  Mujica Decl. Ex. 2 at 58–59; *see
> also id.* at 52.

**Response to Paragraph 55:**  It is undisputed that this paragraph quotes, in part, the 2023

PREPA Fiscal Plan.  The Governor disputes that this paragraph provides an accurate, complete

description of the 2023 PREPA Fiscal Plan and respectfully refers the Court to the text of that

fiscal plan for its complete contents.  *See* Mujica Decl. Ex. 2.

> 56.    The Energy Bureau engaged a consultant, KeyLogic Systems,
> LLC, to prepare the Act 17 study in 2023.  Mujica Decl. ¶ 13; Brenner Decl. Ex.
> 11.

**Response to Paragraph 56:**  It is undisputed that PREB engaged KeyLogic Systems,

LLC in 2023 to conduct a net-metering study.  The Governor further avers that on June 14, 2024,

PREB released a draft net-metering study prepared by KeyLogic Systems to the public.  *See*

Mujica Decl. Ex. 9.

**D.     Act 10-2024.**

57.     On January 10, 2024, the Governor signed Act 10 into law.
Mujica Decl. Ex. 10 at 5.

**Response to Paragraph 57:**  Undisputed.

58.     Act 10 was enacted three months before Act 17's deadline for the
Energy Bureau to complete the Act 17 Study and potentially announce changes to
the net metering program.  Brenner Decl. Exs. 4 at 5, 3 at 68–69.

**Response to Paragraph 58:**  It is undisputed that (i) Act 10 was enacted on January 10,

2024; and (ii) Act 17 required PREB to complete a study on net metering and distributed energy

by April 11, 2024.  *See* Brenner Decl. Ex. 3 at 68–69.  The Governor further avers that on June

14, 2024, PREB released a draft net-metering study prepared by KeyLogic Systems to the public.

*See* Mujica Decl. Ex. 9.  The Governor respectfully refers the Court to the texts of Act 10 and

Act 17 for their complete contents.

59.     Act 10 provides the Energy Bureau may not commence the Act 17
Study on net metering until January 2030, which is more than five years after the
study was required to be completed under Act 17.  Brenner Decl Exs. 4, § 1(a), 3
at 68–70.

**Response to Paragraph 59:**  It is undisputed that Act 17, enacted in 2019, amended Act

114 to require PREB to complete a study on net-metering and distributed energy by 2024, and

that Act 10 further amended Act 114 to postpone the start of the study until January 2030.  *See*

Brenner Decl. Ex. 3 at 68–69; Brenner Decl. Ex. 4 at 3–4.  The Governor further avers that on

June 14, 2024, PREB released a draft net-metering study prepared by KeyLogic Systems to the

public.  *See* Mujica Decl. Ex. 9.  The remainder of this paragraph consists of legal conclusions to

which no response is necessary.  The Governor respectfully refers the Court to the texts of Act

10 and Act 17 for their complete contents.

      60.    Act 10 provides the Energy Bureau cannot "make any
determination related to the net metering program" until "after the study is
concluded[.]"  Brenner Decl. Ex. 4, § 1(a).

**Response to Paragraph 60:**  Disputed.  Act 10 expressly preserves PREB's power to

make any rate adjustments to the net-metering program it sees fit.  *See* Brenner Decl. Ex. 4 at 4

("The rate applicable to net metering customers, including the rate or mechanism through which

the customer will be compensated for the energy supplied to the electric network, shall be

determined exclusively by the Bureau of Energy as part of the rate review procedure for electric

service as set out in Act 57-2014, *or through a separate administrative procedure, when it deems

such procedure to be necessary or appropriate*.").  The remainder of this paragraph consists of

legal conclusions to which no response is necessary.  The Governor respectfully refers the Court

to the text of Act 10 for its complete contents.

      61.    Act 10 provides any changes to the net metering rate structure can
only take effect 12 months after the Energy Bureau decides to make any such
changes.  Brenner Decl. Ex. 4, § 1(a).

**Response to Paragraph 61:**  Disputed.  The use of the term "the net metering rate

structure" is vague and ambiguous.  While Act 10 provides for a 12-month transition period for

certain changes to the net-metering program's crediting structure (to minimize disruption to the

net-metering program, ensure compliance with the new regulatory requirements, provide PREB

additional time to issue necessary technical guidance and address ambiguities, provide LUMA

additional time to implement the changes, and reduce the risks of unintended consequences), Act

10 contemplates that PREB can make changes to other aspects of the net-metering program,

including through PREB's rate-making powers.  *See* Brenner Decl. Ex. 4 at 4 ("The rate

applicable to net metering customers, including the rate or mechanism through which the

customer will be compensated for the energy supplied to the electric network, shall be

determined exclusively by the Bureau of Energy as part of the rate review procedure for electric

service as set out in Act 57-2014, *or through a separate administrative procedure, when it deems*

*such procedure to be necessary or appropriate*.").  The Governor respectfully refers the Court to

the text of Act 10 for its complete contents.

> 62.     Act 10's provisions, taken together, mean that the "current net
> metering policy," including the 1:1 net metering rate structure, must remain in
> place until at least 2031.  Brenner Decl. Ex. 4, § 1(a).

**Response to Paragraph 62:**  Disputed.  This paragraph consists of legal conclusions and

characterizations to which no response is required.  The use of the term "1:1 net metering rate

structure" is vague and ambiguous.  The Governor disputes this paragraph to the extent the

Board implies that the current net-metering program provides compensation based on a "1:1 net

metering rate."  As currently designed, the net-metering program uses a 1:1 ratio to determine

whether a net-metering customer is a "net importer" or "net exporter" of electricity to the grid.

*See* Mujica Decl., Ex. 9 at 72–73.  If a customer is a net exporter, that customer becomes eligible

to receive a monthly credit for the excess electricity the customer exported to the grid in the

previous month.  *See id.*  If a customer exported more electricity in the previous month than the

customer imports in the current month, the unused credits will roll over to the next month.  *See*

*id.*  If a customer by the end of PREPA's fiscal year (on June 30) has any unused credits left, the

customer will be compensated for those credits.  *See id.*  But that compensation is not on a 1:1

basis.  Rather, a net exporting customer receives a year-end compensation for only 75% of the

exported electricity, and the rate used to calculate the credit is typically much lower than the rate

the customer pays—the greater of ten cents per kilowatt-hour or the applicable electric rate less

fuel and purchase power charges.  *See id.*  The Governor further disputes this paragraph to the

extent the Board suggests that PREB under Act 10 cannot make any rate adjustments to the net-

metering program it sees fit.  *See* Brenner Decl. Ex. 4 at 4 ("The rate applicable to net metering

customers, including the rate or mechanism through which the customer will be compensated for

the energy supplied to the electric network, shall be determined exclusively by the Bureau of

Energy as part of the rate review procedure for electric service as set out in Act 57-2014, *or

through a separate administrative procedure, when it deems such procedure to be necessary or

appropriate*.").  The Governor respectfully refers the Court to the text of Act 10 for its complete

contents.

> 63.    Act 10 provides that any customer with a contract, or who has a
> distributed generator installed and certified by a licensed professional and has
> notified the Energy Bureau of the installation at the time the Energy Bureau issues
> its final determination changing the net metering rate structure must be entitled to
> enjoy the present 1:1 net metering rate for at least 20 years from the date of such
> final determination.  Brenner Decl. Ex. 4, § 1(a).

**Response to Paragraph 63:**  Disputed.  This paragraph consists of legal conclusions and

characterizations to which no response is required.  The use of the terms "the net metering rate

structure" and "1:1 net metering rate" are vague and ambiguous.  The Governor disputes this

paragraph to the extent the Board implies that the current net-metering program provides

compensation based on a "1:1 net metering rate."  As currently designed, the net-metering

program uses a 1:1 ratio to determine whether a net-metering customer is a "net importer" or

"net exporter" of electricity to the grid.  *See* Mujica Decl., Ex. 9 at 72–73.  If a customer is a net

exporter, that customer becomes eligible to receive a monthly credit for the excess electricity the

customer exported to the grid in the previous month.  *See id.*  If a customer exported more

electricity in the previous month than the customer imports in the current month, the unused

credits will roll over to the next month.  *See id.*  If a customer by the end of PREPA's fiscal year

(on June 30) has any unused credits left, the customer will be compensated for those credits.  *See

id.*  But that compensation is not on a 1:1 basis.  Rather, a net exporting customer receives a

year-end compensation for only 75% of the exported electricity, and the rate used to calculate the

credit is typically much lower than the rate the customer pays—the greater of ten cents per

kilowatt-hour or the applicable electric rate less fuel and purchase power charges.  *See id.*

Further, Act 10—like Act 17—also has a 20-year "grandfathering clause" for net-metering

customers:  "Any customer who, on the date on which the Bureau issues its final determination,

has a net metering contract or who has notified the Bureau of the certification of a distributed

generator installed by a licensed and registered engineer or by a licensed and registered expert

electrician, shall automatically be considered as a grandfathered net metering customer under the

rate in effect prior to the Bureau's final determination.  In such cases, the net metering customer

shall be entitled to the rate or compensation mechanism in effect at that time for a term of not

less than twenty (20) years, counted from the date of such final determination related to net

metering."  Brenner Decl. Ex. 4 at 4.  The Governor respectfully refers the Court to the text of

Act 10 for its complete contents.

### E.     The Governor's Deficient § 204 Submission for Act 10.

64.     On February 12, 2024, the Oversight Board received the
Submission on behalf of the Governor regarding Act 10, which consisted of:  (*i*) a
Spanish-language copy of Act 10; (*ii*) the AAFAF Certification; (*iii*) the OMB
Attachment prepared in Spanish; and (*iv*) the Treasury Attachment prepared in
Spanish.  Mujica Decl. ¶ 15 & Exs. 10, 11, 12, and 13; Brenner Decl. Exs. 4, 5,
and 6.

**Response to Paragraph 64:**  It is undisputed that the Government submitted the Act 10

Certification to the Board on February 12, 2024.  However, the Governor disputes the Board's

characterization of the OMB Certification as "the OMB Attachment" and of the Treasury

Certification as "the Treasury Attachment."  The Governor respectfully refers the Court to the

texts of Act 10, the AAFAF Certification, the OMB Certification, and the Treasury Certification

for their complete contents. *See* Mujica Decl. Ex. 11; Brenner Decl. Exs. 5-6.

65.     The OMB Attachment is a one-page document.  Brenner Decl. Ex.
5.

**Response to Paragraph 65:**  It is undisputed that the length of the OMB Certification is one page.  However, the Governor disputes the Board's characterization of the OMB Certification as "the OMB Attachment."  The Governor respectfully refers the Court to the text of the OMB Certification for its complete contents.  *See* Brenner Decl. Ex. 5.

66.    The OMB Attachment states, in part, that after evaluating whether Act 10 "may have a potential fiscal impact on the Expenditure Budget of the Government of Puerto Rico[,]" the OMB determined Act 10 "would not have a fiscal impact and, if any, it would have a minimal impact on the certified budget for the fiscal years 2023-2024."  Brenner Decl. Ex. 5 at 1.

**Response to Paragraph 66:**  It is undisputed that paragraph 66 quotes, in part, the OMB Certification.  However, the Governor disputes the Board's characterization of the OMB Certification as "the OMB Attachment."  The Governor further disputes that the paragraph provides an accurate, compete description of OMB Certification and respectfully refers the Court to the text of the OMB Certification for its complete contents and context.

67.    The OMB Attachment states that its findings regarding Act 10 do not "imply any budgetary impact for the subsequent fiscal years contained in the Certified Fiscal Plan."  Brenner Decl. Ex. 5 at 1.

**Response to Paragraph 67:**  It is undisputed that paragraph 67 quotes, in part, the OMB Certification.  However, the Governor disputes the Board's characterization of the OMB Certification as "the OMB Attachment."  The Governor further disputes that the paragraph provides an accurate, compete description of the OMB Certification and respectfully refers the Court to the text of the OMB Certification for its complete contents and context.

68.    While the OMB Attachment references unspecified "corresponding evaluation and analysis," it contains no reasoning, explanation, or financial calculation to support its conclusions.  Brenner Decl. Ex. 5.

**Response to Paragraph 68:**  Disputed.  The OMB Certification certifies that Act 10 "would not have a fiscal impact" because OMB reasons that Act 10 would have only "a minimal impact on the certified budget" for the applicable fiscal years.  Brenner Decl. Ex. 5.  The

Governor also disputes the Board's characterization of the OMB Certification as "the OMB

Attachment."  The Governor further disputes that the paragraph provides an accurate, compete

description of the OMB Certification and respectfully refers the Court to the text of the OMB

Certification for its complete contents and context.

> 69.     The Treasury Attachment "checks" three boxes, signifying the
> Treasury Department examined the law after enactment, and concluded Act 10
> "does not have a fiscal impact," and "would not have an incremental effect" on
> the "FY 2023-2024 certified budget for" an unspecified agency.  Brenner Decl.
> Ex. 6 at 1.  The Treasury Attachment only attempted to address the impact of Act
> 10 for fiscal year 2023-2024, and did not attempt to examine the impact over the
> entire period covered by the Fiscal Plans.  Brenner Decl. Ex. 6.

**Response to Paragraph 69:**  It is undisputed that the Treasury Certification certifies that

Act 10 does not have a fiscal impact in the fiscal year 2023–24.  However, the Governor disputes

the Board's characterization of the Treasury Certification as "the Treasury Attachment."   The

Governor further disputes that the paragraph provides an accurate, compete description of the

Treasury Certification and respectfully refers the Court to the text of the Treasury Certification

for its complete contents and context.

> 70.     The Treasury Attachment includes no reasoning, explanation, or
> financial calculation to support the Treasury Department's conclusions.  Brenner
> Decl. Ex. 6.

**Response to Paragraph 70:**  Disputed.  The Treasury Certification certifies that Act 10

"does not have a fiscal impact" because the Treasury reasons that Act 10 would not lead to "an

increase in expenditure" or a "decrease in revenue."  Brenner Decl. Ex. 6.  The Certification

cannot provide a financial calculation to show this since the effect on the Puerto Rico

government's expenditures and revenues in both cases is zero.  The Governor also disputes the

Board's characterization of the Treasury Certification as "the Treasury Attachment."  The

Governor further disputes that the paragraph provides an accurate, compete description of the

Treasury Certification and respectfully refers the Court to the text of the Treasury Certification

for its complete contents and context.

      71.    The Executive Order states, in part, that the OMB Director is the "sole official authorized to issue certifications of availability of public funds" and only OMB and the Treasury Department are charged with undertaking analyses of new laws to certify their estimated impacts on revenues and spending, as required under PROMESA § 204(a).  Brenner Decl. Ex. 8, § 2.

**Response to Paragraph 71:**  It is undisputed that paragraph 71 quotes, in part, Executive

Order 2019-057.  However, the Governor disputes the Board's interpretation of the Executive

Order.  Executive Order 2019-057 authorized AAFAF, the Treasury, and the OMB *collectively*

to operate as the appropriate entity to provide section 204(a) certifications.  *See* Brenner Decl.

Ex. 8 § 1 ¶ 1 ("The Office of Management and Budget [OMB] in conjunction with the Financial

Advisory Authority and Fiscal Agency of Puerto Rico ('AAFAF') will prepare a universal form

that includes a formal estimate of the budgetary impact, if any, that the new law or Joint

Resolution will have on expenses and revenues of the Government of Puerto Rico.  The aforesaid

form will include a certification that the measure is not significantly inconsistent with the

certified Fiscal Plan, and if so, that specifies the Reasons therefore."); *id.* ¶ 4 ("The [OMB] and

the Department of the Treasury shall conduct an analysis taking into account their financial and

budgetary expertise to certify the estimated impact on expenses and earnings of the law, if

any."); *id.* ¶ 6 ("After receipt of the certifications of the budgetary and fiscal impact, and in a

term not exceeding seven (7) business days counted from the signing of the Law, the AAFAF

will have the obligation to submit to the Board the measure approved by the Governor, together

with: [the formal estimate and the certification].").  The Governor respectfully refers the Court to

the Executive Order for its complete contents.

      72.    In a letter dated June 16, 2023, AAFAF confirmed to the Oversight Board that, per the terms of the Executive Order, it does not conduct formal estimates for § 204(a) purposes, stating that "Treasury and/or OMB conduct the cost estimate analysis because those entities (not AAFAF) have the best

information and expertise to determine a new law's effects on Government expenditures and revenues." *See* Mujica Decl. Ex. 14 at 2.

**Response to Paragraph 72:** Disputed. While paragraph 72 quotes, in part, AAFAF's June 16, 2023 letter, the Board mischaracterizes the letter, which makes clear that under Executive Order 2019-057, AAFAF, the Treasury, and the OMB are authorized *collectively* to operate as the appropriate entity to provide section 204(a) certifications. *See* Mujica Decl. Ex. 14 at 2 ("As you may recall, in 2019, then-Governor Vázquez Garced signed Executive Order 2019-057 that established procedures designed to promote compliance with PROMESA section 204(a) by, among other things, authorizing AAFAF, Treasury, and the Office of Management and Budget (OMB) to collectively operate as the 'appropriate entity with expertise in budgets and financial management' responsible for providing Section 204 analyses and certifications"). The Governor respectfully refers the Court to AAFAF's June 16, 2023 letter for its complete contents.

73.    The OMB Attachment does not contain the certification that Act 10 is or is not significantly inconsistent with any fiscal plan. *See* Mujica Decl. Ex. 12 (Spanish-Language OMB Attachment); Brenner Decl. Ex. 5 (Certified English Translation of OMB Attachment).

**Response to Paragraph 73:** Disputed. The OMB Certification certifies that Act 10 "would not have a fiscal impact." By definition, this means that it is not significantly inconsistent with the Commonwealth Fiscal Plan. The Governor further disputes the Board's characterization of the OMB Certification as "the OMB Attachment." The Governor also disputes that the paragraph provides an accurate, compete description of the OMB Certification and respectfully refers the Court to the text of the OMB Certification for its complete contents and context. *See* Brenner Decl. Ex. 5.

74.    The Treasury Attachment does not contain a certification that Act 10 is or is not significantly inconsistent with any fiscal plan. *See* Mujica Decl.

Ex. 13 (Spanish-Language Treasury Attachment); Brenner Decl. Ex. 6 (Certified English Translation of Treasury Attachment).

**Response to Paragraph 74:** Disputed. The Treasury Certification certifies that Act 10 "does not have a fiscal impact." By definition, this means that it is not significantly inconsistent with the Commonwealth Fiscal Plan. The Governor further disputes the Board's characterization of the Treasury Certification as "the Treasury Attachment." The Governor also disputes that the paragraph provides an accurate, compete description of the Treasury Certification and respectfully refers the Court to the text of the Treasury Certification for its complete contents and context. *See* Brenner Decl. Ex. 6.

75. The Treasury Attachment has "check boxes" for the Treasury Department to certify that the law is or is not "significantly inconsistent with the Certified Fiscal Plan," but neither of the check boxes for certifying consistency with the Fiscal Plan is checked. Mujica Decl. Ex. 13 (Spanish-Language Treasury Attachment) at 2; Brenner Decl. Ex. 6 (Certified English Translation of Treasury Attachment) at 2.

**Response to Paragraph 75:** It is undisputed that the Treasury Certification contains check boxes that state that the statute in question "is not significantly inconsistent with the Certified Fiscal Plan" or that it "is significantly inconsistent with the Certified Fiscal Plan." Brenner Decl. Ex. 6 at 2. It is also undisputed that neither box is checked. *See id.* However, the Governor disputes the Board's characterization of the Treasury Certification as "the Treasury Attachment." The Governor also disputes this paragraph to the extent it implies that the Treasury Certification did not appropriately certify Act 10. The Treasury Certification certifies that Act 10 "does not have a fiscal impact." *Id.* at 1. By definition, this means that it is not significantly inconsistent with the Commonwealth Fiscal Plan. The Governor further disputes that the paragraph provides an accurate, compete description of the Treasury Certification and respectfully refers the Court to the text of the Treasury Certification for its complete contents and

context.

76.      The AAFAF Certification includes the following statement: "Act 10 is not significantly inconsistent with the provisions of the [2023] Certified [Commonwealth] Fiscal Plan and PREPA's Certified Fiscal Plan."  Mujica Decl. Ex. 11 at 6.

**Response to Paragraph 76:**  It is undisputed that paragraph 76 quotes, in part, the

AAFAF Certification.  The Governor respectfully refers the Court to the AAFAF Certification

for its complete contents.

77.      The AAFAF Certification does not address the Fiscal Plans' requirements concerning the Energy Bureau's independence.  Mujica Decl. Ex. 11.

**Response to Paragraph 77:**  It is undisputed that the AAFAF Certification generally

does not address the non-fiscal impact of Act 10.   But the Governor disputes that PROMESA

section 204(a) requires a certification concerning a new law's significant inconsistency with any

fiscal plan provisions that do not have an identifiable fiscal effect.  *See* 48 U.S.C.

§ 2144(a)(2)(A) (requiring "an appropriate entity of the territorial government with *expertise in*

*budgets and financial management*" to prepare a "formal estimate" of "the impact, if any, that

the [new] law will have *on expenditures and revenues*"); § 2144(a)(2)(B)–(C) (requiring the

entity with expertise in budgets and financial management to certify whether the new law is or is

not "significantly inconsistent with the Fiscal Plan for the fiscal year").  The Governor further

disputes that the paragraph provides an accurate, compete description of the AAFAF

Certification and respectfully refers the Court to the text of the AAFAF Certification for its

complete contents and context.  *See* Mujica Decl. Ex. 11.

78.      The AAFAF Certification states that ["]Act 10 still requires [the Energy Bureau] to conduct the study, it just extends the date for doing so" and the PREPA Fiscal Plan "does not include or require a change to the current net metering law or policy."  Mujica Decl. Ex. 11 at 6.  AFAF concluded Act 10 will have no fiscal impact on PREPA because to meet the PREPA Fiscal Plan's projected rate of new interconnected net solar metering capacity, AAFAF claims

the current rate of growth must be maintained, and assumes the only way that can
happen is if the current net metering program is continued without changes—but
provides no explanation for why its conclusions and assumptions should be
credited and what AAFAF did to test its hypothesis. *Id.* at 5.

**Response to Paragraph 78:**  It is undisputed that paragraph 78 quotes, in part, the

AAFAF Certification.  However, the Governor disputes the Board's conclusions and

characterizations of the AAFAF Certification.  AAFAF concluded that "the extension of net

metering policy" under Act 10 will have no fiscal impact because Act 10's effect on "PREPA's

Certified Fiscal Plan revenue and cost projections is expected to be neutral."  Mujica Decl. Ex.

11 at 6.  AAFAF provided a detailed explanation for reaching this conclusion:  "PREPA's

Certified Fiscal Plan load forecast fully deducts expected DG production from load to calculate

Net Utility Sales, used as the input for the denominator to calculate the Overall Required Rate

$/kWh, and there are no projected revenues from DG customers.  This treatment assumes that

DG customers are not required to pay for any portion of the utility revenue requirement unless

there is energy consumption in excess of the DG customers' behind-the-meter production (i.e.,

positive net consumption).  Thus, PREPA's Certified Fiscal Plan assumes that the existing net

metering policy and bill credit structure remains in place."  *Id.* at 5.  Since the PREPA Fiscal

Plan assumes that the current net-metering crediting structure (which Act 10 extends) will

remain in place for the duration of the PREPA Fiscal Plan, AAFAF therefore concluded that Act

10's extension of the net-metering policy would not impact projected revenues or expenditures.

*See id.*  Put differently, AAFAF determined that Act 10 does not impact revenues or costs in any

meaningful way that is not already assumed by the PREPA Fiscal Plan's economic model.  The

Governor disputes the Board's allegation that AAFAF's certification that Act 10 would have no

fiscal impact on PREPA necessarily was based on projections regarding "net solar metering

capacity."  The Governor respectfully refers the Court to the text of the AAFAF Certification for

its complete contents and context.  *See* Mujica Decl. Ex. 11.

**F.    The Oversight Board Notifies the Governor and the Legislature of the Deficiencies in the § 204(a) Submission and Directs the Governor to Correct Them; The Governor Fails to Do So.**

79.    In a letter dated April 10, 2024, the Oversight Board provided AAFAF, the Governor, and the Legislature with its assessment of the Submission and, pursuant to PROMESA § 204(a)(3)(A–B), a notification that the Governor had not provided the required formal estimate and certification.  Mujica Decl. ¶ 18 & Ex. 15.

**Response to Paragraph 79:**  It is undisputed that on April 10, 2024, the Board sent a letter to the Governor, AAFAF, and the Legislature concerning Act 10.  The Governor disputes that paragraph 79 provides an accurate, complete description of that letter and respectfully refers the Court to the text of that letter for its complete and accurate contents.  The Governor disputes that AAFAF failed to provide the required formal estimate and certification under PROMESA section 204(a)(2).  *See* Mujica Decl. Exs. 11, 12.  The Governor respectfully refers the Court to the text of the AAFAF Certification for its complete contents and context.  *See* Mujica Decl. Ex. 11.

80.    In its April 10, 2024 letter, pursuant to PROMESA § 204(a)(4)(A), the Oversight Board directed the Governor to submit a revised submission, including a formal estimate and a certification in compliance with the requirements of PROMESA § 204(a)(2), by April 19, 2024.  Mujica Decl. ¶ 19 & Ex. 15 at 6.

**Response to Paragraph 80:**  It is undisputed that on April 10, 2024, the Board sent a letter to the Governor, AAFAF, and the Legislature concerning Act 10.  The Governor disputes that paragraph 80 provides an accurate, complete description of that letter and respectfully refers the Court to the text of that letter for its complete and accurate contents.  The Governor disputes that AAFAF did not provide the required formal estimate and certification under PROMESA section 204(a)(2).  *See* Mujica Decl. Exs. 11, 12.  The Governor respectfully refers the Court to the text of the AAFAF Certification for its complete contents and context.  *See* Mujica Decl. Ex.

11.

81.    In its April 10, 2024 letter, the Oversight Board also requested confirmation by April 15, 2024, that the Government would repeal or amend Act 10 and further requested a "concrete plan and timeline for doing so."  Mujica Decl. ¶ 19 & Ex. 15 at 6.

**Response to Paragraph 81:**  It is undisputed that (i) on April 10, 2024, the Board sent a

letter to the Governor, AAFAF, and the Legislature concerning Act 10, and (ii) this paragraph

quotes, in part, from that letter.  The Governor disputes that paragraph 81 provides an accurate,

complete description of that letter and respectfully refers the Court to the text of that letter for its

complete contents.

82.    AAFAF responded to the Oversight Board's April 10, 2024 letter in a letter dated April 15, 2024, stating, in part, that the "Government understands the Oversight Board's concerns expressed in the [April 10] Letter" and that it would "assess[] any potential changes to the 204 Submission, or to Act 10, (if any) that may be warranted in order to implement [Act 10] in a manner not significantly inconsistent with PREPA's Certified Fiscal Plan."  Mujica Decl. ¶ 20 & Ex. 16 at 2.  It further claimed that conducting the formal estimate required by PROMESA § 204(a) "represents the functional equivalent of completing the [net metering] Study, which the Government acknowledges is [the Energy Bureau's] responsibility given its expertise and unique role as PREPA's independent regulator."  Mujica Decl. Ex. 16 at 2.  It further suggested that AAFAF's analysis of PREPA Fiscal Plan projections was a suitable formal estimate.  *Id.*

**Response to Paragraph 82:**  It is undisputed that (i) on April 15, 2024, AAFAF sent a

letter to the Board, and (ii) this paragraph quotes, in part, from that letter.  The Governor disputes

that paragraph 82 provides an accurate, complete description of that letter and respectfully refers

the Court to the text of that letter for its complete contents.

83.    In AAFAF's April 15, 2024 letter, it requested the Oversight Board "provide" an unspecified amount of "additional time" to conduct its assessment of "any potential changes to the 204 Submission, or to Act 10, (if any) that may be warranted in order to implement [Act 10] in a manner not significantly inconsistent with PREPA's Certified Fiscal Plan."  Mujica Decl. ¶ 20 & Ex. 16 at 2.

**Response to Paragraph 83:**  It is undisputed that (i) on April 15, 2024, AAFAF sent a

letter to the Board, and (ii) this paragraph quotes, in part, from that letter.  The Governor disputes

that paragraph 83 provides an accurate, complete description of that letter and respectfully refers

the Court to the text of that letter for its complete contents.

> 84.    The Oversight Board responded to AAFAF's April 15, 2024 letter
> in a letter dated May 2, 2024, in which it, among other things, reiterated its
> concerns and noted that AAFAF's letter did not "resolve the issues raised by the
> Oversight Board" regarding Act 10.  Mujica Decl. ¶ 21 & Ex. 17 at 1.

**Response to Paragraph 84:**  It is undisputed that (i) on May 2, 2024, the Board sent a

letter to AAFAF and (ii) this paragraph quotes, in part, from that letter.  The Governor disputes

that paragraph 84 provides an accurate, complete description of that letter and respectfully refers

the Court to the text of that letter for its complete contents.

> 85.    In its May 2, 2024 letter, the Oversight Board requested the
> Governor "take immediate action and work with the [Legislature] to repeal or
> amend Act 10 to restore [the Energy Bureau's] full statutory oversight over Puerto
> Rico's energy system."  Mujica Decl. ¶ 21 & Ex. 17 at 2.

**Response to Paragraph 85:**  It is undisputed that (i) on May 2, 2024, the Board sent a

letter to AAFAF and (ii) this paragraph quotes, in part, from that letter.  The Governor disputes

that Act 10 diminished PREB's independent authority to oversee Puerto Rico's energy system.

Act 10 does not impose any additional responsibilities on PREB, nor does it take away any of

PREB's independent ratemaking authority.  Act 10 only extends until 2030 the date for PREB to

commence its net-metering study.  *See* Brenner Decl. Ex. 4 at 6.  In a statement to the Senate,

PREB testified regarding Act 10 that delaying its net-metering study "could, in its practical

application, benefit the net metering program."  ECF No. 53-3 at 7.  In the interim, Act 10 seeks

only to maintain the status quo by leaving in place the existing net-metering program until the

study is completed and PREB has determined what changes, if any, to make to the net-metering

program. *See id.* at 6–7.  The Act specifically preserves PREB's regulatory power exclusively to

determine the mechanism through which net-metering customers receive compensation for

energy they supply to the network. *See id.* at 7. The Governor disputes that paragraph 85 provides an accurate, complete description of that letter and respectfully refers the Court to the text of that letter for its complete contents.

86. In its May 2, 2024 letter, the Oversight Board requested that such "legislation to repeal or amend" the provisions of Act 10 "be introduced in the Legislature no later than May 7, 2024"—the last day to introduce legislation for consideration in the then-current legislative session—"and enacted no later than June 30, 2024" to "restore [the Energy Bureau's] full statutory oversight over Puerto Rico's energy system." Mujica Decl. ¶ 21 & Ex. 17 at 2.

**Response to Paragraph 86:** It is undisputed that (i) on May 2, 2024, the Board sent a letter to AAFAF, and (ii) this paragraph quotes, in part, from that letter. The Governor disputes that Act 10 diminished PREB's independent authority to oversee Puerto Rico's energy system. Act 10 does not impose any additional responsibilities on PREB, nor does it take away any of PREB's independent ratemaking authority. Act 10 only extends until 2030 the date for PREB to commence its net-metering study. *See* Brenner Decl. Ex. 4 at 6. In a statement to the Senate, PREB testified regarding Act 10 that delaying its net-metering study "could, in its practical application, benefit the net metering program." ECF No. 53-3 at 7. In the interim, Act 10 seeks only to maintain the status quo by leaving in place the existing net-metering program until the study is completed and PREB has determined what changes, if any, to make to the net-metering program. *See id.* at 6–7. The Act specifically preserves PREB's regulatory power exclusively to determine the mechanism through which net-metering customers receive compensation for energy they supply to the network. *See id.* at 7. The Governor disputes that paragraph 86 provides an accurate, complete description of that letter and respectfully refers the Court to the text of that letter for its complete contents.

87. In its May 2, 2024 letter, the Oversight Board offered to "work with" the Government to "ensure the issues with Act 10 are fully resolved." Mujica Decl. ¶ 21 & Ex. 17 at 2.

**Response to Paragraph 87:**  It is undisputed that (i) on May 2, 2024, the Board sent a letter to AAFAF, and (ii) this paragraph quotes, in part, from that letter.  The Governor disputes that paragraph 87 provides an accurate, complete description of that letter and respectfully refers the Court to the text of that letter for its complete contents.

88.     In a letter dated May 7, 2024, AAFAF responded to the Oversight Board, requesting that the Legislature be given "additional time within the current legislative session that ends on June 30, [2024] to consider the Oversight Board's objections, engage in discussions and address potential amendments to Act 10 through the legislative process" and "gather industry feedback" in order to make an "informed decision regarding Act 10."  Mujica Decl. ¶ 22 & Ex. 18 at 1–2.

**Response to Paragraph 88:**  It is undisputed that (i) on May 7, 2024, AAFAF sent a letter to the Board and (ii) this paragraph quotes, in part, from that letter.  The Governor disputes that paragraph 88 provides an accurate, complete description of that letter and respectfully refers the Court to the text of that letter for its complete contents.

89.     As of September 25, 2024, the Governor has made no additional submissions pursuant to § 204(a) with regard to Act 10.  Accordingly, he has failed to comply with the Oversight Board's direction, made on April 10, 2024, to provide a compliant formal estimate and certification for Act 10.  Mujica Decl. ¶ 24.

**Response to Paragraph 89:**  It is undisputed that AAFAF did not submit an additional certification.  The statement that the Governor has supposedly failed to comply with PROMESA section 204(a) is not a "fact," but is argumentative and an impermissible legal conclusion that the Governor disputes, in any event.  The Government submitted its 204(a) estimate and certification for Act 10 on February 12, 2024, which included an estimate from the OMB—the agency responsible for Government spending—that concluded that Act 10 "would not have a fiscal impact and, if any, it would have a minimal impact on the certified budget for fiscal year 2023–24.  Nor does it imply any budgetary impact for the subsequent fiscal years contained in the Certified Fiscal Plan."  Brenner Decl. Ex. 5 at 2.  The certification also included an estimate

from the Department of Treasury—which is responsible for Government revenues—that stated that Act 10 "does not have a fiscal impact." *Id.* Ex. 6 at 2. AAFAF's certification stated that it had conducted "the pertinent analysis" and "determined that Act 10 is not significantly inconsistent with the Certified Fiscal Plan" because "Act 10 does not represent an adverse impact on the Government's revenues and expenditures and does not impose any additional burdens or responsibilities on PREPA, or any other Government entity like PREB." Mujica Decl. Ex. 11 at 7. AAFAF determined that Act 10, compared to PREPA's Fiscal Plan revenue and cost projections, is expected to be revenue neutral while also helping to reach the goal set under Act 57 for 100% renewable energy by 2050. *See id.* On May 7, 2024, AAFAF sent a letter to the Board, which expressed a willingness to continue discussions on Act 10 and requested additional time to further discuss the changes requested by the Board. *See* Mujica Dec. Ex. 18. Rather than continue to engage productively towards a resolution, the Board filed the Complaint seeking to nullify Act 10. *See* ECF No. 1 ¶ 1.

90.     As of September 25, 2024, no legislation has been passed repealing or amending Act 10. Mujica Decl. ¶ 23.

**Response to Paragraph 90:** Undisputed.

## G.     The Oversight Board's § 108(a)(2) Determinations.

91.     After Act 10's enactment, the Oversight Board and its advisors examined the law. Mujica Decl. ¶ 25.

**Response to Paragraph 91:** The Governor lacks sufficient knowledge and information in connection with the Board's review and analysis of Act 10 to confirm or dispute the allegations in this paragraph because, to date, the Board has refused to respond to any of the Governor's Discovery Requests.

92. On April 5, 2024, based on its review and analysis, the Oversight Board determined Act 10 impairs or defeats PROMESA's purposes of achieving

fiscal responsibility and access to capital markets for multiple independent reasons, including because Act 10:

a. "directly contravene[es] the express terms of the [PREPA Fiscal Plan and the 2023 Commonwealth Fiscal Plan], which require [the Energy Bureau] to be political independent";

b. violates the express terms of the PREPA Fiscal Plan, which requires the Energy Bureau to conduct and "complete its net metering study and implement any changes to PREPA's net metering program it deems appropriate by April 11, 2024"; and

c. "impairs the Oversight Board's ability to carry out its statutory duties under PROMESA § 201(b)(1)(B), (G), (H), and (J) to ensure funding of the essential public service of reliable electricity, to enable the achievement of fiscal targets, to create independent revenue forecasts, and to provide for capital expenditures and investments necessary to promote economic growth."

Mujica Decl. Ex. 19 at 3.

**Response to Paragraph 92:** It is undisputed that (i) on April 5, 2024, the Board passed a resolution and (ii) this paragraph quotes, in part, from the resolution. However, the Governor lacks sufficient knowledge and information in connection with the Board's review and analysis of Act 10 to confirm or dispute the allegations in this paragraph because, to date, the Board has refused to respond to any of the Governor's Discovery Requests. Moreover, Act 10 does not impose any additional responsibilities on PREB, nor does it take away any of PREB's independent ratemaking authority. Act 10 only extends until 2030 the date for PREB to commence its net-metering study. *See* Brenner Decl. Ex. 4 at 6. In a statement to the Senate, PREB testified regarding Act 10 that delaying its net-metering study "could, in its practical application, benefit the net metering program." ECF No. 53-3 at 7. In addition, the Governor disputes that paragraph 92 provides an accurate, complete description of that resolution and respectfully refers the Court to the text of that letter for its complete contents.

93. The Oversight Board memorialized its determination in the April Resolution passed on April 5, 2024, which concluded, in part, that Act 10 "violates the Fiscal Plans by interfering with [the Energy Bureau's] independence

[and] by imposing numerous decisions upon [the Energy Bureau] regarding net metering," including by "prohibiting it from making any changes to PREPA's net metering policy until at least 2031, and [] mandating that it establish a legacy program providing PREPA net metering customers and other eligible customers with the current net metering program's terms through at least 2051."  Mujica Decl. Ex. 19.

**Response to Paragraph 93:**  It is undisputed that (i) on April 5, 2024, the Oversight Board passed the April Resolution and (ii) this paragraph quotes, in part, from the April Resolution.  However, the Governor lacks sufficient knowledge and information in connection with the Board's review and analysis of Act 10 to confirm or dispute the allegations in this paragraph because, to date, the Board has refused to respond to any of the Governor's Discovery Requests.  The Governor disputes that paragraph 93 provides an accurate, complete description of April 5, 2024 resolution, and respectfully refers the Court to the text of that resolution for its complete contents.

94.     The Oversight Board informed the Governor, Senate President, and Speaker of the House of Representatives of its April 5, 2024 determination and concerns regarding Act 10 in a letter dated April 8, 2024.  Mujica Decl. ¶ 27 & Ex 20.  The Oversight Board issued a corrected version of its April 8, 2024 letter on April 10, 2024, adding additional detail regarding Act 10's inconsistency with the PREPA and Commonwealth Fiscal Plans requirements for the Energy Bureau's political independence and the PREPA Fiscal Plan's requirements as to net metering, and providing the Governor more time to respond.  Mujica Decl. ¶ 28 & Ex. 15.

**Response to Paragraph 94:**  It is undisputed that (i) on April 8, 2024, the Board sent a letter to the Governor, AAFAF, and the Legislature concerning Act 10, and (ii) on April 10, 2024, the Board sent another letter to the Governor, AAFAF, and the Legislature concerning Act 10.  The Governor disputes that paragraph 94 provides an accurate, complete description of that letter and respectfully refers the Court to the text of that letter for its complete contents.

95.     On June 5, 2024, the Oversight Board certified the 2024 Commonwealth Fiscal Plan.  Mujica Decl. ¶ 29 & Ex. 8.

**Response to Paragraph 95:**  Undisputed.

96.    The 2024 Commonwealth Fiscal Plan includes similar provisions to the 2023 Commonwealth Fiscal Plan regarding the need for the Energy Bureau to operate independently and without political interference.  Mujica Decl. ¶ 30 & Ex. 8 at 76, 140.

**Response to Paragraph 96:**  Undisputed, but the Governor avers that the 2024

Commonwealth Fiscal Plan is not relevant to the issues before the Court, because it was adopted

nearly six months after Act 10's enactment.  *See* Mujica Decl. Ex. 8

97.    On June 21, 2024, the Oversight Board again determined that Act 10 impairs or defeats the purposes of PROMESA for the same reasons set forth in the April Resolution but taking into account the certification of the 2024 Commonwealth Fiscal Plan and the Governor's deficient PROMESA § 204(a) Submission and failure to comply with the Oversight Board's direction to correct the deficiencies, and memorialized its decision in the June Resolution.  Mujica Decl. ¶ 31 & Ex. 21.

**Response to Paragraph 97:**  Disputed.  The statement, particularly the phrase "impair

and/or defeat the purposes of PROMESA," is vague, contains impermissible legal conclusions,

and is not a statement of fact.  While it is undisputed that on June 21, 2024, the Board approved a

resolution, the 2024 Commonwealth Fiscal Plan is not the operative fiscal plan for the Puerto

Rico government for the purposes of this adversary proceeding, because the 2024

Commonwealth Fiscal Plan was not adopted until nearly six months after Act 10's enactment.

*See* Mujica Decl. Ex. 8.  To the extent the 2024 Commonwealth Fiscal Plan is determined to be

relevant, the Governor lacks sufficient knowledge and information in connection with the

Board's review and analysis of Act 10 to confirm or dispute the allegations in this paragraph

because, to date, the Board has refused to respond to any of the Governor's Discovery Requests.

The Governor further disputes that Act 10 contravenes any part of the PREPA Fiscal Plan or the

2023 Commonwealth Fiscal Plan.  The Governor further disputes that the Government's section

204(a) certification was deficient and that AAFAF failed to correct any alleged deficiencies. The

Government submitted its 204(a) estimate and certification for Act 10 on February 12, 2024, which included an estimate from the OMB—the agency responsible for Government spending—that concluded that Act 10 "would not have a fiscal impact and, if any, it would have a minimal impact on the certified budget for fiscal year 2023–24.  Nor does it imply any budgetary impact for the subsequent fiscal years contained in the Certified Fiscal Plan."  *See* Brenner Decl. Ex. 5 at 2.  The certification also included an estimate from the Department of Treasury—which is responsible for Government revenues—that stated that Act 10 "does not have a fiscal impact." *Id.* Ex. 6 at 2.  AAFAF's certification stated that it had conducted "the pertinent analysis" and "determined that Act 10 is not significantly inconsistent with the Certified Fiscal Plan" because "Act 10 does not represent an adverse impact on the Government's revenues and expenditures and does not impose any additional burdens or responsibilities on PREPA, or any other Government entity like PREB."  AAFAF determined that Act 10, compared to PREPA's Fiscal Plan revenue and cost projections, is expected to be revenue neutral while also helping to reach the goal set under Act 57 for 100% renewable energy by 2050.  *See* Mujica Decl. Ex. 11 at 7. The Governor disputes that paragraph 97 provides an accurate, complete description of the resolution and respectfully refers the Court to the text of that resolution for its complete contents.

### H.    The Energy Bureau Publishes a Draft Study on Net Metering.

98.    On June 14, 2024, the Energy Bureau approved a resolution authorizing the publication of an 82-page Draft Study on net metering and distributed energy.  Mujica Decl. ¶ 14 & Ex. 9; Brenner Decl. Ex. 9.

**Response to Paragraph 98:**  It is undisputed that on June 14, 2024, PREB approved a resolution authorizing the publication of a draft net-metering study prepared by KeyLogic Systems.

99.    The Energy Bureau Resolution references the requirement to conduct the Act 17 Study, but notes the requirement was amended by Act 10. Brenner Decl. Ex. 9.

**Response to Paragraph 99:**  Undisputed.

100.    The Energy Bureau Resolution references the requirement to conduct the Act 17 Study, but notes the requirement was amended by Act 10, and further states that the Energy Bureau would publish the Draft Study pursuant to the Energy Bureau's "broad delegated powers and duties" under Act 57, and not Act 114, as amended by Act 17.  Brenner Decl. Ex. 9.

**Response to Paragraph 100:**  It is undisputed that this paragraph quotes, in part, from the June 14, 2024 PREB resolution.  The Governor disputes that paragraph 100 provides an accurate, complete description of the resolution—in particular the assertion that the resolution says the study was "not" published under Act 114, as amended by Act 17.  To the contrary, the resolution does not specify the power under which PREB issued the draft study prepared by KeyLogic Systems.  The Governor respectfully refers the Court to the text of that resolution for its complete contents.

101.    The Draft Study was prepared by KeyLogic Systems, a company engaged by the Energy Bureau to conduct the Act 17 Study, and includes an analysis of net metering programs generally, the experience with such programs in different states, and Puerto Rico's program.  Mujica Decl. Ex. 9.

**Response to Paragraph 101:**  It is undisputed that the (i) Net-Metering Study was prepared by KeyLogic Systems and (ii) PREB engaged KeyLogic Systems to conduct the Act 17 study. The Governor disputes that paragraph 101 provides an accurate, complete description of the Net-Metering Study and respectfully refers the Court to the text of the Net-Metering Study for its complete contents.

102.    The Draft Study finds that "as the penetration of [net energy metering] increases, so will the need to consider alternative pricing approaches along with technical provisions that govern when and how power is exported into the grid" and concludes that "Puerto Rico will find [net metering] uns[us]tainable in the long-run" and "[n]ew methods need to be explored and adopted."  Mujica Decl. Ex. 9 at 3, 82.

**Response to Paragraph 102:**  It is undisputed that this paragraph quotes, in part, from the Net-Metering Study prepared by KeyLogic Systems.  The Governor disputes that paragraph

47

102 provides an accurate, complete description of the Net-Metering Study and respectfully refers the Court to the text of the Net-Metering Study for its complete contents.

Dated: October 23, 2024
     San Juan, Puerto Rico

Respectfully,

**O'MELVENY & MYERS LLP**

*/s/ William J. Sushon*
John J. Rapisardi
William J. Sushon
(Admitted *Pro Hac Vice*)
1301 Avenue of the Americas,
17th Floor,
New York, NY 10019
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
Email: jrapisardi@omm.com
     wsushon@omm.com

-and-

Peter Friedman
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
Email: pfriedman@omm.com

*Attorneys for Governor Pedro R. Pierluisi*

**MARINI PIETRANTONI MUÑIZ LLC**

*/s/ Luis C. Marini-Biaggi*
Luis C. Marini-Biaggi
USDC No. 222301
Carolina Velaz-Rivero
USDC No. 300913
Ignacio J. Labarca-Morales
USDC No. 303307
250 Ponce de León Ave., Suite 900
San Juan, Puerto Rico 00918
Telephone: (787) 705-2171
Facsimile: (787) 936-7494
Email: lmarini@mpmlawpr.com
     cvelaz@mpmlawpr.com
     ilabarca@mpmlawpr.com

*Attorneys for Governor Pedro R. Pierluisi*