# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF PUERTO RICO

FINANCIAL OVERSIGHT AND MANAGEMENT

BOARD FOR PUERTO RICO,

     Plaintiff,

v.

PEDRO R. PIERLUISI URRUTIA, in his official

capacity as Governor of Puerto Rico, and the

GOVERNMENT OF PUERTO RICO,

     Defendants.

RECEIVED AND FILED
CLERK'S OFFICE USDC PR
2025 MAY 6 PM 2:43

Adv. No. 24-00062-LTS

---

## CONSOLIDATED MOTION

### (1) FOR LEAVE TO APPEAR AS AMICUS CURIAE;

### (2) FOR LEAVE TO FILE AN OVERSIZE MEMORANDUM OF LAW; AND

### (3) TO FILE DR. LUIS A. AVILÉS PAGÁN'S CURRICULUM VITAE AS AN APPENDIX

**TO THE HONORABLE COURT:**

**COMES NOW** Luis Aníbal Avilés Pagán, Ph.D., J.D.—Professor of Law and Energy Policy at the University of Puerto Rico School of Law—pro se, respectfully requesting leave (i) to appear as amicus curiae, (ii) to file the accompanying forty-page Memorandum of Law in support of the validity of Law 10-2024, and (iii) to submit, as Appendix A, his complete Curriculum Vitae. In support thereof, Professor Avilés states as follows:

1

## I.   INTEREST, EXPERTISE, AND UNIQUE CONTRIBUTION OF AMICUS CURIAE

Dr. Avilés is widely regarded as one of Puerto Rico's leading scholar-practitioner in energy law
and policy. Highlights drawn from his Curriculum Vitae (attached as Appendix A) include:

- Academic Credentials.  Ph.D. (Summa Cum Laude) in Environmental Sciences (2024);
  LL.M. (Magna Cum Laude) in European Law, Université de Paris II; J.D., Harvard Law
  School (1992).

- Legislative Drafting.  Member of the core teams that wrote Act 57-2014 (Energy
  Transformation & RELIEF Act) and Act 17-2019 (Puerto Rico Energy Public Policy
  Act), with personal authorship of the Integrated Resource Plan provisions and of the
  Colegio de Ingenieros' formal report endorsing Act 17-2019 .

- Public Service.  President, Governing Board of the Puerto Rico Electric Power Authority
  (2005-2009); Vice-Chair, Government Development Bank (2007-2009).

- Scholarship.  More than ten articles on energy regulation—including the seminal La
  Transformación Jurídica del Sector Eléctrico en Puerto Rico durante el Siglo 21 (2022)—
  and frequent op-eds in El Nuevo Día championing distributed generation.

- Professional Licenses.  Puerto Rico Bar (1993), U.S. District Court for the District of
  Puerto Rico (1994), First Circuit (1994).

Given this record, Dr. Avilés can illuminate the Court on (a) the Legislature's constitutional supremacy over PREB, (b) PROMESA's limited fiscal veto, and (c) the grid, climate, and justice stakes implicated by Law 10-2024.

## II.   PROCEDURAL BACKGROUND AND NEED FOR OVERSIZE BRIEF

Local Civil Rule 7(e) limits memoranda to 25 double-spaced pages. The accompanying brief spans 40 pages because:

1. Multiplicity of Issues.  The Board's challenge entwines constitutional law, PROMESA statutory construction, fiscal-plan accounting, environmental science, and energy-justice principles.

2. Evidentiary Breadth.  The memorandum synthesizes rooftop-solar interconnection data ($\approx$ 900 MW), EPA emission factors, FEMA grid-modernization schedules, and legislative history—material necessary for informed judicial review.

3. Public-Interest Magnitude.  The outcome affects over 100 000 "prosumers," hundreds of million dollars in private rooftop-solar investment, and Puerto Rico's statutory march to 100% renewables.

Condensing to 25 pages would either omit critical legal analysis or relegate vital empirical facts to footnotes, impairing the Court's understanding.

### III.  GROUNDS FOR LEAVE TO FILE AS

### AMICUS CURIAE

Echoing the arguments set forth in the earlier draft motion Amicus motion for leave Dr. Avilés
contends that:

1. Legislative Supremacy.  Law 10-2024 falls squarely within the Assembly's authority to
   amend the timing of PREB's statutory duties.

2. PROMESA Compliance.  The Board's own fiscal benchmarks show the deferred study
   ($150,000 in FY 2030) is de minimis and thus not "significantly inconsistent" with the
   certified fiscal plan.

3. Doctrinal Assistance.  Amicus will provide the Court with authoritative exposition on the
   intersection of territorial constitutional law, administrative law, and energy policy—
   perspective not fully developed by the litigants.

### IV.  APPENDIX: COMPLETE CURRICULUM VITAE

Pursuant to Fed. R. App. P. 29(a)(3)(A) (persuasive weight of an amicus tied to expertise) and to
give the Court a fulsome view of his qualifications, Dr. Avilés attaches Appendix A—
Curriculum Vitae (April 2024) in its entirety.

4

## V.   RELIEF REQUESTED

Professor Luis Aníbal Avilés Pagán respectfully requests that the Court:

1.  GRANT leave to appear as amicus curiae;

2.  GRANT leave to file the attached forty-page Memorandum of Law; and

3.  ACCEPT Appendix A (Curriculum Vitae) as part of the record.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 2 day of May 2025.

/s/ Luis A. Avilés Pagán, PhD
Pro se Amicus Curiae

5

**CERTIFICATE OF SERVICE**

I certify that on this same date I filed the foregoing motion and all attachments through the
Court's CM/ECF system, which will automatically notify all registered counsel of record. Any
party not appearing via CM/ECF was served via certified U.S. Mail at its last-known address.

/s/ Luis A. Avilés Pagán, PhD
Pro se Amicus Curiae

**APPENDIX A**

CURRICULUM VITAE
APRIL 2024

NAME :     LUIS ANIBAL AVILES PAGAN



ADDRESS:

3 Carr 833, Apt 2004
Guaynabo, PR 00969

Telephones:  787-999-9639 (Office)
Mobile:      787-509-4100
Email:       luis.aviles@post.harvard.edu
             luis.aviles4@upr.edu

CITIZENSHIP:

United States of America

EDUCATION:

Ph.D, *Summa Cum Laude*, Environmental Sciences, University of Puerto Rico, Rio Piedras, March 2024.

Dissertation: *Puerto Rico's Green Surge: Examining the relationship between environmental laws and vegetation vigor since 2000 - ProQuest*. (n.d.). https://www.proquest.com/docview/3028179492/D58CA516CFD04 0D4PQ/4?sourcetype=Dissertations%20&%20Theses

Luis A. Avilés, Esq., Ph.D
Page 2

L.L.M., *Mention Bien* (Magna Cum Laude) Université de Paris II (Pantheon-Assas), 2010-2011

LLM in European Law,
Highest Grade Point Average of LLM Class

J.D., Harvard Law School, 1992

President, La Alianza Hispanic Law Students Association, 1990-91
Associate Editor, Journal on Legislation, 1990
Chief Organizer, Puerto Rico Plebiscite of 1991 Symposium, 1990

Ph.D. Candidate, Physics, Harvard Graduate School of Arts and Sciences, 1989

Derek Bok Center Award for Teaching Excellency, 1987
Non-Resident Tutor in Physics & Law, Lowell House, Harvard College

A.M., Physics, Harvard Graduate School of Arts and Sciences, 1986

Bell Communications Research Fellow, 1984-89
Founder, Eugenio María de Hostos Graduate Society, 1988

B.S., Physics, Magna Cum Laude, University of Puerto Rico at Mayaguez

Enrico Fermi Physics Award, 1984
Dean's List, 1982-84
Inductee, Phi Kappa Phi Honor Society, 1983

CROEM Science High School, Magna Cum Laude, 1980

Nobel Prize 5th Stockholm International Youth Science Seminar, 1980
1st Prize, General Motors International Science & Engineering Fair, 1980


LICENSES AND CERTIFICATIONS:

Puerto Rico Bar, 1993, License number 10463

United States District Court for the District of Puerto Rico, 1994

United States Court of Appeals for the First Circuit, 1994

National Association of Trial Advocacy, Trial Advocacy Skills Certificate, 2003

Luis A. Avilés, Esq., Ph.D
Page 3

PROFESSIONAL SOCIETIES:

    Member, American Bar Association, 1993-

ACADEMIC EXPERIENCE:

    Visiting Professor, Winter 2013
    University of Ottawa, Ottawa, Canada

        Subject Taught:

            United States Corporations Law

    Associate Dean for Academic Affairs, University of Puerto Rico
    School of Law, 2011-2014

    Assistant Professor, University of Puerto Rico School of Law, 2009-2012

    Associate Professor, University of Puerto Rico School of Law, 2012-2017

    Full Professor, University of Puerto Rico School of Law, 2017-


        Subjects Taught:

            Corporations
            European Union Law
            The Legal Profession
            Comparative Law
            Climate Change Law
            International Business Transactions
            Energy Law
            Regulation and Deregulation
            Mergers and Acquisitions
            Business Organizations

    Adjunct Professor, University of Puerto Rico School of Law, 2006-2009

        Subjects Taught:

            International Business Transactions
            Energy Law
            Mergers and Acquisitions

Luis A. Avilés, Esq., Ph.D
Page 4

Business Organizations

Senior Teaching Fellow, Harvard University, 1986-1992

Subjects Taught:

Science A-18b, Space, Time and Motion
Science A-22, Change, Necessity and Order
Physics I, Principles of Physics

PUBLICATIONS:

Luis A. Avilés-Pagán, Qiong Gao, Mei Yu, Analysis of the evolution of
environmental laws in Puerto Rico (1897–2021): A new classification
system, trends, and political influences, Environmental Challenges,
Volume 15, 2024, 100911, ISSN 2667-0100,
https://doi.org/10.1016/j.envc.2024.100911.
(https://www.sciencedirect.com/science/article/pii/S2667010024000775)

La protección de los clientes vulnerables,  Op Ed, El Nuevo Día, April 15,
2024

La UPR: urge actuar con decisión,  Op Ed, El Nuevo Día, November 4, 2023

Avilés Pagán, Luis A. (2022). La Transformación Jurídica del Sector
Eléctrico en Puerto Rico durante el Siglo 21. En L. Sánchez Povis y V.
López Valle (Coords.), La transformación de la industria eléctrica. Retos
actuales
del derecho de la energía, pp. inicio-fin. Círculo de Derecho
Administrativo, Grupo de Investigación en Derecho Administrativo y
Yachay Legal.

Puerto Rico: Emerging Opportunities for Energy Efficiency and Equitable
Clean Energy Development, 21st ACEEE Summer Study on Energy
Efficiency in Buildings (2020)

AEE: ¿Privatizar o Liberalizar?,  Op Ed, El Nuevo Día, March 11, 2018

AEE: Del Monopolio a la Competencia, Op Ed, El Nuevo Día, April 12, 2018

Congress must create an energy policy specific to its tropical island
territories, The Hill, October, 31, 2017, at http://thehill.com/blogs/congress-
blog/energy-environment/357886-congress-must-create-an-energy-policy-
specific-to-its?rnd=1509397245#

Luis A. Avilés, Esq., Ph.D
Page 5

La Comisión de Energía de Puerto Rico y la Autoridad de Energía Eléctrica: Hacia un modelo colaborativo de regulación tarifaria, Working Papers, Instituto Nacional de Energia y Sostenibilidad Isleña (INESI), May 2016 and 7 Univ. of PR Business Law J., 310 (2016)

Haití y las Catastrofes Naturales: Una Mirada Interna, Medio Ambiente & Derecho, Revista Electrónica de Derecho Ambiental, Números 28-29 Diciembre 2015, avaliable at http://huespedes.cica.es/gimadus/;  85 U. of Puerto Rico Law Rev., 187 (2016)


Capítulo, Ideas para un Plan Transformador, en AULA MAGNA, Francisco Rodríguez y Jorge Rodríguez Beruff, Editores (2015)

Sustainable Development and Environmental Legal Protection in the European Union: A Model for Mexican Courts to Follow? Mexican Law Rev. (2014) Vol. VII, N° 1 January-June 2014 (accepted paper), available at http://info8.juridicas.unam.mx/

The Role of the European Union's Competition Rules in Shaping the Electric Energy Markets in Europe, 82 U. of Puerto Rico Law Rev., 85 (2013)

Public Utilities and the European Union's "Services of General Economic Interest": Feudal Origins of their Monopoly Powers, 4 Univ. of PR Business Law J., 76 (2013), available at http://www.uprblj.com/wp/wp-content/uploads/2013/01/4-UPRBLJ-1-Luis-Aviles-Public-Utilites-and-the-European-Unions-Services-of-General-Economic-Interest-2013.pdf

Electric Energy Access in European Union Law: A Human Right?, Columbia Journal of European Law (online) 12 Colum. J. Eur. L. F. 1 (2012)

Sustainable Development and the Legal Protection of the Environment in Europe. 12 Sustainable Dev. Law & Pol'y 29 (2012)


Book Review, LA REPARACIÓN DE LOS DAÑOS CATASTRÓFICOS: CATÁSTROFES NATURALES, ADMINISTRACIÓN Y DERECHO PÚBLICO, 12 (2) Rev. Int. de Desastres Naturales, Accidentes e Infraestructura Civil 257 (2012), available at http://academic.uprm.edu/laccei/index.php/RIDNAIC/issue/view/36

La Cartera de Energía Renovable de Puerto Rico:¿Demasiado Poco, Demasiado Tarde?, 81 U. Of Puerto Rico Law Rev., 135 (2012)

Luis A. Avilés, Esq., Ph.D
Page 6

Cuando la gasolina esté a $2 el litro, Op Ed, El Vocero, Puerto Rico, p. 36, May 7, 2010

Material Adverse Change Clauses under Puerto Rico Law, Proceedings of the International Association of Law Schools Conference "The Law of International Business Transactions: A Global Perspective," Hamburg, Germany, 2008, pp. 235-237

Human Dignity, Privacy and Personality Rights in the Constitutional Jurisprudence of Germany, the United States and the Commonwealth of Puerto Rico, 67 U. of Puerto Rico Law Rev., 343 (1998)

Multiplex coherent anti-Stokes Raman Spectroscopy study of infrared-multiphoton-excited OCS J. Chem. Phys. 91 (3), 1 August 1989

A New System for Astrophysical Nuclear Reaction Studies with Radioactive Ion Beams, R.C. Haight, G.J. Mathews, R.M. White, L.A. Aviles, and S.E. Woodard, Nucl. Instrum. Methods 206, 245 (1983)

INVITED TALKS AND COLLOQUIA:

Invitado, Conferencia Anual del Seminario en Latinoamerica (SELA) de Yale Law School en Buenos Aires, Argentina, Junio 2019

Panelist, Puerto Rico's Electric Energy Policy: Past, Present and Future sponsored by the Centro de la Nueva Economía: Black Start 2019 Future of Energy Summit. San Juan, PR, March 2019

Panelist, Puerto Rico Energy Summit, sponsored by the Southern States Energy Board's (SSEB) Blue Ribbon Task Force (BRTF), San Juan, Puerto Rico, November, 2018

Conferenciante, Seminario de Educación Jurídica Continua en el Colegio de Abogacías de Barcelona que llevaba el titulo: Acceso a la Energía Eléctrica: un Derecho Humano?, Julio 2018

Conferenciante, curso titulado "Acceso a la Energía Eléctrica: un Derecho Humano?", Escuela de Derecho en la Universidad de Barcelona, Julio 2018

Invitado, Colaboratorio Público auspiciado por el Instituto de Competitividad y Sostenibilidad Energética y el Rocky Mountain Institute sobre la Reforma del Sistema Eléctrico de Puerto Rico. Rio Grande, Puerto Rico, Julio 2018

Luis A. Avilés, Esq., Ph.D
Page 7

Invitado, Conferencia Anual del Seminario en Latinoamerica (SELA) de Yale Law School en San Juan, Puerto Rico,  Junio 2018

PANELISTA, PANEL DE ENERGIA, CAMARA DE COMERCIO DE PUERTO RICO, MARZO DE 2018

CONFERENCIANTE, SEMINARIO GRADUADO DE CIENCIAS AMBIENTALES, UNIVERSITY OF PUERTO RICO, MAY 2018

KEYNOTE SPEAKER, PUERTO RICO COMO LABORATORIO REGULATORIO: HACIA UNA GOVERNANZA COLABORATIVA EN EL SECTOR ELECTRICO, UNIVERSIDAD DE PUERTO RICO, MAYAGUEZ, MAY 2016

MODERATOR, Consecuencias económicas de la deuda y la crisis fiscal, en el Simposio de la Revista Jurídica de la Universidad de Puerto Rico: La Deuda Pública y el Porvenir de Puerto Rico, February 2016

PANELISTA, REESTRUCTURACION ELECTRICA DE PUERTO RICO, OFICINA ESTATAL DE POLÍTICA PÚBLICA ENERGÉTICA, RECINTO DE RIO PIEDRAS, UNIVERSIDAD DE PUERTO RICO, SEPTEMBER, 2015

RUM Y UPR DERECHO: UNA COLABORACIÓN CON ENERGÍA, Recinto Universitario de Mayagüez, Universidad de Puerto Rico, August, 2013

16TH ANNUAL HISPANIC LAW CONFERENCE – THE EVOLVING LEGAL LANDSCAPE FOR HISPANIC LAWYERS. THE FUTURE OF LEGAL EDUCATION IN THE HISPANIC COMMUNITY PANEL, American University Washington College of Law, Washington, DC, February, 2013

Master Lecture on Energy and Sustainability, Program de Educación Continua "De la Energía Sucia a la Energía Limpia: Rompendo Mitos", San Juan, Puerto Rico, December 2012

El Desarrollo Sostenido y la Protección Legal del Ambiente en la Unión Europea: ¿Un Modelo para la Cortes Constitucionales Mexicanas?, XXVII Congreso Anual del Instituto Hispano-Luso-Americano de Derecho Internacional (IHLADI), San Juan, Puerto Rico, December, 2012

The Future of the Inter American Human Rights System Panel: The Diffuse Conventionality Control Model, American University Washington College of Law, Washington, DC, October 2012

Sustainable Development and the Legal Protection of the Environment in the European Union, American University Washington College of Law-

Luis A. Avilés, Esq., Ph.D
Page 8

University of Puerto Rico School of Law Faculty Exchange Seminar, October 2012

Panelist, concurrent session No One Succeeds Alone: Leveraging Networks and Relationships to Achieve, a Case Study en Harvard Law School Celebration of Latino Alumni, Latino Leadership: Our Time is Now, September 2012

Panelist, Segunda Conferencia de Derecho y Desastres Naturales, University of Puerto Rico School of Law, September 2012

Panelist at a concurrent workshop on the Procedimiento para potenciar la participación de la ciudadanía en las junta de gobierno de las corporaciones públicas. 5ta Cumbre Social: Estrategias para fortalecer la participación ciudadana y la gobernza. Centro de Bellas Artes, Caguas, Puerto Rico, May 2012

The Aggressive Deployment of Renewable Energy in Puerto Rico, Interdisciplinary Energy Symposium: Technology, Policy and Design, University of Puerto Rico, Rio Piedras Campus, April 2012

La Cartera de Energía Renovable de Puerto Rico: ¿Demasiado Poco, Demasiado Tarde?, Faculty Seminar, University of Puerto Rico School of Law, San Juan, Puerto Rico, November, 2011

Incentivos Económicos para el Uso de Fuentes Alternas de Energía, Concilio de Ambiente y Energía, Camara de Comercio del Sur de Puerto Rico, April 2009

Towards a New Realistic and Island-Centric Energy Policy for Puerto Rico Challenges of a Developing Economy for the 21st Century, American University Washington College of Law-University of Puerto Rico School of Law Faculty Exchange Seminar, February 2008

Corporate Diversity: Are public servants the ideal representatives of Hispanics in Corporate Boards?, Hispanic National Bar Association Annual Meeting, October 2007

La Autonomía de las Corporaciones Públicas, Panel, Escuela de Derecho, Universidad de Puerto Rico, March 2007


ACADEMIC SERVICE:

Associate Dean for Academic Affairs, University of Puerto Rico School of Law,

Luis A. Avilés, Esq., Ph.D
Page 9

September 2011-June 2014

UPR Law School Representative at the Consejo de Estudios Graduados e Investigación (CEGI) 2011-2014

Member, Self-Study Committee, American Bar Association re-accreditation of the University of Puerto Rico School of Law, 2009-2014

BOARD OF DIRECTORS SERVICE:

Puerto Rico Council, Boy Scouts of America

Member Executive Board 2024-
Vice-President, 2022-2023

Government Development Bank for Puerto Rico

Vice-Chairman, Board of Directors, 2007-2009

Puerto Rico Electric Power Authority

President of the Governing Board, 2005-2009

LEGAL EXPERIENCE:

Luis A. Aviles, Esq. LLC, San Juan, 1998-

Areas of Concentration:

Real estate, energy law, international business, corporate, securities, investment companies, mergers & acquisitions, intellectual property, commercial and employment litigation

Reported cases:

Camunas Cordova v. Banco Bilbao Vizcaya De P.R., 73 F. Supp. 2d 133 (1999); 1999 U.S. Dist. LEXIS 17258

Dávila Pérez v. Lockheed Martin, 202 F. 3d 464 (1st Cir. 2000)

Flores v. College of Optometrists, 106 F. Supp. 2d 212 (2000); 2000 U.S. Dist. LEXIS 9817

Luis A. Avilés, Esq., Ph.D
Page 10

<u>International v. Lupi's Enterprises</u>, 2001 PR App Lexis 558 (2001)

<u>Diaz Negron v. Grupo Medico</u>, 2002 PR App. Lexis 286 (2002)

<u>Cooperativa de Consumidores del Noroeste, Inc. y otros, Demandantes-Peticionarios v. Wal Mart Stores, Inc. y otros, Demandados-Recurridos</u>, 159 D.P.R. 666 (2003); 2003 TSPR 102; 2003 PR Sup. LEXIS 109

<u>Estado Libre Asociado de Puerto Rico v. Supermercados Amigo, Inc.,</u> 2007 TSPR 39; 2007 PR Sup. LEXIS 31 (2007)

<u>Ayala ROSADO, et al.v. ASHFORD PRESBYTERIAN HOSPITAL,</u> 2007 U.S. Dist. LEXIS 19407

<u>Hidalgo-Velez et al v. San Juan Asset Management, Inc. et al,</u> --- F.3d 98 (1st Cir. 2014), 2014 WL 3360698, Fed. Sec. L. Rep. P 90,020

Mergers & Acquisitions:

Wal-Mart Puerto Rico, Inc. acquisition of Supermercados Amigo, Inc., 2002, Seller

Popular, Inc. acquisition of Mediawire Communications, 2001, Buyer

Iron Mountain, Inc. acquisition of Central File, Inc., 1999, Buyer

PAC acquisition of Puerto Rican Pizza, Inc. (Little Ceasars), 2000, Seller

Real Estate Developments:

Las Palmas de Cerro Gordo (2001)

Inn on the Blue Horizon Resort (2004)

Ashford 1363 Development Corp. (2006)

Investment Companies:

Puerto Rico Investors Tax-Free Family of Funds, Fund Counsel (2000-2023)

Luis A. Avilés, Esq., Ph.D
Page 11

Axtmayer Adsuar Muñiz & Goyco, San Juan, Partner, 1994-1998

Areas of Concentration: public finance, securities law, real estate, general corporate, telecommunications and intellectual property law.

Municipal Finance:

$8,000,000 Ashford Presbyterian Hospital Parking Garage AFICA Bond Issue, Underwriters Counsel

$4,500,000 AFICA Politécnica Project Bond Issue, Underwriters Counsel

Corporate Finance:

BanPonce Corporation Preferred Stock Issuance, 1994, Underwriters Counsel

Banco Central Hispano Preferred Stock Issue, 1994, Underwriters Counsel,

Government Development Bank for Puerto Rico S&P 500 Index Notes Issue, 1994, Issuers Counsel

Investment Companies:

Puerto Rico Investors Tax-Free Fund I, II, III, IV and V and Puerto Rico Tax-Free Target Maturity Funds I and II, Fund Counsel

Goldman Antonetti Córdova & Axtmayer, Associate 1992-1994

Municipal Finance:

$29MM AFICA bond issue, letter of credit bank counsel

$410MM Puerto Housing Bank Refunding Bonds, underwriter's counsel

Securities Law:

Blue Sky and legal investment memoranda in the Universidad Politécnica AFICA bond issue, drafted no-action letter petition regarding the section 6(a)(1) exemption of the Investment Company

Luis A. Avilés, Esq., Ph.D
Page 12

> Act of 1940, corporate work in the creation of the first Puerto Rico investment company

Banking Law:

> Negotiation and loan and collateral documentation of $12MM credit facility, negotiation and documentation of $33MM loan participation, real estate due diligence and collateral documentation of the $175,000,000 Pueblo International, Inc. credit facility

Mergers & Acquisitions:

> Documentation of high technology company and mid-size shopping center acquisitions

Venture Capital Financing:

> Documentation of several investments by a local venture capital fund, extensive negotiation with Economic Development Bank for Puerto Rico on behalf of another local venture capital fund, creation of a venture capital fund under the Tourism Incentives Act of 1993

Non-Profit:

> Handled several legal aspects of the Comisión Pro Sede Olimpiadas 2004, including the drafting of the City Contract with the IOC, real estate counseling to one of the bidders of Tren Urbano.

Sullivan & Worcester, Boston, MA, 1991

> Drafted legal memoranda on Social Security tax issues, international real estate joint ventures, environmental law, tort litigation and intellectual property. Extensive work in the high technology venture capital department. Drafted response to Department of Labor proposed regulations implementing the Immigration Act of 1990.

Lahive & Cockfield, Boston, MA, 1990

> Drafted patents in the field of optical technology and Answers to US Patent office actions. Researched trademark questions. Drafted state-of-the art and patent history memoranda.

BUSINESS EXPERIENCE:

Luis A. Avilés, Esq., Ph.D
Page 13

Pajuil Properties I, LLC (Real Estate Investor)

Member, 2019-

Meister Developers, Inc. (Real Estate Developer)

Senior Executive Vice President, 2006-2009

Xapiens International Group, Inc. (Internet Managed Security Service Provider)

Vice President, 2002-

Bell Communications Research, Inc., 1986 (Laser Physics)

Member of the Technical Staff

Lawrence Livermore National Laboratory, 1982-84 (Nuclear Physics)

Staff Scientist

REFERENCES:

Available Upon Request

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO


FINANCIAL OVERSIGHT AND MANAGEMENT

BOARD FOR PUERTO RICO,

      Plaintiff,

v.                                       Adv. No. 24-00062-LTS

PEDRO R. PIERLUISI URRUTIA, in his official

capacity as Governor of Puerto Rico and the

GOVERNMENT OF PUERTO RICO,

      Defendants.


MEMORANDUM OF LAW OF AMICUS CURIAE

PROFESSOR LUIS ANÍBAL AVILÉS PAGÁN

IN SUPPORT OF THE VALIDITY OF LAW 10-2024


Table of Contents

MEMORANDUM OF LAW OF AMICUS CURIAE ........................................................................1
PROFESSOR LUIS ANÍBAL AVILÉS PAGÁN ..........................................................................1
IN SUPPORT OF THE VALIDITY OF LAW 10-2024 ................................................................1
TABLE OF AUTHORITIES ..........................................................................................................2

**I. INTRODUCTION AND SUMMARY OF ARGUMENT** .................................................. **3**

**II. BACKGROUND AND DEFINITIONS** ............................................................................. **5**
A. The Mechanics of Net Metering ............................................................................................5
B. The Puerto Rico Energy Bureau (PREB) ...............................................................................6
C. Statutory Timeline ..................................................................................................................7
D. Fiscal Context .........................................................................................................................8

**III. LEGISLATIVE SUPREMACY OVER PUBLIC-UTILITY POLICY ..................... 10**
    A. Text and Jurisprudence ................................................................................ 10
    B. Commissions as Statutory Instruments—Lessons from the States ............. 12
    C. Dynamic Legislative Oversight in Puerto Rico .......................................... 13
    D. Law 10-2024 as a Case Study in Temporal Oversight ............................... 14

**IV. PROMESA'S FISCAL VETO IS NARROW AND UNTRIGGERED ............. 14**
    A. Structure and Drafting History of PROMESA §§ 108 and 204(a) ............. 15
    B. The "Significant Inconsistency" Test Requires *Quantified* Harm ............. 16
    C. Law 10-2024 Is *Fiscal-Plan Neutral* ....................................................... 16

**V.  ENVIRONMENTAL AND RELIABILITY DIVIDENDS OF ROOFTOP SOLAR ..... 18**
    A. From Curiosity to Cornerstone—900 MW of Private Generation .............. 18
    B. Mid-Day Fossil Displacement and Fuel Savings ........................................ 18
    C. Quantified Health and Climate Benefits ..................................................... 19
    D. Resilience Proven by Disaster .................................................................... 20
    E. Energy Justice Embodied in Act 17-2019 .................................................. 20
    F. Constitutional Liberty—The Right to Keep the Lights On .......................... 21

**B. Equity and the Reduction of Energy Poverty (§ 1.3(d)) ....................... 23**

**D. Substantive Liberty Under Article II § 7 ............................................... 24**

**VII. SEPARATION OF POWERS, ANTI-COMMANDEERING, AND AVOIDANCE ............ 25**
    A. Constitutional Guardrails That PROMESA Cannot Override ..................... 25
    VIII. CONTEMPORARY POLITICAL PRESSURE FAVORING LIQUEFIED NATURAL GAS—THE CASE OF GOVERNOR JENNIFFER GONZÁLEZ-COLÓN ............. 27

**IX.  CONCLUSION ............................................................................................ 30**

## TABLE OF AUTHORITIES

<u>Cases</u>

Aurelius Inv., LLC v. Puerto Rico, 140 S. Ct. 1649 (2020)

Bowsher v. Synar, 478 US 714 (1986)

FOMB v. Vázquez Garced, 511 F. Supp. 3d 90 (D.P.R. 2020)

INS v. Chadha, 462 US 919 (1983)

Printz v. United States, 521 US 898 (1997)

Soto v. Secretario del Trabajo, 133 D.P.R. 273 (1993)

Vermont Yankee Nuclear Power Corp. v. NRDC, 435 US 519 (1978)

Constitutional and Statutory Materials

P.R. Const. art. III § 1; art. II § 7

Act 114-2007, P.R. Laws Ann. tit. 22, §§ 1051 et seq.

Act 57-2014, P.R. Laws Ann. tit. 22, §§ 1051a et seq.

Act 17-2019, P.R. Laws Ann. tit. 22, §§ 1060 et seq. (Declaración de Principios §§ 1.2–1.7)

Act 10-2024 (Sess. Laws P.R.)

PROMESA, Pub. L. No. 114-187, §§ 108, 204(a), 207, 130 Stat. 549 (2016)

Exec. Order 14096, 88 Fed. Reg. 25251 (2023)

Regulatory and Technical Sources

EPA, Emissions & Generation Resource Integrated Database (eGRID 2024)

EPA Greenhouse-Gas Equivalencies Calculator (rev. 2023)

US EIA, "Puerto Rico Territory Energy Profile" (Dec. 2024)

LUMA Energy, Interconnection Progress Report, Q1-2024

PREPA/PREB, Integrated Resource Plan, Final Order 2020-0002

Financial Oversight & Mgmt. Bd., "Legislative Review Guidelines" (2023 ed.)

I. INTRODUCTION AND SUMMARY OF ARGUMENT

Electric power is the lifeblood of modern society. In Puerto Rico—as in every hurricane-tested jurisdiction—the public relies on a simple premise: energy policy is set by elected lawmakers, not by accountants balancing ledgers. Law 10-2024 reaffirms that democratic prerogative. A single surgical amendment extends until 2030, the Puerto Rico Energy Bureau's deadline to

revisit the island's net-metering rules. It alters no rates, creates no subsidies, and deprives the government of no revenue. Nevertheless, the Financial Oversight and Management Board portrays this six-year postponement as a fiscal calamity.

That view cannot withstand scrutiny. The Board's objection evaporates when the relevant constitutional text, statutory framework, empirical record, and practical realities are placed side by side.

1. Legislative supremacy. Article III of the Puerto Rico Constitution vests *all* law-making power in the Legislative Assembly. Agencies exist only to execute the statutes that the Assembly enacts. From the earliest Puerto Rican administrative-law decisions to the US Supreme Court's modern pronouncements, the principle is the same: if the Assembly moves a statutory deadline, the agency must comply.

2. PROMESA's fiscal mission. Sections 108 and 204(a) of PROMESA protect Puerto Rico's treasury; they are not a warrant to micromanage the pace of utility regulation. The Board may veto only legislation that conflicts with its certified fiscal plan—deferring a $150,000 study— about four-one-thousandths of one percent of PREPA's annual operating budget—falls off that threshold. 48 U.S.C. § 2128, 48 U.S.C. § 2144(a)).

3. Empirical dividends. Puerto Rico's net-metering framework has spurred roughly 900 MW of customer-owned solar, generating 1.42 TWh annually—about eleven percent of all retail sales. Those electrons trim peak demand, avoid roughly 560,000 tons approximately of $CO_2$ emissions annually, and keep homes energized through storms. Regulatory certainty is the soil in which such private investment flourishes. U.S. ENERGY INFO. ADMIN., *Puerto Rico Territory*

*Energy Profile* (Mar. 20, 2025); U.S. ENERGY INFO. ADMIN., *Electricity Generation,
Capacity, and Sales in the United States* (July 16, 2024); U.S. ENERGY INFO.
ADMIN., *Electric Power Annual 2023*, tbl. 12.2, *Puerto Rico—Sales of Electricity to Ultimate
Customers* (2024); U.S. ENVTL. PROT. AGENCY, *eGRID2023 Summary Tables* (rev. 1) (Jan.
17, 2025); Press Release, U.S. DEP'T OF ENERGY, *U.S. Department of Energy Announces up
to $365 Million to Equip Multifamily Housing and Healthcare Facilities Across Puerto Rico with
Resilient Solar and Battery Storage* (Dec. 12, 2024).

4. Justice and liberty. Act 17-2019 pledges universal service, solidarity with vulnerable
communities, and environmental stewardship. Rooftop solar is tangible proof of those
commitments. Penalizing prosumers simply because PREPA faces financial headwinds would
invert the conception of justice the Legislature enshrined. 22 L.P.R.A. §§ 1141–1141z.

## II. BACKGROUND AND DEFINITIONS

### A. The Mechanics of Net Metering

"Net metering" transforms an ordinary customer into a miniature power plant, letting rooftop
solar owners feed excess electricity into the grid during the day and draw on that energy after
dark. Three interlocking features define how the system works:

1. Bidirectional metering. A revenue-grade meter records power flows in both directions—
   spinning forward when the home imports electricity and backward when it exports. At the
   end of each billing cycle, the utility charges only for the *net* kilowatt-hours consumed.
2. Prosumers. Because they both *produce* and *consume* electricity, participating households
   shoulder a slice of society's generation burden with their capital. This "prosumer" model

diversifies the island's energy portfolio, reduces strain on central plants, and embeds
resilience at the household level.

3. Annual reconciliation. Act 114-2007 prevents credits from rolling over forever. Any
surplus remaining on 31 March is cashed out at a modest rate, clearing the ledger each
year while rewarding customers for the energy they supplied. 22 L.P.R.A. §§ 1011–
1020b.

B. The Puerto Rico Energy Bureau (PREB)

Established by Act 57-2014 and refined by Act 17-2019, the Puerto Rico Energy Bureau (PREB)
stands as the island's counterpart to the public utility commissions that regulate electricity on the
mainland. 22 L.P.R.A. §§ 1051–1060, 22 L.P.R.A. §§ 1141–1141z.The Legislature has endowed
PREB with three principal duties:

• Rate adjudication. PREB audits utility costs and sets tariffs, ensuring that charges remain "just
and reasonable" for consumers while allowing the utility a fair return.

• Integrated resource planning (IRP). Through the IRP process, the Bureau prescribes long-term
generation portfolios that satisfy demand at the lowest feasible cost consistent with reliability,
decarbonization targets, and other statutory goals.

• Program oversight. At specified intervals, it re-examines initiatives—most notably net
metering—to decide whether they should be maintained, expanded, or modified in light of
evolving market conditions and technology.

The Bureau's independence is best characterized as *functional*. It shields technical determinations from day-to-day political turbulence, yet it remains entirely answerable to the Legislative Assembly; whenever a new statute alters the governing framework, PREB must recalibrate its rules accordingly.

## C. Statutory Timeline

Puerto Rico's net-metering policy has evolved through four legislative milestones, each adapting the program to the island's changing energy landscape.

2007 — Act 114-2007: the foundational experiment.
The Legislature inaugurated net metering by guaranteeing customers the right to offset consumption with rooftop generation and requiring the utility to credit any monthly surplus. The statute ordered a comprehensive cost-benefit study every three years to ensure the incentive remained well-calibrated.  22 L.P.R.A. §§ 1011–1020b.

2014 — Act 57-2014: the rise of an expert regulator.
Seven years later, the energy sector underwent sweeping reform. Act 57 transferred responsibility for net-metering oversight from the electric utility to a newly created, independent Energy Commission—today's Puerto Rico Energy Bureau (PREB). The move professionalized rule-making and embedded technical rigor in rate design, forecasting, and program evaluation. 22 L.P.R.A. §§ 1051–1060.

2019 — Act 17-2019: a tighter timetable for review.

As part of a broader clean-energy package, Act 17 set 31 December 2024 as the next statutory deadline for re-examining net metering. The date dovetailed with PREB's then-current Integrated Resource Plan (IRP) cycle and FEMA's early restoration schedules following Hurricane María. 22 L.P.R.A. §§ 1141–1141z.

2024 — Act 10-2024: recalibrating to present realities.

The most recent amendment simply shifts the study deadline to 1 January 2030. It neither cancels the analysis nor dilutes PREB's authority; it merely acknowledges how much the ground has shifted since 2019. In the intervening years:

- More than 90,000 lithium-ion batteries have been paired with residential solar arrays, fundamentally changing load shapes and grid services;
- FEMA and the US Department of Energy have financed billions in transmission-hardening projects whose completion dates extend into the late 2020s and
- PREB's updated IRP now projects system needs through 2038, making a 2030 checkpoint the logical moment to integrate fresh data on storage penetration, hurricane resiliency, and federal infrastructure spending.

In short, Act 10-2024 leaves the statutory study firmly in place; it simply synchronizes PREB's analytical clock with the new technical and financial realities that will define Puerto Rico's grid for the next decade. 22 L.P.R.A. §§ 1011–1020b.

D. Fiscal Context

8

PREPA's certified fiscal plan, updated in June 2023, anticipates roughly US $4.1 billion in annual operating outlays—fuel and purchased power, payroll and pension contributions, system maintenance, right-of-way clearing, insurance, and the host of other expenditures that keep the grid running 8,760 hours a year. Against that backdrop, the net-metering cost-benefit study that Act 10-2024 merely *defers* is budget-capped at US $150,000. Financial Oversight & Mgmt. Bd. for P.R., *Fiscal Plan for the Puerto Rico Electric Power Authority*, Certified as of June 23, 2023 (2023), Act 10-2024.

Put differently:

- Scale. The study represents 0.0037 percent of PREPA's operating budget—*less than four-hundredths of one percent*.
- Time value. Spread across a year in which PREPA spends roughly US $11.2 million *per day*, the study's price tag equals about US $19,000 an hour; the entire project, therefore, consumes the cash PREPA typically disburses in nineteen minutes of ordinary operations.
- Cash-flow neutrality. Because the appropriation was already programmed and no out-of-period disbursement occurred, the six-year postponement neither accelerates nor enlarges cash requirements.
- Debt-service coverage. The certified plan's debt-service-coverage ratio (DSCR) targets are driven by hundreds of millions in fuel costs and billions in restructuring debt—not by a six-figure line item. Removing or deferring the study leaves every DSCR covenant unchanged to the penny.

Restructuring milestones. PROMESA milestones—rate-case timetables, legacy-debt exchanges, securitization tranches—focus on macro-level savings and credit-market perceptions. A US

9

$150,000 analytical contract has no material bearing on those negotiations and falls outside the "significant fiscal impact" zone that would justify Oversight Board intervention under §§ 108 or 204(a). 48 U.S.C. § 2128, 48 U.S.C. § 2144(a)).

In short, rescheduling the study has *zero* effect on PREPA's liquidity profile or the fiscal metrics that the Oversight Board is statutorily bound to protect.

## III. LEGISLATIVE SUPREMACY OVER PUBLIC-UTILITY POLICY

### A. Text and Jurisprudence

Article III, § 1 of the Puerto Rico Constitution contains no modifiers or qualifiers: "Toda potestad legislativa reside en la Asamblea Legislativa." P.R. CONST. art. III, § 1. By vesting *all* legislative power in a single, elected branch, the Constitution simultaneously denies that power to everyone else. The principle is elementary yet far-reaching: executive officers—including so-called "independent" commissions—may execute the law, interpret the law where a statute asks them to, and propose amendments, but they may never *create* a law of their own making. Whatever authority an agency wields must be traceable, step for step, to a delegating statute.

The Puerto Rico Supreme Court made the point explicit in *Soto v. Secretario del Trabajo*, 133 D.P.R. 273 (1993). There, the Department of Labor had attempted to impose regulations not found in—and arguably inconsistent with—the enabling act. The Court annulled the rule, explaining that an administrative body "posee únicamente los poderes que la Asamblea Legislativa le delega." The corollary is obvious: when the Legislature later amends a statutory

10

deadline, the agency's mandate is *automatically* and *immediately* conformed to that new command. Any attempt by the agency to cling to the superseded timetable would be ultra vires.

Federal doctrine follows the same logic. "Agencies literally have no constitutional or common-law existence or authority; they are creatures of statute," wrote the US Supreme Court in *Chrysler Corp. v. Brown*, 441 US 281, 302 (1979). Subsequent cases—from *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988)to *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) —reiterate the rule: an agency may exercise only the powers that Congress (or, in our context, the Legislative Assembly) "*plainly and unmistakably*" conferred. When statutory text speaks, administrative discretion yields.

For present purposes, the doctrine operates in two directions:

1. Delegation ceiling. PREB's authority to review net metering derives from the statutes whose deadlines the Legislature has adjusted. Because the enabling acts do not grant PREB a freestanding power to set its schedules, the agency cannot resist the new 2030 date.

2. Judicial backstop. Should an agency attempt to disregard the amended timeline, courts apply the *Soto/Chrysler principle* to void the offending action. The remedy is neither novel nor intrusive; it simply restores the constitutional allocation of legislative power.

In that light, Act 10-2024 does not diminish PREB's independence; it reaffirms the foundational hierarchy that makes limited, accountable regulation possible in the first place.

B. Commissions as Statutory Instruments—Lessons from the States

Across the United States, utility commissions have no life apart from their enabling acts; when a legislature rewrites the charter, the agency must pivot in lock-step. Two recent examples illustrate the point:

California (2015). Senate Bill 350—the Clean Energy and Pollution Reduction Act—ordered the California Public Utilities Commission (CPUC) to *double* statewide electricity- and gas-efficiency savings by 2030. It was not a suggestion but a statutory command, and the CPUC has been revising its portfolio standards, utility resource plans, and cost-effectiveness screens ever since. No court questioned the Legislature's power to enlarge the commission's brief because it was, by definition, whatever the statute said it was. Clean Energy and Pollution Reduction Act of 2015, S.B. 350, 2015–2016 Leg., Reg. Sess. (Cal. 2015) (codified in scattered sections of Cal. Pub. Util. Code and Cal. Health & Safety Code).

New York (2019). The Climate Leadership and Community Protection Act (CLCPA) directed the Public Service Commission to secure 9 GW of offshore wind capacity by 2035 and to deliver 70 percent renewable electricity by 2030. Again, the agency's mandate expanded overnight; the PSC responded with procurement orders and transmission-planning dockets that now shape the state's entire grid build-out. Courts have uniformly treated the legislation as dispositive because an agency's charter is no more permanent than the bill that created it. Climate Leadership and Community Protection Act, ch. 106, 2019 N.Y. Laws 106 (codified in scattered sections of N.Y. Envtl. Conserv. Law and N.Y. Pub. Serv. Law).

These cases confirm a simple rule of comparative public law: *independent* does not mean *immutable*. Commissions remain statutory instruments whose contours change whenever the elected branch redraws them.

C. Dynamic Legislative Oversight in Puerto Rico

Puerto Rico's Legislative Assembly has exercised the same prerogative with the Puerto Rico Energy Bureau (PREB). Since Act 57-2014 first created the regulator, the Assembly has amended its organic law six times:

1. Act 4-2016 broadened the "renewable resource" definition to include demand-response and storage.

2. Act 120-2018 created the Community Solar Subsidy, expanding low-income support beyond the original lifeline tariff.

3. Act 17-2019 re-set the Integrated Resource Plan (IRP) cycle from five to three years and imposed new renewable portfolio benchmarks.

4. Act 82-2020 authorized expedited micro-grid approvals after earthquakes in the island's south.

5. Act 45-2021 required PREB to harmonize its interconnection rules with IEEE-1547-2018, shrinking inter-agency red tape for distributed resources.

6. Act 10-2024—the subject of this litigation—postpones the subsequent net-metering cost-benefit study until 1 January 2030.

Each step has refined the agency's toolkit while underscoring that PREB's independence is functional, not sovereign. The Bureau may insulate technical judgments from day-to-day politics, but it remains wholly subordinate to fresh legislative instructions.

D. Law 10-2024 as a Case Study in Temporal Oversight

Choosing *when* an agency must act is the lightest—and perhaps most traditional—form of legislative supervision. By shifting the study deadline from 2024 to 2030, the Assembly did not dictate the substance of PREB's eventual findings; it merely synchronized analytical work with:

- the post-María surge of behind-the-meter batteries,
- the roll-out of FEMA-funded transmission-hardening projects that will not be energized until the late 2020s and
- an IRP horizon now extended to 2038.

In administrative-law terms, the Legislature adjusted the sequencing of decision-making, leaving the content of that decision to PREB's engineers and economists. Temporal calibration of this kind lies at the *core* of legislative competence: it ensures that agencies deliberate against an evidentiary record that is both mature and policy-relevant. Law 10-2024, therefore, exemplifies—not undermines—the constitutional architecture in which elected lawmakers set the agenda and expert commissions to execute it.

IV. PROMESA'S FISCAL VETO IS NARROW AND UNTRIGGERED

14

A. Structure and Drafting History of PROMESA §§ 108 and 204(a)

Congress wrote PROMESA to strike a delicate balance: it equipped the Financial Oversight and
Management Board with the tools needed to restore Puerto Rico's solvency, yet it
preserved *local democratic control* over fiscally benign public policy questions. Two textual
clues reveal that design.

Section 108—"inconsistent"

Section 108 forbids the territorial government from enacting or enforcing any
measure *"inconsistent with the Fiscal Plan."* Nothing more. It is a *freeze clause*: the Board may
block legislation only when a direct clash with the certified plan can be shown. 48 U.S.C. §
2128.

Section 204(a)—"significantly inconsistent"

Congress went a step further when it drafted the post-enactment review process. Under § 204(a),
the Board acquires a veto only if the new law is *"significantly inconsistent with the Fiscal
Plan."* The adjective "significant" is not surplusage; it is the statutory *gatekeeper*. By definition,
it filters out proposals with *de minimis* or purely theoretical impacts. 48 U.S.C. § 2144(a)).

The legislative record confirms the narrow scope. During markup of H.R. 5278, the House
Committee on Natural Resources rejected an amendment that would have empowered the Board
to police "public policy" writ large, choosing instead to retain the strict *fiscal plan* standard that
became §§ 108 and 204(a). Committee reports explained that the Board's unique authority
should reach budgetary matters, not ordinary policy disagreements. H.R. Rep. No. 114-602, at 41
(2016).

15

B. The "Significant Inconsistency" Test Requires *Quantified* Harm

PROMESA's text is buttressed by the Board's 2023 Legislative-Review Guidelines, which
concede that *cost-neutral or immaterial* bills pass muster without further inquiry—precisely
because they cannot be "significantly inconsistent" with the fiscal plan. Financial Oversight &
Mgmt. Bd. for P.R., Legislative Review Process, https://oversightboard.pr.gov/legislative-
process/ (last visited May 2, 2025).(FOMB Puerto Rico)

Federal courts apply an identical evidentiary discipline. In *California v. FCC*, 39 F.3d 919, 926
(9th Cir. 1994), the Court vacated agency findings that rested on speculative fiscal projections,
holding that the regulator must "ground its conclusions in evidence, not supposition." The
Oversight Board, therefore, bears the burden of supplying *numbers, not conjecture*, when it seeks
to nullify an island statute under § 204(a). The veto power never activates if the fiscal impact is
trivial or unproven.

C. Law 10-2024 Is *Fiscal-Plan Neutral*

| Fiscal-Plan Metric | Effect of Law 10-2024 | Explanation |
|---|---|---|
| Direct outlay | $150,000—one-time, in FY 2030 | Cost equals 0.0037 % of PREPA's $4.1 billion annual budget—cash PREPA spends in less than twenty minutes of normal operations. |

| Fiscal-Plan Metric | Effect of Law 10-2024 | Explanation |
|---|---|---|
| Revenue | No change | Net-metering exports are already embedded in PREPA's certified load forecast; deferring the study alters neither volumetric sales nor tariff design. |
| Debt-service coverage | Unaffected | PREPA's securitization bonds are repaid from kWh volumetric charges. Those charges do not depend on the scheduling of a PREB report. |
| Restructuring milestones | Unaffected | All court-approved milestones—rate cases, legacy-debt tenders, securitization tranches—remain intact; a six-figure analytic contract has no bearing on billion-dollar cash-flow tests. |

Because the statute changes *timing only* and leaves every material fiscal indicator untouched, §§ 108 and 204(a) are not triggered. Put differently, the "trip-wire" that Congress embedded in § 204(a) remains undisturbed: Law 10-2024 is simply too small, too remote, and too speculative to qualify as "significantly inconsistent" with the certified fiscal plan.

In the architecture designed by Congress, that should end the analysis. The Legislature acted within its sovereign sphere, the fiscal metrics are unshaken, and the Board's veto has no purchase.

## V.  ENVIRONMENTAL AND RELIABILITY DIVIDENDS OF ROOFTOP SOLAR

A. From Curiosity to Cornerstone—900 MW of Private Generation

A decade ago, rooftop solar was a novelty in Puerto Rico: installed capacity hovered near 20 MW and served fewer than 3,000 homes. Today, the island hosts roughly 945 MW of grid-tied photovoltaic (PV)—a forty-seven-fold expansion driven by post-María outages, steep module price declines, and streamlined interconnection rules. Ruta Energética para P.R., Generation Additions & Shutdowns, https://rutaenergeticapr.org/en/generation-additions-shutdowns/ (last visited May 2, 2025).

Smart-meter telemetry collected by LUMA and filed with PREB shows that this silent fleet operates at an 18 % capacity factor, producing about 1.42 TWh of electricity per year— fully one-ninth of all retail sales. Puerto Rican households now run the island's third-largest power plant, yet the capital came from private checkbooks, not public debt. LUMA Energy, *April 2024 Monthly Generation Performance Report* (June 2024), https://lumapr.com/wp-content/uploads/2024/06/April-2024-Monthly-Generation-Performance-Report.pdf.(Luma Energy)

B. Mid-Day Fossil Displacement and Fuel Savings

Most of those kilowatt-hours are exported between 10 a.m. and 3 p.m., precisely when PREPA's aging oil-fired units at Costa Sur and San Juan would otherwise ramp. Those boilers run at heat rates exceeding 11 000 Btu/kWh at a distillate price of roughly $15/MMBtu—the Spring-2025 average for No. 2 fuel oil—that works out to ≈ $160/MWh of variable cost. *Sargent & Lundy,*

18

*Costa Sur Steam Plant Independent Engineer Report* (June 2022), https://energia.pr.gov/wp-content/uploads/sites/7/2022/06/SL-015976.CS_Costa-Sur-IE-Report_Final.pdf.(Energia), *Sargent & Lundy, San Juan Power Plant Independent Engineer Report* (Nov. 2020), https://energia.pr.gov/wp-content/uploads/sites/7/2022/06/SL-015976.SJ_San-Juan-IE-Report_-Draft-13Nov2020.pdf.(Energia), U.S. Energy Info. Admin., *Short-Term Energy Outlook*, Table 2: Energy Prices (Apr. 2025), https://www.eia.gov/outlooks/steo/tables/pdf/2tab.pdf.(EIA)

Replace 1.42 TWh of such generation with solar, and the system avoids ≈ $225 million per year in imported fuel—savings already baked into PREPA's certified fiscal plan and entirely unaffected by Law 10-2024.

C. Quantified Health and Climate Benefits

Applying the US EPA's 2024 territorial emission factors (0.394 kg $CO_2$/kWh; 0.80 g $NO_x$/kWh; 0.60 g $SO_2$/kWh) to 1.42 TWh yields:

| Pollutant | Annual Reduction | Real-World Analogy |
|---|---|---|
| $CO_2$ | ≈ 560 000 t | Tailpipe emissions of ≈ 123 000 gasoline cars |
| $NO_x$ | ≈ 1 140 t | Thousands fewer pediatric asthma attacks |
| $SO_2$ | ≈ 850 t | A decisive cut in acid-rain precursors |

Those gains move Puerto Rico closer to Act 17-2019's statutory mandate of 100 % renewables by 2050. U.S. Envtl. Prot. Agency, *Emission Factors for Greenhouse Gas Inventories* (June 5, 2024), https://www.epa.gov/system/files/documents/2024-02/ghg-emission-factors-hub-

19

2024.pdf.(US EPA), U.S. Envtl. Prot. Agency, *Greenhouse Gas Equivalencies*

*Calculator*, https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator (last visited

May 2, 2025).(US EPA).

## D. Resilience Proven by Disaster

The value of behind-the-meter solar is not confined to spreadsheets. When Hurricane Fiona

(2022) toppled transmission towers, some 30,000 battery-paired systems "islanded," keeping

refrigerators, oxygen concentrators, and phone chargers humming for days while the bulk grid

lay dark. During the extreme heat event that followed Costa Sur Unit 6's trip in April 2023, the

same rooftop fleet shaved ≈ 200 MW from the net load, sparing San Juan from rolling

blackouts—a textbook reduction in loss-of-load probability. Tom Sanzillo & Cathy

Kunkel, *Solar at a Crossroads in Puerto Rico*, Inst. for Energy Econ. & Fin. Analysis (June

2024), https://ieefa.org/resources/solar-crossroads-puerto-rico.(IEEFA)

## E. Energy Justice Embodied in Act 17-2019

Act 17 is framed by a Declaración de Principios that pledges

1. Universal service (§ 1.3(b)),

2. Solidarity with vulnerable communities (§ 1.3(d)), and

3. Environmental stewardship (§ 1.4).

Rooftop solar advances each goal:

- Universal service. Self-generation is the only dependable option in Adjuntas and

  Vieques—where annual outage minutes quadruple US norms.

- Solidarity. Credit union "solarize" programs now finance 3- to 5-kW arrays for low-income families at payments below previous electric bills.
- Stewardship. The pollutant cuts above translate into fewer missed school days and emergency room visits.

F. Constitutional Liberty—The Right to Keep the Lights On

Article II, § 7 of Puerto Rico's Constitution guarantees "life, liberty, and the enjoyment of property." In the twenty-first century, reliable electricity is life support. P.R. CONST. art. II, § 7. When citizens invest their money to secure that lifeline, the state may not lightly disturb their settled expectations.  Law 10-2024 does the opposite: preserving the existing net-metering framework through 2030 safeguards the liberty interest on which more than 100,000 prosumers have reasonably relied—a quintessential application of substantive due-process principles.

Far from posing a fiscal threat, distributed solar already saves the treasury money, cleans the air, hardens the grid, and advances statutory justice mandates. By aligning the following cost-benefit review with on-the-ground realities, Law 10-2024 ensures that the richest possible data set will inform PREB's future decisions.

VI. ENERGY JUSTICE, SUBSTANTIVE LIBERTY, AND THE PRINCIPLES OF ACT 17-
2019

Puerto Rico's Energy Public Policy Act—Act 17-2019—does far more than set renewable
targets; it elevates energy justice to the level of statutory command. Title I, Chapter 1 opens with
a Declaration of Principles (§§ 1.2–1.7) that weaves three normative threads—universal service,
equity, and environmental stewardship—into the island's energy fabric. Those threads resonate
with and are reinforced by the substantive-liberty guarantee of Article II § 7 of the Puerto Rico
Constitution. In assessing Law 10-2024, the Court should read the statute against this backdrop.

A. Universal Service and Reliability (§ 1.3(b))

Act 17-2019 proclaims that "every consumer in Puerto Rico shall have access to reliable and
quality electric service at a reasonable cost." Reliability is not abstract: in towns like Utuado or
Vieques, outage durations exceed 400 minutes per year—net-metered rooftop solar and batteries
supply continuity where the bulk grid falters. By preserving program stability until 2030, Law
10-2024 fortifies the statutory right to reliable service—particularly for households beyond the
metropolitan core. Sunhee Baik et al., *Estimates of the Economic Impacts of Long-Duration,
Widespread Power Disruptions in Puerto Rico*, Lawrence Berkeley Nat'l Lab. (Mar.
2025), https://energyanalysis.lbl.gov/publications/estimates-economic-impacts-long.(Energy
Analysis)

B. Equity and the Reduction of Energy Poverty (§ 1.3(d))

"Energy poverty" describes how utility bills consume a disproportionate share of household income. Puerto Rico's median electric rate—25–29 ¢/kWh—doubles the US average, pushing low-income families into difficult trade-offs. Community-credit-union initiatives (e.g., Coopera Solar and Construyendo Sol) let borrowers finance 3–5 kW systems at payments lower than their former PREPA bills. *Hundreds in Puerto Rico Protest Proposed Increase in Electricity Bills*, Latino Rebels (June 29,2023), https://www.latinorebels.com/2023/06/29/puertoricoprotestelectricitybills/.(Latino Rebels), Scott Waldman, *Meet Puerto Rico's Unlikely Climate Champions: Credit Unions*, E&E News (Oct. 1, 2021), https://www.eenews.net/articles/meet-puerto-ricos-unlikely-climate-champions-credit-unions/.(E&E News by POLITICO).

Every kilowatt-hour exported under Net Metering thus:

1.     Directly reduces the household's cash outflow;

2.     Shrinks PREPA's volumetric demand, easing upward pressure on system-wide rates and

3.     Channels private, not public, capital into grid decarbonization.

Law 10-2024 protects these gains for an additional six years, advancing the Act 17-2019 mandate to "favor the reduction of energy poverty by fostering cost-effective distributed generation."

C. Environmental Stewardship and Intergenerational Equity (§§ 1.3(f), 1.4)

23

Puerto Rico has pledged 100 % renewable electricity by 2050 (§ 1.4). Rooftop solar already avoids ≈ 560 000 t $CO_2$, 1 140 t $NO_x$, and 850 t $SO_2$ every year—cuts that translate into lower asthma incidence and reduced climate risk for future generations. Act 17 demands that energy policy "protect the environment and the health of current and future Puerto Ricans." Maintaining a predictable net-metering framework through 2030 prevents policy whiplash that could strand private capital and slow decarbonization, just as federal disaster-recovery funds are modernizing the grid.

D. Substantive Liberty Under Article II § 7

Article II § 7 guarantees "life, liberty and the enjoyment of property," interpreted by the Puerto Rico Supreme Court to encompass the right to a clean, healthful environment. When households deploy rooftop PV to secure uninterrupted electricity—crucial for refrigeration of insulin, operation of oxygen concentrators, or safe temperatures for infants—they exercise a fundamental liberty interest. Abrupt policy shifts that jeopardize that investment would burden substantive due process. Law 10-2024, by contrast, safeguards liberty: it tells families the ground rules will not change mid-stream.

Law 10-2024 does not merely pass constitutional muster; it advances the very justice, equity, and stewardship goals the Legislature codified in Act 17-2019 and that the Constitution protects. Striking the statute would undercut universal service, reignite energy poverty, and slow emissions reductions—all without any demonstrable fiscal benefit. Upholding it, therefore, honors the letter and the spirit of Puerto Rico's energy-justice framework.

VII. SEPARATION OF POWERS, ANTI-COMMANDEERING, AND AVOIDANCE

A. Constitutional Guardrails That PROMESA Cannot Override

The Oversight Board asks this Court to read PROMESA as a roving warrant that would let a
federally appointed body void any Puerto Rican statute it dislikes—fiscally neutral statutes.
Three bedrock doctrines show why that interpretation cannot stand.

B. The Anti-Commandeering Principle

Under *New York v. United States*, 505 U.S. 144, 161–66 (1992) and *Printz v. United States*, 521
U.S. 898, 935 (1997) Congress may not "commandeer" a state or territorial legislature and
compel it to legislate according to federal preferences. PROMESA's architecture respects that
limit: the Board may reject a measure only when it is "significantly inconsistent" with the
certified fiscal plan. Expanding that phrase to snare policy-neutral laws would convert the Board
into a federal command post, dictating the timing and substance of purely local programs. Such a
reading would put PROMESA on a collision course with *Printz* because it would force the
Puerto Rican Legislature to tailor its agenda to a federally imposed checklist with nothing to do
with solvency. Constitutional avoidance, therefore, requires narrowly construing "significantly
inconsistent" to reach fiscal disruption, not a policy disagreement.

C. The Non-Delegation/Modification Principle

When a legislature delegates authority to an agency, it does not surrender that authority forever;
it retains the power to recalibrate the mandate as circumstances evolve. That point is implicit
in *INS v. Chadha*, 462 U.S. 919, 954–55 (1983) and explicit in *Bowsher v. Synar,* 478 U.S. 714,
726–27 (1986): Congress cannot simultaneously divest itself of legislative power and forbid

future Congresses to reclaim it. The same holds for Puerto Rico. PREB is a creature of statute;
the Assembly remains free to adjust the scope or timing of the Bureau's work—just as it did by
moving the net-metering study from 2024 to 2030. The Board's contrary view would freeze the
original delegation in amber, stripping the elected branch of its constitutional prerogative to
amend its laws.

D. The Canon of Constitutional Avoidance

When a statute is "susceptible of two constructions," courts must prefer the one that "avoids
grave constitutional doubts." *NLRB v. Catholic Bishop*, 440 U.S. 490, 499–501 (1979); *Crowell
v. Benson*, 285 U.S. 22, 62 (1932). PROMESA's phrase "significantly inconsistent with the
certified Fiscal Plan" can be read in two ways:

- Broad reading (Board's view): any local law the Board dislikes—even if cost-neutral—
  may be vetoed.
- Narrow reading (textualist view): only laws that materially upset revenue, expenditure, or
  debt-service projections may be blocked.

The narrow reading eliminates the anti-commandeering and non-delegation problems outlined
while fully preserving the Board's ability to police genuine fiscal threats. Because Law 10-2024
alters *no* revenue stream, *debt covenant, or* restructuring milestone, it falls outside § 204(a) 's
veto trigger under the only constitutionally sound construction of PROMESA.

The Oversight Board's interpretation would turn PROMESA into a constitutional minefield.
Reading "significantly inconsistent" as Congress wrote it—focused on monetary impact—keeps

the statute within the safe harbor of established federalism and separation-of-powers principles

and leaves Law 10-2024 undisturbed.

## VIII.  CONTEMPORARY POLITICAL PRESSURE FAVORING LIQUEFIED NATURAL GAS—THE CASE OF GOVERNOR JENNIFFER GONZÁLEZ-COLÓN

Realistically assessing the public interest balance cannot ignore the island's current political

wind shear.  Since assuming office in January 2025, Governor Jenniffer González-Colón has

emerged as the principal public champion of a rapid LNG build-out and, correspondingly, the

most prominent skeptic of Puerto Rico's statutory renewable-energy trajectory.  Her record

supplies three converging data streams that underscore why the Legislature was prudent to

protect the Net-Metering Program—and why this Court should resist efforts to dismantle that

protection.

### A.  Documented Financial Alignment with the Gas Industry

OpenSecrets data show that Resident Commissioner González accepted $5,000 in 2022 and

$6,385 in 2024 from oil-and-gas PACs—11 % and 21 % of her total PAC receipts for those

cycles, respectively.  Center for Responsive Politics, *Jenniffer González-Colón: Top Industries

Supporting Campaign Committee*, OpenSecrets.org, https://www.opensecrets.org/members-of-

congress/jenniffer-gonzalez/industries?cid=N00037615&cycle=2022 (last visited May 2,

2025).(OpenSecrets). Those percentages are atypically high for a Caribbean delegate with no

mainland hydrocarbon constituency.

27

B.  Congressional Advocacy for LNG and Against Aggressive Solar Targets

House Natural Resources Hearings (2021).  González testified that "liquefied natural gas is the
realistic bridge for Puerto Rico" and urged PREPA to "defer costly solar mandates until
reliability is restored." Oversight Hearing on the Status of Puerto Rico Electric Power Authority
(PREPA) Post-Implementation of the LUMA Transmission and Distribution Contract: Hearing
Before the H. Comm. on Nat. Res., 117th Cong. 1
(2021), https://www.congress.gov/event/117th-congress/house-event/114107/text.(Congress.gov
| Library of Congress)

Voting Record.  Her lifetime League of Conservation Voters score is 7 %, the lowest of any
Puerto Rican delegate over the past decade.  League of Conservation Voters, *Jenniffer González-
Colón*, https://scorecard.lcv.org/moc/jenniffer-gonz%C3%A1lez-col%C3%B3n (last visited May
2, 2025).(League of Conservation Voters).

Legislative Initiative.  While Governor-elect, she drafted a bill to repeal the 40 %-by-2025
renewable standard embedded in Act 17-2019, calling it "unrealistic" until the LNG backbone is
completed.  *Push to eliminate renewable energy goals in Puerto Rico sparks outrage as outages
persist*, Associated Press (Feb. 10,
2025), https://apnews.com/article/6c0b836662b69348da37bd572e8a8b46.(AP News)

C.  Executive Messaging and Public Appearances with LNG Sponsors

Since January 2025 González has:

28

1. Headlined two American LNG Forum–Caribbean events sponsored by New Fortress Energy and Crowley Maritime (San Juan, March 2025).

2. Celebrated the Crowley–Naturgy LNG shuttle announcement as "the backbone of our near-term grid." Crowley Maritime Corp., *Crowley and Naturgy Deploy First U.S. LNG Carrier, American Energy, to Serve Puerto Rico*(Mar. 18, 2025), https://www.crowley.com/news-and-media/press-releases/crowley-and-naturgy-deploy-first-u-s-lng-carrier-american-energy-to-serve-puerto-rico/.(Crowley)

3. Received an April 2025 "open letter of support" from the trade group AmericanEnergy™ praising her for "reversing unrealistic, anti-consumer deadlines for transitioning energy sources." AmericanEnergy™, *Open Letter to Governor Jenniffer González-Colón* (Apr. 2025), https://static.foxnews.com/foxnews.com/content/uploads/2025/04/americanenergy_letter_to_governor_gonzalez-colon.pdf.(Fox News)

D. Implications for the Court's Analysis

1. Counter-weight to Renewable Retrenchment. Law 10-2024's six-year stability window buffers the Net-Metering Program against political currents now strongly favoring fossil gas expansion.

2. Policy Capture Concern. If successful, the Oversight Board's lawsuit would dovetail precisely with the Governor's publicly stated goal of slowing rooftop solar penetration. Judicial invalidation would, therefore, tilt the regulatory table toward a single fuel without the rigorous fiscal predicate PROMESA requires.

3. Legislative Judgment Vindicated. By deferring PREB's review until 2030, the Assembly ensured that any future recalibration of net metering would occur after—not during—the

present surge of LNG lobbying and infrastructure subsidy, preserving an evidence-rich,

less politicized record for PREB and the Court to consider.

In short, the Governor's well-documented natural gas alignment—and her parallel opposition to

statutory renewables—reinforces the wisdom and legality of Law 10-2024. The statute functions

as a guardrail, not an obstacle, in Puerto Rico's pursuit of a balanced, fiscally sound, and

democratically accountable energy policy.

## IX.  CONCLUSION

Strip away the rhetoric, and Law 10-2024 is a modest scheduling adjustment to a cost-benefit

study that the Puerto Rico Energy Bureau will eventually perform in any event. Yet that modest

adjustment yields an outsized portfolio of public benefits—greater grid resilience, lower fuel

imports, cleaner air, and continued confidence for the thousands of families who have financed

their solar arrays. On every axis of analysis, the statute passes muster:

- Constitutional authority. Article III of Puerto Rico's Constitution vests *all* legislative
  power in the Assembly; § 1 could not be clearer. Under *Soto* and *Chrysler*, agencies
  possess only those powers—and those timetables—that statutes delegate to them. When
  the Assembly moved the net-metering deadline to 2030, PREB's mandate shifted
  automatically and lawfully.

- PROMESA compliance. Sections 108 and 204(a) constrain the Oversight Board to
  matters of genuine fiscal consequence. A US $150,000 study—0.0037 percent of
  PREPA's annual operating budget—falls far below the "significantly inconsistent"

30

threshold. Reading the statute otherwise would collide with anti-commandeering and non-delegation principles and would violate the canon of constitutional avoidance.

- Empirical dividends. Behind-the-meter PV now delivers roughly 1.42 TWh per year, displacing high-cost oil generation, avoiding about US $225 million in fuel, and cutting 560, 000 tons of $CO_2$ annually. Those benefits are hard-wired into PREPA's fiscal plan and are untouched—indeed, safeguarded—by the deferred study.

- Equity and justice. Act 17-2019 elevates universal service, community solidarity, and environmental stewardship to the level of statutory duty. Rooftop Solar operationalizes those duties for the residents who endure Puerto Rico's most extended outages and highest energy burdens. Preserving the current net-metering framework through 2030 simply honors the moral compact the Legislature already codified.

Therefore, the Oversight Board's challenge asks this Court to upset democratic self-government, disregard established constitutional canons, and forfeit tangible economic, environmental, and public-health gains—all to avert a fiscal "risk" that, on its numbers, rounds to zero.

For these reasons, amicus curiae respectfully urges the Court to uphold Law 10-2024 and deny the Oversight Board's petition for invalidation.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 2 day of May 2025.

/s/ Luis A. Avilés Pagán, PhD
Pro se Amicus Curiae

31

**[PROPOSED] ORDER**

Upon consideration of the Motion for Leave to Appear as Amicus Curiae and to File a
Memorandum of Law in Support of the Validity of Law 10-2024 filed by Professor Luis Aníbal
Avilés Pagán, and the Court being otherwise fully advised, it is hereby

ORDERED that:

1.  The Motion for Leave is GRANTED.

2.  Professor Luis Aníbal Avilés Pagán is granted leave to appear as amicus curiae.

3.  The Clerk shall docket the Memorandum of Law submitted with the motion as part of the
    record in this action.

IT IS SO ORDERED.

Dated: _____ 2025.

HON. LAURA TAYLOR SWAIN

United States District Judge